# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| **HAROLD WAYNE NICHOLS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | <u>**CAPITAL CASE**</u> |
| | ) | |
| **v.** | ) | **No. 3:25-cv-442** |
| | ) | |
| **JONATHAN SKRMETTI, in his official** | ) | **Judge Richardson** |
| **capacity as Attorney General and** | ) | |
| **Reporter of the State of Tennessee,** | ) | |
| | ) | |
| **FRANK STRADA, in his official capacity** | ) | |
| **as Commissioner of the Tennessee** | ) | |
| **Department of Correction,** | ) | |
| | ) | |
| **KENNETH NELSEN, in his official** | ) | |
| **capacity as Warden of the Riverbend** | ) | |
| **Maximum Security Institution, and** | ) | |
| | ) | |
| **JOHN DOE Participants,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

A Tennessee jury sentenced Harold Wayne Nichols to death in 1990 for the brutal murder of Karen Pulley. For decades, justice has waited as Nichols's conviction and sentence survived exhaustive challenges in state and federal courts. With those avenues closed and his execution finally set, Nichols now makes a last-ditch effort to stave off his sentence by contesting the Tennessee Department of Correction's (TDOC) eminently humane and uniformly upheld lethal-injection procedure.

Nichols faces an exceedingly high bar since neither the U.S. nor Tennessee Supreme Court has ever invalidated a State's method of execution. Yet Nichols asks this Court to break new

ground by finding that TDOC's plan to execute him with pentobarbital—a "mainstay of state executions," *Barr v. Lee*, 591 U.S. 979, 980 (2020) (per curiam)—is unconstitutional. Nichols also attempts to manufacture a non-existent dispute about his access to spiritual advisors, attorneys, and telephones—matters that neither reflect a ripe dispute nor relate to the method of execution itself.

The complaint should be dismissed. Nichols's claims fail on the merits under established U.S. and Tennessee Supreme Court precedent. And all the contrived free-speech, free-exercise, RLUIPA, and court-access claims are unripe. Under a straightforward application of state and federal law, this late attempt to further delay justice must end.

## BACKGROUND

### I. Legal Background

The Eighth Amendment bars the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "Similarly to the federal constitution, the Tennessee Constitution provides that 'excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'" *West v. Schofield*, 519 S.W.3d 550, 567 (Tenn. 2017) (*West III*) (quoting Tenn. Const. art. I, § 16). Because there is "no difference in language" that would warrant "application of a different standard," the Tennessee Supreme Court analyzes the two constitutional provisions using the U.S. Supreme Court's Eighth Amendment framework. *Id.* at 568 n.16; *accord Abdur'Rahman v. Parker*, 558 S.W.3d 606, 616 (Tenn. 2018) (*Abdur'Rahman II*).

### A. The U.S. and Tennessee Constitutions permit capital punishment.

The U.S. "Constitution allows capital punishment." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019). That approval reflects the death penalty's status as an "accepted punishment at the time of the adoption of the Constitution and the Bill of Rights." *Glossip v. Gross*, 576 U.S. 863, 867-68 (2015). The Tennessee Supreme Court has also "repeatedly . . . upheld the death penalty as permissible under the Tennessee Constitution." *West III*, 519 S.W.3d at 568 n.17 (collecting

cases).

"[B]ecause it is settled that capital punishment is constitutional, it necessarily follows that there must be a constitutional means of carrying it out." *Glossip*, 576 U.S. at 869 (quoting *Baze v. Rees*, 553 U.S. 35, 47 (2008) (plurality op.)) (cleaned up). That "recognition" has "animated" the U.S. and Tennessee Supreme Courts' interpretation of the bar on cruel and unusual punishment. *Id.*; *see Abdur'Rahman II*, 558 S.W.3d at 615 (discussing *Baze*, 553 U.S. at 47). A few general principles from the precedents are particularly relevant here.

To begin, "the Eighth Amendment does not guarantee a prisoner a painless death— something that, of course, isn't guaranteed to many people, including most victims of capital crimes." *Bucklew*, 587 U.S. at 132-33 (citing *Glossip*, 576 U.S. at 869-70). After all, "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." *Baze*, 553 U.S. at 47 (plurality op.). If the Eighth Amendment "demand[ed] the elimination of essentially all risk of pain," that "would effectively outlaw the death penalty altogether." *Glossip*, 576 U.S. at 869. So the mere fact that "an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze*, 553 U.S. at 50 (plurality op.) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n.9 (1994)).

Instead, the cruel-and-unusual-punishment provision prohibits only "long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Bucklew*, 587 U.S. at 133 (cleaned up). That emphasis on the State's "malevolence," *Baze*, 553 U.S. at 50, in imposing a "wanton infliction of pain" reflects Founding-era history. *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 306 (Tenn. 2005) (*Abdur'Rahman I*). As ratified, the cruel-and-unusual-punishment provision draws from the English Bill of Rights "to ensure that the new Nation would never resort" to "certain barbaric punishments" previously

practiced. *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024). Among them: "disemboweling, quartering, public dissection, and burning alive," *id.*, as well as "the use of the rack or the stake," "breaking on the wheel, flaying alive, rending asunder with horses, maiming, mutilating, and scourging to death," *Bucklew*, 587 U.S. at 131 (cleaned up). Uniting these off-limits methods is their "unnecessary cruelty"—meaning the method chosen "savored of torture" and reflected the executioners' being "pleased with hurting others." *Id.* at 130-31 (cleaned up).

To help draw the line, courts look to the modes of execution the Eighth Amendment was understood to forbid with those it was understood to permit. Hanging was the predominant method of execution at the Founding and for decades thereafter. *Glossip*, 576 U.S. at 867. Yet "[m]any and perhaps most hangings were evidently painful for the condemned person because they caused death slowly." *Bucklew*, 587 U.S. at 132 (quoting S. Banner, *The Death Penalty: An American History* 48 (2002) (Banner)). But hanging's use was "virtually never questioned" under the Eighth Amendment. *Id.* (quoting Banner, *supra*, at 170). As the U.S. Supreme Court observed, hanging's lawful status presumably reflects that it was not "*intended* to be painful"; instead, the risk of pain involved was considered "unfortunate but inevitable." *Id.* at 131 (quoting Banner, *supra*, at 170). The U.S. Supreme Court has employed similar reasoning to uphold death by firing squad, *Wilkerson v. Utah*, 99 U.S. 130, 134-135 (1879), the electric chair, *In re Kemmler*, 136 U.S. 436 (1890); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463-64 (1947) (plurality opinion) (upholding electrocution of prisoner despite initial failed attempt), and lethal injection, *Bucklew*, 587 U.S. 119; *Glossip*, 576 U.S. 863; *Baze*, 553 U.S. 35.

To sum up: The U.S. and Tennessee Constitutions do not "demand the avoidance of all risk of pain in carrying out executions," meaning a method is permissible even if pain occurs by "accident or as an inescapable consequence of death[.]" *Bucklew*, 587 U.S. at 130, 134 (citation removed). Instead, punishments are constitutionally suspect only when the method "superadds pain well beyond what's needed to effectuate a death sentence." *Id.* at 137. Any other rule would

impermissibly coopt "courts to serve as boards of inquiry charged with determining best practices for executions," "with each ruling supplanted by another round of litigation touting a new and improved methodology." *Id.* at 134 (citation omitted); *Baze*, 553 U.S. at 51.

**B.    Method-of-execution claims face an "exceedingly high bar" to prevail.**

The U.S. Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Barr*, 591 U.S. at 980 (quoting *Bucklew*, 587 U.S. at 133). "[U]nderstandably so." *Bucklew*, 587 U.S. at 133. Tennessee and other States, working "through the initiative of the people and their representatives," have historically endeavored to adopt "less painful modes of execution." *Id.*

Courts facing method-of-execution claims like Nichols's apply a "two-prong test" under both the U.S. and Tennessee Constitutions. *West III*, 519 S.W.3d at 567-68; *see Bucklew*, 587 U.S. at 133-34. Challengers face an "exceedingly high bar" to obtaining relief. *Barr*, 591 U.S. at 980. The demanding two-step standard reflects that "the Constitution affords a measure of deference to a State's choice of execution procedures." *Bucklew*, 587 U.S. at 134 (quotation omitted). It also helps prevent "method-of-execution claims from becoming a 'backdoor means to abolish' the death penalty." *Id.* at 137 (citation omitted).

*First*, an inmate must establish that a given method "presents a risk that is *sure or very likely* to cause serious illness and needless suffering and give rise to sufficiently *imminent* dangers." *West III*, 519 S.W.3d at 563 (cleaned up) (quoting *Glossip*, 576 U.S. at 877) (emphasis in original). The method must "present[] a 'substantial risk of serious harm'—severe pain over and above death itself." *Nance v. Ward*, 597 U.S. 159, 164 (2022) (quoting *Glossip*, 576 U.S. at 877). "[M]ere possibilities" or "hypothetical[s]"—like allegations of the "risk[] of maladministration" or "improper" handling of chemicals—"are not sufficient to satisfy the Plaintiffs' burden to establish a substantial risk of severe pain." *West III*, 519 S.W.3d at 564-65 (quoting *Baze*, 553 U.S. at 62) (collecting cases).

*Second*, the inmate must "show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 587 U.S. at 134 (citations omitted). "A minor reduction in risk is insufficient; the difference must be clear and considerable." *Id.* at 143. Further, a challenger must establish that the State "could carry . . . out" the alternative method "relatively easily and reasonably quickly." *Id.* at 141 (citation omitted). The fact that "other states have or can" use the alternative method does not suffice to show that Tennessee likewise "can do so." *Abdur'Rahman II*, 558 S.W.3d at 623.

## II. Tennessee Executions

Tennessee historically executed "by hanging." *Shipp v. State*, 172 S.W. 317, 318 (Tenn. 1914) (quoting Shannon's Code § 6442). Although never disqualified as an unconstitutional punishment, Tennessee eventually followed other States' lead to replace it with electrocution. *Id.* Tennessee used electrocution for decades, with the Tennessee Supreme Court holding—time and again—that this was not a "cruel and unusual punishment." *State v. Caldwell*, 671 S.W.2d 459, 466 (Tenn. 1984) (collecting cases); *State v. Keen*, 926 S.W.2d 727, 743 (Tenn. 1994); *State v. Black*, 815 S.W.2d 166, 178-79 (Tenn. 1991) (collecting cases); *State v. Barber*, 753 S.W.2d 659, 670 (Tenn. 1988); *State v. Adkins*, 725 S.W.2d 660, 664 (Tenn. 1987); *see also State v. Suttles*, 30 S.W.3d 252, 263-64 (Tenn. 2000) (collecting cases).

Following the trend among many other States, Tennessee adopted lethal injection as a method of execution in 1998, Tenn. Code Ann. § 40-23-114 (Supp. 1998), because it was widely touted as a "more humane" alternative to "electrocution." *Adkins*, 725 S.W.2d at 664; *see Suttles*, 30 S.W.3d at 264 (citing 1998 Tenn. Pub. Acts ch. 982; 2000 Tenn. Pub. Acts ch. 2000). Two years later, it became the State's default[1] method of execution and has remained so ever since.

---

[1] If lethal injection is held unconstitutional or lethal-injection chemicals are unavailable, then the method of execution shifts to electrocution. Tenn. Code Ann. § 40-23-114(e). Persons sentenced

Tenn. Code Ann. § 40-23-114 (Supp. 2000); *State v. Morris*, 24 S.W.3d 788, 797 (Tenn. 2000). In 2004, the Tennessee Supreme Court upheld the use of lethal injection as a constitutionally permissible means of execution. *State v. Robinson*, 146 S.W.3d 469, 529 (Tenn. 2004) (appendix). But challenges to the particulars of the State's lethal-injection protocols continued to proliferate.

*Three-Drug Protocol*. At first, Tennessee used a common three-drug "protocol" (using sodium pentothal, pancuronium bromide, and potassium chloride) to effectuate lethal injections. *Abdur'Rahman I*, 181 S.W.3d at 300. The drugs in that protocol "put[] the inmate to sleep," then "stop[ped his] breathing," then "stop[ped his] heart." *Id*. The Tennessee Supreme Court has repeatedly upheld three-drug protocols across multiple challenges. *See id*. at 297–98; *accord Abdur'Rahman II*, 558 S.W.3d at 610 (upholding protocol using midazolam, vecuronium bromide, and potassium chloride). The U.S. Supreme Court did the same in *Baze* and *Glossip*.

But opponents of capital punishment continue to make lethal-injection methods difficult for States to pursue. States' need for injectable drugs made them more dependent on drug manufacturers, who in turn were "lobbied" to cease participation in executions by "[a]nti-death-penalty advocates." *Glossip*, 576 U.S. at 871. States like Tennessee faced "ongoing difficulty in obtaining" required drugs and continued revising their protocols accordingly. *Abdur'Rahman II*, 558 S.W.3d 611–12, 616; *see Glossip*, 576 U.S. at 869–72 (describing this widespread problem).

*Single-Drug Protocol with Pentobarbital*. In 2013, Tennessee adopted a single-drug protocol that causes sedation and death through the injection of pentobarbital. *See West III*, 519 S.W.3d at 552 (citing Tenn. Code Ann. § 40-23-114(c) (2012)). As used in executions, pentobarbital works to "repress[] the brain's respiratory impulses, causing the body to become oxygen deficient and resulting in the cessation of cardiac activity." *West III*, 519 S.W.3d at 556. But first it causes "a quick and complete loss of consciousness." *Id*. at 557; *see id*. at 560–61.

---

to death for offenses committed prior to 1999 may also choose to be executed by electrocution. *Id.* § 40-23-114(b).

Given its efficacy, the "single-dose pentobarbital" protocol has "been repeatedly invoked by prisoners as a *less* painful and risky alternative to the lethal injection protocols of other jurisdictions." *Barr*, 591 U.S. at 980 (emphasis in original); *Abdur'Rahman II*, 558 S.W.3d at 612 (inmates cited single-dose pentobarbital as "alternative" preferred method). And Justices of the U.S. Supreme Court have cited single-dose pentobarbital as a "significantly less risky alternative" method given that pentobarbital "does not carry the risks" of other drugs and "is widely conceded to be able to render a person fully insensate." *Zagorski v. Parker*, 586 U.S. 938, 939 (2018) (Sotomayor, J., dissenting).

Pentobarbital "has become a mainstay of state executions." *Barr*, 591 U.S. at 980. As of 2020, it had "been used to carry out over 100 executions, without incident." *Id*. And its use has been upheld by the U.S. Supreme Court, federal circuit courts, and state courts of last resort. *See, e.g.*, *Bucklew*, 587 U.S. 119; *Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017); *Jones v. Comm'r*, 811 F.3d 1288, 1296 (11th Cir. 2016); *Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. Mar. 6, 2015); *Gissendaner v. Comm'r*, 779 F.3d 1275 (11th Cir. 2015); *West III*, 519 S.W.3d at 564-65; *State ex rel. Johnson v. Blair*, 628 S.W.3d 375 (Mo. 2021); *Owens v. Hill*, 758 S.E.2d 794, 802-03 (Ga. 2014); *Valle v. State*, 70 So.3d 530, 541 (Fla. 2011).

The Tennessee Supreme Court, for its part, considered and rejected a constitutional challenge to the State's earlier one-drug pentobarbital protocol. In *West III*, the Court applied the two-prong method-of-execution test to conclude that the use of a single dose of compounded pentobarbital did not violate the U.S. or Tennessee Constitutions' prohibition on cruel and unusual punishments. 519 S.W.3d at 568. And "mere possibilities" of protocol maladministration, the Court explained, are "not sufficient to satisfy the [inmates'] burden to establish a substantial risk of severe pain." *Id*. at 564.

<u>Later and Current Protocols</u>. The shifting availability of lethal-injection drugs has forced TDOC to change its lethal-injection procedures several times in the past decade. When

pentobarbital became unavailable, TDOC had to revise procedures again, adopting a new three-drug alternative protocol using midazolam (a sedative in the benzodiazepine family of drugs) followed by vecuronium bromide (a paralytic agent) and potassium chloride (a heart-stopping agent). *Abdur'Rahman II*, 558 S.W.3d at 611, 616. In late 2018, TDOC adjusted the protocol to make the three-drug alternative "the exclusive method of execution by lethal injection in Tennessee." *Id.* at 611–12. And earlier this year, the State reverted to a single-drug pentobarbital protocol (the "Protocol"). (Dkt. 1, Ex. 2 at 13.) Despite the overwhelming history affirming the use of lethal injection generally and pentobarbital specifically as a humane method of execution, Nichols now argues it constitutes a cruel and unusual punishment.

## III. Harold Wayne Nichols

In 1988, under the cover of darkness, Nichols broke into the house of 21-year-old Karen Pulley. *State v. Nichols*, 877 S.W.2d 722, 726 (Tenn. 1994). He grabbed a two-by-four piece of lumber in the house and headed upstairs to Pulley's bedroom. *Id.* There, Nichols "tore her undergarments from her and violently raped her." *Id.* While raping her, Nichols struck Pulley on the head twice with the two-by-four. *Id.* But after Nichols finished raping Pulley, she continued to struggle with him, so he repeatedly used the two-by-four to strike her head "with great force." *Id.* Nichols left Pulley for dead, and she laid in a pool of her own blood until her roommate discovered her the next morning. *Id.* Pulley died the next day. *Id.*

Evidence later showed that Nichols roamed the city at night, relentlessly searching for vulnerable women to rape. *Id.* By the time of his trial for Pulley's murder, Nichols had been convicted for the aggravated rape of four other Chattanooga women. *Id.* In all, Nichols was charged with the aggravated rape or attempted rape of twelve women besides Pulley. *Nichols*, 877 S.W.2d at 726, n. 2.

Nichols pleaded guilty to Pulley's rape and murder. At the penalty phase, he testified that he had a "strange energized feeling" he could not resist when committing his violent acts and that

he would have continued to violently attack women if he had not been arrested. *Nichols*, 877 S.W.2d at 727. The jury took just two hours to sentence Nichols to death. *Id.*

Over the next 24 years, Nichols exhausted the three-tier system of review, with state and federal courts repeatedly upholding his convictions and sentences. *See Nichols*, 877 S.W.2d at 739 (affirming death sentence because Nichols "is undoubtedly among the worst of the bad"); *Nichols v. State*, 90 S.W.3d 576 (Tenn. 2002) (upholding denial of state post-conviction relief); *Nichols v. Heidle*, 725 F.3d 516 (6th Cir. 2013) (upholding dismissal of habeas petition), *cert. denied,* 574 U.S. 1025 (2014).

## IV.  Nichols's Claims

Over eleven counts, Nichols complains about TDOC's adoption/implementation of the Protocol and about other collateral issues related to his execution.

Count I seeks to force Defendants' agreement not to oppose a stay of Nichols's execution until this suit's resolution on the merits. (Dkt. 1, ¶ 102.) He alleges unequal treatment compared to similarly situated inmates in *King v. Strada, et al.,* No. 3:18-cv-01234 (M.D. Tenn.) and *Middlebrooks v. Strada, et al.*, No. 3:19-cv-01139 (M.D. Tenn.). (*Id.*, ¶¶ 92-96.) He also complains about denial of access to the unredacted Protocol, which other inmates have received.[2] (*Id.*, ¶¶ 99-101.)

Count II cites Eighth Amendment and due process guarantees as grounds for delaying execution until this suit reaches final judgment. (*Id.*, ¶¶ 109-15.)

In Count III, Nichols alleges that *any* execution using pentobarbital creates a substantial and unjustifiable risk of severe pain and needless suffering. (*Id.*, ¶¶ 116-27.) Specifically, he alleges that an injection of pentobarbital constitutes poisoning that (1) causes pulmonary edema (*id.*, ¶¶ 120-24) (2) causes extreme pain upon injection (*id.*, ¶ 125), and (3) can damage the veins

---

[2] The parties have already filed a joint motion for a protective order that will permit Nichols to receive the unredacted Protocol while limiting its further distribution. (Dkt. 23.)

and leak into surrounding tissues (*id*.). As alternative execution methods, Nichols proposes a firing squad (*id*. at ¶¶ 75-84) or a single bullet to the back of the head (*id*. at ¶¶ 85-91).

In Count IV, Nichols alleges that even if the Protocol is facially constitutional, it is unconstitutional as applied to him because it does not account for his individual physical and psychological characteristics. (*Id*., ¶¶ 128-31.) Nichols alleges he is sure or very likely to face serious pain and needless suffering because Defendants and the execution team will not account for these individual characteristics. (*Id.*, ¶¶ 132-33.) He also alleges that Defendants' lack of training or qualifications to carry out executions creates substantial and unjustifiable risk of serious pain and needless suffering. (*Id.*, ¶¶ 134-37.)

Counts V through VIII rest on constitutional and statutory rights of speech, religion, and court access. In Count V, Nichols alleges that the Protocol violates the First Amendment to the United States Constitution, Article I of the Tennessee Constitution, the Religious Freedom Restoration Act of 1993 (RFRA), the Tennessee Preservation of Religious Freedom Act, and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) by prohibiting clergy from being present in the execution chamber during execution. (*Id.*, ¶¶ 138-41.) He also alleges that his choice of execution method violates his religious rights. (*Id.*, ¶ 142.)

In Count VI, Nichols alleges that the Protocol's limitations on visits and phone calls in the middle of the night before execution burdens his right to free exercise of religion and free speech under the First and Fifth Amendments to the U.S. Constitution, RLUIPA, and Article I of the Tennessee Constitution. (*Id.*, ¶¶ 153, 159.)

In Count VII, Nichols says the Protocol's use of the term "clergy" "connotes a narrower conception of religious leadership [and] is an effort to exclude religious beliefs and traditions" that burdens his free exercise of religion under the Equal Protection Clause of the Fourteenth Amendment, Article I of the Tennessee Constitution, and RLUIPA. (*Id.*, ¶¶ 163-166.)

In Count VIII, Nichols alleges the Protocol violates his right to court access under the First,

Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I of the Tennessee Constitution. Nichols's says the Protocol deprives him of court access because it (1) makes no provision for his counsel to have phone access before or during an execution (*id*., ¶ 179), (2) prevents his counsel from viewing him being secured to the execution gurney (*id*., ¶ 185), and (3) prevent his counsel from viewing when and how the physician confirms his death (*id*.).

In Count IX, Nichols alleges that his choice as to method of execution violates the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. (*Id*., ¶ 196.) He also alleges a violation of due process by having to elect his execution method before knowing the details of the pentobarbital that will be used. (*Id*., ¶ 202.) Nichols also claims that any execution by electrocution violates the Eighth Amendment of United States Constitution. (*Id*., ¶ 205.)

In Count X, Nichols says the Protocol lacks information about the pentobarbital to be used and the execution personnel in violation of the First Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution was well as Article I of the Tennessee Constitution, and Tennessee Code Annotated § 10-7-501 *et seq*. (*Id.*, ¶¶ 215-21.)

Finally, in Count XI, Nichols claims the Protocol was promulgated without following the required rule-making procedures required by Tennessee's Uniform Administrative Procedures Act because it that Act. (*Id.*, ¶¶ 222-30.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1) a court "must dismiss" a claim if it lacks subject matter jurisdiction. A key ingredient of subject matter jurisdiction is ripeness. *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002). The ripeness doctrine bars courts from issuing advisory opinions or deciding hypothetical disputes. *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 263 (6th Cir. 2009). If a claim is not ripe for review, federal courts lack jurisdiction, and dismissal is required. *Norton*, 298 F.3d at 554. A motion to dismiss under

Rule 12(b)(1) can "challenge[ ] the factual existence of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014). When a motion to dismiss makes such a factual attack, "a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence" in deciding whether jurisdiction has been established. *Id.*

Courts assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must "construe the complaint in the light most favorable to the plaintiff, accept [the plaintiff's] allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quotation omitted). A complaint must plead claims that are facially plausible—*i.e.*, supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The mere "possibility that a defendant has acted unlawfully" is insufficient. *Id.*

## ARGUMENT

### I. Nichols Has No Constitutional Right to Force the Attorney General to Agree to a Stay of Execution. (Count I)

Following Governor Lee's pause of executions through 2022, TDOC officials moved to stay proceedings in two consolidated challenges to the State's execution protocol. *See King,* No. 3:18-cv-01234; *Middlebrooks*, No. 3:19-cv-01139. Along with the stay of litigation, the parties also agreed that, during the life of those suits, Defendants would not oppose a motion for stay of execution for King or Middlebrooks and, that if such motion was denied, Defendants would advocate for a reprieve from the Governor. Nichols asserts that the Equal Protection Clause

entitles him to the same agreement.[3]  But he has no constitutional right to force a litigation position, particularly where rational distinctions exist between his suit and the suits of *King/Middlebrooks*.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[4]  Its purpose "is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination[.]" *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918).  It prohibits governmental discrimination that "burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005) (citation omitted).

Nichols alleges that Defendants discriminate by not extending the *King/Middlebrooks* agreement to him.  He does not allege membership in a suspect class, nor can he show that a fundamental right is at stake.  *See Zink*, 783 F.3d at 1111 ("There is no 'fundamental right' to avoid execution while . . . legal activity is pending.").  Instead, his claim rests on "a 'class of one' theory." *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009).  To succeed on this theory, Nichols must show that "(1) he . . .'has been intentionally treated differently from others similarly situated'; and (2) 'there is no rational basis for the difference in treatment.'" *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (quoting *Vill. of Willowbrook v. Olech*, 528

---

[3] Nichols asserts "violations of the Due Process Clause of the Fifth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment and Article I of the Tennessee Constitution."  (Complaint at 29.)  But the Fifth Amendment only applies to the federal government, *Myers v. Vill. of Alger*, 102 F. App'x 931, 933 (6th Cir. 2004) (citing *Scott v. Clay County*, 205 F.3d 867, 873 n. 8 (6th Cir. 2000)), and allegations of unequal treatment are properly analyzed under the Equal Protection Clause rather than the due process framework.  *McClafferty v. Portage Count Bd. of Elections*, 661 F. Supp. 2d 826, 834 (N.D. Ohio 2009) (collecting cases).

[4] The relevant provisions of the Tennessee and United States constitutions confer essentially the same protection[.]" *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993).  Thus, when analyzing equal protection claims, Tennessee courts follow "the framework developed by the United States Supreme Court[.]" *McWherter*, 851 S.W.2d at 153.

14

U.S. 562, 564 (2000)).

Nichols cannot show that Defendants are intentionally treating him differently than others who are similarly situated. To clear this threshold, Nichols and his comparators "must be alike 'in all relevant respects.'" *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1152 (6th Cir. 2022) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). This requires "relevant similarity" but not "exact correlation[.]" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012). Although Nichols, Middlebrooks, and King are all awaiting death sentences in the same prison, the similarities stop there. When it comes to the challenged conduct—the decision whether to oppose a stay an execution—there are material differences. The State entered the *King/Middlebrooks* agreement in a context unique to the litigation of those consolidated cases. Nichols is not a party to that litigation, and that litigation does not affect him in any way. At the time of the *King/Middlebrooks* agreement, Defendants did not know (1) the duration of Governor Lee's pause on executions, (2) the results of the independent investigation, (3) whether and to what extent the execution protocol would be amended, (4) what new staff, training, or resources might be needed to implement any changes to the protocol, and (5) what legal challenges a new protocol might face. But Defendants have answers to those questions now. And in *King/Middlebrooks*, Defendants faced the pressure of continued litigation and potentially intrusive discovery over a protocol that might never have been used again could they not reach an agreement on a stay. Nichols has no such leverage. The timing, factual record, and procedural posture of this case differ significantly from *Middlebrooks* and *King*. Thus, Nichols cannot show that he is similarly situated to Middlebrooks and King in all material respects.

Even if Nichols were similarly situated, his equal-protection claim still fails. The Supreme Court has recognized that "[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 603 (2008). In those situations, "treating like

15

individuals differently is an accepted consequence of the discretion granted." *Id*. For instance, class-of-one claims have been rejected in the employment context because such claims would transform "any personnel action in which a wronged employee can conjure up a claim of differential treatment" into "a federal constitutional claim." *Id*. at 608. The Sixth Circuit extended this rationale to protect a college "coach's decisions about who plays, how much playing-time each player gets, and whether a player remains part of the team at the end of a season." *Heike v. Guevara*, 519 F. App'x 911, 922 (6th Cir. 2013).

Other circuits have also extended the *Engquist* rationale. The Ninth Circuit denied class-of-one actions challenging "decisions on matters such as which drug protocol to use, which people to select for the execution team, and whether to use a central femoral IV" for executions. *Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012) ("the existence of discretion, standing alone, cannot be an Equal Protection violation"). The Eleventh Circuit applied *Engquist* to government-contractor relationships. *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269 (11th Cir. 2008). The Eighth Circuit denied a class-of-one challenge to the discretionary enforcement of noxious weed ordinances. *Novotny v. Tripp Cnty.*, 664 F.3d 1173, 1179 (8th Cir. 2011). And the Seventh Circuit protected prosecutorial and sentencing discretion against class-of-one suits. *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008). What unites these cases

> is the impediment to efficiency in government that would be created by allowing class-of-one litigation in areas in which frontline public officers . . . exercise discretionary authority guided unavoidably by subjective, individualized factors that are bound to create disparate treatment. Class-of-one liability in such circumstances would not eliminate the disparities, because they are inherent in the exercise of discretion in such activities, but would foment litigation and disrupt law enforcement."

*Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 898 (7th Cir. 2012)

Tennessee's "subjective and individualized" litigation strategy "rest[s] on a wide array of factors that are difficult to articulate and quantify." *Engquist*, 553 U.S. at 604. The decision not to oppose a stay of execution requires broad discretion. "Allowing a challenge based on the

arbitrary singling out of a particular person" in such context "would undermine the very discretion that such state officials are entrusted to exercise." *Id*. at 603. Tennessee agreed not to oppose a stay of Middlebrooks' and King's executions based on the unique posture of those cases at the time. Nichols cannot successfully challenge the broad discretion behind this highly "subjective, individualized decision." *Id*. at 604. It is rational for Defendants to take a different position in his new case than the one it took years ago in *King* and *Middlebrooks*. Thus, Count I of the complaint fails to state an equal protection claim.

General Skrmetti should also thus be dismissed as a party because this is the only claim against him. Plaintiff only alleges that General Skrmetti entered the *King/Middlebrooks* agreement and has refused to enter a similar one with Plaintiff. (Dkt. 1, ¶ 2.) Plaintiff cannot establish standing against General Skrmetti or evade his sovereign immunity on any other claim. *Doe v. Lee*, 102 F.4th 330, 335 (6th Cir. 2024); *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023).

## II. Nichols Has No Constitutional Right to Delay His Execution Through Litigation. (Count II)

Nichols seeks a stay of execution pending resolution of his own suit as well as the suits in *Middlebrooks* and *King*. He alleges that proceeding with his execution while these legal challenges are pending violates due process and constitutes cruel and unusual punishment (Dkt. 1, ¶ 109.) But there is no constitutional right to delay a lawful death sentence simply based on pending litigation. "The State's decision to carry out a lawful sentence when there is no judicial stay in place does not burden a prisoner's rights under the Eighth Amendment or other constitutional provision." *Zink*, 783 F.3d at 1111. And simply filing a civil rights complaint "does not entitle [an inmate] to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 583 (2006).

Rather, "a stay of execution is an equitable remedy . . . and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the

federal courts." *Id*. at 584. Like parties seeking the extraordinary remedy of a preliminary injunction, "inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Id*. For the reasons stated in this memorandum, Nichols's claims fail as a matter of law. Thus, he cannot meet the requirements for a stay of execution. And even if some substantive claims survive dismissal, Nichols must still satisfy stringent requirements to get the extraordinary relief of a stay. *Id*.

III. **Nichols's General Challenge to Lethal Injection Is Barred by the Statute of Limitations and foreclosed by Supreme Court Precedent. (Count III)**

Nichols claims that any attempt to execute him by lethal injection would be unconstitutional, no matter the details of any protocol. (Dkt. 1, ¶¶ 117-19.) He argues that any lethal injection is cruel and unusual because it was not an execution method accepted "at the founding of our country or when Tennessee joined the Union." (*Id.,* ¶¶ 119.)

To start, Nichols brought this claim too late. "The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In Tennessee, actions under 42 U.S.C. § 1983 are restricted by Tenn. Code Ann. § 28-3-104(a), which is "Tennessee's one-year statute of limitations for civil rights claims." *Thomas v. Copeland*, 758 F. App'x 377, 380 (6th Cir. 2018). Although the applicable time period is borrowed from state law, "[t]he date on which the statute of limitations begins to run in a § 1983 action is a question of federal law." *Eidson*, 510 F.3d at 635. Under federal law, the statute of limitations is triggered when a plaintiff "knows or has reason to know of the injury" giving rise to the plaintiff's cause of action. *Thomas*, 758 F. App'x at 381 (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)). For method-of-execution claims like Nichols's, the clock starts either "upon the conclusion of direct review in the state court" or "when the particular

method of execution is adopted by the state." *Irick v. Ray*, 628 F.3d 787, 789 (6th Cir. 2010).

Nichols's state court direct review ended in 2002. *Nichols*, 90 S.W.3d 576. Lethal injection became the default method of execution in 2000. 2000 Tenn. Pub. Acts, c. 614, § 4. At best, Nichols had one year from 2002 to challenge the constitutionality of lethal injection. His 2025 challenge is decades too late.

Moreover, claiming all lethal injection is unconstitutional runs headlong into "settled precedent." *Bucklew*, 587 U.S. at 149; *Glossip*, 576 U.S. at 884; *Baze*, 553 U.S. at 53. That claim should be dismissed.

## IV. Nichols's Challenge to the Use of Pentobarbital Does Not State a Claim of Cruel and Unusual Punishment. (Count III)

The U.S. Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Glossip*, 576 U.S. at 869. Nichols cannot be the first to upend that long history. His allegations that pentobarbital could escape his circulatory system or cause pulmonary edema do not state a claim on which relief can be granted. "[T]he Eighth Amendment does not guarantee a prisoner a painless death." *Bucklew*, 587 U.S. at 132. It only bars as "cruel and unusual" those punishments that are "sure or very likely" to involve an "objectively intolerable risk of harm." *Baze*, 553 U.S. at 50. Count III cannot clear that bar for two reasons.

First, circulatory escape is not "sure or very likely" to occur. Nichols alleges that pentobarbital escaping into the tissue "*can* [] caus[e] significant excruciating paint." (Dkt. 1, ¶ 125 (internal quotations removed) (emphasis added).) In support of that assertion, he cites a U.S. Department of Justice report that merely says pentobarbital can cause "vascular injury *if improperly administered*." (Dkt. 1-7, at 14 (emphasis added).) Nichols's speculative claim that qualified state officials might improperly administer the pentobarbital fails to acknowledge that the Protocol affirmatively protects against that very risk. Members of the IV team must be trained

medical professionals. (Exhibit 1, at 11.)[5] The inmate is restrained to prevent manipulation of the catheter and IV lines. (*Id.*, at 19.) And the IV team establishes a backup catheter in case the primary catheter fails. (*Id.*, at 20.) "Simply because an execution method may result in pain . . . by accident" does not make it cruel and unusual. *Baze*, 553 U.S. at 50. Nichols's circulatory-escape theory does not state a viable Eighth Amendment claim.

Second, the pain Nichols alleges could result from pulmonary edema is not "intolerable." Pentobarbital "is widely conceded to be able to render a person fully insensate and does not carry the risks of pain that some have associated with other lethal injection protocols." *Barr*, 591 U.S. at 980 (cleaned up); *Zagorski v. Parker*, 586 U.S. 938, 939 (2018) (Sotomayor, J., dissenting). It is "a mainstay of state executions" and "[h]as been used to carry out over 100 executions, without incident." *Id.* Most importantly, whatever pain could be felt—if pulmonary edema occurred while Nichols was conscious—is not the sort that is cruel and unusual. Even "sensations of drowning and suffocation . . . look[] a lot like the risks of pain associated with hanging[.]" *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 290 (6th Cir. 2019); (*cf.* Dkt. 1, ¶ 120 (alleging "a drowning sensation")). And hanging—which often "caused death slowly" through suffocation over several minutes, *Bucklew*, 587 U.S. at 132—"ha[s] been considered constitutional for as long as the United States have been united," *In re Ohio Execution Protocol Litig.*, 946 F.3d at 290. In short, even taking all of Nichols's speculation as fact, the pain that he alleges he will suffer is pain the Constitution has long tolerated.

At bottom, Nichols's allegations are speculative and do not allege the kind of superadded pain that constitutes an Eighth Amendment violation. Indeed, "[s]peculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally

---

[5] The Court may consider the text of the Protocol without converting this motion into one for summary judgment because it is "integral to the complaint." *Clark v. Jackson*, No. 22-5553, 2023 WL 2787325, at *2 (6th Cir. April 5, 2023).

sound protocol unconstitutional." *Cooey v. Strickland*, 589 F.3d 210, 225 (6th Cir. 2009). And the sort of pain alleged by Nichols has been "virtually never questioned." *Bucklew*, 587 U.S. at 132. The complaint falls far short of showing that pentobarbital will "intensif[y] the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Id*. at 133 (cleaned up). The speculative risk of pain alleged here does not compare to being "dragged to the place of execution," "embowelled alive," "beheaded," "quartered," "public[ly] dissect[ed]," or "burn[t] alive." *Wilkerson*, 99 U.S. at 136. Nichols therefore cannot state a claim for infliction of cruel and unusual punishment, and Count III should be dismissed.

## V.     Nichols Fails to Allege How His Medical Conditions Will Plausibly Lead to an Eighth Amendment Violation.  (Count IV)

Nichols alleges that the Protocol's failure to account for his specific medical conditions may result in unconstitutional maladministration. (Dkt. 1, ¶¶ 128-37.) But while Nichols lists a litany of medical conditions, he does not explain how those conditions will increase the risk of pain to an "objectively intolerable" level. This failure to plead facts raising a plausible claim requires dismissal. *Ashcroft*, 556 U.S. at 678.

Nichols also alleges that TDOC's "history of error, negligence, and malfeasance in carrying out lethal injections in Tennessee is sure or very likely to cause" a risk of serious pain. (Dkt. 1, ¶¶ 134-37.) But precedent forecloses Nichols's broad speculations about potential maladministration.

### A.     Nichols's fails to plead a plausible claim related to his health conditions.

Nichols says he suffers from "advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes," which create a "substantial risk he will experience unnecessary and serious pain" during his execution. (*Id*., ¶ 129.) He speculates that the Protocol's failure "to account for unique physical" and mental characteristics "*may affect the efficacy*" of the execution process. (*Id*., ¶¶ 130-31 (emphasis added).) But Nichols fails to show

that his specific medical conditions are "sure or very likely" to cause pain above any other execution under the Protocol. "[S]peculation cannot substitute for evidence" that the condition is "*sure or very likely* to cause serious illness and needless suffering." *Brewer v. Landrigan*, 562 U.S. 996 (Mem.) (2010) (emphasis in original).

And Nichols falls short with his allegation that the Protocol fails to explicitly address his medical conditions. (Dkt. 1, ¶¶ 130-31.) The Protocol is not required to account for hypothetical injuries that are unlikely to occur. *Jackson v. Danberg*, 594 F.3d 210, 228 (3d Cir. 2010). And the Protocol "is not constitutionally infirm simply because it does not specify every step of the procedure in explicit detail." *West III*, 519 S.W.3d at 565. Nichols "cannot successfully challenge [Tennessee's] method of execution merely by showing a slightly or marginally safer alternative," though he has not even done that. *Baze*, 553 U.S. at 51. Because Count IV does not allege superadded pain that is "sure or very likely" to occur, it should be dismissed.

## B. Precedent forecloses Nichols's broad speculations about maladministration.

The U.S. Supreme Court has long rejected the idea that an "accident" in the administration of an execution "establish[es] the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *See Baze*, 553 U.S. at 50 (quoting *Farmer*, 511 U.S. at 842, 846, and n. 9, 114). Protocol challenges alleging a risk of maladministration are "all but foreclosed" by *Baze. Cooey*, 589 F.3d at 225. At "the motion-to-dismiss stage," allegations of "hypothetical risks" posed by failure to follow a protocol are "insufficient." *Whitaker*, 862 F.3d at 497-99. Unless the allegations show a concrete, "high level of likelihood" that an inmate will needlessly suffer, *Gissendaner*, 779 F.3d at 1279-80, 1283, a "potential flaw" in administration is too speculative "to state an Eighth Amendment claim," *Zink*, 783 F.3d at 1101.

A method-of-execution challenge "based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of [that court's] judicial authority." *Cooey*, 589 F.3d at 225. The Eighth Amendment's

purpose is to prevent cruel and unusual punishment, "not to substitute the court's judgment of best practices for each detailed step in the procedure for that of corrections officials." *Id*. Thus, to avoid "transform[ing] courts into boards of inquiry charged with determining 'best practices' for executions," Nichols must do more than "merely [] show[] a slightly or marginally safer alternative" such as "additional monitoring by trained personnel." *Baze*, 553 U.S. at 51.

Count IV includes the same sort of speculative "what ifs" that the Supreme Court and the Sixth Circuit have long rejected. *Id*. at 50; *Cooey*, 589 F.3d at 225. For example, Nichols speculates that the pentobarbital might be improperly procured, handled, or stored; that the IV team might make a mistake setting IV catheters or heart monitor leads; and that the Special Operations Team Leader might administer the pentobarbital improperly. (Dkt. 1, ¶ 135.) These allegations that the execution team *might* improperly administer the LIC drug do not create an unconstitutional risk of harm. *Baze*, 553 U.S. at 55-56; *Cooey*, 589 F.3d at 225.

In fact, the opposite is true: the Protocol's panoply of safeguards renders the risk of maladministration not "so substantial or imminent as to amount to an Eighth Amendment violation." *Baze*, 553 U.S. at 55-56; *Whitaker*, 862 F.3d at 498-99; *Zink*, 783 F.3d at 1101; *Gissendaner*, 779 F.3d at 1280, 1283; *Cooey*, 589 F.3d at 225. For example, the Protocol requires (1) that the IV team consist of two medical professionals certified, licensed, and/or qualified to place IV lines, (2) that members of the Special Operations Team receive annual training in vascular access and IV therapy from a qualified third party, (3) that the execution team read the Protocol upon selection and annually thereafter, (4) that the execution team attend monthly practice sessions with simulations of all steps of the execution process, beginning two hours before the execution, and (5) that the execution team attend additional practice sessions as least twice weekly starting two weeks before an execution. (Ex. 1, at 12.)

And those are not the only safeguards in the Protocol. The execution team must prepare a contingency set of syringes containing the pentobarbital. (*Id*., at 18.) The restraint team secures

the inmate's arms on the gurney and confirms both that the inmate's circulation is not impeded and that the inmate cannot manipulate the IV lines. (*Id*., at 19.) The IV team inserts a backup IV line in case the primary IV fails. (*Id*., at 20.) And the Protocol requires an initial flow of sterile saline solution in each IV to keep the lines open. (*Id*., at 20); *see Raby v. Livingston*, 600 F.3d 552, 558 (5th Cir. 2010) (finding no risk of pain where protocol required IV to flow properly for several minutes before lethal drugs are administered). The Protocol contains abundant safeguards against the alleged risks of maladministration.

Like Nichols's speculations about what *might* happen if pentobarbital does not work as usual, his jabs about the value of organizational culture at TDOC amount to nothing. Even "proof[] of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional." *Cooey*, 589 F.3d at 225. And even assuming a State "botched [an] execution" and the inmate "suffered great pain" would still not prove a substantial risk of serious harm in a future execution. *Jackson*, 594 F.3d at 225-26. So Nichols's allegations, even if taken as true, do not implicate any sure or very likely infliction of objectively intolerable, superadded pain.

Thus, Nichols's claim of maladministration fails as a matter of law. Circuit courts across the country have already found speculative allegations of maladministration like Nichols's "all but foreclosed," *Cooey*, 589 F.3d at 225, because alleging a "potential flaw" in administration does not "state an Eighth Amendment claim," *Zink*, 783 F.3d at 1101. The Protocol contains extensive, well-established safeguards—including trained personnel, contingency plans, as well as rigorous training and practice—to mitigate any risk of harm. Nichols's claim that TDOC *might* make any number of mistakes in administering the Protocol falls short of stating an Eighth Amendment violation.

Nichols has not alleged superadded pain that is sure of very likely to occur. Instead, he has generically referenced his medical conditions without connecting those specific conditions to any

risk of pain. And he has raised hypothetical risks of maladministration that ae foreclosed under Sixth Circuit precedent. Count IV should be dismissed.

## VI. Nichols's Free-Speech, Free-Exercise, and Court-Access Claims Do Not Present a Justiciable Controversy. (Counts V, VI, VII, VIII)

Nichols's First Amendment and RLUIPA claims in Counts V, VI, VII, and VIII are "not ripe for adjudication" because they rest on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Tennessee State Conf. of the N.A.A.C.P. v. Hargett*, 441 F. Supp. 3d 609, 627 (M.D. Tenn. 2019) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Ripeness is a justiciability doctrine that "focuses on the timing of the action[.]" *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747, 751 (6th Cir. 2003). "[It] is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *River City Cap., L.P. v. Bd. of Cnty. Comm'rs*, 491 F.3d 301, 309 (6th Cir. 2007) (cleaned up). "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ." *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Courts apply a two-part analysis to determine ripeness, evaluating (1) the fitness of the issues for judicial decision and (2) "'the hardship to the parties of withholding court consideration'[.]" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (quoting *Abbott Lab'ys.*, 387 U.S. at 149.). The first prong asks whether Nichols's claims stem from an existing legal controversy or depend on contingent events that may never occur. *Texas*, 523 U.S. at 300. The second prong examines whether delayed adjudication would cause the parties hardship – for example, by forcing them to choose between complying with a burdensome law or risking serious penalties. *Warshak*, 532 F.3d at 525 (internal citations omitted). Nichols's claims fail on both

fronts. They rest on hypotheticals, not live controversies, and impose no immediate hardship that would justify premature judicial intervention.

### A. There is no present controversy over spiritual advisors. (Counts V and VII)

In Count V, Nichols claims that the Protocol's alleged "prohibition on clergy in the execution chamber" burdens his free exercise of religion because his faith requires the "laying on of hands" before, during, and after his execution. (Dkt. 1, ¶¶ 138-41.) But the Protocol contains no such prohibition. To the contrary, it expressly permits "clergy, if requested" to accompany the inmate into the execution chamber. (Ex. 1, at 19.) In fact, under this very Protocol, Oscar Smith's spiritual advisor remained in the chamber through the completion of his execution. (Exhibit 2); Kirsten Fiscus et al., *Oscar Franklin Smith, 75, dies by lethal injection in first Tennessee execution since 2020,* The Tennessean, May 22, 2025, at 4.[6] And Defendants have already Nichols they will accommodate his religious practices. (Exhibit 3.)

Count VII asserts that the Protocol's use of the "limited term, 'clergy'" unlawfully restricts the participation of "spiritual advisors" because it discriminates between religious traditions.[7] (Dkt. 1, ¶¶ 162-63, 173.) But this semantic distinction does not amount to a constitutional violation. The lack of the term "spiritual advisor" to describe a person that performs chaplaincy services for an inmate does not render the Protocol unconstitutional. *West III*, 519 S.W.3d at 565. Defendants fully understand they may not discriminate between religious advisors of different faiths when determining who may accompany an inmate in the execution chamber. *Murphy v. Collier*, 587 U.S. 901, 902 (2019) (Kavanaugh, J., concurring). Here, the Protocol gives TDOC

---

[6] The Court should consider evidence beyond the complaint in deciding Defendants' factual attack on jurisdiction. *Cartwright*, 751 F.3d at 759.

[7] The use of the term "clergy" in the Protocol simply mirrors Tennessee Code Annotated section 40-23-116(a)(3), which limits witnesses to an execution to include "a member of the clergy who has been preparing the condemned person for death[.]" The complaint does not challenge section 40-23-116(a)(3).

no discretion to exclude spiritual advisors or to prefer one faith over another. TDOC does not so discriminate, and Nichols has already been granted access to his chosen advisor.

There is no live dispute between Nichols and Defendants: his request to engage in religious practices with his chosen advisor has been granted. Because Counts V and VII seek an advisory opinion untethered from any live controversy, they are unripe and should be dismissed.

**B. Nichols does not allege an imminent controversy with the limitation on middle-of-the-night communications. (Count VI)**

The Protocol directs the Warden to ensure "non-contact visits and phone calls—excluding visits and calls from the inmate's attorney of record—are concluded by 10:00 p.m. the night before the execution unless expressly approved by the [TDOC official]."[8] (Ex. 1, at 19.) Nichols claims this restriction on late-night communication infringes his First Amendment and religious rights. (Dkt. 1, ¶¶ 153-54.) But his allegation ignores a key provision: the Protocol expressly permits such communication with TDOC approval. (*Id*., ¶ 147.)

For Nichols to have a cognizable claim, two contingencies must occur:

1) He asks to communicate with someone other than counsel after 10:00 p.m. the day before the scheduled execution; and

2) That request is denied.

Nichols does not allege either will happen. He does not claim to have made any such request, let alone that TDOC denied one. Nor does he allege that TDOC is likely to deny such a request in the future. With no allegation of past or likely injury, Nichols presents no ripe dispute.

Equally important, the Protocol imposes no obligation on Nichols to "engage in, or to refrain from, any conduct." *Texas*, 523 U.S. at 301. Thus, the complaint reflects no imminent dispute over any Nichols's phone use during the night before his execution. Count VI is therefore based on a hypothetical scenario and seeks an advisory opinion. It should be dismissed as unripe.

---

[8] The identity of this official is protected.

**C.** **Nichols's counsel will be able to view the execution and use a phone in the official witness room. (Count VIII)**

In Count VIII, Nichols contends that the Protocol denies his counsel telephone access during the execution, thereby obstructing access to the courts. (Dkt. 1, ¶¶ 179-80.) This claim is also unripe. In Tennessee, attorney-witnesses to executions have had phone access in the official witness room for years. *See Miller v . Parker*, 2018 WL 6003123 *6 (M.D. Tenn 2018) ("the Court takes judicial notice that Defendants and their predecessors have permitted attorney-witnesses to executions to have access to a telephone during several previous executions[.]"). And Nichols's counsel will have that same access. (Exhibit 4.) A protocol is not unconstitutional simply because it lacks exhaustive procedural details. *West III*, 519 S.W.3d at 565.

Nichols also alleges that the Protocol bars his counsel from witnessing key aspects of the execution, thereby blocking meaningful access to the courts to assert Eighth Amendment rights. (Dkt. 1, ¶ 184.) Not so. The Protocol ensures "defense counsel witness, and clergy, if requested," are with the inmate when he enters the execution chamber. (Ex. 1, at 19.) There, they observe every critical step: the inmate being secured, electrocardiograph leads placed, IV catheters inserted in both arms, and the saline solution initiated to keep the lines open. (*Id*., at 20.) Counsel also remains present in the official witness room to observe the administration of the pentobarbital and the five-minute waiting period that follows. (*Id*., at 21.)

The only moment of restricted visibility is during the physician's entry into the execution chamber to confirm death. At that point, a curtain is drawn to protect the physician's identity, as required by Tennessee law. *See* Tenn. Code. Ann. § 10-7-504(h)(1); *West v. Schofield*, 460 S.W.3d 113, 124-25 (Tenn. 2015) (*West I*) ("[O]ur legislature [has] declared the public policy of Tennessee to favor the anonymity of those involved in carrying out capital punishment[.]").

Nichols speculates that his counsel's inability to observe "when and how the physician confirms his death" violates the Constitution. (Dkt. 1, ¶ 185.) But he offers no explanation for

why this particular moment bears constitutional significance. Indeed, there is no record of pentobarbital failing to complete its task. *Barr*, 591 U.S. at 980 ("[Pentobarbital] [h]as been used to carry out over 100 executions, without incident."). Put simply: once the IV line is secured and the lethal dose administered, there are no remaining Eighth Amendment rights for counsel to vindicate. Because Count VIII rests on mischaracterizations of the Protocol and speculative harms, it is unripe and should be dismissed.

## VII. Nichols's Choice in The Method of Execution Does Not Violate the Constitution. (Count IX)

Tennessee provides certain inmates with the opportunity to choose from among two lawful, historically accepted methods of execution: lethal injection and electrocution. The default method is lethal injection. Tenn. Code Ann. § 40-23-114(a). But inmates who committed the underlying offense before January 1, 1999 may sign a written waiver electing to be executed by electrocution instead. Tenn. Code Ann. § 40-23-114(b). To facilitate this option, the revised Protocol provides eligible inmates an opportunity to sign an affidavit waiving or declining to waive the right to execution by lethal injection. Nichols asserts this procedure violates his constitutional rights under the First, Fifth, Eighth, and Fourteenth Amendments. But Nichols is not required to choose his method of execution and "[t]he mere existence of the option" between lethal injection and electrocution "is not a violation of [Nichols's] constitutional rights." *Johnson v. Bell*, 457 F. Supp. 2d 839, 841 (M.D. Tenn. 2006) (quoting *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997)).

The option to waive execution by lethal injection does not violate Nichols's free exercise rights under the First Amendment. *Id.* (holding that an inmate's "free exercise of religion is not violated by forcing him to choose, or not to choose, the method of execution."). And it is not cruel and unusual punishment under the Eighth Amendment. *Id.* at 843 ("The existence of an option that [Nichols] may choose to exercise, or may choose not to exercise, standing alone, does not constitute cruel and unusual punishment."). Nor does it violate the Fifth Amendment, because it

does not apply to state action. *Myers*, 102 F. App'x at 933.

Nichols's Fourteenth Amendment challenge also fails. He asserts that the revised Protocol violates due process because he must choose his method of execution before he knows whether Defendants have the pentobarbital to execute him, whether the LIC has expired, and whether it has been tested. Put differently, before deciding whether to elect to be executed by electrocution, Nichols wants more information about the pentobarbital that would be used in the absence of such election. But Nichols does not have a protected interest "in knowing—for the purpose of electing a method of execution—whether a given execution protocol exists at all," much less details about the chemicals to be used. *Woods v. Dunn*, No. 2:20-CV-58-ECM, 2020 WL 1015763, at *13 (M.D. Ala. Mar. 2, 2020). Due process only prevents deprivations of "life, liberty, or property interests[s]." *Fields v. Henry Cnty.*, 701 F.3d 180, 185 (6th Cir. 2012); U.S. Const. amend. XIV. And Nichols has no "freestanding right to detailed disclosure about [Tennessee's] execution protocol." *Zink*, 783 F.3d at 1109; *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014); *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013); *Bixby v. Stirling*, No. 3:24-CV-05072-JDA, 2024 WL 4224081, at *7 (D.S.C. Sept. 18, 2024); *Woods*, 2020 WL 1015763, at *12. So his Fourteenth Amendment challenge also fails.

## VIII. Nichols's Challenge to Electrocution Is Unripe. (Count IX)

Nichols asserts that "[e]xecution by electrocution constitutes cruel and unusual punishment." (Dkt. 1, ¶ 210.) But he will not be subject to electrocution unless lethal injection "is held to be unconstitutional" or lethal injection chemicals are "unavailable" to TDOC. *West v. Schofield*, 468 S.W.3d 482, 491 (Tenn. 2015) (*West II*). So that method "does not now and may not ever apply" to him. *Id*. at 494. That claim is "unripe and nonjusticiable." *Id*.; *West v. Parker*, No. 3:19-cv-00006, 2019 WL 2341406, at *17 (M.D. Tenn. June 3, 2019). Because Nichols "is given the option of electrocution and lethal injection," this Court "need not evaluate the constitutionality of electrocution." *Stanford v. Parker*, 266 F.3d 442, 462 (6th Cir. 2001). Count

IX should be dismissed.

## IX. Tennessee Law Constitutionally Protects the Identities of Execution Participants. (Count X)

Nichols claims a constitutional right to the details of who and how Tennessee will carry out his lawfully imposed death sentence. But that claim runs headlong into settled law: "there is no free-standing constitutional right for death row inmates" to access such information. *Irick v. Mays*, No. 3:18-CV-00737, 2018 WL 3753208, at *3 (M.D. Tenn. Aug. 8, 2018) (citing *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016)). Tennessee law reinforces this point by statutorily shielding the identities of those involved in executions.

The Tennessee Supreme Court made clear, "our legislature [has] declared the public policy of Tennessee to favor the anonymity of those involved in carrying out capital punishment." *West I*, 460 S.W.3d at 124-25. That policy is codified in the Tennessee Public Records Act, which makes confidential any record identifying individuals who "has been or may in the future be" involved in an execution and anyone "involved in the procurement or provision of chemicals, equipment, supplies and other items." Tenn. Code Ann. § 10-7-504(h)(1).

This protection is neither novel nor unique to Tennessee. A longstanding tradition and national consensus favor execution-team confidentiality. "[T]here has . . . been a longstanding tradition of concealing the identities of those who carry out . . . executions." *Owens*, 758 S.E.2d at 805. "Historically, the executioner was cloaked in anonymity to protect against retaliation by supporters of the condemned and to help communities find people to do the tough job." Mary D. Fan, *The Supply-Side Attack on Lethal Injection and the Rise of Execution Secrecy*, 95 B.U. L. Rev. 427, 428 (2015). And there is certainly "no longstanding custom or entitlement to know the maker of the rope and scaffold used to hang, or the scaffold or the gun used to execute someone by firing squad." *Id*. at 451-52. The Tennessee Supreme Court has embraced that view, holding that inmates are "not entitled to the disclosure" of identifying information about execution team

members or LIC sources.  *West I*, 460 S.W.3d at 127.

In any event, courts have long rejected claims like Nichols's that the "vagueness of the revised Protocol makes any challenge prohibitive."  (Dkt. 1, ¶ 221).  The Sixth Circuit put it plainly: "no constitutional right exists to discover grievances or to litigate effectively once in court."  *Phillips*, 841 F.3d at 420.

Here, Nichols complains that the Protocol vaguely describes quality control testing and assurances, transportation and storage of the pentobarbital, and selection criteria of individuals involved in the execution process.  (Dkt. 1, ¶ 215.)  But federal courts must presume that state officials carry out their duties related to executions "in a careful and humane manner."  *Cooey*, 589 F.3d at 224 (quoting *Louisiana ex rel. Francis*, 329 U.S. at 462).

And Nichols's alleged need to uncover those details confers no constitutional entitlement.  As mentioned above, the Tennessee Supreme Court has already rejected that theory.  *West I*, 460 S.W.3d at 127.  So have other courts. *See, e.g.*, *Wellons*, 754 F.3d at 1267 (citations omitted) ("Neither the Fifth, Fourteenth, or First Amendments afford [inmates] the broad right 'to know where, how, and by whom the lethal injection drugs will be manufactured,' as well as 'the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters.'"); *Owens*, 758 S.E.2d at 805 ("To the extent that Hill seeks to turn the First Amendment into an Open Records Act for information relating to executions, his claim clearly fails."); *Sepulvado*, 729 F.3d at 420 ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol."); *Williams v. Hobbs*, 658 F.3d 842, 852 (8th Cir. 2011) (holding that confidentiality of details of execution procedures did not raise a plausible due process access-to-courts claim).

Count X fails as a matter of law.  There is no constitutional right to access the Protocol details Nichols demands, no entitlement to disclosure of the identities of execution personnel or suppliers, and no basis to override Tennessee's carefully calibrated confidentiality provisions.

Accordingly, Count X should be dismissed with prejudice.

## X.     Nichols's UAPA Challenge Is Foreclosed by Tennessee Precedent.  (Count XI)

Nichols's final challenge also fails.  He argues that TDOC's Protocol is a "rule or regulation" that must undergo rulemaking procedures under Tennessee's Uniform Administrative Procedures Act, Tenn. Code Ann. § 4–5–101 *et seq.*  (Dkt. 1, ¶¶ 224, 226.)  Thus, he alleges, TDOC's failure to follow required UAPA procedures is a violation both of Tennessee law and due process.  (*Id.*, ¶¶ 227, 230.)  But the Tennessee Supreme Court has already addressed and rejected this argument.

The revised Protocol "is not a rule as defined by the UAPA." *Abdur'Rahman I*, 181 S.W.3d at 311 (citing Tenn. Code Ann. § 4–5–102(10)).  Rather, it "fits squarely within two exceptions to the meaning of 'rule': statements concerning only the internal management of state government and not affecting private rights privileges or procedures available to the public," and "statements concerning inmates of a correctional or detention facility[.]" *Id.* (citations omitted). This Court "must defer" to that "interpretation[] of state law." *Chapman v. Brentlinger Enters.*, 124 F.4th 382, 406 (6th Cir. 2024).  Because TDOC did not violate the UAPA by issuing the Protocol, Count XI fails to state a claim.

## CONCLUSION

For these reasons, the complaint should be dismissed in its entirety.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*/s/ Cody N. Brandon*
CODY N. BRANDON (BPR# 037504)
Deputy Attorney General
Constitutional Defense Division

MARY MCCULLOHS (BPR# 026467)
Senior Assistant Attorney General

DAVID WICKENHEISER (BPR# 040427)
Assistant Attorney General

MATTHEW KUBICEK (BPR# 040774)
Assistant Attorney General

SAMANTHA MORRIS (BPR# 038178)
Assistant Attorney General

Law Enforcement and
Special Prosecutions Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
Off. (615) 532-7400
Fax (615) 532-4892
Cody.Brandon@ag.tn.gov
Mary.McCullohs@ag.tn.gov
David.Wickenheiser@ag.tn.gov
Matthew.Kubicek@ag.tn.gov
Samantha.Morris@ag.tn.gov
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was filed and served by operation of the Court's electronic filing system on this the 20th of June 2025, upon:

Stephen A. Ferrell
Susanne Bales
Luke P. Ihnen
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
*Counsel for Plaintiff*

/s/ *Cody N. Brandon*
CODY N. BRANDON
Deputy Attorney General