# EXHIBIT 2

**In the Matter Of:**

KEVIN BURNS vs FRANK STRADA

25-0414-IV

# HEARING

*July 14, 2025*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

KEVIN BURNS, ET AL., )
)
)
Plaintiffs, ) Case No.
) 25-0414-IV
v. )
)
FRANK STRADA, ET AL., )
)
)
Defendants. )

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE RUSSELL T. PERKINS
CHANCELLOR

Monday, July 14, 2025

11:00 a.m.

Nashville, Tennessee

HALEY GROSSMAN
Tennessee Licensed Court Reporter

APPEARANCES OF COUNSEL

On behalf of KEVIN BURNS, BYRON BLACK, JON HALL, KENNATH HENDERSON, ANTHONY DARRELL HINES, HENRY HODGES, FARRIS MORRIS, WILLIAM GLENN ROGERS, AND OSCAR SMITH:

KELLEY HENRY, ESQ.
KIT THOMAS, ESQ.
TRACY PENNEBAKER, ESQ.
DREW BRAZER, ESQ.
OFFICE OF THE FEDERAL PUBLIC DEFENDER
810 Broadway
Suite 200
Nashville, Tennessee 37203
615-736-5047
kelley_henry@fd.org
kit_thomas@fd.org
drew_brazer@fd.org

On behalf of FRANK STRADA, IN HIS OFFICIAL CAPACITY AS TENNESSEE'S COMMISSIONER OF CORRECTION, AND KENNETH NELSEN, IN HIS OFFICIAL CAPACITY AS WARDEN OF RIVERBEND MAXIMUM SECURITY INSTITUTION:

CODY BRANDON, ESQ.
MATTHEW KUBICEK, ESQ.
DAVID WICKENHEISER, ESQ.
SAMANTHA MORRIS, ESQ.
TENNESSEE ATTORNEY GENERAL'S OFFICE
P.O. Box 20207
Nashville, Tennessee 37202
615-741-3491
cody.brandon@ag.tn.gov
matthew.kubicek@at.tn.gov
david.wickenheiser@ag.tn.gov
samantha.morris@ag.tn.gov

Also present:

Dr. Joseph Antognini, Zoom Attendee

# INDEX

WITNESSES:

DR. DANIEL MARTELL


| | |
|---|---|
| Direct Examination by Ms. Henry | 16 |
| Cross-examination by Mr. Brandon | 27 |
| Redirect Examination by Ms. Henry | 51 |


DR. GAIL VAN NORMAN


| | |
|---|---|
| Direct Examination by Ms. Henry | 57 |
| Voir Dire Examination by Mr. Brandon | 68 |
| Direct Examination (Cont.) by Ms. Henry | 73 |
| Cross-examination by Mr. Brandon | 204 |
| Redirect Examination by Ms. Henry | 299 |


# EXHIBITS


| Plaintiffs' | Description | Marked | Admitted |
|---|---|---|---|
| Exhibit 1 | Dr. Martell's CV | 19 | 19 |
| Exhibit 2 | Dr. Martell's reports | 21 | 21 |
| Exhibit 12 | Dr. Van Norman's CV | 59 | 59 |
| Exhibit 13 | Dr. Van Norman's Declaration and Reports | 75 | 75 |
| Exhibit 14 | Single Drug Report | 79 | 79 |
| Exhibit 15 | Riverbend Records | 102 | 102 |
| Exhibit 16 | General Records | 103 | 103 |
| Exhibit 17 | Flash Drive of Video | 148 | 148 |
| Exhibit 18 | Article | 189 | 189 |
| Exhibit 19 | Article | 303 | 303 |

EXHIBITS (CONT.)

| Defendants' | Description | Marked | Admitted |
|---|---|---|---|
| Exhibit 3 | Byron Black Authorization 2018 | 32 | 32 |
| Exhibit 4 | Byron Black Authorization 2019 | 33 | 33 |
| Exhibit 5 | Byron Black Authorization 2020 | 35 | 35 |
| Exhibit 6 | Byron Black Progress Report | 36 | 36 |
| Exhibit 7 | Byron Black Authorization 2022 | 40 | 40 |
| Exhibit 8 | Byron Black Authorization 2022 | 41 | 41 |
| Exhibit 9 | Byron Black Power of Attorney 2022 | 43 | 43 |
| Exhibit 10 | Byron Black Directive Health Care | 45 | |
| Exhibit 11 | Byron Black 2024 | 50 | 50 |

PROCEEDINGS

THE BAILIFF: All rise. Davidson County Chancery Court is now in session. All persons having business with this court, come forward, and you shall be heard. God save the United States, the state of Tennessee, and this honorable Court. The Honorable Russell T. Perkins presiding. Please be seated.

THE COURT: Good morning, everybody. Are the parties ready to proceed?

MS. HENRY: Plaintiffs are ready, Your Honor.

MR. BRANDON: Yes, Your Honor.

THE COURT: Do we have parties or lawyers participating by video?

MR. BRANDON: Yeah. A witness for the defendants, Dr. Joseph Antognini, is participating via video. He's listening in now so that he can hear the evidence presented.

THE COURT: Okay. Thank you.

Any preliminary matters?

MS. HENRY: Your Honor, there's a matter of a Motion to Strike that we filed last evening.

THE COURT: I'll hear it.

MS. HENRY: Your Honor, very briefly, with respect to Exhibits 2 and 3 of the Defendants' Response to our Motion for Preliminary Injunction, respectfully

Exhibit Number 2 was not -- was a declaration that was filed, not under penalty of perjury and not in compliance with Tennessee's -- Tennessee Rule of Civil Procedure 72. This morning, the State has purported to fix that error in filing by filing an amended petition. I'll just leave that where it is for the Court. But I would also mention that we have an additional Motion to Strike Paragraphs 24 and 26 of that Declaration because it contains testimony which is not appropriate for an expert witness.

With respect to Exhibit Number 3, which is the testimony of Dr. Litsa, L-I-T-S-A, I believe it's Lambrakos, L-A-M-B-R-A-K-O-S. That exhibit is excludable for a couple of reasons. First, it is -- the opinions stated therein are not stated to a reasonable degree of scientific or medical certainty, and therefore do not meet the requirements of the Tennessee Rules of Civil Procedure and Tennessee Rules of Evidence, so it should be excluded on that basis.

In addition, the Declaration itself contains information for which the Declaration does not establish that the witness has the expertise with which to provide those opinions, and in fact is merely a recapitulation of the opinions of Dr. Joseph Antognini, and that's A-N-T-O-G-N-I-N-I, I believe, although he'll correct us

later this afternoon if I'm wrong, which is improper bolstering of an expert witness. Dr. Lambrakos does not have any experience in pain management, anesthesia, or surgery, and so is not a witness who has the proper foundation to provide many of the opinions in her declaration.

And so for those reasons, we move to strike those from the record. Obviously, these witnesses are going to testify live and they can attempt to fix their problems on the witness stand. But as far as the record goes, we all know that there's a possibility that another court will look at whatever it is that this Court does. We want to make sure that the record complies with the Tennessee Rules of Evidence.

THE COURT: Thank you.

MS. HENRY: Thank you.

THE COURT: I'll hear from the other side.

MR. KUBICEK: Good morning, Your Honor.

THE COURT: Morning.

MR. KUBICEK: Briefly, as it relates to Dr. Antognini, Counsel is correct. That was an oversight. We did submit this morning an updated Declaration that does use the magic words "under penalty of perjury." I think that settles that matter.

THE COURT: I agree.

MR. KUBICEK: As to Dr. Lambrakos, the very first page, Paragraph 3, she states that her testimony is to a medical degree of -- a degree of medical certainty, right on the first page on Paragraph 3. As it relates to her qualifications, she'll be testifying Wednesday.

For her Declaration, she is the only expert proposed to testify in this particular hearing that is a cardiac electrophysiologist. This hearing is about an implantable ICD. She is the one who has the expertise to discuss how it works, when it works, and when it doesn't work. Excluding her testimony is simply -- would be an error. We believe that she is more than qualified, and she will show that on Wednesday when she testifies.

And, just so we're clear, she cites both the plaintiffs' expert and the defense expert in her Declaration as it relates to the effects of pentobarbital, and she is subject to cross-examination on whether her knowledge fits or not for that. But she is the only cardiac electrophysiologist that's going to testify in this hearing, which is what this case is about today.

THE COURT: What about the other objection as to particular paragraphs?

MR. KUBICEK: These are expert witnesses. Dr. Antognini has an opinion as to Dr. Van Norman's opinion. This is how that works. When experts have competing opinions, they are entitled to make an opinion regarding the expert on the other side. Dr. Van Norman is a very experienced anesthesiologist. Dr. Antognini is a very experienced anesthesiologist. They have been on opposite sides of these cases for years. They're entitled to make opinions regarding the other's opinion, and the other -- I'm sure Dr. Van Norman will be more than happy to respond to what Dr. Antognini's opinions are, and he will be subject to cross-examination regarding those opinions from Counsel.

THE COURT: The Motion is respectfully denied. The Court reserves the right that if something is without proper foundation or it should not properly be considered, that the Court may disregard it and let everybody know it -- that the Court is disregarding it. But at this point I'm not striking that. So that's the Court's ruling.

Are we ready to proceed with the first witness?

MS. HENRY: We are, Your Honor.

THE COURT: All right. Go ahead.

MS. HENRY: Your Honor, the plaintiff Byron

Black calls Dr. Daniel Martell.

MR. BRANDON: Your Honor, before we hear from Dr. Martell or any witness, I have a couple objections to the Court. First, I think Your Honor needs to consider the objection of jurisdiction that the defendants have made to this Court. The ability to stay an execution or set conditions on this execution that's set to happen on August 5th is exclusively within the provenance of the Tennessee Supreme Court, who just recently last week reaffirmed, in its order on Mr. Black's competency appeal, that "there or by the order of March 3rd, the warden or his designee shall carry out the execution of Byron Lewis Black in accordance with Tennessee law on the 5th day of August unless a stay is entered by this Court or by a federal court."

I think it'd be inviting error, Your Honor, for this Court to even consider testimony on these motions or considering the evidence when the Court lacks jurisdiction. So we would ask that this Court address the jurisdictional issue at the threshold.

THE COURT: I respectfully conclude that I do have jurisdiction to hear this. Now, what relief, if any, I grant, there may be some jurisdictional boundaries to that. But to hear the proof, I can do that. So that's the Court's ruling. There has not been

a request on the part of the plaintiffs to delay the execution. So we're here on what could be a narrow issue, but we'll see as to proof of Defense.

MR. BRANDON: Your Honor, one final objection before -- I understand, Ms. Henry wants to call Dr. Martell first. Dr. Martell, according the Declaration, offered -- in support of the plaintiffs' motion has formed opinions about Mr. Black's competency to be executed. Each of the opinions that he has formed in declarations and supplemental declarations over the last five years relate to that standard of competency to be executed. That Declaration was offered in support of the competency petition in the criminal court that did not survive threshold scrutiny and make it to an evidentiary hearing. His declarations don't purport to evaluate any of the issues in this case or reading this motion. We think his testimony is irrelevant.

We also think that his testimony ought to be excluded for the separate reason that Dr. Martell formed his opinions after having the opportunity to evaluate and examine Mr. Black personally and draw conclusions based on that examination, and the defendants have been denied that similar opportunity due to the protests by Plaintiffs of even taking Mr. Black's deposition, and denying any access to him at all.

So because both his testimony is formed based on evidence that the defendants have not been able to have access to, and because Dr. Martell doesn't offer any testimony that could possibly be relevant to the issues before the Court today, we suggest that the Court dispense with that testimony belonging to the witnesses that will actually make an influence over the Court's decision.

THE COURT: I'll hear from the other side.

MS. HENRY: Your Honor, Dr. Martell is not being offered as a witness to testify about Mr. Black's competency to be executed. Rather, the defendants have made an issue of the pleadings in this case and indicated that Mr. Black, according to them, should be held to a higher standard of pleading than most people in Tennessee. So Dr. Martell is being offered to rebut their position with respect to what Mr. Black should have been able to plead in the complaint with the respect to his pacemaker. So Dr. Martell will be testifying as a result of his evaluations of Mr. Black over the course of the last five years, with respect to his intellectual and major neurocognitive disorders, and how that affects his ability to express language and to speak to counsel.

THE COURT: So the proof is suspected to be

more narrow than the submission that was made in writing and that we're not going to venture into questions of whether Mr. Black is competent to be executed. Is that what you're saying?

MS. HENRY: Yes, Your Honor. Dr. Martell is not going to offer any opinions about competency at all. He's only going to give the Court information as to Mr. Black's intellectual functioning and his major neurocognitive disorder and the ways in which that impacts his ability to use expressive language.

THE COURT: As to -- you will definitely get another chance, Counsel. As to the question before the Court, as I understand it, the only issue before the Court is whether this device, and that's about as well as I can describe it, will be deactivated shortly before or at the same moment that the lethal injection is proposed to be administered. Isn't that the only issue before the Court?

MS. HENRY: That's the only issue that Plaintiffs presented before the Court, Your Honor. However, Defendants have defended against our position saying that the Court doesn't have the authority to grant any relief on Claim 1.4, because the complaint itself uses the word "pacemaker" and does not use the phrase "implantable cardioverter," C-A-R-D-I-O-V-E-R-T-

E-R, "defibrillator." An ICD, as Dr. Van Norman will testify, does have a pacemaker function. It also has a defibrillator function. But the defendants have made it an issue that "pacemaker" is the language in the complaint and alleged the Court doesn't have authority over the complaint because of the use of the word "pacemaker." So they've put this in issue.

THE COURT: All right. I'll hear from the other side.

MR. BRANDON: Your Honor, just to clarify, the defendants have not said that the Court lacks jurisdiction because of the use of the term pacemaker in the complaint. They have simply noted Black's delay in bringing this claim timely to the attention of the Court. The facts about which the papers argue before the Court in terms of the tactical delay are undisputed. The record is very clear about what was filed, when it was filed. Dr. Martell doesn't have anything to offer on that point.

And I guess I'll add to my objection, hearing from Ms. Henry that Dr. Martell is isn't going to offer any opinion about competency to be executed, that now we're being presented with what I expect will be a brand new opinion, which was never disclosed in Dr. Martell's Expert Declaration. The Declaration that was filed

includes a report dated August 25th, 2020, a supplemental report dated December 13th, 2021, and a report dated May 27th, 2025, and Dr. Martell's CV. None of those, by logical operation of the calendar, could have anything to do with anything about inclusion of pacemaker in the complaint. That all relates to the competency in the executed proceedings.

So if we're not going to hear about competency to be executed, we're going to hear brand new testimony from the witness that Defendants have had no opportunity to prepare for. I can say, if he gets on the stand, we will attempt to make a showing. We'll have to go through his medical records, put those into evidence. We may be pulling jail calls to play for the Court. We can get into that sort of sideshow, but it's not relevant to the Court's decision today.

THE COURT: Of course we wouldn't have to get into this if we agreed that under Rule 8.06, the pleadings are to be construed so as to do substantial justice and because this inmates and his complaint with the assistance of his Counsel said pacemaker rather than the actual name of the device, we wouldn't be here. So this is what I'm going to do. I'm going to hear this. I hope it's not very long if it's on a narrow issue. I'm going to allow you to reserve every objection

imaginable, even apart from him saying his name. And that'll be reserved and we won't -- we won't have to go through that and that you object on every question that's going to be, so that that will be preserved for the record. And maybe we can get through this part quickly and go onto what's next. All right? Does that does that work?

MR. BRANDON: Understood, Your Honor.

THE COURT: Okay. All right.

You may come up, sir. Watch your step.

THE CLERK: Please raise your right hand.

DR. DANIEL MARTELL,

having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. HENRY:

Q. Good morning, Dr. Martell.

A. Good morning.

Q. Could you state your name for the record and please spell your last name for the court reporter?

A. My name is Daniel Martell, M-A-R-T-E-L-L.

Q. And, Dr. Martell, how are you employed?

A. I'm a forensic neuropsychologist.

Q. How long have you been a forensic neuropsychologist?

A. Thirty-some years.

Q. And as a forensic neuropsychologist, have you testified in any courts?
A. I've testified many times all around the country over the last 30-some years.
Q. And have you always been accepted as an expert in neuropsychology?
A. I have.
Q. Have you testified in the courts of the state of Tennessee?
A. Yes.
Q. And have you testified on behalf of the state of Tennessee in criminal proceedings as a forensic neuropsychologist?
A. Yes.
Q. Which ones?
A. Well, there have been many, two that may be most relevant to these proceedings would be the Coe (phonetic) case, was Robert Allen (phonetic) Coe and Paul Weed (phonetic).
Q. And have you been accepted as an expert witness in the state of Tennessee?
A. Yes.
Q. Do you have a curriculum vitae?
A. I do.
MS. HENRY: Your Honor, may I approach the

witness?

THE COURT: Yes, you may.

MS. HENRY: Would you also copies of the exhibits?

THE COURT: Please. Thank you.

MS. HENRY: Dr. Martell, I'm handing you a document, but I should ask the Court. How do you prefer to have documents marked? Do you want them identified first?

THE COURT: Yes. Identify first and then we'll mark it in sequence.

MS. HENRY: Thank you, Your Honor.

BY MS. HENRY:

Q. Could you identify that document for us, please?

A. This is my current curriculum vitae.

Q. And does that curriculum vitae accurately -- fairly and accurately summarized your professional expertise in the field of neuro -- clinical -- forensic neuropsychology?

A. It does.

MS. HENRY: And would -- Your Honor, I would move into admission Dr. Martell's curriculum vitae as the next numbered exhibit.

THE COURT: I'll hear from the defendants.

MR. BRANDON: Notwithstanding the prior objections, we don't object to his CV.

THE COURT: All right. Exhibit 1 would be the curriculum vitae admitted into evidence based on the statements of Counsel for the Defendant preserving the prior objection, but not particular objection as to the contents of this exhibit.

(Exhibit 1 was received into evidence.)

BY MS. HENRY:

Q. Dr. Martell, have you been accepted as an expert in Courts throughout the country on the topic of intellectual disability?

A. I have.

Q. And did you in fact testify for the Commonwealth of Virginia in the case of Daryl Atkins?

A. I did.

MS. HENRY: Your Honor, based on the testimony of Dr. Martell and his curriculum vitae, I may that he be accepted as an expert in the field of forensic neuropsychology.

THE COURT: I'll hear from the defendants.

MR. BRANDON: Again, subject to the foregoing objections, we don't object to Dr. Martell being qualified as an expert in his field.

THE COURT: All right. Dr. Martell would be

accepted as an expert witness in his field, subject to the broader objections lodged with the Court by the Defense. Go ahead.

MS. HENRY: Thank you, Your Honor.

BY MS. HENRY:

Q. Dr. Martell, we're going to move this along, so I'm going to ask you about your particular involvement in the case of Byron Black. Have you met Byron Black?

A. Yes, I have.

Q. Have you had an occasion to evaluate, conduct a forensic neuropsychological evaluation of Byron Black?

A. I have on two occasions, the first in 2019 and the most recent one, two months ago in May of this year.

Q. And during the course of conducting your evaluation of Byron Black, did you pro -- prepare and sign expert witness opinions on behalf of Byron Black's legal team?

A. I -- I prepared reports.

Q. Okay. And did you recently provide us a declaration attesting to the truth and validity of those three reports?

A. Yes, I did.

MS. HENRY: Your Honor, may I approach the witness?

THE COURT: Yes.

BY MS. HENRY:

Q. Okay. Dr. Martell, I'm handing you a document. Can you identify that document for the Court, please?

A. This is my declaration with my three reports attached.

Q. And did you sign that declaration on 28th of June, 2025?

A. Yes, I did.

Q. And are the contents of the declaration as well as the appended reports, true?

A. They are.

MS. HENRY: Your Honor, I move admission of the declaration of Dr. Daniel Martell as the next numbered exhibit.

THE COURT: Objection?

MR. BRANDON: The same one we have on the outset, Your Honor.

THE COURT: All right. This exhibit will be the next numbered exhibit with the statements and the broader objection being noted for the record.

(Exhibit 2 was received into evidence.)

BY MS. HENRY:

Q. Dr. Martell, will it assist your testimony to

have these -- this declaration and reports in front of you as we go through your examination?

A. It would be nice if I need to refresh my recollection.

MS. HENRY: Your Honor, I would request that he be permitted to refer to the declaration.

THE COURT: Any objection?

MR. BRANDON: No, Your Honor.

THE COURT: Thank you, sir.

MR. BRANDON: Move to strike.

THE COURT: All right. You may proceed.

BY MS. HENRY:

Q. Dr. Martell, back in 2020 when you first evaluated Mr. Black, can you please describe your testing protocol for the Court?

A. I -- I saw him actually in 2019.

Q. I'm sorry. Yes.

A. It's okay.

MR. BRANDON: Excuse me, Your Honor. If we're going all the way back to 2019 or 2020, again, object to the scope here. The report going way beyond anything that could be possibly relevant to this mission with this filed a few weeks ago.

THE COURT: What do you say, Counsel?

MS. HENRY: This is relevant because it

provides the testing material upon which we're providing information to the Court about our client's intellectual and functioning in his brain damage.

THE COURT: I prefer to treat it as background.

MS. HENRY: Yes.

THE COURT: Let's get to something more current, please.

BY MS. HENRY:

Q. Dr. Martell, in 2020 or '25, did you conduct another neuropsychological evaluation of Byron Black?

A. Yes, I did.

Q. And did you rely, in your evaluation of 2025, on the data that you had obtained when you evaluated Mr. Black in 2 -- in 2019?

A. I did.

Q. And did you take that -- and while we talk about that, let's just go to your 2025 evaluation. In 2025, what was your testing protocol?

A. I administered -- the purpose was to see if anything had changed from when I saw him in 2019. We call this serial neuropsychological assessment. So I readministered a subset of the tests that I had given originally to look for any changes in his cognitive abilities.

Q. So prior to coming to see him this year, when you conducted your contemporaneous evaluation, based on the testing that you had completed in the past, had you already come to some conclusions, as a forensic neuropsychologist, about Mr. Black's intellectual functioning?
A. I had.
Q. And what were those conclusions?
A. That he suffers from intellectual disability.
Q. And what standard did you use to conclude that he had intellectual disability?
A. I relied on the DSM-5, the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, as well as the AIDD (sic) criteria.
Q. Okay. And with respect to the -- that criteria, when you saw Mr. Black in 2025, was there anything in your testing that changed your opinion about Mr. Black's intellectual functioning?
A. No, it reinforced it.
Q. So as we sit here today, do you have an opinion to a reasonable degree of neuropsychological certainty as to whether or not Mr. Black is a person living with intellectual disability?
A. I do.
Q. And what is that opinion?

A. He is.

Q. And what do you base that opinion on?

A. On the testing, the history, my clinical examination, my reliance on other doctors who did comparable things over the years, and we all converge on the same answer.

Q. And did you list the materials that you relied upon in your 2020 report as well as your 2025 report?

A. Yes.

MS. HENRY: Your Honor, I'm not going to go through all of those. Those materials as are reflected in Dr. Martell's report are already in the record attached to our memorandum in support of preliminary objection. So for purposes of short cutting, those are already in the record as declarations, but we're just going to move straight to 2025, if that's okay.

THE COURT: Thank you.

BY MS. HENRY:

Q. So with respect to your testing in 2025, you did -- performed a neuropsychological battery; is that correct?

A. I did.

Q. And can you just briefly describe to the Court what a neuropsychological battery is?

A. So it's a collection of tests that each test

different neurocognitive domains: memory, attention, language abilities, constructional abilities, things like that, executive functioning, higher level cognitive abilities.

Q. Okay. And did you draw any conclusions -- and you had done a full battery back in 2019 is that correct?

A. Yes.

Q. And in 2025, when you conducted this subset of tests in your neuropsychological battery, did you come to any conclusions about Mr. Black's neurocognitive functioning in addition to your conclusion that he has intellectual disability?

A. I did.

Q. Can you please describe those conclusions for the Court?

A. Well, to -- to make it brief, he now has dementia, what we call a major neurocognitive disorder. He probably had it before, but his neurocognitive abilities have deteriorated significantly over the five-year period to the point where he went from maybe the 16th or the 10th percentile down into minuscule 1 in 1,000, 1 in 10,000 levels of impairment in language, executive function, and memory.

Q. What does that mean for Mr. Black in terms of

his everyday functioning with respect to his language skills?

A. Well, this severely limits his ability to communicate effectively. You know, he's -- he's certainly able to hold a conversation. He's a likable, laughable gentleman, but he's unable to find words that he needs to express himself. He can't access them. If you show him a picture of a -- a week, he cannot come up with a word for what that is, for example.

MS. HENRY: Your Honor, if you'll just give me one moment to consult my Co-Counsel.

Thank you, Your Honor. That's all the questions I have.

THE COURT: All right.

Cross-examination?

CROSS-EXAMINATION

BY MR. BRANDON:

Q. Good morning, Dr. Martell.

A. Good morning.

Q. My name's Cody Brandon. I'm an attorney for the Defendants in this case working in the Tennessee Attorney General's Office. I don't believe you and I have had the privilege of meeting before, have we?

A. I don't think so.

Q. All right. I am just going to ask a few

questions. Hopefully I can clear up about your testimony earlier.

You testified your assessment of Mr. Black was made earlier this year in May, I think, was the last time you had the opportunity to physically examine Mr. Black?

A. That's right.

Q. All right. At that time, the request for the examination related to evaluating his competency to be executed, correct?

A. I don't think that was my specific referral question. I -- my recollection is there was another expert who was taking on that issue. But I was asked to do testing that might support her opinion.

Q. If we could look at your third report dated May 27 -- 27th, 2025.

A. I have it.

Q. And Paragraph 5 on the first page of referral questions, "At common law, an individual is categorically exempt from execution if he or she was found to be non compos mentis. Does Mr. Black meet the following criteria for being non compos mentis?"

That question that you answered with respect to Mr. Black was specifically related to his competency to be executed?

A. It was. That -- that was unique. I was thinking forward incompetency, which I did not evaluate, but I did -- was asked to address that, yes.
Q. Okay. Dr. Martell, in your evaluations, did you review Mr. Black's medical records?
A. I did.
Q. Okay. I'm going to show you a few documents from those records. If I could, we can look through them here. The first is what I've marked for identification as Defendants' Exhibit AA.
MR. BRANDON: Your Honor, if I could approach and share these --
THE COURT: You may approach.
MS. HENRY: Excuse me, Your Honor. If I might object.
THE COURT: Excuse me?
MS. HENRY: I have an objection to this exhibit.
THE COURT: Go ahead.
MS. HENRY: This Exhibit AA, Your Honor, this is an exhibit which is a medical power of attorney -- I'm sorry, Authorization for Release of Health Services Information Mr. Black signed in 2018. Again, this is a document of 2018 prior to the 2025 evaluation of Mr. Black consistent with this Court's ruling.

I limited my questioning of Dr. Martell to the case contemporary evaluation with background information. So release of information signed from '18 is stale.

THE COURT: Your response, Counsel?

MR. BRANDON: Your Honor, I believe Dr. Martell and the response to Ms. Henry's questions said that his opinions were formed based on the earlier evaluation, the review of the medical history, and his observations of Mr. Black changing over time in the five years between his evaluations.

If we're going to set -- accept Dr. Martell's testimony -- allow it into the record, I ask that it be allowed to cross-examine him very briefly on these medical records, which in informed his opinion.

THE COURT: All right. Objection overruled.

Go ahead.

BY MR. BRANDON:

Q. And, Doctor, as Ms. Henry's just stated, the top of this document reads "Authorization for Release of Health Services Information." And if you could, look down at the bottom under offender's signature and tell me if you recognize the name there.

A. I do. Okay.

Q. Whose name is that?

A. Mr. Byron Black.

Q. All right. And just above his signature, there is a paragraph in bold italics. I'm going to read it and you correct me if I get it wrong here. It says, "If the subject is not legally competent to sign or is unable to sign, authorized representative, a legally appointed conservator, guardian or attorney-in-fact appointed pursuant to a durable power of attorney for healthcare must sign this authorization." Did I get that correct?

A. You did.

Q. And Mr. Byron Black signed that, not an -- durable of power of attorney or other agent acting on his behalf?

A. That's right.

Q. All right. Doctor, we're going to move to what's been marked for identification as Defendants' Exhibit BB.

THE COURT: Well, let's get to AA. Do you want this offered into evidence or just marked for identification?

MR. BRANDON: Yeah. If we could move it in, Your Honor, I'd appreciate that.

THE COURT: Any objection?

MS. HENRY: Only my previous one, Your Honor.

THE COURT: All right. Subject to the prior objection, Exhibit 3 is admitted into evidence.

(Exhibit 3 was received into evidence.)

MR. BRANDON: And Your Honor, if I could approach again?

THE COURT: Yes, you may.

MR. BRANDON: Would Your Honor like if I just approach at leisure or I can ask permission each time? It's up to you.

THE COURT: You can continue your permission, but sometimes lawyers want it on the record. It's up to you.

MR. BRANDON: All right.

BY MR. BRANDON:

Q. Doctor, I've handed you what is marked as Defendants' Exhibit BB. If you could turn to the second page of that exhibit and read again the title of that document.

A. "Authorization for Release of Health Services Information."

Q. And then on the second page, do you see a signature down on the bottom under or above offender signature?

A. I do.

Q. Whose signature is that?

A. Mr. Byron Black.
Q. And what's the date of that signature?
A. 9-24-2019.
Q. And just above that signature, there's the same paragraph. Again, I'll paraphrase this time, if the subject is not legally competent to sign or is unable to sign, authorized representative must sign this authorization. That -- that's the same that we just read the last time?
A. It is.
Q. And Mr. Byron Black signed under that paragraph, didn't he?
A. He did.
THE COURT: Are you offering this?
MR. BRANDON: Yes, Your Honor. I'd ask that be admitted.
THE COURT: Any objection?
MS. HENRY: Same objection, Your Honor.
THE COURT: All right. Exhibit 4 is admitted over the objection.
(Exhibit 4 was received into evidence.)
THE COURT: Go ahead.
BY MR. BRANDON:
Q. Doctor, I'm going to hand you what's been marked as Defendants' Exhibit DD for identification.

Doctor, again, with that in hand, could you read the title of that document?
A. "Authorization for Release of Health Services Information."
Q. And do you see a signature again under or above offender signature at the bottom of that page?
A. Yes, I do.
Q. Whose signature is that?
A. Byron Black.
Q. And what's the date of that signature?
A. May 20, 2000.
Q. Sorry. What date was the -- what year was that?
A. Oh, maybe it's 2020. I'm sorry, yeah.
Q. That's fine. Dr. Martell, does this form contain the same paragraph that if the subject is not legally competent to sign or unable to sign, the authorized representative must sign this authorization?
A. It does.
Q. And Mr. Black signed that authorization as well?
A. Yes, he did.
MR. BRANDON: Your Honor, I'd ask that that be admitted as the next exhibit.
THE COURT: Any objection to Exhibit 5?

MS. HENRY: Same, Your Honor.
THE COURT: All right. Exhibit 5 is admitted over objection.
(Exhibit 5 was received into evidence.)
BY MR. BRANDON:
Q. All right. Doctor, I'm going to hand you what I've marked as Defendants' Exhibit FF for identification. Doctor, with that in hand, could you read the title of that document?
A. "Problem Oriented Progress Record."
Q. And that's a document that's on Tennessee Department of Correction letterhead, I guess, has the title there?
A. Yes.
Q. If we could turn to the second page of the exhibit, you see the paragraphs that appear to be notes there in that progress record?
A. I do.
Q. And what is the first date of those notes in the left column?
A. On my copy the month is cut off, but based on what appears further down the paragraph, I would say it's October 29th, 2020.
Q. Okay. And in the paragraph with the notes there, the third sentence starts with, "He denied" --

MS. HENRY: Excuse me, Your Honor, if I might object. This is a hearsay document, and there's no proof of foundation or authenticity as to the nurse practitioner who summarized Mr. Black, no quotation marks from Mr. Black in this document, and I don't think it's inadmissible for the truth of the matter asserted.

THE COURT: Counsel?

MR. BRANDON: Your Honor, this is a document provided by Plaintiffs in response to request for production. It would bear a date stamp -- a Bates stamp if it was produced, it would authenticate it as part of Mr. Black's medical records. And Dr. Martell has already testified that his opinion was informed by Byron Black's medical records.

This goes to the quality and credibility of his opinion and the effect that that information that he reviewed had in contributing to his opinion.

THE COURT: All right. I don't see a lot of probative value to it, but we'll allow Exhibit 6 to be admitted into evidence.

(Exhibit 6 was received into evidence.)

BY MR. BRANDON:

Q. Beginning there, Doctor, with the third sentence -- well, I guess I'll start with the second sentence. The note reflects Mr. Black came to the

appointment with one person assistance?
A. It does.
Q. And then in the sentence following that, he, being Mr. Black, denied any urinating difficulty or frequent urinating.
A. Correct.
Q. He also denied short of breathing.
A. Correct.
Q. He stated he gained a lot of weight because he ate a lot more than before.
A. That's right.
Q. He admitted that he was drinking a lot of fluid daily.
A. He did.
Q. He complained about right hip pain.
A. Yes.
Q. He also described taking Lortab q8h PRN, almost every dose --
MS. HENRY: Your Honor, I object because that's a misstatement of the document. He takes Lortab very well just even nurse noting what Mr. Black is taking. Not --
MR. BRANDON: That's fine, Your Honor. I'll move on from that question.
THE COURT: All right. I don't see a reason

why we need to go through all this. It's in the -- it's in evidence.

MR. BRANDON: That's fine, Your Honor. I can move on for time purposes.

BY MR. BRANDON:

Q. Doctor, it -- it's -- Mr. Black in this progress records -- in all of the details that we'll move past, provided a number of detailed statements about himself and his medical care to the person taking the notes?

A. I didn't hear the end of your question.

Q. Mr. Black in this progress record reflects that he provided detailed information about his medical condition to the person taking notes?

A. He did. I mean, it -- it -- basic information. I don't know how detailed it is.

Q. Doctor, I'm going to show you what's --

MR. BRANDON: Or, Your Honor, I think that's already been moved into evidence, the previous exhibit. Just want to make sure for record purposes.

THE COURT: You talking about this document that we're talking about now?

MR. BRANDON: Yes. The progress record.

THE COURT: Yes.

MR. BRANDON: All right. We'll move on then

to what's been marked for identification as Defendants' Exhibit HH.

BY MR. BRANDON:

Q. Doctor, in your hand marked as Defendants' Exhibit HH, could you read the title of that document?

A. Authorization for Release of Health Services information.

Q. And do you see a signature above offender signature down at the bottom of the page?

A. I do.

Q. Whose signature is that?

A. Byron Black.

Q. And what's the date next to that signature?

A. March 3rd, 2022.

Q. And like similar authorizations we discussed before, there's a paragraph above the signature reflecting that if the subject is not legally competent to sign or unable to sign, the authorized representative must provide the authorization?

A. Correct.

Q. And Mr. Black signed that document?

A. He did.

MR. BRANDON: Your Honor, I'd ask that be admitted as the next numbered exhibit.

MS. HENRY: Same objection.

THE COURT: Same objection? Exhibit 7 is admitted over the objection.

(Exhibit 7 was received into evidence.)

BY MR. BRANDON:

Q. Doctor, I'm going to approach with what's marked as Defendants' Exhibit MM. Doctor, if you could read the title at the top of that document?

A. Authorization for Release of Health Services Information.

Q. And do you see a signature above offender signature at the bottom of the page?

A. I do.

Q. Whose name is that?

A. Mr. Byron Black.

Q. What's the date of that signature?

A. 9-15-2022.

Q. And there's a paragraph above that's the same as the paragraphs we read before, that if the subject is not legally competent to sign or unable to sign, the authorized representative must sign the authorization?

A. There is.

Q. And Mr. Black signed that document?

A. Yes.

MR. BRANDON: Your Honor. I'd ask that that be admitted as the exhibit.

THE COURT:  Exhibit 8 is admitted over the objection of Counsel for the plaintiff.

(Exhibit 8 was received into evidence.)

BY MR. BRANDON:

Q.   All right, Doctor, I'm going to show you what's been marked for identification as Defendants' Exhibit NN.

THE COURT:  Without going into any details, we might need some redactions on Exhibit 3 through 8.

MR. BRANDON:  Your Honor, if we could, we can work that out during the verdict, if that's all right.

THE COURT:  Yeah.  No need to stop.  We'll take care of that later, but I want it to be noted.

BY MR. BRANDON:

Q.   Dr. Martell, if you could look at what is marked for identification as Defendants' Exhibit NN and tell me the title of that document?

A.   Durable Power of Attorney for Healthcare.

Q.   And in the first paragraph under Designation of Healthcare Agent, it reads, "I, Byron Lewis Black, appoint Kelley J. Henry, supervisory assistant federal public defender, 810 Broadway, Suite 200, Nashville, Tennessee, 37203, 615" -- I'll spare the phone number there -- "as my agent to make any and all healthcare decisions for me, except to the extent I state otherwise

in this document. The Durable Power of Attorney for Healthcare takes effect if I become unable to make my own healthcare decisions and this fact is certified in writing by my physician."

Did I read that correctly?

A. You did.

Q. Have you seen any documents in Mr. Black's medical records where consents are signed by Kelley J. Henry, supervisory assistant federal public defender, instead of Mr. Black?

A. No.

Q. Have you seen any documents in Mr. Black's medical records certifying in writing by his physician that he is unable to make his own healthcare decisions?

A. No.

Q. If you could flip to the second page there, Doctor, there's a signature in the middle of the page. Do you recognize that signature?

A. I do.

Q. Whose is it

A. Byron Black.

Q. And what is the date above that signature?

A. August 19th, 2022.

Q. And to your knowledge, Kelley J. Henry, supervisory assistant federal public defender, is that

counsel for the plaintiff that is in the courtroom today?

A. As far as I know, yes.

MR. BRANDON: I'd ask that that be admitted as the next numbered exhibit.

THE COURT: Exhibit 9 is submitted into evidence over Counsel for Plaintiffs' objection.

(Exhibit 9 was received into evidence.)

BY MR. BRANDON:

Q. Doctor, I'm going to show you what's been marked for identification as Defendants' Exhibit PP. Doctor, at the top of that exhibit, it looks like there's some splotches, I guess, on the exhibit. But best as you could make out, what's the title of that document?

A. Advance Directive for Healthcare.

Q. And under Agent, the document reads, "I want the following persons to -- person to make healthcare decisions for me. This includes any healthcare decision I could have made for myself if able, except that my agent must follow my instructions below."

Did I accurately read that?

A. Yes.

Q. And who is person designated as the agent on that form?

MS. HENRY: Your Honor, I'm sorry, if I could object. I do not object to the fact that Mr. Black has filled out various advanced directives for healthcare, and I do not impugn the probability of the State. But this document is not the original. Page 2 does not contain some information -- signatures of which I'm aware, and I am aware of Page 1 of this document as well as Page 3 of this document. So this is not the complete original. And so I -- this witness cannot authenticate this document. But I'm just telling you this is not the document.

MR. BRANDON: Can you provide it?

MS. HENRY: I don't know what to do about that.

MR. BRANDON: Yeah. Do you have the original release --

MS. HENRY: The original was given to Riverbend Security Institution at the time it was signed. He signed a few of these over the years at my request. I have no idea what Riverbend does with their records and their recordkeeping, but this is not a complete document. Dr. Nwozo was not present when this document was signed.

THE COURT: So let's mark it for identification purposes as Exhibit 10.

(Exhibit 10 was marked for identification.)

BY MR. BRANDON:

Q. And, Doctor, sorry, forgive me if I've asked you this already, who is the agent designated on this form?

A. Arleta Swanson.

Q. And an alternate agent is also designated. Who is that agent?

A. Melba Corley.

Q. On the second page, there's a signature under signature and about the word patient. Do you recognize that signature?

A. I do.

Q. Whose is it?

A. Byron Black.

Q. And what's the date of that signature?

A. March 14th, 2023.

Q. And in your review of Mr. Black's medical records, have you seen any consents or other forms signed by Arleta Swanson instead of Mr. Black?

A. Not that I recall.

Q. And any by Melba Corley?

A. No.

Q. The when effective on this advance directive asked the signer to mark a box. The first box says, "I

give my agent permission to make healthcare decisions for me at any time, even if I have capacity to make decisions for myself." Is that correct? On the first page? Sorry, Doctor, towards the top above the first black line.

A. Yes. I see that.

MR. BRANDON: If I could just have one moment to confer?

THE COURT: You may.

MR. BRANDON: Your Honor, if I could ask the Court a favor to withdraw Exhibit 1 to Plaintiffs' Motion for a Temporary Injunction in the Court file. I seem not to have a copy of that particular exhibit. Or if Ms. Henry has a copy that she can provide?

MS. HENRY: Excuse me, Exhibit 1 is what?

MR. BRANDON: Exhibit 1, it's the Motion for Temporary Injunction.

MS. HENRY: Which was filed with the Court electronically?

MR. BRANDON: Yes.

MS. HENRY: And you're asking it to be withdrawn because you --

MR. BRANDON: No, I'm sorry. If I could withdraw it from the Court's file, just so I could -- I have a copy of it?

MS. HENRY: What is Exhibit 1?

MR. BRANDON: It's a number of medical records that were attached to the filing.

MS. HENRY: One moment. We'll provide those in just a minute, Your Honor.

THE COURT: Of course.

MR. BRANDON: And, Your Honor, I guess I can take up while we look for that exhibit. I'd ask -- I may have additional questions for Dr. Martell. This will be my last in relation to this exhibit. There are some audio files that I'm having technical difficulties being able to present to the -- to Your Honor right now. I'd just ask that the doctor be subject to recall if we feel it's necessary to call him and show him those exhibits at a later time.

THE COURT: We don't have all -- we don't have all week for this and -- so I'll allow some leeway, but audio files and all that, you know, we need to get to the issues again.

MR. BRANDON: Understood, Your Honor.

THE COURT: I understand --

MR. BRANDON: It's consonant with my objection to giving testimony.

THE COURT: I know you're trying to -- I know you got a leeway on cross-examination and all that, but

let's get to it.

MR. BRANDON: I apologize. If Your Honor will be patient with me for just one moment. I'm trying to find Page 100 out of 300 pages of documents that are not labeled with page numbers.

THE COURT: Take your time. I want you to get the right document.

Counsel, if you want short recess, I'm amenable.

MR. BRANDON: I think that might be appropriate, Your Honor.

THE COURT: All right. Let's take -- let us know when you're ready.

THE BAILIFF: All rise.

(A recess was taken.)

THE BAILIFF: Please be seated.

MR. BRANDON: Thanks for your patience, Your Honor. I was looking through pages of the wrong exhibit and now I found the right one.

THE COURT: Well, good.

BY MR. BRANDON:

Q. Doctor, I'm going to approach with a document. It's unmarked and I've only got one copy. So I'm going to leave it in your hands and ask that you pass it up to the Court after we're done.

A. Understood.

MR. BRANDON: And just for the record, Ms. Henry has seen this document while we were on break.

THE COURT: Thank you. Thank you.

BY MR. BRANDON:

Q. Doctor, if you could read the title of that document?

A. "Consent for surgery or special procedures for treatment or diagnosis."

Q. And what is the name of the patient listed at the top there?

A. Byron Black.

Q. And just under that, the description of the procedure to be performed?

A. If I'm reading the handwriting correctly, I believe it says, "Duct chamber implanted cardioverter."

Q. Could that be dual --

A. And -- and the next line, "Defibrillator."

Q. Could that be, "Dual chamber implanted cardioverter defibrillator"?

A. Yes.

Q. That's the device that we're talking about at this hearing today?

A. It is.

Q. Down farther on the document. Do you see a

line in bold that starts, "I hereby sign this consent"? I apologize. The writing is fairly small.

A. I do.

Q. Could you read that line out loud?

A. "I hereby sign this consent with the understanding of the possible benefits, risks and possible alternatives involved. I understand that I may withdraw my consent after signing this form."

Q. And whose signature is beneath that consent?

A. The physician and Mr. Black.

Q. And what's the date of those signatures?

A. May 24th, 2024.

Q. That's the same day that the device, the ICD that we're having a hearing about today was implanted?

A. Correct.

MR. BRANDON: Your Honor, as I mentioned earlier, I guess, first I'd ask that that be moved in as the next exhibit?

THE COURT: Objection to Exhibit 11?

MS. HENRY: No, Your Honor.

THE COURT: All right. Exhibit 11 is admitted into evidence without objection.

(Exhibit 11 was received into evidence.)

MR. BRANDON: Your Honor, that's all I have with the exhibits now. As I mentioned, there's a couple

files that we're having some technical difficulty with. I'd ask just that Dr. Martell remain available. I'll try to be judicious for the Court's time. And we may not bring him back at all understanding the time constraints. But we ask that just he would remain available until we give word that he is released?

THE COURT: We'll try to accommodate that.

MR. BRANDON: Thank you, Your Honor.

THE COURT: Thank you.

Redirect?

MS. HENRY: Very briefly.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. HENRY:

Q. Dr. Martell, do you have Defendants' Exhibit Number 6 in front of you?

MR. BRANDON: I'll hand it to him.

THE WITNESS: All my copies have two letters. I don't know which --

BY MS. HENRY:

Q. Oh, I'm -- I think they marked it for identification purposes as FF.

A. FF. I have it.

Q. Does that document indicate that Mr. Black had to have an assistant with him at the appointment?

Second sentence.

A. FF?

Q. Yes.

A. Oh, on the second page?

Q. Yes.

A. Yes, it does.

Q. With respect to all of these -- each of these exhibits, which you have been handed, they all appear to be pre-printed forms; is that correct?

A. Yes.

Q. Do you have any knowledge as to what information was provided to Mr. Black prior to his signature?

A. I do not.

Q. Is it uncommon for individuals in the healthcare -- in a healthcare setting to have pre-printed forms that are then explained to the patient in words that they can understand?

A. Yes.

MR. BRANDON: Your Honor, I -- objection. Before we go any further down this line of questioning. That's more of a question of speculation as to what information was or wasn't conveyed to Mr. Black?

MS. HENRY: That's my point.

THE COURT: I'll allow that question. But

let's not get into it too far, please, because then it'll open up a lot of other stuff.

MS. HENRY: Yes, sir.

THE COURT: So go ahead.

BY MS. HENRY:

Q. Does Mr. Black's signature on these pre-printed forms do anything to change your opinion with respect to his intellectual functioning, his major neurocognitive disorder?

A. No.

Q. Did you provide or administer tests of malingering to Mr. Black?

A. I did.

Q. What are tests of malingering?

A. These are -- to put it bluntly. These are tests to see if he's faking.

Q. And how did Mr. Black do on those tests?

A. He passed seven of them on two different occasions.

Q. And with respect to the exhibit, which is number PP purporting to -- which does, according to the Defense, appoint Arleta Swanson and Melba Corley as Mr. Black's power of attorney. And as the Defendants' Counsel pointed out to you, it says, "I give my agent permission to make my healthcare decisions, even if I

have capacity to make decisions for myself." Is that correct?
A. It is.
Q. In your experience, why would an individual -- I'm going to take that back.
You stated that you've never seen any indication that Melba Corley has ever provided consent or Arleta Swanson have provided consent for healthcare for Mr. Black; is that correct?
A. Not that I'm aware of.
Q. And the document, Exhibit Number 11, Defense Exhibit Number 11, does not indicate that either Arleta Swanson or Melba Corley were contacted to give consent on behalf of Mr. Black despite his advanced directive; is that correct?
A. It does not state that. You're correct.
Q. When you asked Mr. Black -- did you ask Mr. Black in 2025 about any healthcare procedures he'd undergone?
A. I did.
Q. What did he tell you about the device in his chest? What did he call it?
A. He called it a pacemaker.
Q. Thank you.
MS. HENRY: I don't have any further

questions.

THE COURT: Any additional questions?

MR. BRANDON: Nothing else right now, Your Honor.

THE COURT: All right. You can step down. But you might have to remain available.

MR. MARTELL: I'll do my best, Your Honor. I have a flight home in the morning.

THE COURT: All right. Thank you. Flying home tomorrow. All right.

MS. HENRY: Your Honor, Plaintiff for client Byron Black calls Dr. Gail Van Norman.

THE COURT: All right.

MS. HENRY: Your Honor, I ask that Dr. Antognini remain in video. I can add -- after I requested, has to remain off video. And I would ask that he remain off video during the course of Dr. Van Norman's testimony. He can observe, obviously, but I don't think we should have him on the screen.

THE COURT: All right.

MS. HENRY: Like we said, Your Honor.

THE COURT: So you want him off the screen?

MS. HENRY: Yes, sir.

THE COURT: All right. Okay. There we go.

MS. HENRY: Thank you, sir.

Doctor, I --

Your Honor, I do expect that Dr. Van Norman's testimony would be quite lengthy. I don't know what his schedule is for today, as far as taking a meal break.

THE COURT: All right. I'll ask the lawyers.

What's your preference in terms of taking a lunch break?

MR. BRANDON: I'm happy to go through at whatever pace or schedule Your Honor desires.

THE COURT: Okay. Why don't we plan to, if we're at a good breaking point, take a lunch break at about 1:30.

MS. HENRY: Sounds good, Your Honor. Thank you.

Dr. Van Norman to the stand.

DR. GAIL VAN NORMAN,

having first been duly sworn, testified as follows:

THE CLERK: Okay. Thank you.

MS. HENRY: Your Honor, at some point during Dr. Van Norman's testimony, we will be wanting to display a very brief video to the Court. I don't think that's going to come up prior to the lunch recess. But I just wanted to let you know. We do have our assistant here --

THE COURT: All right.

MS. HENRY: -- assisting us.

THE COURT: Thank you. If you can confer with Counsel and give him a rough idea of what it's about, that'd be --

MS. HENRY: Yes, sir.

THE COURT: -- that might expedite it.

MS. HENRY: Yes, sir. And it's mentioned in --

Off for now, please. We don't need this to display this right now. Thank you.

THE COURT: We're not going to do it yet?

MS. HENRY: No. Correct.

MR. BRANDON: Your Honor, I think we may have lost Dr. Antognini. I think he might have gotten booted. He's saying he's having trouble hearing.

UNIDENTIFIED SPEAKER: He is in the waiting room right now. Do you want me to let him in?

MR. BRANDON: It would be (inaudible) to turn his camera off (inaudible).

DIRECT EXAMINATION

BY MS. HENRY:

Q. Good afternoon, Dr. Van Norman. Would you please introduce yourself to the Court, and please spell your first and last name for the court reporter?

A. My name is Gail, G-A-I-L. Middle initial A.

Van Norman, spelled as two words, V-A-N, with a space, N-O-R-M-A-N.

Q. Dr. Van Norman, how are you employed?

A. I -- I'm sorry.

Q. How are you employed?

A. I'm a professor emeritus at the University of Washington Medical Center in Seattle, Washington. And I work in perioperative medicine in the University Medical Center.

Q. And how would you -- let me ask you this question. Are you a cardiothoracic anesthesiologist?

A. I am. I work in the Department of anesthesiology and pain medicine and I'm a cardio -- I'm a specialist in cardiothoracic and pain medicine.

Q. Okay. And Dr. Van Norman, do you have a curriculum vitae that describes your experience?

A. I do. It's included in the report that was submitted to the Court.

Q. Thank you. Just one moment.

A. Thank you so much.

Q. While I pour this water, Dr. Van Norman, I've handed you a document. Do you recognize that document?

A. I do.

Q. What is that document?

A. This is my CV.

Q. And does that CV fairly and accurately summarize your professional experience, publications, educational experience, et cetera?

A. It does with the exception of several publications that have been entered since the last update in January of 2025.

Q. Would it assist you and your testimony to refer to the curriculum vitae during the course of your testimony?

A. It may well, yes.

MS. HENRY: Your Honor, I would ask that Dr. Van Norman's curriculum vitae be admitted as the next numbered exhibit.

MR. BRANDON: No objection.

THE COURT: Exhibit 12 is admitted without objection.

(Exhibit 12 was received into evidence.)

BY MS. HENRY:

Q. Dr. Van Norman, could you please describe for the Court your educational background?

A. Well, I attended undergraduate school at the University of Washington in Seattle, Washington, and majoring in microbiology, and graduated with honors. Went to the University of Washington Medical School for my undergraduate -- or for my graduate training in

medicine. Then I did internship in internal medicine residency at Virginia Mason Hospital in Seattle, Washington. Became boarded in internal medicine there. I did have a brief practice period, but then returned for residency training in anesthesiology and pain medicine at the University of Washington again, followed by fellowship training in cardiothoracic anesthesiology. That's the sum of my medical training. I've had additional certifications since then.

Q. You mentioned that you're boarded in internal medicine. What does that mean?

A. It means that I've not only completed residency, but I've passed both oral and written tests that determine my competency to practice in the internal medicine. I've also been boarded in anesthesiology in the same way.

Q. Have you worked in the professional setting inside an operating room?

A. Yes. For many, many years.

Q. Doing what?

A. Anesthesiology. I've been administering anesthesia to patients, both cardiac patients and other patients, in our institution at the University of Washington. You're virtually required to have specialty training to perform cardiac anesthesiology. So during

much of my career, that was a concentration, but not an exclusive area in which I practiced.

Q. Do you also have experience or a specialty -- a special interest in ethics?

A. Yeah. Yes. I'm -- I have a, from early career onward, an interest in medical ethics, and I became certified in clinical ethics at the University of Washington following my anesthesia residency. I -- and I am a practicing clinical ethicist. And in fact, much of my scholarly career, meaning what I've written about and published about, is about clinical ethics, ethical care in anesthesiology, and other areas of medicine, as well as end-of-life care.

Q. So you've also been involved in issues regarding end-of-life care and medical ethics?

A. Yeah. I mean, it -- that's -- that's all -- it's a -- a large part of what happens in much of medicine, obviously, and almost all the specialties. And so that end-of-life care is a -- a big topic that I've been interested in. And I completed a -- a residency in Switzerland where I was specializing looking at end-of-life care, physician-assisted suicide, those sorts of things, and spent some months there interviewing appropriate people to write papers and things like that on that topic.

Q. And you have, in fact, published in that area?
A. Oh, yeah.
Q. How many -- well, let me ask you this: What's a referee journal?
A. A referee journal means that, when you submit your -- your publication to them, they have a number of people and who then review your publications -- review your proposed publication, offer critique, and then offer a verdict to the journal about whether it's worthy of publication, either out of interest, or out of -- out of style, or out of accuracy. And so you pass a gauntlet of reviews before you get your paper published.
Q. And have you been published in referee journals on the topics of ethics and anesthesiology?
A. Yes.
Q. And with respect to end-of-life care?
A. Yes.
Q. Have you received any awards for your work?
A. Yeah. In medical school. From medical school on, I had -- I'd received things like the Merck medicine award. I'll have to go back and look because it's -- it's been a while since I did all these. I was elected to Alpha Omega Alpha Honor Society in medicine. I have the -- I received the John J. Bonica anesthesiology award from the Department of Anesthesiology when I was a

medical student; Award of Merit service -- of service to the healthcare needs of Native Americans when I served in my internal medicine capacity in Spokane, Washington; the President's Award for the Pacific Anesthesia for heading up their cardiology -- their -- I'm sorry, their anesthesia cardiac service and their echocardiography team; the Mary Jane Kugel Award for serving on the ethics board for research for the National Juvenile Diabetes Association; and the Roche Foundation residency, which I already mentioned, is also considered an honor in medicine.

Q. And have you also served as an editor for certain journals?

A. Yeah, as an -- yes. I've served basically on the Journal of Bioethical Inquiry. I was a -- a section editor. And I've done special editions of various journals. We just did a two edition publication for the North American Clinics -- clinics in Anesthesiology in which I was an editor. And I've also served as a reviewer on many major journals generally to do with ethics and end-of-life care.

Q. And those are all listed in your --

A. Yeah. You can find it all there.

Q. Have you testified in court before?

A. I have.

Q. About how many times?
A. In the last four years, I've offered testimony in the form of depositions and court appearances six times. There's a handful of times before then. If you're asking specifically for court testimony, it's been approximately five times.
Q. And have you been accepted as an expert witness when you provide testimony?
A. Always, yes.
Q. And have you consulted outside any area of medical malpractice over the years as an expert?
A. Yes. I do a lot of consulting work for both plaintiff and defendants in the area of medical malpractice as it refers to anesthesiology. I also give expert testimony separately from that regarding medical ethical care, so in those same kinds of contexts.
Q. Do you derive a significant portion of your income from your work as an expert witness?
A. No -- no, and I never have. I wouldn't want to.
Q. Dr. Van Norman, do you have specialty experience with the use of -- well, with CIEDs? And let me ask you, what is a CIED?
A. Okay. CIED is cardiac implantable electronic devices. It's an umbrella term that refers to any kinds

of cardiac-related electronic devices that can be implanted in patients. There are several, two -- several different types of devices, two of which are pacemakers and ICDs, which are the implantable cardioverter defibrillators.

Q. And do you have specialty training and experience through your professional work with those devices?

A. Yes, in a couple of capacities. One is as a cardiothoracic anesthesiologist. We actually place temporary pacemakers during surgery. So we -- I actually have placement with some of those devices. With regard to the devices that generally are implanted by cardiologists, our university was -- is one of -- I think it's still only three or four in the nation that have a developed specialty team in anesthesiology to interrogate and program these devices in the setting of operating room care for both pacemakers and defibrillators.

Q. Let me stop you for just a second because you've introduced a new vocabulary term for us today.

A. Oh. Sorry.

Q. What does it mean to interrogate?

A. When -- when -- to interrogate is literally to ask the pacemaker or the defibrillator, what have you

been up to and what are your settings. So when we examine a patient who has an implanted device, we use a special computer set up with a -- we call it a wand. It's a -- it's an electronic device that can -- that -- that we then attach to the patient's device. And it reads for us both what the patient's heart is doing at this time and what it has done since the last interrogation. So we can look at EKGs. It also looks at device settings, what they are currently. In some cases, it'll mention what has been placed in the past. So that's an interrogation. We're really learning what the device is, what it does, how it performs, and we can make a guess, or actually not even a guess. We know what the device will do under certain circumstances.

Q. So we'll go back to that --

A. Uh-huh.

Q. -- topic in a little bit when we talk about Mr. Black specifically. But with respect to the program that you have at the University of Washington, which you've described as existing in only three or four universities nationwide, can you explain to us why that -- what that program is and why it is so special?

A. Well, it's -- the program itself, to -- to start with that, is a program that was started about in 2008 or '9, I'd have to go back and look, in which we

worked with our cardiology electrophysiology department to train five anesthesiologists to form a team who could then, independent of the cardiology department, would be certified by the cardiology department and privileged and certified by the university to go and interrogate and program devices that we encountered in the hospital setting. Usually, that was in the operating room.

Q. And did you participate in that program?

A. Yes. I was one of the five original -- five original team members.

Q. And have you personal experience with interrogating and programming CIEDs?

A. Yes, but with hundreds.

Q. I'm sorry. I didn't hear the last part of that.

A. Over the course of about nine years, I've interrogated and programmed hundreds of them. Yeah.

Q. And that included ICDs?

A. Yes -- yes.

Q. Okay. And you encounter ICDs in the operating room?

A. Sure. Anybody -- you know, people who have ICDs need surgery, too. So they come to the operating room. We don't -- we encounter them both in a different way when they're being implanted or explanted, meaning

being removed. But we manage them for the patients that are coming in for other surgeries because their device may behave differently in the operating room than it's intended to.

MS. HENRY: Your Honor, at this point, I would ask the Court to accept Dr. Van Norman as an expert witness in the area of cardiac anesthesiology.

THE COURT: Any objection?

MR. BRANDON: Get a brief opportunity to voir dire Dr. Van Norman?

THE COURT: All right.

VOIR DIRE EXAMINATION

BY MR. BRANDON:

Q. Good morning, Dr. Van Norman.

A. Good morning.

Q. My name is Cody Brandon. I'm an attorney at the Attorney General's office and counsel for the defendants here today. I don't believe we've met before. Have we?

A. Not that I know of. No.

Q. Okay. Just a few details to ask you about. I believe your CV mentions that your board certified in internal medicine as of 1984.

A. That's correct.

Q. And you practiced for two years as an


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 70 of 390 PageID #: 848

internist?
A. It was about three years, actually.
Q. Three years. All right. Did you still practice as an internist or as an anesthesiologist?
A. It's both. I do perioperative medicine. And so some of what I practice has to do with the internal medicine management of patients coming to the operating room, and some is -- has to do with the anesthesiology management. So it crosses those boundaries.
Q. What was the last time you were in an operating room practicing as an anesthesiologist?
A. Roughly two years ago. I had to withdraw from the operating room due to personal health problems.
Q. As you discussed on Page 2 of your report, you said you've been specifically trained in the interrogation and programming of CIEDs, such as pacemakers and implanted defibrillators. Could you remind me, when was this training?
A. The training -- the -- the original training was back, I want to say 2008, 2009, and it took place over approximately a two-year period.
Q. All right. And I understand from your testimony, that training was provided by cardiac electrophysiologists?
A. Yes, it was -- yes. We were overseen by a

cardiac electrophysiologist, one of whom, the -- the head of the department was Jeanne Poole, who is very well-known to the world of cardio electrophysiology because she has -- has headed many of the societies and -- and the -- well, many of the societies anyway. So yeah.

Q. And you were in trained -- you were trained to engage the interrogator method or interrogation techniques of CIEDs in the operating room?

A. That's correct.

Q. I think I heard -- I want to make sure I understand, the devices that you trained on included both pacemakers and ICDs?

A. Yes. Pacemaker -- ICDs, you should know, actually all are pacemakers also.

Q. Sure. But they're pacemaker -- some are just pacemakers?

A. And -- but there are -- there are -- there are different devices that only pace. So we encountered both of those.

When I mentioned devices that are not in those two groups that are also called implantable devices, those are things like loop reporters, that -- and cardiologists implant to look at arrhythmias, things like that. We didn't have anything to do with those.

We merely worked with devices that paced or de-fibrillated the heart.

Q. And did you train or work with the Boston Scientific ICD?

A. Many of them, yes.

Q. Despite that training, you are not board certified in cardiology?

A. I am not a cardiologist. No.

Q. When you're in the operating room, a cardiologist or cardiothoracic surgeon does the heart surgeries?

A. A -- a cardiologist doesn't do heart surgeries.

Q. Sorry. Cardiothoracic surgeon would be doing the heart surgeries?

A. That's correct.

Q. All right. The cardiologist is going to be the one to diagnose cardiac arrhythmias?

A. In what setting?

Q. Let's say the clinical setting.

MS. HENRY: Your Honor, I'm sorry. I think we've gone way beyond of what are her qualifications and moved into cross-examination.

THE COURT: Yeah, I think we're going --

MR. BRANDON: If I could, Your Honor, this

is -- I don't intend to contest Dr. Van Norman's qualifications to opine in the fields of anesthesiology.

It's Defendants' position that her opinion reaches far beyond the field that she's qualified in. And I'm trying to examine the contours of where she may be qualified as an expert and where not. I don't have --

THE COURT: Do you have an objection or concern about her being accepted as an expert in cardiothoracic anesthesiology?

MR. BRANDON: No, Your Honor.

THE COURT: All right. So she is accepted as an expert in that area.

So we can go on with the cross -- with the direct examination.

MR. BRANDON: I -- Your Honor, can I have to preserve an objection to limit the testimony. I can do this in objections to specific questions when we get there, but I would like for the opportunity to ask a few more questions that might govern the scope of the direct examination here and the state of the declaration that's admitted.

THE COURT: The plaintiff gets to go first on that direct examination. The expert has already been recognized and accepted by the Court.

So let's go forward from that standpoint and you can make objections as you see fit.

MR. BRANDON: Understood, Your Honor. For record preservation purposes, could I put a couple cases into the record that would have supported my motion to limit Dr. Van Norman's testimony at the threshold?

THE COURT: I'm sorry, I didn't hear that.

MR. BRANDON: I -- just for record preservation purposes, Your Honor, I'd like to cite a few cases that would have supported the motion that I was intending to make. I just want to put a proffer, so that it's available there for a court that might review it later.

THE COURT: Let's go forward with the examination, please.

MR. BRANDON: I'm sorry. With Ms. Henry's or mine?

THE COURT: The plaintiffs.

The goal is to determine whether the person is qualified, who says she's qualified. Anything else sounds like fodder for cross-examination to me. I could be wrong.

So you may proceed.

CONTINUED DIRECT EXAMINATION

BY MS. HENRY:

Q. Dr. Van Norman, you testified previously that in the last four years, you've testified in courts about five times; is that correct?
A. Five or six. Yes.
Q. And also provided some deposition testimony?
A. I have. I -- I will just refer to my report because I think I included the complete list there in my report.
Q. Let's grab that report right now.
Dr. Van Norman, can you please identify the document in this exhibit?
A. Well, the top page is entitled Declaration of Dr. Gail A. Van Norman, and consists of my declaration. The second page is the beginning of my expert opinion report in this case for the Court.
Q. And did you state your opinions in your report to a reasonable degree of medical and scientific certainty?
A. I did.
Q. And Dr. Van Norman, have you, in the last five years, testified in the -- in courts of law and been accepted as an expert on the topics that are contained within your declaration and expert report?
A. Yes.
MS. HENRY: Your Honor, I would ask that the

declaration of Dr. Van Norman be admitted as the next numbered exhibit.

MR. BRANDON: Your Honor, I -- I'm going to have to object to the admission of the declaration as an exhibit on the same basis that I moved to exclude parts of her testimony, because she's unqualified to offer opinions beyond the scope of her expertise, is the issue that I was trying to get to in the voir dire here, is to assess her qualifications go beyond the field of cardiothoracic anesthesiology.

I -- I've been prevented from making that proffer or the supporting motion to limit there, but I still have to object to the admission of the declaration in full, and it goes beyond the scope of what we're not objecting to on qualification.

THE COURT: All right. The Court will allow this into evidence. And if I'm persuaded that it shouldn't be in or parts of it shouldn't be in, I'll deal with it.

(Exhibit 13 was received into evidence.)

THE COURT: But the reason why I rule the way I wanted -- the way I ruled was, there's a -- there's a line between asking the expert questions about the qualifications and disrupting the plaintiffs' ability to present their expert. And I think we were getting close

to that line, and I wanted to hear the proof.

So nothing has been lost. If you want to raise something, you're doing a great job of preserving the record. It can come back up again. It's not -- it doesn't fall out of the case.

But right now we're going to proceed with the direct examination of this expert who has already been accepted by the Court.

So this will be Exhibit 13.

MS. HENRY: Thank you, Your Honor.

BY MS. HENRY:

Q. Dr. Van Norman, will it assist you in your testimony to have your -- what is Plaintiffs' Exhibit Number 13, your declaration of opinion, with you during the course of the testimony?

A. I -- I do think so. Yes.

MS. HENRY: Your Honor, I would ask that Dr. Van Norman be permitted to refer to her report during --

THE COURT: Any objection to that?

MR. BRANDON: No problem.

THE COURT: Okay.

MR. BRANDON: Correct.

THE COURT: Thank you.

Dr. Van Norman will be permitted to refer to her expert report.

BY MS. HENRY:
Q. Dr. Van Norman, during the course of your work as an expert witness in the field of cardiothoracic anesthesiology, were you called as a witness in the case involving the challenge to the federal execution protocol?
A. I was, yes.
Q. And was that during the previous administration of President Trump?
A. It was, yes. It was at the -- it was towards the end.
Q. And was that involving the use of a single drug protocol, pentobarbital?
A. It was.
Q. And are you familiar -- and were you accepted as an expert witness in that case?
A. I was.
Q. Are you familiar with a report from the Office of Legal Policy from the United States Department of Justice with respect to the single drug pentobarbital protocol?
A. I am.
Q. And were you cited in that report?
A. Yes.
Q. What did that report conclude?

A. The report concluded that the issue of consciousness during a -- during and after pentobarbital injection was not solved, and that there was significant reason to doubt that inmates might be conscious when they are -- when they -- and feel sensations of drowning, suffocation as they died from an anoxic -- died in an anoxic death.

And that the federal -- the federal government should -- the advice was that the federal government should not use single drug pentobarbital until those issues are resolved.

Q. Dr. Van Norman, do you recognize the exhibit I just handed to you?

A. I do.

Q. What is that?

A. This looks to me to be the -- the publication of the review that the Department of Justice did as a result of the various cases regarding single drug pentobarbital executions.

Q. And is this the review that cites your research and testimony?

A. It is. I'm cited among others.

Q. And this review also notes the testimony of Dr. Joseph Antognini?

A. I'm sorry, say again?

Q. It also discusses that it was aware of the testimony of Dr. Joseph Antognini?

A. I think it mentions him, yes.

MS. HENRY: Your Honor, I would ask the Court to take judicial notice of the publication of the United States Department of Justice, Office of Legal Policy, January 2025, review of federal execution protocol agenda on the manner of execution regulations, and have it be admitted into evidence as our next numbered exhibit.

THE COURT: Any objection?

MR. BRANDON: Your Honor, I have to refresh my recollection, but I believe this document has been withdrawn by the U.S. Department of Justice. I don't know whether it's properly a subject of judicial witness anymore.

THE COURT: Counsel?

MS. HENRY: As part of his executive order on the first day of his administration, President Trump did withdraw the policy, but this document remains in existence.

THE COURT: Okay. So the Court will allow Exhibit 14 into evidence.

(Exhibit 14 was received into evidence.)

BY MS. HENRY:

Q. And, Dr. Van Norman, you stated previously, before we got on your qualifications, that you have specific training in the area of programming and interrogating ICDs, including the Boston Scientific.
And that began in 2009 and occurred for how long?
A. I'm sorry, say again?
Q. It began in 2009, and you were interrogating and programming ICDs for how long after that?
A. Well, I believe I said in my report nine years, but that's incorrect, since we began in 2009.
I continued doing that until I stopped doing OR anesthesia several years ago. So what would that be? It would be about 11 years, so I just want to make that correction to the record.
Q. So for about 11 years?
A. Yeah.
Q. Okay. And when you are working in the OR -- you know, I'm going to ask you this later. Sorry. Kind of got off track there for just a minute.
So we've talked about your qualifications. You've talked about your experience.
Why did the University of Washington develop this program where cardiothoracic anesthesiologists would be it -- programming and interrogating ICDs in the

operating room?

A. Well, there were two basic reasons, one of which was just efficiency and -- and financial. OR cases begin at, like, 7:30 in the morning, and when we needed devices programmed for the operating room, the cardiologist had not arrived at work yet. And so we couldn't get early cases started and it impeded the flow of the OR. It was a constant source of problems. That was one set of reasons.

But the real reason that we wanted to develop a specialty anesthesia service for this was that the needs of patients in the operating room are different than those that -- usually that are walking around. There's a lot of interference with these devices in the operating room due to something called electromagnetic interference, or EMI. The devices can perform differently under operating room conditions unexpectedly and -- and need treatment during the case. And we sometimes need the device to do different tasks for us in the operating room.

And so in order to get all of that -- and -- and the cardiologists were not trained in that, by the way. Their training in programming these devices and in interrogating these devices was for the patient who's walking around, who's -- who has this every day. And

they were not necessarily as knowledgeable about the kinds of exposures the devices would have under our care, as well as the particular needs we would have in managing the anesthesia for people with those devices.

So it felt more appropriate to have anesthesiologists who had specialty expertise in both fields to do that. And they picked the cardiothoracic team for obvious reasons, and trained us with the cardiologists. The cardiologists were delighted to have us do that because it relieved them of having to puzzle through the complexities of the operating room.

Q. And you mentioned something called EMI or electromagnetic interference. What is that and how can it affect the ICD?

A. Well, it -- it's electric -- sorry, electromagnetic energy is given off by a lot of things, including a lot of the monitoring equipment in the operating room or in the hospital in general. And also, for example, just to give us specific operating room idea, the cautery that we use to stop bleeding in the operating room is an EMI device. EMI, though, can be found out in the world too, like when you go through those metal detectors in the stores and you know those signs you see at TSA that say if you have a pacemaker or a defibrillator don't go here, go around. Those sorts

of things are giving off EMI energy. They could also appear in unexpected places both in the hospital and without and EMI has -- always presents some risk to these devices that they will cause them to perform differently than they're expected to.

Q. Would an example of an EMI be a metal detector that an inmate might need to go through if they were going in and out of prison?

A. Yeah. There -- there's many case reports. I don't know that there's a -- a full-on study, but there's certainly many case reports of people having devices and in particular, it's worrisome with defibrillators that, when they walk through these things, they may either have the device begin to pace in an erratic manner, reset their programming, or actually deliver inadvertent -- not inadvertent, I'm sorry, inappropriate shocks when the patient's heart is performing fine and doesn't need a shock.

Q. And you mentioned resetting. What does that mean? Reset -- how does it reset something that's already sewn into the body?

A. Well, EMI energy is penetrating as long as you don't have much tissue over the device. These devices are generally, the ones that we're talking about which are transvenous, are implanted under a thin layer of

tissue, so the EMI gets to it just by being in close proximity however -- whether it's being given off by a machine or a device. If you're going to ask me exactly how it flows, it does things, I'm not a -- I'm not a biomechanic and I'm not going to be able to address that.

Q. Fair enough.

A. Yeah. Yeah.

Q. So with respect to your work and experience with these ICDs in the OR, do you have an estimate of how many times you've worked with an ICD in the ER (sic)?

A. Like -- as I was saying before, it would be hundreds of times when -- when I would be on -- there's five of us. So we'd average basically four times a month, and we would do an average of probably 15 to 20 a day during that month. We have a very busy electrophysiology service. I don't have the math in my head, but I -- if you're looking at that, you're looking at 80 to a hundred a month times 11 years and that's a lot of devices; probably not quite as many as the straight math would say, but let's just say hundreds.

Q. Okay. Thank you so much. And in this particular case with this particular motion, we contacted you and asked you to give us an opinion about

the specific device that is implanted in Mr. Black; is that correct?

A. That's correct.

Q. Okay. So before we get into how the device works, because I know we're going to get into a lot of technical terms --

A. Oh, I hope not.

Q. I think that it would be wise to get us all in the same place and understand under the same frame what certain things mean. So first of all, can you just -- let's just start with the architecture of the heart itself. How does the heart -- what is the heart and how does it work?

MR. BRANDON: Your Honor, I -- I've got to object again. It looks like we're leading into a field that would be best suited for a cardiologist or a cardiothoracic surgeon, cardiac electrophysiologist. I know Your Honor's ruled on the objection. I just have to remind the Court, State v. Farrell from the Tennessee Supreme Court 2009, State v. Stevens from the Tennessee Supreme Court in 2002, the qualification of an expert is a threshold issue, and it must be the Court's determination whether the expert is qualified to offer an opinion within the area of his or her expertise and on the subject at issue, I think it would be appropriate

to allow continued voir dire as to the scope of Dr. Van Norman's qualifications to find on these areas outside of her subject matter.

THE COURT:  I have to respectfully disagree. The witness has testified about being a cardiothoracic anesthesiologist and an internist, and she knows a little something about the heart.  When -- how far she gets into it, we'll find out.

MR. BRANDON:  Okay.

BY MS. HENRY:

Q.   Can you just explain the basic architecture of the heart?

A.   Well, restricting it to what's relevant to this discussion, the heart has four chambers:  two atria, two ventricles.  The atria contract to push blood into the ventricles.  The ventricles are the ones that push blood out to the rest of the body.  The natural pacemaker of the heart rests up near the right atrium, so electrical impulses, which we're going to be talking about, travel from the atria to the ventricles, causing a successive contraction:  atria first, ventricles second.  The flow of blood through all of this apparatus is from the -- if we're injecting something, for example, in the peripheral vein, is to go from the vein to the right side of the heart, from the right side of

the heart to the lungs, from the lungs to the left side of the heart, and then out to the body. Is that what you were hoping for?

Q. Thank you. Yes. So we'll start there. We've got the atria and we've got the ventricles.

Can you describe what sinus rhythm is?

A. Sinus rhythm is the natural rhythm of a heart and it's called sinus rhythm because the area in the heart that naturally sends regular electrical signals to the heart is called the sinus node. So sinus -- normal sinus rhythm is a rhythm that arises from natural electrical activity in the sinus node that flows through the heart at a normal heart rate. I mean, you can have sinus activity that isn't normal, but normal sinus rhythm brings in that activity at a normal heart rate, which is roughly beating between 60 and 100 beats a minute.

Q. Oftentimes we use heart rate and heart rhythm synonymously; are they synonymous?

A. No. Heart rate is how fast your heart is going, and you can be going, you know, various speeds in different heart rhythms. Heart rhythm is about both how the electricity is flowing through the heart and how the contraction of the heart is happening as a result of the way that electricity is flowing.

Q. And so can you then define -- I think there's something called arrhythmias?

A. Uh-huh.

Q. What is an arrhythmia?

A. An arrhythmia is basically anything -- in -- in its simplest explanation is any rhythm that is not normal sinus rhythm. Not all arrhythmias are harmful, but anything outside of that normal parameter I gave you can technically be called an arrhythmia.

Q. And what is a malignant arrhythmia?

A. It's -- it's a -- it -- it's a term that we use and I'd almost say it's a -- it's kind of a -- there isn't a specific definition that it's this rhythm or that rhythm. Malignant arrhythmias are arrhythmias that are dangerous when they happen and, if they don't get terminated, will likely lead to patient harm.

Q. We hear on TV V-tach.

A. Yeah.

Q. What's V-tach?

A. V-tach is a fast heart rate that originates from areas in the ventricles. So it's not a sinus nodal rhythm. It's an abnormal rhythm because of where it originates. It goes very fast usually, 180 beats per minute and above. And because it goes so fast and because it has the ventricles contracting without the

help of the atria, the actual amount of blood flow can fall dramatically during that rhythm. And V-tach, while there are -- are people who have what's called stable V-tach where they -- this rhythm is going slowly enough that they're actually still getting blood out to the rest of the body, most of the time V-tach does not get blood flow to the rest of the body or brain adequately. And it will usually be fatal if it isn't interrupted. Some patients have short runs of V-tach, two, three, five beats, even longer, and don't suffer harm from them, but that is an abnormal condition.

Q. And what is V-fib or ventricular fibrillation?

A. Well, ventricular fibrillation is a rhythm that isn't accompanied by a coordinated contraction. It also arises in the ventricles, and it's as though the electricity just starts kind of moving around the ventricle circuits and it causes little microcontractions on the heart, but the whole ventricle doesn't contract with it. And I think, watching what happens when my patients would have V-fib in the heart room when we were doing heart surgery, it looks like a little bag of snakes. It's -- it's just creeping and, you know, quivering. Quivering is a good word. This rhythm is always fatal if it isn't interrupted because it doesn't lead to blood flow. It's -- it's just --

or -- or very, very little, if any, blood flow.

Q. How -- or does the ICD -- before I ask this question, is there also something called atrial fibrillation?

A. Yeah. Atrial fibrillation, which is the -- sort of similar to what I mentioned about ventricular fibrillation. The electricity is not occurring in an organized way, and it may be arising out of areas other than the sinus node and the atria kind of quiver. They don't contract. Because the atria only contribute about a quarter of the blood amount that needs to go out to the body, being in atrial fibrillation usually but not always doesn't cause serious problems to being able to walk around and do things. It has other dangers associated with it, like formation of clots and strokes and things like that. But the atria -- and it can also lead to very fast ventricular rates because the atria are quivering and some of that electricity gets through and flows down to the ventricles and makes them contract as well. So it -- it's a problematic rhythm for a number of reasons, but it's not usually in the short term going to present an issue of being fatal.

Q. Now, does the ICD affect atrial fibrillation?

A. You mean does it shock for atrial fibrillation?

Q. Yeah.
A. No. No. There are things that atrial fibrillation can do that may cause the ICD to shock a ventricular rhythm that arises out of it, but atrial fibrillation itself will not lead to the ICD firing.
Q. So when we talk about the ICD we're really interested in ventricular tachycardia and ventricular fibrillation.
A. And anything that the ICD thinks is -- remember, it's just a machine, right? So as it's reading the electricity, if it sees something that it thinks is V-tach or V-fib and is programmed to recognize as that, that's what the ICD will react to.
Q. Now, you've spoken several times about programming, but I'm neglected to ask you specifically about what it means to program an ICD. Can you just describe for the Court what an ICD is, how it works, and what it means to program it?
A. Well, an ICD is -- it's a little device, it's about that big, and it sits usually up on the left-hand side up under the pectoral muscle. That's the generator box. And then from it, there will be two or sometimes three electrical leads that, in this case we're going to talk about, Mr. Black, eventually pass through the veins, are placed through the veins and into the heart.

With a dual-chamber pacemaker and defibrillator, they'll have at least one electrode in the atrium and one that then is flowed through to the ventricles.

So -- and the -- the device works by both sensing electrical activity that's in the heart and responding or more likely deciding not to respond to it; and by pacing, when it determines that there is a pacing function that is needed; and shocking when it's determined that a shocking arrhythmia has occurred. So the device is both listening, if you will, sensing and acting on what it's seeing. Most of the time most of these devices are just listening because things aren't happening continually. They're waiting for something to happen.

Q. Now, these devices are dispensed -- are created by different companies; is that right?

A. Yeah. There're -- I think there's six or eight companies now in the U.S., but the -- there are four -- four main popular ones, of which Boston Scientific is either the second or third most popular, depending upon when you take your survey, so.

Q. And Boston Scientific is the ICD we're interested here in this case.

A. Yes, Mister -- Mr. Black has a dual-chamber, Boston Scientific ICD, so he has a device that will both

pace and will shock.

Q. So let's talk about what it means to pace. What is the pacing function of an ICD?

A. Well, it's -- the pacing function, literally, is these devices give off small electrical impulses that replace what the sinus node is doing to cause the ventricle -- atria and ventricles to contract. They can -- in a dual chamber device, the -- a -- the leads can both give impulses to the atria and the ventricles. And they basically set those chambers to contract, and for -- for electricity to flow through the heart and make the ventricles contract.

So pacing means that they are going to actually ask the heart to beat at a certain rate, preset rate or a variable rate that is within parameters that's programmed into the device. So when the device is pacing, it is pinging the heart with little electrical impulses to make it beat at a certain rate.

That can be used for a number of reasons. People can have heart rates that are too slow. They can have damage to the conduction system in the heart so that the signals don't get around there. And the -- and the pacers have to give those signals. They can be used to break up tachycardia. Tachycardia means fast. Tachy, cardio, heart.

So fast heart rates, these devices can sometimes use what's called overdrive pacing to try to get ahead of it, capture the heart and slow it down. So there's a lot of different reasons why someone would have a pacemaker in. In Mister -- if you want me to address Mr. Black's device --

Q. In just one moment. So you said earlier there are pacemakers without ICDs, but did I hear you that every ICD is pacemaker?

A. All ICDs have pacing function, yes.

Q. And so you've mentioned before programming. The person who implants the device is going to program it is that --

A. That's -- well, yes. The team will. I -- yes. That -- that's essentially correct, yes.

Q. So they're going to -- they're going to program the pacemaking function and then they're going to program the defibrillating function. Am I understanding that correctly?

A. Yeah. It's all programmed at the same time.

Q. And Boston Scientific, these different companies that come up with these ICDs, the ICD is going to come out of the box with a certain program. Is that fair to say?

A. Yeah. There's a factory. The -- the factory

sets on it. Yeah.
Q. And then the cardiologist, I presume gives the order about how to set it.
A. Yeah. Or sets it themselves. I mean, they may be -- they may be talking to a tech saying, I want this, this, and this or they may be actually at the machine themselves setting it, yes.
Q. Is it common to consult with the techs at these companies to ask them about the program settings?
A. I would say yes, it is. It's -- it's quite common. The techs, they -- mind you I want to distinguish asking them about the settings of the device versus asking them about what the patient's therapy should be. The cardiologist will have therapeutic goals.
We may have therapeutic goals in the operating room. And we want to make sure that we understand what this setting is going to do, for example, to other settings in the device. Very common for us to ask the techs about that, very common for the cardiologist to ask the techs about that.
Q. So when the device is implanted, there's a therapy. Is that almost like a prescription, a doctor's order?
A. Oh, yeah. It -- it -- the device settings

have to -- by, at least by standards, have to be prescribed by a cardiac electrophysiologist or other qualified person.

Q. And then you or others will -- are able to program the device to meet that doctor's order?

A. We were at our -- we are at our institution at several others because we have special training to allow us to do so. It's not -- it's not common for every anesthesiologist to be able to do that.

Q. How often is it recommended that these devices be interrogated?

A. It's recommended that after implantation, they get an interrogation about three months afterwards, because the leads are healing in. The electric -- the impedance in the leads and the electricity can change. And then thereafter about every three to six months.

Q. And is that the only way to know what the current setting of an ICD is, is to interrogate it?

A. It is for sure. Because in between the times that their interrogations occur, things can happen. The leads can develop fractures and impedices. The generator can change in its function. The battery can change in its function.

And so you can't rely on the device being in exactly the same settings where it was left, although

usually it will stay there.

Q. And in the course of providing the report here for Mr. Black, did you look at some records about what the device settings were upon implementation?

A. I did, yeah.

Q. And did you also look for records that there had been an interrogation more contemporaneously?

A. I did.

Q. Did you find one?

A. No. Well, what I found is that his implantation occurred in May of 2024. And then I did not, I don't believe I saw the actual interrogation, but in August of 2024, which would be approximately the right interval, he reportedly had another interrogation. What I saw was Doctor, is it Moto?

Q. Nwozo.

A. Nwozo. Thank you. Had requested an interrogation at another interval and was denied because they said the -- I don't know if it's -- who was denying it, whether it was the Department of Corrections or whether it was the insurance or whatever.

But it was denied based on the fact that he'd had an interrogation in August. And the denier said, you should now have this interrogated once a year, and which would not be the standard of care for these

devices. But I did not find any records that since August of 2024, he had had an interrogation.

Q. So as we sit here today, we don't know for sure what the device programming settings might be. We only have the information from August of 2024.

MR. BRANDON: Objection. Leading.

THE COURT: Rephrase.

BY MS. HENRY:

Q. Do we have any way of knowing today what the device settings are?

A. Not for sure. I mean, we -- we can -- they're probably close to his original setting, but we don't know for sure.

Q. And because we didn't have that information, did you call Boston Scientific's rep to ask questions about the ICD?

A. I did. I -- I called to ask specifically -- specifically about something called the magnet program, and which is important. I don't know if you want me to talk about that now or later.

Q. Well, since we're getting there, let's talk, what is the magnet program?

A. Well, most of these devices, all of them are, meaning defibrillators, and well pacers as well. Will per perform certain functions if a certain strength

magnet is placed over properly over the device in the correct position.

And in the case of pacemakers, it may tell it just pace at this rate and don't pay any attention to it -- don't sense anymore. In the case of defibrillators, the primary function of the magnet is usually to disable the shocks. So you could place a magnet on there and the shocks won't happen.

But in order for that to happen, the function in the device has to be what's called magnet program on. You can turn that magnet program off. I've actually asked some of the -- my EP guys, why do they have the off function, and Jeanne Poole, for example, said, I don't know. I wish they'd get rid of it because it's frequently turned off for whatever reason.

And certainly when we program devices in the operating room, we ran into that thought relatively frequently that the person would have an ICD, but the device was incapable of shocking them because the cardiologist or somebody or something had changed the programming to off.

And we would call the cardiologist and say, your tacky programming's off. Do you want me to turn -- while I'm here, do you want me to turn it back on again? And I -- I don't recall a cardiologist ever saying no.

He always said, yes, please, it should be on.
Q. So because we were interested in turning off Mr. Black's ICD at the point of execution, and we didn't have contemporaneous interrogation reports, did you call Boston Scientific and ask about what that setting might be out of the box?
A. Yeah, I said that what's the -- what's the manufacturer's setting on that?
Q. And what information did you get?
A. They told me that the default programming was magnet off.
Q. So I want to go back and I and we needed to ask that question because that wasn't even in the interrogation report that we have; is that fair?
A. There is no indication in the -- in -- in what we know from the medical records what the programming of the magnet -- of the magnet function was ever.
Q. So as we stand here, we don't know what the magnet function is?
A. No.
MR. BRANDON: Objection. Leading. Sorry I'm late, Your Honor.
THE COURT: I don't think that was leading. Overruled.
BY MS. HENRY:

Q. Now, Dr. Van Norman, when I asked you to look at Mr. Black's ICD and how it might perform in an execution and what could be done about it, did I provide you certain medical records?

A. You did.

MS. HENRY: And if I could have the Riverbend records, please.

THE COURT: Does Opposing Counsel know what you're doing?

MS. HENRY: I already gave him a copy of this during Dr. Martell's.

THE COURT: Okay, great.

MS. HENRY: Sorry.

THE COURT: That's all right. Thank you.

BY MS. HENRY:

Q. Dr. Van Norman --

MS. HENRY: Well, Your Honor, I believe that we have a stipulation as to the authenticity of these exhibits, so I would ask that the Riverbend security records be admitted as the next numbered exhibit.

THE COURT: Any objection?

MR. BRANDON: We've got no objection to authentication, Your Honor. I don't know if it's necessary or relevant to make the full medical record an exhibit.

THE COURT: Exhibit 15 is admitted into evidence without objection, but a concern about whether the whole thing needs to be offered is noted by Counsel and it's noted for the record.

(Exhibit 15 was received into evidence.)

MS. HENRY: Thank you, Your Honor. And I would just note for the record as well that we're providing the complete records for completeness. And I certainly do not intend to go through every page of these records.

May I have the Nashville General Records, please.

Your Honor, I've already given a copy of these to Opposing Counsel as well.

THE COURT: Thank you.

BY MS. HENRY:

Q. Dr. Van Norman, I'm going to hand you a large stack of documents.

MS. HENRY: And, Your Honor, I would note that these records do come with a business records affidavit, and I would ask that these be admitted as the next exhibit.

THE COURT: Any objection?

MR. BRANDON: Same position, Your Honor.

THE COURT: No objection, but a concern about

the whole document coming in has been noted by Counsel for Defendants. Exhibit 16 is admitted.

(Exhibit 16 was received into evidence.)

BY MS. HENRY:

Q. And, Dr. Van Norman, having reviewed both the -- and I'm not going to ask you to go through each page.

MS. HENRY: Probably the pages I want to get to, we might pull out over lunch, if that's okay with Your Honor.

THE COURT: That's fine.

BY MS. HENRY:

Q. But having reviewed the National General records and the Riverbend Maximum Security institution records, were you able to determine whether or not Byron Black had an ICD implanted?

A. Yes. There's records in here. I'm not even going to try to find the pages that included the procedure description, and when is -- a pacemaker was implanted in May of '24. Described what was implanted, gave the program settings.

There are a couple of mentions, again, the doctor's request for reinterrogation that are in there. And that is, other than an occasional mention that he either has a pacemaker, sometimes they say that,

sometimes they say ICD, there's really not much information past the implantation date on this particular device.

Q. So we've got a lot of documents, many pages, very few of them actually talk about this ICD.

A. That's correct.

Q. But there are a lot of pages that talk about Mr. Black's health problems and health issues.

A. Yeah.

Q. Were you able to determine from reviewing the medical records, the purpose for implanting the ICD?

A. Yes. Mister -- Mr. Black has something called ischemic cardiomyopathy and has severe heart failure. Now, heart -- heart failure, it doesn't mean the heart stops. Heart failure means the heart isn't pumping well enough and fluid builds up in the body and in the lungs. And -- and basically eventually the heart will deteriorate and may go into a bad arrhythmia.

And so he suffers from heart failure that is quite severe. At one point, his -- there's measure measurement called the ejection fraction, which is what percentage of blood that the heart receives can it pump out. And in my case, it's 70 percent, and I'm not an athlete. In his case, it's 12 percent, to give you a -- a kind of idea. At that -- at that level of heart

function, he has a high probability of developing malignant arrhythmia, either -- particularly either V-tach or V-fib. And what happens is if he has -- those arrhythmias, when they occur, need to be rapidly resuscitated or -- or the person will die.

So in cases where patients like him have had an episode of V-tach or V-fib, that's one indication for putting in the exact device he has. Another indication is when someone has a low enough EF. It's Ejection Fraction. If it's below about 35 percent, there's a high risk that an episode will happen even if it hasn't happened before. And having a defibrillator in place will have a good chance of resuscitating him if he has an episode of V-fib arrest.

So his -- his device was implanted, not because he'd had the arrhythmia before, but because his ejection fraction is so low, the risk is quite high that he will have the arrhythmia, and that this device can rescue him. And --

MR. BRANDON: Your Honor, I'm sorry. Just to interject, and I'll make this the last time.

But again, you're giving your testimony about diagnosing cardiac arrhythmia as a treatment for it. I think this is beyond the scope of the case. I understand Your Honor's ruling on the objection and I


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 107 of 390 PageID #: 885

just want to make sure it's heard for the record here. If I can avoid any other interruptions, I understand --

THE COURT: Well, you can interrupt all you want, and you should if you feel the need, but I respectfully overrule the objection. She's reviewed the records, and she's reporting what she saw.

BY MS. HENRY:

Q. So with respect to Mr. Black's specific ICD that was implanted, I believe, May the 24th of 2024, were you able to determine from the interrogation that occurred in August of 2024 some of the basic settings of the ICD?

A. Yes.

Q. But we don't have a complete report of everything?

A. No.

Q. With respect to ventricular tachycardia, V-tach, what is the setting of the ICD?

A. Well, the in interesting thing is, for V-tach, which is that organized rhythm where you still get some output from the heart, the actual setting is to monitor only and to not give a shock unless the heart rate goes above 220, which would be quite fast.

So the V-tach is -- is what's on monitor only settings with the exception that if he gets really fast,

he will -- he will get a shock.

Q. So if the heart rate gets up to 220, he gets a shock, but if not, it's just listening to the heart rate?

A. That's right.

Q. What is the V-fib setting?

A. It's to shock, V-fib. And so the setting says to deliver -- basically, these -- these devices give a series of shocks if necessary. So they give a shock to the heart, there's a brief period, a couple hundred milliseconds in which it listens, and if it still sees the V-fib, it shocks again. And it listens again. It shocks again.

He is supposed to get four shocks at one energy setting, followed by two shocks at a different energy setting if that arrhythmia persists after each shock. It's -- a -- a single shock has a high likelihood, initially, of turning that arrhythmia around.

Q. So when we talk about these shocks and this therapy, I want to get really specific about what we're talking about. So is it fair to call it an -- you said that, like, one to four, there's one setting, and then --

A. Yeah.

Q. When we talk about series of shocks, what are we talking about? See, I'm an English major, and I'm getting into medicine and I shouldn't have.

A. Well, as I said, if -- if he's in this arrhythmia, the device isn't going to deliver six shocks and then figure out if it fixed it. It's going to deliver a shock, listen, and then if it hasn't fixed it, shock, listen. If it hasn't fixed it, it will go on. If it reaches the end of the six shocks and it's still there, the arrhythmia is still there, it does not treat further. It's -- it won't be able to convert.

But if it then -- it will start -- it will start listening. And if it sees something different that looks like a -- a new arrhythmia is starting, different than the one before, it will resume its series of shocks, meaning it will shock and listen, shock, listen, until it completes a set of six, after which it won't deliver again unless something new happens.

Q. So that's what we're talking about, the series of shocks?

A. And I want to emphasize that it isn't that the device would give six shocks in all cases. It's going to listen between each one and see if it needs to complete the series of six or if it can stop, so.

Q. So if it shocks one time and the heart starts

to get back into rhythm, it stops and listens again?
A. Yep.
Q. But then if the heart were to come out of rhythm, have that quivering bag of snakes thing happen, it might shock again? It would shock again?
A. And it would -- the device would be -- would know that it has to start a new series of six. So even if it had shocked once before, it wouldn't then give five. It would start one -- at number one again. One and listen, two and listen, three -- all the way through six. So it -- it resets as though it hasn't given the first shock.
Q. And if Mr. Black's heart rate gets below 60, what's the device going to do?
A. His device is supposed to pace -- it's supposed to give the little electrical impulses that will make the heart contract at the rate of 60. That function is common in ICDs because if an ICD delivers a shock, the heart frequently, when it comes back in sinus rhythm, will come back very slow, like at a rate of 30 or something. And so the pacemaker comes in and starts to pace at 60 to pull that heart rate back up.
And then once the patient -- whether it's after a shock or not, once their own intrinsic heart rate comes up above 60, a device like Mr. Black's will

just start listening and not pacing.

Q. Were you able to review EKGs in Mr. Black's medical records?

A. I saw a few EKG strips, yes.

Q. Within the last year?

A. I believe they were, yes.

Q. So were you able to determine whether or not the device, at least during the portions of the EKG, was needing to pace his heart?

A. In none of the strips did I see any paced beats that I recall. So his heart rate was around 72, and so he wasn't requiring the pacemaker to pace him. And that's a -- a completely expected result in --

Q. Why?

A. -- in a patient like him. Because the -- he wasn't implanted with a pacemaker because they were having trouble with slow heart rates. He was implanted with an ICD that has a pacemaker that can pace at low heart rates. And ICDs generally -- people with ICDs generally benefit from having some pacing after a shock.

Q. Why would you need pacing after a shock?

A. Well, as I mentioned, when a heart gets a shock, it sort of resets. It's a shock to the heart, literally. And it -- it resets, and it will often be kind of slow and, like, what? You know, and come back

at a -- at a low rate. It isn't going to be very good for him for a while.

So if the pacemaker kicks in and starts to pace him, we call it backup pacing. It starts to pace him. His heart output will be better until the heart fully recovers from the shock and takes over again.

MS. HENRY: Your Honor, I'm about to get into another different area that's pretty extensive. May I have the Court's indulgence to break for lunch a little bit early so I can organize the next set of exhibits --

THE COURT: Sure.

MS. HENRY: -- and not waste your time?

THE COURT: Let's come back from lunch at 2:35.

THE BAILIFF: All rise.

(A recess was taken.)

THE BAILIFF: All rise. Court is back in session. Please be seated.

THE COURT: You may proceed.

MS. HENRY: Thank you, Your Honor.

MR. BRANDON: One clarification for the record, Your Honor. I was able to confirm, during the break, the DOJ memorandum. There was a withdrawal by President Trump under an executive order in January, as Ms. Henry mentioned, of the directive. This policy

memorandum was actually withdrawn by Attorney General Bondi in February of 2025 shortly after that executive order, so it has been withdrawn by the Department of Justice. Just make the same objection (inaudible).

THE COURT: Okay. Thank you for expanding the record on that.

You may proceed.

MS. HENRY: Thank you, Your Honor.

BY MS. HENRY:

Q. Dr. Van Norman, before you -- before we concluded at lunch, I'd asked you about some documents that you had reviewed in the medical records or the prison records of Mr. Black.

Do you recall that?

A. Yes. Uh-huh.

MS. HENRY: And just for clarification of the record, I just want to show you just a few of those documents so that we can be clear which ones we're talking about.

And I'm just going to go ahead and use the ELMO, if that's okay?

THE COURT: Yes. Well, we've got -- all right.

BY MS. HENRY:

Q. So, Dr. Van Norman, are you able to see that

document in front of you?
A. I am.
Q. Is that one of the documents that you reviewed that's contained within the compilation of Exhibit 15, for the record?
A. It is.
Q. And if you can tell us what the importance of that document was for you in your review?
A. Well, it just clarifies -- it's -- it's a document that basically is a referral document asking for an ICD to be placed by a -- a proceduralist. And it's stating the reason why, indicating that this is for Mr. Byron Black, and that he has a diagnosis of severe heart failure with reduced ejection fraction, and that that's the diagnosis that requires the placement of an ICD to prevent sudden death episodes.
Q. And does that also provide us with the date of the implantation?
A. Thank you. Looking through all of that.
Yes. It has May 24, 2024.
Q. And this is signed by Dr. Nwozo, N-W-O-Z-O, M.D.; is that correct?
A. Yeah, exactly.
Q. So that's who you were referring to before on direct exam?

A. It is. I've never been able to read that handwriting, so I apologize to Dr. Nwozo in absentia. I just -- I can't read what's on the page.

Q. So after that medical referral, you mentioned on direct examination that there had been a request to reinterrogate the device.

And we had another document from Exhibit 15 up on the ELMO. Is that the document that you were referring to?

A. Yes.

Q. And what does that document tell you how was your request?

A. Well, it gives the date of the request as September 6th of 2024. And it requests a device interrogation ICD check, basically because of the status post-placement.

And it says -- again, it says that it's for Mr. Black and that it's because he has a severe CHF with an -- CHF standing for congestive heart failure, with ICD implantation on 5-24-24. Was seen by the cardiologist on 8-5-24. And the cardiologist on that date recommended a device interrogation.

Q. And then down at the bottom, does it tell you what the decision of the -- of Centurion was?

A. You know, I could -- I think it does, but I

can't read that portion of the document below the -- below the doctor's signature.

Q. Let's see if I can --

A. And yeah, I think it's out of -- there. And if you make it a little smaller, now I can read it. There we go.

So this was denied. And what it says is that the determination was made that the device didn't need interrogation in September because it had been interrogated in August of 2024. Patient clinically stable, no adjustments to device or medications were made. That's presumably at the interrogation. No active specialist management at this time, and onsite management with annual device interrogation and re-consultation, but with cardiology, of clinical status changes.

Q. So that would indicate that the device would be due to be reinterrogated in August of this year?

A. Of -- of 2025.

Q. Yes.

A. According to that. It's actually, according to standards, should have been interrogated much earlier.

Q. Thank you.

And then with respect to the device settings

that we talked about on direct, again, I'm going to refer you to some documents that were pulled from Exhibit 15 and see if these indicate the interrogation parameters that you saw.

A. Yeah. You can -- you can reduce that a bit in size and move it up. We can move those.

Q. Well, if I'm capable.

A. Thanks.

Q. I just want to confirm that these are the sorts of documents that you've looked at?

A. That's correct. Yeah.

Q. Okay. And then it kind of went over to the second page. But these are the parameters that we discussed.

A. That's correct. It gives some of the -- some characteristics of the lead, and then it gives the parameters that were programmed

Q. And it -- will -- that -- it'll become relevant later. But it does not have a parameter report in that then?

A. No.

Q. Thank you for indulging me with just putting those documents up.

With respect to Mr. Black's ICD, I'm going to ask you some questions in a little while about how we

might expect it to respond in a -- an execution.

MS. HENRY: And I won't be using the ELMO again. Thank you. I might be again, but not right now.

BY MS. HENRY:

Q. But before we get to that, the key issue, as you know, is one of consciousness and awareness. So I'd like to now turn to that area of your academic study of the topic of those issues.

And before we get into that, let me just ask you: What is the goal in the OR of anesthesia?

A. Well, I mean, the goal is to have the patient be comfortable and be able to undergo their procedure, however that happens.

But if you -- if you want the exact sort of definition of general anesthesia and what its goals are, it's -- in the past, we used to say that it's lack of awareness; amnesia, so forgetfulness; analgesia, meaning lack of pain; and absent -- it's all these A's, absence of movement.

In recent, the last couple of decades, the lack of awareness part has been a big source of consternation and research, and there's a heavy amount of anesthesia research that is going in to try to understand when people are aware and unaware.

Q. So when somebody goes in for a major surgery

where general anesthesia is going to be needed -- and let me again, I -- I'm so sorry with all these vocabulary words, but I want to be really specific.

Is there a difference between general anesthesia and anesthesia?

A. Well, the term anesthesia encompasses more than general anesthesia. We can have you comfortable during surgery for many surgeries without general anesthesia.

For example, if you were having hand surgery, we could do a regional block in your arm. You could have surgery like that, or we could do a little sedation so you feel relaxed. That would be called regional anesthesia because the person's awake, or at least not deeply enough asleep that they would hold still for surgery if they weren't also numb.

We also have something called monitored anesthesia care, which is where we're just there giving basically sedatives and no anesthetic at all. And we're basically watching the patient, taking care of their heart and their lungs and things like that, while someone else is doing a procedure that doesn't require anesthesia.

Q. So sedative does not equal anesthesia; is that --

A. That's correct.
Q. Okay. What is a sedative?
A. A -- a sedative, it's a general term for drugs that tend to reduce people's concern, reduce their responses to what would otherwise be either physically or psychologically upsetting phenomena. But it's -- we -- it can also include some inducing sleepiness and things like that, but it's at a level at which the -- the patient will respond if anything significantly painful is done to them.
Q. So we have this concept of general anesthesia, which you said -- and I just want to make sure I'm clear. It has different component parts, analgesia, amnesia, lack of movement, and ideally lack of awareness?
A. Yes.
Q. And to achieve that state of being for the patient, do they receive just one drug?
A. Not for significantly painful procedures, no. There are occasional really brief procedures that might even be a bit painful, where really what we want them to be is still for a fraction of a second or -- or maybe a few minutes, and we -- they're not going to have pain afterwards. And so we may give them some analgesia, but we won't aim for the stop -- the sort that by itself

would keep them from moving. And we would definitely in -- for amnesia for even that amount of discomfort. And you can achieve some of that with a single drug.

But for general anesthesia that requires all the components for a significant stimulus, we virtually would never approach that with just a single drug because a single drug can't hit all of the centers in the nervous system that would permit that to happen without some either degree of awareness or experience of pain or any of the other thing -- or having the patient move. So we need to -- we need to give multiple drugs, and one drug doesn't get at all of those functions.

Q. You mentioned central nervous system, another phrase that has been pretty hit recently. But can you define what central nervous system is?

A. Well, we generally refer to the central nervous system as the part of the nervous system which is the brain and the spinal cord. Most of the time when you're hearing me talk about it up here, I'm talking about the brain.

Q. And so there are different receptors in the central nervous -- in the brain in the central nervous system?

A. Yeah. Various -- I mean, your brain works by creating chemicals inside the brain that then act to

make various nerves fire and interact in ways that allow movement and thought and emotion and all of that. And those -- all of those different areas of the brain are -- all those chemicals that the brain produces, as well as some of the electricity it produces, act on receptors in the brain, little places that those molecules have to attach in order to have action.

And so there are very specific types of receptors that accept some drugs but not others, and have -- and once they accept a drug, there's some effects and not others that will be produced.

Q. So when we talk about the chemical pentobarbital, which is the drug used in Tennessee's execution, what kind of a drug is that?

A. You mean in terms of -- and -- and it's a class of drug called a barbiturate. It's a very short-acting barbiturate. It's what we call a hypnotic, which is a drug that affects people's arousal status. It -- it affects whether they are quick to respond to things. It affects whether they're responsive to things.

People call them sleep drugs, but there are significant worries now that sleep is actually not what they produce while you're applying painful stimulants, so.

Q. And you've looked at the Tennessee execution

protocol in this case; is that correct?

A. I have.

Q. And so are you aware of the way in which pentobarbital is used by the State of Tennessee in order to accomplish an execution?

A. Yes.

Q. In what ways does the Tennessee lethal injection protocol resemble general anesthesia, if at all?

A. Well, somebody handles some syringes at some point during -- during the execution and there are drugs involved, but the process of execution has no relationship to anesthesia at all, and no -- no competent anesthesiologist would pretend to do an anesthetic for surgery or anything else this way, because it -- it doesn't take into account the -- what's needed in the brain to provide all the characteristics of general anesthesia and safety for the patient.

Q. When we talk about pentobarbital as a hypnotic, is it also -- it's a sedative hypnotic?

A. Yeah. I mean, people use those terms, so they're not quite the same, and they really are very similar terms. So I -- I tend to use them interchangeably.

Q. Does pentobarbital have any analgesic effects?

A. No. In fact, in -- in low -- lower doses, it actually is antalgesic. It actually amplifies pain. And in higher doses, it has no analgesia properties, meaning it doesn't relieve pain that occurs at higher doses, no matter how high the dose.

Q. Is there any chemical used in the Tennessee execution protocol that you reviewed that addresses those receptors in the brain that feel pain?

A. No.

Q. So you mentioned, Dr. Norman (sic), that there has been quite a bit of controversy or concern in your field about the ability of a patient, even in general anesthesia with all of these drugs on board, continuing to be awake and experience the -- having general surgery; is that correct?

A. Yeah.

Q. Can you explain -- we're going to get into a lot of this, I know in detail, but just as a general overview, can you explain to the Court what the concern is?

A. Well, the concern is that we've always thought, oh, gee, people are asleep under anesthesia and they don't know what's happening to them, but we've always been worried because occasionally patients wake up and tell us, we remember everything. And indeed they

do. They -- they tell us exactly what happened to them, even though we gave them the right drugs and all of that happened.

So we -- everybody's been aware for a long time that this can occasionally happen, but it was thought to be a really rare event. The -- the typical statistic given is, like, one in 1000 times. The problem is that all the drugs -- virtually all the drugs we give during anesthesia wipe out memory. And so for a patient to wake up and tell us that they're aware, that they remember -- that they were awake during the surgery, they not only have to have been awake during the surgery, they have to remember it. And the drugs we give are very good at wiping out that memory.

Memory isn't important here in this discussion for execution because there's going to be no one left to remember. But that does not wipe -- just because you don't remember something doesn't mean you're not aware of it. And getting a handle on how many people are aware under anesthesia has been a challenge that has come down through the decades. And it's -- it's being more and more studied and an increasing amount of data suggests that a lot of -- a -- a large proportion of patients we thought were, in fact, asleep are not. They simply don't remember.

Q. And so you've used a lot of different terms again. So we're going to go back to our vocabulary lesson here, because the word conscious and unconscious in sleep means one thing in a colloquial setting, and it means something completely different in the medical setting. And so because we are being very precise here, I want to talk about each of those terms. So what does -- when you say conscious, what does that mean?

A. Well, when I -- first of all people use, even in the medical literature, they use conscious in ways that are not very precise. So I want to say that up front. But consciousness, we generally think of as a subjective experience. You're able to feel, you're able to hear, not necessarily all of those things at once. But you are having an experience and that experience relates in some way to something that's happening in your environment. I call it the real world. And what I mean by real world is outside of your head, so something could be happening to your body and it would still be in the real world. And so that's a conscious experience. Conscious experiences happen all the time without remembering them. But that's what we generally mean by consciousness.

Q. And when we say someone is unconscious, what does that mean?


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 127 of 390 PageID #: 905

A. What it should mean is they can't have that subjective experience. They are unable to have any of those feelings occur. But in the medical literature, I'll caution people are reading the literature that people use unconscious to mean they're not moving. And they're not moving has very little relationship to whether the person is actually asleep. You can -- you can move and be asleep, although generally don't. You can certainly be awake and not move.

Q. So not moving is a very important part of the anesthetic process. Is that fair to say?

A. It's important both for technical reasons for the surgeon. But for ages, it's been one way that we thought we knew patients were asleep, when in fact they're probably not.

Q. So when we talk about -- I'm going to -- I'm going to get your response to this in just a minute. But in your report, you provided some citations to submit articles. One of which talked about connected consciousness versus disconnected. Can you explain that concept?

A. Yes. This is -- this is a spectrum. It's -- I wish we had black and white boxes we could put this in. But in -- under the -- the umbrella of consciousness, we have two big categories and one sort

of category. One of -- connected consciousness is what I sort of described just then. Something in the real world out -- meaning outside your brain is affecting you and you have an experience of it. And maybe you're able to respond and indicate that you have that experience or maybe not.

Disconnected consciousness is where you are having a real subjective experience, but it may not be related to the real world. And a good example is dreaming. So what's happening to you is inside your head and you're responding to it. People have emotional responses to their dreams, even in their dreams. People wake up crying, sometimes they shout. They may move around. They may feel like they're fleeing monsters or whatever. Those are subjective experiences, but they are not connected consciousness because they're not related to something that's really happening to them. It's inside their head.

There's something called dissociative consciousness, which we don't probably need to get into. Basically it's sleepwalking where there's some reaction and not to the outside world. And I will just, again mention that connected consciousness and disconnected consciousness overlap because sometimes your dreams can be affected by what you are actually hearing in the real

world. And sometimes you can react in the real world to something that's happening in your dreams. But we -- we generally call those the two categories.

Q. So when we talk about a person being under a general anesthetic not being able to be aware and experience what's happening, what does that mean to you? Awareness of what's happening?

A. That means to me that their brain is not able to receive the signals about what's happening to them. And they aren't having a -- a subjective experience of it, which can be pain or fear or anxiety, things like that.

Q. Are there studies that show that patients under a general anesthetic with the regimen as you've described have been aware and responsive under general anesthesia?

A. Yeah. There are many studies now that show that patients, a higher percentage than you might imagine, actually can demonstrate awareness if we test it -- test for it specifically, and that they're learning a lot more about how we see awareness that is happening under general anesthesia.

Q. So is one of the techniques that you've -- that you're -- that you've studied called the Isolation Forearm Technique?

A. Isolated Forearm Technique.
Q. Yes.
A. Yeah. That is a technique that was developed. I think the first times it was used was in the early '90s. But it's a -- a technique that was developed in Britain that allows us to kind of peek under the hood, if you will, about awareness during anesthesia because it's permitted -- it's sort of opened the door to us understanding that what we were seeing on the operating table was not what was happening in people's heads.
Q. And can you describe the isolate -- the IF -- is it called the IFT, is that what --
A. You can -- yeah. We can call it the IFT because we can't do those big words either very fast.
Q. I know I can't. So can you describe how the IFT is performed?
A. Yeah. It -- first of all, I should say, that this is developed using general anesthetics in which muscle -- muscle relax -- we call them muscle relaxants, which sounds so nice. Paralytic agents are used. Paralytic agents are used to hold the patient still or to relax muscles that the surgeon needs relaxed for surgery. And so in those cases because we were giving drugs that will paralyze the patient, we knew they would not be able to tell us they were awake, right?

So this technique involved before the patient is put under general anesthesia, they are -- they have a tourniquet that's put on their forearm. Drugs are given, including the paralytic agent, but they can't get to the arm. And they've been trained ahead of time by the anesthesiologist who says, hey, I may ask you if you have pain during the surgery, squeeze my hand if you do.

And so then the rest of the anesthetic is routine, get them off to sleep, put a breathing tube in because you're going to paralyze them, and they'll need to be breath -- they'll need to have someone breathing for them. And then the anesthesiologist simply does what I described. You see things like, are you awake and the patient -- and please squeeze my hand if you're awake. Please let go of my hand now. Do you have pain? Please squeeze my hand twice if you have pain, things like that.

If a patient does what they're asked to do, when that happens, they have to be awake, right? Because they have to hear what the person has said to them. They have to understand it and they have to respond with the direction. So that's a pretty complicated thing. That's not a reflex. It's not something that happens accidentally. It's a deliberate act. And so this Isolated Forearm Technique first began

to reveal to us that a lot of patients could do just what I described, even though they were having full-on surgery and under anesthesia. And virtually, none of them would remember it later because we give all those fantastic drugs that wipe out memory.

Q. And did you provide a snippet of a video that shows this technique in practice?

A. I -- I did. And it's by the actual physician who you don't see in the video, but you can hear his voice is one of the people who was one of the early adopters of this.

MS. HENRY: Your Honor, with your permission, I'd like to show that video. It's about 15 seconds.

THE COURT: Any objection?

MR. BRANDON: No, Your Honor.

THE COURT: All right.

THE WITNESS: If you can freeze it when you put it up just briefly so I can explain what you see on the screen, that would be great.

MS. HENRY: So she's like -- yeah, just leave it right there.

BY MS. HENRY:

Q. Okay. So --

A. There you go right there. Yes. I want to explain what you're looking at, because what you see,

the patient is actually laying with their arms out kind of straight out from their sides like this. And what you see, the blue that you see behind is the gown of the anesthesiologist who is standing just beyond there. The green is the drapes of the surgery. The black object you see around the forearm is the tourniquet that I mentioned. The white stuff is just some padding so that the tourniquet doesn't hurt.

They put a little band around her fingers. We -- we find that people often with the movement of the table will -- their arms will come off the -- the armrest so we do that. And what you're going to hear in a moment is the anesthesiologist. Now, I should say this patient is a woman who is having open abdominal and pelvic surgery. As this video is going on, you'll see the surgeons in the background under lights as they operate on her.

(Video played for the record.)

THE WITNESS: So that's it. When I'm talking about the IFT, that's what I'm talking about. She is under general anesthesia with the surgeons operating deep in her belly and pelvis. And yet she's responding with -- to commands with her hand as she was told to do ahead of surgery.

BY MS. HENRY:

Q. Now, this patient did not open her fingers when she was asked whether or not she was in pain. Was she given anesthesia?

A. Yes. In general anesthesia, a big component is strong pain relieving drugs. So we do see people on the IFT who do have pain. So it isn't that the drug, you know -- that a single drug, for example, will wipe out pain. But under most general anesthetics, one of the receptor -- or a -- a bunch of the receptors we're trying to hit are the pain receptors in the brain and spinal cord.

Q. So this procedure, this IFT has it been replicated?

A. It's -- it's used widely. It's considered the gold standard right now for procedures in determining awareness under anesthesia. One of the -- one of the problems with it is that while it does detect awareness, when there's a response like that on this test, that's awareness. It doesn't detect all awareness. Some patients don't move on the IFT, but when they can remember, tell us that they remember. So that's a rare combination. But we know from them that the IFT doesn't detect all awareness, but it detects the most we've seen.

Q. And how many studies are currently in PubMed

right now using the IFT?
A. Well, when you just use it as a major search term, you'll get 80 or 90 studies now. If there are -- I -- I didn't go through the trouble of looking for all of the literature that mentions the IFT or that cites it, so there's a lot more of that. But ones that are primarily studies using the IFT, it's about 80 out there right now.
Q. And what results have we seen from the use of the IFT? What has that told us about the percentage of patients who appear to be aware during a general anesthesia setup?
A. It's -- it's so startling that people don't want to believe it. The early studies showed that patients undergoing general anesthesia for operations, like cesarean section and hysterectomies. These are big surgeries. About 72 percent of the patients responded on the IFT. When the drug in -- in the -- the drugs that are used in many of the studies are -- excuse me, midazolam and alfentanil and some others.
There are a -- there are fewer studies that use pentobarbital. Because using barbiturates during anesthesia, kind of went out in the late '80s, early '90s. I'm old enough that I've given a bunch of anesthetics with them, but that's way, way back. And so

the studies were just coming in as pentobarbital were going out, but there are a few of them, and they are really scary. One of them that used pentobarbital as a sole induction agent, meaning something to start off the general anesthetic with, 90 -- over 96 percent of the patients indicated they were aware for at least 12 minutes into the -- into the anesthetic. They gradually lost awareness, but only when those other anesthetic drugs were added on, particularly inhalational drugs.

So in those phases when they were only given pentobarbital, almost all of them were awake well into the anesthetic.

Q. And you mentioned that barbiturates have fallen out of use in general anesthesia. Why is that?

A. Well, you want the medical or the social reason?

Q. We'll stick with the medical reason.

A. Yeah. The medical reason is that the barbiturates have problems in terms of what happens when you give them in large enough doses for anesthetics, or to start off anesthetics. They primarily, first of all, will reduce the heart rate low in the beginning, and also the blood pressure. And then they not just going to reduce those things, but they can cause the contraction of the left ventricle, the main ventricle in

the heart, to be weakened by it.

Now in a healthy patient, those -- those effects are tolerable. In other words, it's temporary. The -- the pentobarbital doesn't do anything that put -- that permanently injures the heart. But those effects are temporary and a healthy person, they tolerate them well. But we were actually using these drugs also for heart surgeries in places where patients were -- had pretty delicate heart systems, and it was a problem. These drugs could produce dangerous changes in heart rate and blood pressure. And we were looking hard for better drugs.

There were some other issues with the -- with the barbiturates. They're unpleasant for people when they're injected, because even in -- in low doses, they produce a considerable amount of pain. If they're injected fast and they're high doses, they're extremely painful because they're caustic.

And also the -- the drugs tend to produce a -- a funny smell. A lot of patients say they smell really oniony or garlicy and they -- they just hated it.

So there were lots of things that made us not like them. And right around the time we were -- wanted to get rid of the barbiturates, other drugs came along that were much -- much better and much more stable. And

we just -- everybody just flips over.

So the barbiturates have not been used for general anesthesia purposes in any significant numbers, in the United States, anyway, probably since the mid-'90s.

Q. So Dr. Van Norman, you've had an opportunity to review Dr. Antognini's opinion; is that correct?

A. Yes.

Q. And you're familiar with his criticism of the IFT, as you reported in your declaration, correct?

A. Yes.

Q. So Dr. Antognini suggests that these patients in the IFT are under only a light dose of anesthesia; is that accurate?

A. No. No. I mean, you've got people who have cut you wide open and they're operating on you. And -- and I'm sorry, women do need actual anesthesia for being cut open and having their babies removed and their uterus removed. Those are the big surgeries that were used. But we saw other surgeries as well.

He -- he may have gotten that idea because one study said this was light general anesthesia. I don't know how even the study authors said -- said that because they gave full doses. This is full on general anesthesia of the type I would give in the operating

room today.

Q. And also Dr. Antognini cites a couple of reports involving the study of horses; is that correct?

A. Yeah.

Q. One of those reports is from an author named Aleman, A-L-E-M-A-N. Are you familiar with that study?

A. Yes. Although if you're going to ask me for it, if I could look at it, because he cites two very similar studies and I would like to not mix them up.

Q. So there's the Aleman study in the Buhl study, right?

A. Buhl study. Yeah. I just don't want to, you know, in these -- in the excitement here get the wrong one.

Q. I appreciate that. Is the other study by a gentleman by the name of Buhl, B-U-H-L?

A. H-L. Uh-huh.

MS. HENRY: And, Your Honor, these are studies that were provided by the defense. Or that the defense cited and then we pulled from the internet.

BY MS. HENRY:

Q. So I'm going to show you the first document. Do you recognize that as the Aleman study?

A. This is the Aleman study from 19 -- or from 2015.

Q. And I'll show you another document.
A. Yes. Yeah, this is the Buhl study, and it's from 2012.
Q. Right. And I'm not going to move to introduce them through your testimony, but would it assist you to refer to those studies in your testimony today?
A. Yes, it would.
Q. Can you describe first the Aleman study?
A. Both of these studies are similar. They are studies of euthanizing horses. In the Aleman study, the animal -- and -- and they were euthanized with either pentobarbital as the euthanizing drug, or the veterinary form of it, which may -- which may contain additive drugs that they don't mention here.
But let's -- it -- we'll just say it's pentobarbital. And that -- this is -- what they did was they had horses that were -- that they were marked for euthanasia because they had unlivable conditions and needed to be put down. Some of them were -- there were about half of them -- I think there were 30 horses, or something like that. They divided the groups in half. One was a group that was sedated, meaning they were given just an IV injection to make them sleepy or to make them lose consciousness before they would be given the pentobarbital. The other horses were under full on

general anesthesia.

So the -- and Dr. Antognini cited these as demonstrating that when you give pentobarbital the horses collapsed, their legs went out from under them, and therefore they must be unconscious. And then they died from the pentobarbital. I mean, that's essentially it.

Q. In the Aleman study were the horses given just pentobarbital, or were they given additional drugs?

A. No. Horses in both groups were given additional drug, and so this is not a solo drug study that -- even though the impression I got from Dr. Antognini's report was that he thought they were. For example, in the -- in the sedative group, they got xylazine, which is a -- it's another receptor, works at a different receptor than pentobarbital called the Alpha-2 receptor. And it was -- and they also got ketamine, which is an NMDA receptor antagonist. So this is now a multiple drug anesthetic. That's what it is.

The ones who were marked as being on anesthesia got all of that, plus they got -- let's see. What all did they get? They got inhalational anesthesia with isoflurane or desflurane, and they got propofol at times for that. So they got even two more drugs. These were given multiple drugs. And the problem is the --

and so that's one thing, these animals were not given just one drug.

Another is, I would like to point out, you cannot study consciousness in an animal.

Q. Why is that?

A. Consciousness is a subjective experience. It's what you feel. It's what you see. And animals can't tell us that. We can watch some behavioral changes, but we can't know what they're experiencing. And so consciousness in humans -- the nature of consciousness in humans must be studied in humans. Too often, both in animals and humans, when people -- when the subject, whether it's an animal or a human, stops moving -- moving, we assume they're asleep and they're -- and the IFT shows us they're not.

In this case, in both of these studies, it was mentioned in Dr. Antognini's report that the horses collapsed, "and lost consciousness." But the horses don't collapse because of any -- any effect on their consciousness at all, they -- they collapse because the drugs get rid of a reflex they have called the stay apparatus. Horses stand up to sleep. This is a farm girl talking now. They stand up to sleep. They have to be ready to run if predators come after them. And so they have a special system of pulleys and tendons and

everything in their shoulders, hips, and legs that permit them to fall asleep with their -- with their legs stiff. And it doesn't take much drug to get rid of that. You don't have to be unconscious.

So you give a bit of these drugs to a horse, they're going to drop, and they're going to drop right down. But it's not because they've lost consciousness. And in fact if you look at videos of horses that are falling once they've been given one of these drugs, they're trying to hold their head up. So it's not that they've fallen like a limp noodle, they're -- they're still making efforts.

So this is not a study of whether pentobarbital causes horses to lose consciousness or kills them efficiently. It's a study of whether a multi-drug sedative regimen interferes with a stay apparatus and perhaps produces unconsciousness, we don't know, but then does kill them efficiently.

Q. And with the --

MR. BRANDON: Your Honor, I'm sorry, I'm going to move to strike the testimony about the stay apparatus and the testimony about veterinary medicine. Yet another subject which Dr. Van Norman is unqualified to testify about.

THE COURT: Your response?

MS. HENRY: Your Honor, I can ask -- one, I think Dr. Van Norman has established her ability and facility and knowledge to provide the testimony that she provided. I can ask her some additional questions about her experience with horses as well, having actually seen these horses engage in exactly the activities she just described.

THE COURT: All right, we'll allow a little more.

BY MS. HENRY:

Q. Dr. Van Norman, have you actually seen a horse do this?

A. I was raised on a farm and we had -- we raised horses and cattle back in the day when there weren't vet techs. So when a vet comes out to take care of your animals, they expect you to go out and help them, so we're the vet tech.

I've seen horses and cows under anesthesia. The cows don't have a stay apparatus. They sleep lying down. Every farm kid knows that their horse sleeps upright and cows lay down. That -- we all know that. That's not something that is esoteric veterinary knowledge. The stay apparatus is something you learn about in 4-H when you're a kid, it's something you learn about when you're handling horses, because every kid

wants to know how a horse manages to sleep standing up.

So no, this is not something that's esoteric enough that it requires a veterinarian to tell you about it.

Q. With respect to having looked into this study as you have, because you saw it in Dr. Antognini's report and you looked -- you told us about the pharmaceutical regimen that were given to these animals, the Alpha -- the xylazine --

A. Xylazine.

Q. -- it's an Alpha-2 agonist?

A. Agonist. Uh-huh.

Q. And what does that mean?

A. Alpha -- well, Alpha -- of the many receptors in the brain that all of these chemicals -- we -- we give Alpha-2 agonists in human anesthesia as well. Clonidine is the drug we tend to use. The Alpha-2 drugs tend to have effects on blood pressure, but also they're analgesic. They cause pain -- they -- they give pain control, in -- in addition to sometimes having some effects, it appears, to be on awareness, but.

Q. So the xylazine is a pain reliever?

A. Yes. Uh-huh.

Q. Designed to block pain in the -- in the horse?

A. Uh-huh.

Q. I'm sorry --

A. Yes. Sorry.

Q. And was the xylazine given prior to the pentobarbital?

A. It -- it was. And also it was given as the introduction before the pentobarbital was given. Also, they gave ketamine.

Q. And what would -- what would ketamine do?

A. Ketamine is an -- an NMDA receptor antagonist, and it actually is profoundly analgesic. Profoundly analgesic. It's closest relative in human -- I mean, we use it in human medicine, but it's closest relative -- you might remember what it was like to be on what they -- how they described street users of Angel Dust, which is a ketamine analog. They were superhuman because they weren't stopped by pain because they didn't feel any when they were on it. They could do anything. And that's what ketamine is like. It's profoundly analgesic.

Q. And both of these drugs were on board prior to the pentobarbital?

A. They were. Uh-huh.

Q. And with respect to Dr. Buhl's study --

A. Uh-huh.

Q. -- can you describe that study?

A. It's a very similar study, which is why I wanted these in front of me, so I didn't get them confused. It's another horse study. And I -- I should also mention that if I could back up for a minute on both --

Q. Yeah.

A. -- if these studies, this applies to both. They tried to measure EEGs, so electrical activity in the horse's brain. So they said, well, the horses are unconscious because they got at some point a flat lining EEG, which is an important thing to know. So in Buhl's study, they were doing the same thing. But let me refer to what they gave the horses because I don't want to confuse it with the Aleman study. So these horses were given detomidine hydrochloride, which is a -- a sedative drug. And then they were given a -- a high dose phenobarbital. Some of them were -- I mean, they were also given an analog of glycopyrrolate, which is an anticholinergic drug, which is yet another drug that affects the brain and how it's -- it handles signaling. So these drugs were -- the -- so these were given multiple drugs again.

Q. And with respect to -- let me back up to the Aleman study for just a moment.

A. Uh-huh.

Q. Was there a problem with the way the EEGs were even working in the Aleman study?

A. Well, yeah. I mean, the horses were falling. The EEG electrodes were coming off, and they had to try to slap them on back in a hurry once they came off some horses and do that. But it -- I -- they saw flat line EEGs, so there's no denying that.

Q. With the Buhl study, does Buhl make any conclusions with concerns about the animals feeling pain?

A. I don't remember that. Let me just refresh my memory here. Oh, no. I -- I do and here it is. They did make the comment, "It's impossible" -- may I read? "It is impossible to know whether horses are able to register pain or distress from the commencement of the pentobarbital injection until cardiac death occurred up to 15 minutes later." So they felt that no matter what they'd seen on the EKGs, these horses -- and no matter what they saw because they also saw the collapse of the horses that they didn't know.

Q. And that was a point of concern that they noted about the study?

A. They listed it as a serious limitation.

MS. HENRY: Let me just find my pen. Your Honor, just one more before I move to my next topic.

The flash drive that we used with the video of the IFT, the patient who was responding under anesthesia, I would like to move that into evidence and into the record.

THE COURT:  Any objection?

MR. BRANDON:  No objection.

THE COURT:  Flash drive will be Exhibit 17, admitted without objection.

(Exhibit 17 was received into evidence.)

MS. HENRY:  Thank you.  And, Your Honor, I will provide that to the Court at the next break.

BY MS. HENRY:

Q.   Now, with respect to the ability of an EEG to tell us whether or not a person is able -- a flat line EEG tells us whether or not a person is able to be aware and experience pain, have you conducted some study of that on your own?

A.   Well, I'm -- when we got this report from Dr. Antognini, I became interested.  I -- I wondered what was out -- else was out there on the EEG electrical silence.  And it turns out that this very thing has been studied in humans.

Q.   And what does that study in humans tell us?

A.   It says that when you give a large dose of pentobarbital and you get a flat line EEG, the patients still -- what you're doing is reading -- now, the

patients don't move in response to stimulus. So they're unresponsive. But when you watch their EEG and you stimulate them, they respond virtually normally. So for example, the stimulus that was given in the human study was clap your hands. This is not painful stuff they did to the patients. Clap your hands, call the patient's name, shut the hospital door loudly, move the limbs of the patient, flashlights in their eyes. Then they would watch what happened on the EEG, and they saw almost the same responses that you would see if the drug had not been given. These patients had been given pentobarbital for seizures.

What they saw was a slight delay, but all of the same areas lit up. And there was connectivity in the cortex, meaning that they were not just little pings. The brain was putting things together. And that these occurred very slightly delayed and at higher amplitude than they would in the patient who had not received the drug. And their -- their -- and by the way, they then repeated this thing in rats and found the same thing. The rats, when you blew on their whiskers, do the same thing, would have their brains just light up. Even though they were unresponsive and they'd been given a high dose of pentobarbital. And the authors concluded that the brain, when its given pentobarbital,

is not inhibited. Rather, it -- it's put in a state of temporary rest. So that when it's not being bothered, it just stays in that temporary rest. But if you do anything to stimulate it, it's able to respond in a way that looks like an awake patient.

Q. And again, these were patients -- human patients with flat line EEGs?

A. The -- they were human patients that were given high doses of pentobarbital in order to make their EEGs flat.

Q. But even though they were flat lined, they weren't dead?

A. No.

Q. And can you explain again, like, when you clap -- when someone clapped their hands, what would happen?

A. They would see areas of the brain light up. It's -- they called it an auditory -- what's an auditory evoked response. A -- a sound that evokes a response in the brain. And they would see areas of the brain that would normally light up with sound stimuli, light up, and connect. So they could hear it.

Q. So they tested their ability to hear auditory. Did they also test their ability to sense or touch?

A. Yeah, that what they did was they lightly

touched their face, their shoulders, their arms. I don't think they touched their legs. But they described exactly just lightly brushing them and touching them. And they would see this -- the -- that areas of the brain that would normally light up in a person who didn't have the drug, lit up again.

Q. And again, this was replicated? The study was replicated in rats?

A. It was replicated in rats. The same -- the -- the same investigators did a very similar study in rats with pentobarbital.

Q. So we've described this problem of being -- oh, let me ask you this: Having reviewed the protocol -- the Tennessee lethal injection protocol, is there an EEG in the Tennessee lethal injection protocol?

A. No. And it wouldn't help them if it were -- if there were.

Q. There's also in the literature, Dr. Antognini has discussed before the use of something called a BIS. What is a BIS?

A. A BIS monitor is a -- it's a bispectral index monitor. It's a processed EEG. Basically, the company invented a proprietary formula by which they translate an entire EEG into a number from 0 to 100. And in general, they decided that if you wore these, you know,

electrodes on your head and you had a BIS number that was above 60, you were awake. And if it was below 60, you weren't.

Q. Are there problems with that methodology?

A. Well, it doesn't work. It has been shown over and over again in human studies that -- that patients who are anesthetized -- and this is in -- during general anesthesia. And also I should say, it's during clinical anesthesia, also during nonclinical anesthesia studies. That patients who have BIS's in -- below 60, can still have total recall in one -- in -- in an interesting study in which no drugs but a muscle paralytic were given to volunteers. So there's no effect on the brain. It's all a peripheral muscle thing. The BIS went to 60. And actually, it went down to 50 in some folks. So it indicated they were asleep. When they were wide awake and they'd been given mathematic tasks to do while they were given the drug and when they reversed the drug, they asked them to do -- tell them the answers and they could. Just to show that they really were wide awake.

Q. So Dr. Van Norman, should we all be afraid of having surgery?

A. Well, gee, I don't know. No. I mean, I'm -- what I'm trying to explain to you is that when you get a general anesthetic, that is nothing like a -- an

execution. And I worry about the fact that there are parties involved in execution discussion that call it an anesthetic and say, this is what it is. And it's not. It's nothing like it. We give drugs that -- we give multiple drugs. There are probably ten or 12 drugs given in average anesthetic, and they are drugs that hit different receptors in the brain. One of the most prominent ones we want to hit are the pain receptors. We want to get those actually taken care of. And we do it usually by hitting several different types of pain receptors.

We do want people to be -- to, if possible, not be aware. But that's a -- that's a -- a commodity we don't have a good monitor for yet. We can test for it, but it's not easy to monitor or during general anesthesia. We want people not to be anxious, and we also want them to be able to lie still so that the surgeon can get the job done. And so we're doing all of those things. And a general anesthetic actually is a complicated thing to give safely and in a directed manner. And that's why we go through so many years of training to be able to do it. It's not giving one slug of one drug to somebody and hoping that I get the result that I want, whatever that might be.

Q. And as a physician who is very concerned with

medical ethics and patient care, is this issue of patient's awareness and ability to experience the surgical process something that is of concern to you?

A. It's a concern to just everybody in my profession. I mean, I'll just point out that in the latest issue of Anesthesiology is another review of how to produce amnesia during the surgery. Because as the authors put it, we're not sure we can create unawareness anymore. We're not sure of that anymore. So we need to at least be sure if we're doing that. We need to understand the mechanisms of memory and how to interrupt those. So virtually, every kind of journal that comes out every month has something in it about memory amnesia, responsiveness, those things. Or if not everyone, multiple times during the year, we'll see articles come out so.

Q. Thank you. Now with respect to -- I going to move into another area, if that's okay, and talk about pentobarbital executions. As you stated earlier in your testimony, you have testified in some proceedings regarding pentobarbital executions.

In the process of studying pentobarbital executions, have you had the opportunity to review autopsy reports of prisoners who had been executed using pentobarbital?

A. Yes. I have actually autopsy reports on about 300 prisoners, at least 180 of which were executed using pentobarbital as a solo drug or in combination with other drugs. The other drugs that are given are not generally central brain drugs that -- by this, I'm talking about giving muscle paralytic agents and potassium. So pentobarbital is the -- in -- even in those protocols is the solo hypnotic drug that's given.

Q. And when you have reviewed these autopsies for people with pentobarbital executions, have you observed anything in those autopsy reports, which tells you something of concern about the way they died?

A. Well, it -- this one -- I -- I -- I'd love to claim I was the first one to notice this. But a number of us noticed in early pentobarbital autopsy reports that patients were -- that the body had developed pulmonary edema. That the -- the prisoner had developed pulmonary edema, which is fluid congestion in the lungs. It's -- pulmonary edema can be a sign of many things and probably is a sign of many things in pentobarbital executions. When we looked closer, we found -- I found, in reviewing 28 autopsies, the -- the -- there's variability in the autopsy reports, in the quality of the reporting from the medical examiner. Many of them are very good, but some are -- some -- some lack detail.

When they contain the appropriate amount of detail in the lungs, and that's most of the reports, 100 percent of the prisoners have pulmonary congestion and edema.

Q. What is pulmonary congestion and edema?

A. So pulmonary congestion and edema is fluid in the lungs. It's not a normal autopsy finding. Living patients can have pulmonary edema and do have it, and that's where most of our experience comes from. And it can occur -- fluid can get in the lungs from a number of mechanisms. For example, it can be there because the heart fails. And so pressure builds up in the -- in the -- backs up behind the -- in the blood vessels in the lung. So it just pushes fluid out into the air-containing spaces. It can come from direct injuries. It can come from a lot of different mechanisms. In the case of barbiturates, barbiturate poisoning is well known to cause pulmonary edema. And the mechanism has multiple causes.

Q. So I'm going to stop you right there when you say pentobarbital is well known to cause pulmonary edema. What is the source of that statement?

A. The source is understanding -- oh, back in the '50s and '60s, the favorite drug to overdose on was barbiturates. Barbiturates were partially responsible for Marilyn Monroe's death, for example. It's a -- it

was the -- it wasn't really a street drug, but it was an illicit drug use. That -- so people would show up in ERs with barbiturate overdoses. And one of the things they frequently had was heart failure and pulmonary edema. If they survived the initial episode and got it treated, there was nothing that pentobarbital had done that would permanently hurt the heart, but it -- it caused heart failure that led to pulmonary edema. So this is known to happen in -- in even oral barbiturate overdoses. It doesn't have to be given by needle.

Q. So -- but even before you looked at the autopsies, it was a known fact that barbiturate overdose can cause --

A. Could cause it. Now, oral overdoses tend not to cause it as often, it appears. And the reason for that is when you take an oral medication, it doesn't go straight into your bloodstream in one big slug. It's meted out into your bloodstream as it's absorbed from the stomach. And so probably the levels of barbiturate that you get, even in big overdoses, don't have one characteristic that is probably responsible for the vast majority of pulmonary edema in prisoners. And that is that barbiturates are extremely alkaline. They're like Drano. They have a pH of around nine, so -- between -- between eight and nine.

They cause, on contact, to mucus -- to -- to delicate membranes, they can cause burns. And so injection, even clinical doses of barbiturates, is painful because it burns -- causes some burning in the veins. Injections of massive doses rapidly will be even worse. And the very first place the barbiturates go to when you inject them by vein is to the right, heart, and to the lungs. And the lungs have all of these delicate membranes in them through which we're doing air exchange. Blood -- blood is on one side, air on the other. And on contact, they appear to cause a caustic injury to the -- to the lungs that allow them to become very leaky. So even before the barbiturate goes to the brain, the lung membranes are leaking.

Q. I would like to show you just an example, if I could, on the --

MR. BRANDON: Your Honor, I don't know how long this testimony on the lungs and pulmonary edema is going to go. I do have to object to the relevance. I think we're here on a motion today about whether Mr. Black's ICD is going to be deactivated. I fail to understand how pulmonary edema (inaudible) is at all relevant to that motion.

THE COURT: Okay. Objection overruled. We'll go a little further with this.

BY MS. HENRY:

Q. So, Dr. Van Norman, I've put a schematic up on the ELMO. Are you able to see that on your screen?

A. I am.

Q. Would that schematic assist you in explaining to the Court the way in which pulmonary edema will work during an execution?

A. I think so. Yeah.

Q. So if you could, using this schematic, explain, again, how does the -- how does pentobarbital enter the body, and how does it work in the lethal injection?

A. Well, in this diagram, the heart has been divided into two, with the right side of the heart of the right and the left side on the left. And it's just to show you that the lungs actually, even though the heart sits -- all those chambers sit together in the body, the heart is separated -- the left and right sides are separated by the lungs.

So the IV injection, which you see happening on the left, goes into the peripheral vein, and it travels first to the right heart and then to the lungs, where it starts the process of pulmonary edema, and then to the left heart, where it has a detrimental effect on the pumping function of the left heart. The left heart

starts to fail and fluid backs up. And among -- in -- in those injured membranes in the lungs, even more fluid leaks out.

After all of those processes have started, the drug travels to the brain. And it -- it starts to act very quickly when it gets there. It starts to act within section -- seconds to reduce responsiveness, but it peaks in about two minutes.

Q. And when you say it peak -- it acts to reduce responsiveness, that's different from reducing awareness?

A. That's right. People stop moving, but I already told you about these overdoses of pentobarbital great enough to cause the same flat line EEGs that Dr. Antognini cited for the horses. And yet those patients have brains that light up when they're given stimulation as though they're awake.

Q. So when the extremely caustic pentobarbital reaches the lungs, what is it that happens to the lung?

A. Basically a big burn everywhere that the drug goes.

Q. And how does that cause the pulmonary edema?

A. Well, the membranes break down and fluids from the -- from the -- from the blood vessels that are collecting oxygen start -- like the plasma in the blood,

starts to leak in. In addition, you get other fluids coming into the lungs because you get swelling with injury. And so fluids start to leak through the -- what are called the interstitial, the in-between spaces, in the lungs from there.

Q. And then what happens once this fluid comes into the lungs? What happens to the person's ability to breathe?

A. They start to drown. So in terms of respiration, how -- pentobarbital has two main areas where it has effect. So fluids flood into the lungs, and it's a lot of fluid, and the -- the person starts to drown. And if they are aware, they're going to feel drowning, and they're going to feel like they're suffocating, mainly drowning at this point. Then when the drug hits the brain, it causes collapse of the upper airway because it gets rid of some of the reflexes in the upper airway. And so even aware or not, they're not able to hold their airway open. And so when they try to take a breath, it's collapsed, and they can't get air in, but the attempt to take the breath, that negative pressure, that sucking to try to take the breath, sucks more fluid into the chest. So there's no real mystery how -- why the fluid gets there is what I'm saying.

Q. And from the autopsy findings, have you seen

evidence of this pulmonary edema in the autopsies of individuals who've been executed with pentobarbital?

A. Yeah, it's present in -- like I said, if there's enough information on the lungs, that's present 100 percent of the time. Sometimes the medical examiner -- examiners comment on it and call it severe or moderate pulmonary edema. Sometimes they don't. But another way you can tell that the lungs are edematous and have this extra fluid is they weigh much more than they should. We know what an -- we know what average lungs should weigh if there's no extra fluid in them. And most of these prisoners have one and a half, two, sometimes more times the fluid in them than they should have.

Q. And is there something else about the autopsies in terms of froth in the lungs?

A. Well, you can get froth in the lungs, and froth happens -- we -- froth can happen because there's turbulence in -- in fluids. For example, it can happen because fluids are mixing with air. And so there are air contain -- gas-containing spaces in the lungs that this fluid can mix with and cause frothiness. It's a -- froth is -- is not necessary for pulmonary edema to be present. But when we talk about classic signs of pulmonary edema in awake patients, many of them will

have froth that appears when that happens. And they may even have pink froth when some of the blood from their bloodstream mixes with the fluids in the lungs.

Q. And have you -- in the autopsy reports of individuals who've been executed with pentobarbital, have there been some findings of pink froth?

A. There have been, and there's been also pink -- what they call exudate, so -- so fluid that leaks when you cut the surfaces of the lung, pink and edematous fluid comes out. There's fluid that sometimes pools in the major airways, in the trachea, the bronchi, and even in one case I read, all the way up to the back of the throat.

Q. Now you've reviewed Dr. Antognini's report, and he suggests that this pulmonary edema happens after death.

A. Pulmonary edema requires blood pressure. It requires a beating heart to do that. And that's -- that's just known. There are -- I know that he's -- he's included a couple of studies in his report in which he claims to show that it happens after death. It does not. And it -- it requires pressure in the blood pressure system. There are movements of fluid in the chest after death. So if you lay somebody flat and they're dead and they have fluid in their lungs, that

fluid will gradually settle down with gravity if -- if nothing else is done over time. So you can see movement of fluid around the chest, but you don't see accumulation. And there's only one study I know of that's been done in humans with autopsies and looking at the lungs, and they found that there was no increase in the fluid that hit the lungs in -- you know, in the time that it took to do an autopsy.

Q. If Mr. Black were aware, what would it feel like to experience negative pressure of pulmonary edema?

A. Well, we know exactly what --

MR. BRANDON: Objection. Asking for speculation. Asked what Mr. Black's sensation of --

THE COURT: Just rephrase. Just rephrase more scientifically.

MS. HENRY: Okay. Thank you.

BY MS. HENRY:

Q. Dr. Van Norman, based on your experience, your medical experience, research into the area of pentobarbital executions, and knowledge of negative pressure of pulmonary edema, what is the experience for the patient who experiences negative pressure pulmonary edema?

A. Well, we know this because this happens in awake patients, and they can tell us exactly what it

feels like. And without help with their breathing, they feel like they're drowning or -- and/or suffocating. And that is one of the most powerful negative feelings known to man. It is terrible. It's -- it's a feeling that when you feel like you need to take a breath, you'll have to do it. Even if you're -- even if you're drowning in water, you'll take a -- you'll -- because you're gasping for air. It's rated as one of the worst sensations. It's that sense -- it's that sensation that -- that is elicited during enhanced interrogation techniques called water boarding. They're trying to make people feel like they're drowning. And awake patients tell us about that. They -- they feel like they can't get air.

Q. Now there's one study that doctor -- I don't know if it's a study. There's a letter from a gentleman by the name of Powell to Nature Magazine in 1955, cited by Dr. Antognini.

Are you familiar with that letter?

A. I remember it, hearing the name of -- is that the letter where they took rabbit surfactant and mixed -- and shook it up in test tubes, and -- yeah.

Q. Tell us about the -- that letter to Nature in 1955.

A. Well, first of all, it's a 70-year-old article

and scientific methods were pretty crude. Surfactant is a -- is a -- a mucus -- not a mucus. It's a -- a film that covers our lungs that makes them slick so they'll slide back and forth over one another, and it's kind of -- it's easy to make foam inside of surfactants. So this guy killed a bunch of rabbits, which have completely different respiratory systems than we do, and shook up some of their edema fluid with surfactant and got foam, and said, well, this could happen after death. He didn't really propose how the shaking up would happen after death, except to say gases produced in the dead body would maybe produce this.

This was not a study. It was not peer-reviewed. It was put in the literature as an interesting letter to the editor: Hey, I once did this. And nobody that I know of -- of has tried to replicate it. And even if they had, it's a rabbit study, and it doesn't say what happens in humans.

Q. Now, with respect to -- let me get back to the ICD and Mr. Black, and how we put this all together, this pentobarbital, how it works in the body, and the pulmonary edema, and why that matters. So it's turned to what's going to -- what could happen if the ICD works, as it is -- as at least it was -- it was programmed in August of 2024, or at least what we know

about it.

MR. BRANDON: That -- was that a question there? I lost the train there.

MS. HENRY: I was just providing the transition to where we're going, okay.

MR. BRANDON: Sorry.

BY MS. HENRY:

Q. So, Dr. Van Norman, in forming your opinion about the effect of the ICD in Mr. Black, did you also consult resources about ICDs in patients at end of life?

A. Yes, we have -- we know exactly what happens to patients who are dying an asphyxic death, meaning a death with hypoxia, drowning and suffocation. And what happens If they have an intact ICD in place that can shock them when the arrhythmias that occur happen.

Q. And is this a matter of concern for individuals who are receiving end-of-life care who have also have these ICDs?

A. Yes, it is. It's -- it's a -- there's a -- a ton of literature out there about it now. It's been of such great concern that societies like the Heart Rhythm Societies and the -- the Association of Electrophysiology. I -- I can't remember the exact name of the -- the group, even have put out statements about what needs to happen at end of life for these people

with regard to their ICDs. And so the reports we have from many patients who have gone through what will happen, are that it's -- it's a terrible process.

Q. What does it feel like for the patient, for that ICD shock to go off in their body?

A. Well, first of all, I should say that ICDs sometimes deliver shocks that are not needed. They do it because of a variety of reasons we don't need to get into, but they're called inappropriate shocks. And they can occur without warning. And they can occur in about one in five patients who are normal and have an ICD and who are otherwise normal and have an ICD in place. And so we know exactly what the awake patient feels when they get an ICD shock.

And it's -- when you go out and you look at the patient basic literature, what -- what people tell patients from cardiology sites, it sounds pretty benign. Oh, you know, yeah, it feels bad. Go ahead, sit down. Literally, they say meditate for a while and call your doctor. What the medical literature says is, this is devastating to patients. They are traumatized. Patients go through horrible, psychological sequelae from this. They have post-traumatic stress disorder. There's an inadvertent there's a Florida Shock Pain Scale, it's so painful. Patients will describe it as

being kicked right in the chest by a horse. They'll describe it as though they -- they'll say it's as though I stuck my finger in a light socket. Patients have come in demanding to have their ICDs removed when this happens. It's terrible.

Q. You mentioned the Florida Pain Scale. What is that?

A. Well, I was I -- I just think it's a sign of how -- not -- how big this issue is, that they've developed a scale by which they can sort of assess how bad the pain and trauma is to the patient who receives an inadvertent shock from their ICD. It's about that. And so this is used in -- in studies now of patients who have psychological damage from this occurrence, to rate how -- how much the pain was and what -- what impact it's had.

Q. And did you in fact include the graphic from the Florida Pain Scale in your report?

A. Yeah. In my report is a graphic that shows a pain scale from I think it's 0, not 1, to 10. And basically, 10 is the worst pain you can possibly imagine ever happening. You can't think of anything worse. Anything from 7 up is severe pain that you can't do anything else but pay attention to the pain. 0 is obviously 0. And in studies of patients that have --

they had had inadvertent shocks, there is no -- like in one study, nobody rated the pain of that shock less than a 7. So it was always severe. And if they got more than one shock, they jumped up at least 2 points. So some of them were getting up to pain levels where -- that were the worst pain they could imagine.

Q. And that's with multiple shocks?

A. Yeah. When they got more than one shock. But some patients with only one shock were up in that -- in that category, but nobody rated their pain less than a 7.

Q. So all of it was severe?

A. Yeah.

Q. And because of this pain, the Heart Rhythm Society and other societies have -- well, I may be wrong about which society, so let me get the report.

A. Yeah.

Q. Just a moment. But there have been some statements in professional organizations about what should be done with these implanted cardio -- their defibrillators; is that correct?

A. Yes. Oh, yes. And I -- I'm going to turn to it as well, so I get the right societies. But the other thing, I mean, it's not just the pain level. It's the likelihood that that will happen in end of life because

it's -- it's a very likely occurrence. Sorry, I'm going to turn it to the same --

Q. The HRS Expert Consensus Statement, please.

A. Yeah. So --

Q. I'm going to show you the document.

A. It's Page 10 in my report.

Q. Doctor, I'm going to hand you a document and ask you if you can identify it.

A. I'm sorry. Say again?

Q. Can you identify the document that I just gave to you?

A. Sorry.

Q. I turned my back. I apologize.

A. No worries. I want to make sure that this is all one document because it's big, and then I will. Well, I've seen it. Well, I've seen it in my PDF. I haven't printed it out, so I just want to make sure we're looking at all the same thing. Okay.

So this is the 2023 Heart Rhythm Society, European Heart Rhythm Association, the -- I'm not sure I'll get all these heart society acronym's correct. So I'll just leave that the APHRS and the LAHRS Expert Consensus Statement on Practice Management. Oh, no, that's from the remote clinic. Is that what you meant to hand out?

Q. No, I handed you the wrong thing.
A. Okay.
Q. I'm going to hand you another one.
A. Never mind.
Q. I think we printed it out a couple of different ways. So I'll give that to you the right way. I've got a couple of expert consensus statements, so --
A. Yeah.
Q. Let's try this. I'm sorry. I only have one copy. I'm going to take this one back from you. Yay. And I'm going to identify the document. And it may be the same thing in a different format.
A. Oh, this is different than what you -- what --
Q. Okay. Can you tell us about that document?
A. This is the Heart Rhythm Society Expert Consensus Statement on the management of cardiovascular implantable electronic devices, CIEDs in patients nearing end of life or requesting withdrawal of therapy. And it's dated in 2010.
Q. And would it assist you in your testimony to refer to that document? I'm not going to try to introduce it right now, but would it assist you?
A. Yes, please.
Q. Can you tell us what the consensus is of those organizations with respect to ICDs in end-of-life care?

A. Well, they general -- there are a bunch of societies that, if I can mention some other ones, including this one, the American Heart Association, American College of Cardiology, the American Academy of Hospice and Palliative Medicine, the American Geriatric Society, European Heart Rhythm Association, and the Hospice Palliative Care Nurses Association, just to name a few, that all agree that they have -- that at least deactivating the ICD needs to be discussed and offered to patients who are in the dying phase of life.

And that to prevent the device from delivering shocks that are going to both prolong the dying process by reviving the dying heart, but will also cause pain from the multiple shocks, the societies are all in agreement that the deactivation should be accomplished in the -- as part of the plan in the dying process. And that that deactivation should be done by programming, not by use of a magnet. It should be done by programming an ICD by a person trained and expert in doing so under the direct supervision of a cardiac electrophysiologist.

Q. So Dr. Van Norman, these folks who are at their end of life, this might seem to be a silly question, but are these folks very sick?

A. Yes, they are.

Q. And by definition, do they have problems with their heart?
A. Yes, they do.
Q. And yet there's still a concern amongst the -- these various professional societies that these devices be turned off?
A. Yes.
Q. And why so?
A. Because there is a high probability of, in the dying process, the device interpreting or detecting arrhythmias that will shock them.
Q. Thank you. I'm going to grab that document back because I'm not going to introduce it?
A. This one?
Q. Yes.
A. Okay.
Q. Thank you. Now, Dr. Antognini in his report, likened the shock on the ICD to cardioversion. Do you recall that?
A. I do.
Q. Do you have an opinion about what happens to -- well, have you been a part of cardioversions?
A. Oh, many times, yes.
Q. What happens when you have a patient go through a cardioversion?

A. You mean starting --
Q. Oh, actually, I that's a really bad word again. English trying to do medical school. What is cardioversion?
A. Cardioversion -- well, cardioversion is technically applying a shock to the heart to convert it out of, usually, an atrial rhythm, an atrial fib or atrial flutter.
Q. And how is that achieved?
A. What we do is we anesthetize the patient, and we place the -- people have seen it acted out in dramas where you take the big paddles and you put -- place them in specific places on the chest, and you give an electric shock to the heart that is of a significant quantity to cause the heart to reset its electrical system and go back into sinus rhythm.
Q. And when you say you give them an anesthetic, does that include analgesia?
A. It almost always does, but I will say sometimes not, because it is such a brief procedure, and therefore -- and it doesn't have pain associated afterward with it. So what we definitely give is a drug that's going to cause amnesia.
Q. And why is that?
A. Because it's extremely painful.

Q. Have you witnessed patients undergoing cardioversion experiencing pain?

A. Well, many, if not most patients, given -- even given the drugs for cardioversion, will vocalize, move, and even sort of try to sit up when the shock is delivered. In fact, in one of the articles that Dr. Antognini supplied, which he said the patient seemed pretty happy, they were happy. They didn't remember it. But eight out of 30 patients cried out, moved, and had to be restrained by their physicians during the process.

Q. And when you say you've observed patients vocalizing, what does that mean?

A. It means that they are yelling, crying out, moaning, saying, oh no. Sometimes they'll say words. Sometimes they just make a noise like -- you know, that sort of thing.

Q. And in those situations, the patient isn't able to remember it, but at the time it's happening, they are experiencing it?

A. Yes.

Q. And responding to it?

A. Many are. I will say that some patients don't move, but we've talked about how sometimes patients won't.

Q. Now, with respect to Mr. Black and his ICD --

and I want to get into now what will happen, how his ICD will react to the administration of high dose of pentobarbital. We've already established there's no pain reliever in our protocol.

Once the pentobarbital enters his system, what will happen?

A. Well, he'll get a IV bolus of a large dose of pentobarbital, and it's going to be given fairly rapidly, so it's going to hurt. And then that drug is going to flow through the peripheral vein, which is injected, or a central vein. He happens to get a central line to the right side of the heart and straight out to the lungs, where it will start the process of burning the lung tissue. It will then flow to the left side of the heart, where it will decrease its first effect almost -- I mean, it's very predictable that the first effect would be a lowering of heart rate because that's the first effect we see from pentobarbital.

Q. I'm going to stop you right there. Once this heart rate begins to lower, if it lowers below 60 beats per minute, what will the device do?

A. The device will start to pace him at 60 beats per minute and will not let him go below 60.

Q. So it's, sort of, it's counteracting the effect of the pentobarbital, essentially?

A. It's -- it's counteracting. Yes. The effect. It's not counteracting the drug itself. It's counteracting the lower heart rate that's happening.

Q. And so it will pace him to 60 beats per minute?

A. Yep.

Q. And then the pentobarbital will continue to work its way up to the brain?

A. Well, two things will be happening. One will be that, in addition, the pumping action of the left ventricle is going to start to fail, which will both increase fluid in the lungs and also probably predispose him to having arrhythmias developed in his left heart. Even if they don't develop at that moment. The blood flow is also taking the drug to the brain. The responsiveness is decreasing, and the airway is collapsing. And the ability to take a breath is beginning to fail. So there may be -- he may make respiratory efforts. If he hasn't yet reached a level of unresponsiveness, then he can't. We've seen both happen in executions.

Q. And again, unresponsiveness does not equal unawareness?

A. I'm being really careful to say unresponsiveness because the studies I've been

presenting to you indicate that pentobarbital does not ablate the brain's responses to outward stimuli.

Q. When you say ablate?

A. I'm sorry, ablate. Does not destroy. Does not get rid of. Does not end.

Q. And as the heart begins to be impacted by the pentobarbital, you said that arrhythmias could begin to develop; is that correct?

A. Yes. And this is not speculation. I mean, they -- they can develop and almost certainly will. The exact probability is hard to work out because it's very individualized. It depends on the nature of the heart disease that's already present, lung disease that may be present, and a whole bunch of individual factors. But we do know in asphyxic death -- asphyxic deaths, meaning deaths that occur because a lack of oxygen, which is how pentobarbital kills you in this situation, that there is a prolonged period in which there -- a lot of heart arrhythmias can occur due to lack of oxygen. So it is very -- it's very likely that he will develop cardiac arrhythmias as that happens and that some of those may be seen by the ICD or will be seen by the ICD as being shockable rhythms.

Q. And when you say shockable rhythms, in Mr. Black's case, we're talking about ventricular

fibrillation?

A. Ventricular fibrillation and V-tach above 220 beats per minute.

Q. So if his heart rate goes up to over 220 beats per minute, he'll get a shock?

A. Yep.

Q. And if it goes into that chaotic, snakes in a bag situation that you discussed earlier, he'll be shocked?

A. Yes.

Q. And what happens as a result of -- what will happen to his body when that shock happens?

A. Well, I mean, apart from the fact that that is a very painful experience, right, about 89 to 100 -- depending on the study, 89 to 100 percent of the time that first shock will revive his heart.

Q. So if the ICD wasn't there, the heart wouldn't be revived, but because the ICD is there, 89 to 100 percent of the time it will be revived?

A. Yeah.

Q. And will his body actually physically display signs of having been shocked?

A. It may or may not. This is not like the external cardioversion where we're applying paddles and the current is flowing over the chest wall. So

sometimes there would be -- there might be some jerking movements seen. If he is not yet totally unresponsive, you may see struggling movements, but it's also possible that he will be experiencing all of this and unable to respond and will not show any movement at all.

Q. And there'd be no way for us to know?

A. There is no way.

Q. Now, as this happens, his heart is being paced. Let's talk about how the pacemaker works, and we'll talk about the ICD again in some more detail, if that's okay.

How long does the pacemaker continue to work?

A. Until it can't capture the heart anymore, and that's going to be variable depending upon the individual. It'll depend on how fast his oxygen has fallen, how quickly other arrhythmias intervene. It's -- it's not really predictable. But pacemaker will likely work for a little while because, as I mentioned, the pentobarbital does not cause a direct injury to the heart itself, and so the capability of the heart to respond should still be there.

Q. And we know from looking at the Tennessee lethal injection protocol, there's an EKG. Is that your understanding of the protocol?

A. Yeah. Yes.

Q. But the physician, according to the protocol, isn't in the room with the EKG because he's in the garage?

A. He's in the garage.

Q. So there's nobody, from the description in the protocol anyway, that would be trained to understand what's happening on that EKG?

A. No.

Q. And so if the pacemaker is pacing his heart, it's going to continue to show heart rhythm on the EKG?

A. Yes. If it captures the heart, yes.

Q. And then with respect to the ICD, can ventricular fibrillation happen while the heart is being paced, or does the heart have to stop being paced before ventricular fibrillation could happen?

A. Well, it depends on what you mean by the heart being paced, right? The pacemaker may still be delivering electrical impulses. It doesn't know better. It's just a machine that says I'm not seeing 60 beats a minute so I'm going to give 60 impulses a minute. But what will happen is that the -- if the ICD -- if the ICD then recognizes electrical activity that looks like V-fib, V-tach, or a shock of a rhythm, it'll charge up and get ready to shock. And if it doesn't see that convert, it will shock.

Q. And you mentioned something that made me realize I forgot to ask you to explain what pacing means. And you said it'll keep making it -- giving it the little -- I forget what you said.
A. It'll -- it'll keep giving impulses. Yeah.
Q. Okay. So the electrical impulse is designed to basically mimic -- make the heart beat when it's not beating on its own?
A. It's -- yes. When that's due to electricity. That's right.
Q. And that in and of itself is not painful; fair to say?
A. It -- it's fair to say. Some patients can feel the impulses of their pacemakers, but it's usually things like -- when they can, they call them little twitches or -- they don't generally describe them as disturbing experiences.
Q. But if the pacemaker makes his heart continue to work longer and he's aware and experiencing the pulmonary edema, the pacemaker is not going to have anything to do with what he's experiencing at the time?
A. I -- I -- I'm sorry, I didn't follow you.
Q. I didn't follow me either. I guess what I'm getting at is, if the pacemaker is keeping his heart working longer, pumping longer, that's going to extend

the amount of time that, if he's aware, that he's experiencing the pulmonary edema?

A. That's correct. He will -- it will -- it will extend the execution by some length of time depending -- and that length of time will be individual to him, depending on the function of his heart, the level of oxygen in his blood at the time, and other -- and lung disease and other factors. So --

Q. Now, with respect to the way the ICD shocks, Dr. Lambrakos takes some issue with the way you described the way the pacemaker and the ICD work in tandem with each other.

Can you explain what it is you were saying in your report about the way the ICD and the pacemaker work together?

A. Now, I think she read my report, and I may -- I may be misinterpreting what she said. I think she read my report to say, first, the pacemaker does it, and then somehow it tells the ICD to do something. These two functions happen independently. So the pacemaker, as long as it's producing a heartbeat, the ICD will not shock the patient -- or the prisoner. Once the pacemaker can no longer get the heart to beat, if the -- if the ICD sees a malignant arrhythmia that it's programmed to shock, it will charge up. And if that --

if that rhythm continues through the charge up, it will deliver the shock. The two are not dependent on one another, but they will happen one after another.

Q. So the pacemaker is keeping the heart beating. Eventually it's unable to do its job. And then the -- if the heart becomes this bag of snakes, the ICD shocks?

A. That's right.

Q. And that's how it's designed to work?

A. That -- it's doing its job.

Q. And is that why in end-of-life-care situations, the recommendation of all these societies is, we need to turn this thing off so it doesn't happen?

A. Yeah. It's because in -- we know from what actually -- this is not -- this is not speculation. It's not supposition. We know what happens in patients at end of life with these devices in, and that is patients who are at end of life frequently go through these arrhythmias on their way to death and these -- these -- I'm sorry, these ICDs shock them. And they shock them -- they could shock them once and then fail and then everything is over. But they can get in these cycles that we talked about before where they shock multiple times with reports of 30, 40 shocks being given to people as they're dying. So we know that happens.

And we also know from studies of heart

electrical activity -- there was a big New England Journal study, for example, that looked at 480 patients who had died after they'd had their breathing tubes removed, they died a hypoxic death as part of their dying, you know, withdrawal of -- of treatments. And those patients had electrical activity that could persist for a long time. So we know that also could go on for a variable length of time.

In the New England Journal article, some of them went out -- one of them went out in 30 minutes. Wouldn't expect that, but certainly they saw a lot of people that went out quite a few minutes with electrical activity of various sorts happening. They included EKGs from several of those patients to show what they meant, and those -- those patients -- the EKGs in the article showed shockable rhythms. So those patients, if they had ICDs in, would have also received shocks.

Q. I'm going to ask you -- ask Tiffany (phonetic) to get that article from the New England Journal of Medicine.

A. Uh-huh.

MS. HENRY: But I need to be able to tell you the name of it.

THE WITNESS: Sorry, I wish -- I wish I could tell you. I think I -- I don't have that with me.

MS. HENRY: Anesthesia (inaudible).

BY MS. HENRY:

Q. This may not be the study that you were referencing because the one that I found had New England Journal of Medicine next to it on my index.

A. Uh-oh.

Q. I'm going to ask you if it's the right one.

A. Okay.

Q. Dr. Van Norman, is that -- the document I just handed you the correct New England Journal of Medicine --

A. No.

Q. Okay. Then hand that back to me. We won't use that one.

MS. HENRY: Sorry, Your Honor.

THE COURT: It's okay.

MS. HENRY: On a break, I'll find that New England Journal of Medicine article. I don't want to take time.

THE COURT: How about a ten-minute break now?

MS. HENRY: That would be fantastic.

THE COURT: All right.

THE BAILIFF: All rise.

(A recess was taken.)

THE BAILIFF: All rise. Please be seated.

THE COURT: I understand the parties have been talking about the schedule of -- on how we're going to proceed. Are the parties willing to finish this up on Wednesday starting at noon?

MS. HENRY: Yes, Your Honor.

MR. BRANDON: Yes, Your Honor. I'd suggest, if possible, if we could finish with Dr. Van Norman today, we'll make both of our witnesses available on Wednesday.

THE COURT: All right. Thank you.

MS. HENRY: I don't think I have more than about 15, 20 minutes left with Dr. Norman --

THE COURT: All right.

MS. HENRY: -- Van Norman.

THE COURT: When you say finish, you mean finish with cross?

MR. BRANDON: If possible, Your Honor.

THE COURT: Very good. We'll see if we can do that.

All right. You may proceed.

MS. HENRY: Thank you, Your Honor.

BY MS. HENRY:

Q. Dr. Van Norman, before the break, we were discussing this study in the New England Journal of Medicine, and I would note there are some 86 footnotes

in your report. By having -- I think I have found it. If you can let us know the --

A. Yes.

Q. -- what the document is I just handed to you.

A. Yeah. This is the correct one. Thank you.

Q. And what is that article, the title?

A. Well, this article is entitled Resumption -- resumption of Cardiac Activity After Withdrawal of Life Sustaining Measures.

Q. And was that the study that you were discussing on direct examination earlier?

A. Yeah. It's -- it's discussing how -- basically how long cardiac activity can resume and continue after an anoxic death.

MS. HENRY: So, Your Honor, I would ask that the article from the New England Journal of Medicine be admitted as the next numbered exhibit.

THE COURT: Any objection?

MR. BRANDON: No, Your Honor.

THE COURT: Okay. Exhibit 18, the article, is admitted without objection.

(Exhibit 18 was received into evidence.)

BY MS. HENRY:

Q. Now, Dr. Van Norman, I'd like to turn to the topic of what I've been calling colloquially turning the

ICD off. In medical terms, what is it called to disable the ICD? Just that?

A. It could be just -- we -- I -- I think doctors talking to one another would just say, we're going to turn the ICD off. It's deactivating therapy, is what the -- what the actual technical term.

Q. Deactivating therapy?

A. Uh-huh.

Q. How does one deactivate an ICD?

A. Well, the best way, and really the only way to be sure you've deactivated an ICD, is to use a programming computer with a programming head. You place it over the device and then that's attached to a computer that first of all interrogates the device, gives -- feeds you all of the settings of the device, and then allows you to change settings as you wish.

So for example, the -- it would be simple to say to the ICD, it -- we want all V-fib and V-tach therapies on monitor only, which means it would recognize it would not do anything.

Q. And would you -- if you were able to deactivate the ICD using this programming method, would you also be able to turn the pacemaker off?

A. I -- yeah. I mean, you can -- there are various ways you can do it. You can turn it to zero,

sure.

Q. Right.

A. To prevent the -- what I would assume would just be pacer spikes at that time on the EKG, it wouldn't be -- but if -- if the device is entered at shock mode in this situation, I don't expect that the pacer is going to be able to actually cause cardiac contraction.

Q. But if, for example, we wanted to prevent the device from extending the execution by pacing the heart, could that be done with the programming method in advance?

A. Oh, certainly. Yes. Certainly.

Q. And then we could also turn off the -- it's already -- well, we don't know for sure, but if we look at the last interrogation, it's monitoring only for V-tach, but we could also turn it to monitor only for V-fib?

A. Yes.

Q. And that would 100 percent eliminate the possibility of those shocks occurring during an execution?

A. It would.

Q. And extending the execution?

A. It would.


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 193 of 390 PageID #: 971

Q. How common is it for medical professionals to disable, deactivate the ICDs in a medical setting?
A. Well, we did it all the time in the operating room because the devices are at high risk for interpreting that electromagnetic interference in the operating room as a shockable rhythm. So we don't want it. We apply external defibrillator pads so that we can manually treat V-fib or V-tach if it occurs in that setting. But we -- we want those therapies turned off in the operating room and in other settings in the hospital where that would be likely to happen.
Q. Now, what are the requirements for someone to be able to deactivate the device?
A. Well, I -- I think the -- the professional societies want someone who is specially trained in using the interrogating computers and -- and computer heads. So that could be an electrophysiology nurse, a technician, someone like me, and in the case of the technicians or the nurses, they would want an -- a cardiac electrophysiologist present to oversee that, because there may be programming questions that come up that require greater expertise. But they could do that under the direct supervision of a cardiac electrophysiologist.
Q. But a correctional officer, for example, on an

execution team would not be somebody who could deactivate?
A. No.
Q. It does require someone with this special experience?
A. Yeah. You have to know how to program the device. You have to be -- have experience in programming the devices.
Q. There's another way to deactivate the ICD as well. Can you describe that additional method?
A. Sure. Application of a strong magnet, there are medical magnets that come in the right douse power for that, when it's placed in the correct position over the device, will usually deactivate it, but it will -- in the case of ICDs, it'll usually deactivate the therapies, but it won't always do so. And there's a significant possibility of not deactivating the device and not realizing that the magnet has not done so. It's recommended, for example, when we really want the device off in the operating room, that we not use a magnet, that we do the programming, because the magnet is not always reliable.
Q. And what are some reasons why the magnet is not always reliable?
A. Well, the first thing is a lot of people don't

notice this, but those magnets require precise positioning over the device. So for example, one of the guided devices that's shaped like that, you're supposed to have the magnet slightly off center and a little bit over the edge. Who knew? Others will be in different positions and all of the different manufacturers have different requirements for this.

So you need to have the device positioned properly and that means you need to know where that magnet has to go. You have to -- so that's one thing that can -- if it's not positioned properly over the device, it will not work. If there is too much tissue between the -- the magnet and the device, the magnet will not deactivate. If there's -- if there's objects like the -- we talked about the gurney straps that usually go crisscrossing over the chest in the Tennessee executions would probably prevent a magnet from being able to work.

If, during the course of placing the magnet, between the time that you place the magnet over the device, and in this case, the execution is done, if the prisoner moves and moves that magnet accidentally a little bit, it may allow the tachyarrhythmias to come back. Also, magnets don't always work because in a -- in a -- in a significant number of cases, the program

that allows the magnet to work that's in the device is turned off. We talked about this earlier. I can't remember her name. I'm sorry.

Q. Dr. Lambrakos?

A. Lambrakos, and no -- no disrespect to her. I just didn't have it in my head at the moment. Dr. Lambrakos talked to a tech rep about whether the device has automatically got a magnet on function or if it comes out of the box with the magnet off. We both got conflicting reports from the tech rep. Doesn't matter. There -- those magnet programming functions get changed sometimes. If the device has ever been interrogated, sometimes a careless interrogator can flip that switch.

We have people who show up in the operating room where we don't know why their device magnet -- their magnet function has been turned off, and it's a surprise because they really need it on. But the cardiologist can't tell us. They said, I -- I swear I turned it on, or it was on when I last looked at it. Maybe they got exposed to some EMI in their life. Maybe the device -- the devices still do this and we don't know how. But it is not rare by any means to discover, as we interrogate a device, that the magnet function has been turned off. So --

Q. When you mentioned EMI, the electrical --

A. Magnetic interference.

Q. Such as a metal detector?

A. Walking through a security device anywhere can do that. I'm sure your people downstairs are instructed to pat down people who might have pacemakers and ICDs in them because passing through those types -- sorts of things can have interference effects on the devices. And I mentioned TSA and other places there -- the store detectors have at times caused inadvertent shocks from these devices. So they are at -- the devices are pretty good at avoiding those things, but they're not 100 percent reliable. And we sure saw it happen. I mean, we saw these changes in devices when we were doing programmings for the operating room.

Q. Now you mentioned earlier that there can be interference with the ICD, and this is not the greatest reproduction of the photo in your report, but do you recognize the photograph that I'm showing you on the ELMO right now as a picture of the configuration of the chest straps on the gurney in the lethal injection?

A. Yeah. This -- this is exactly that, and the shoulder straps, no matter which side the device is on, are resting right above -- right on top of where devices are typically implanted.

Q. And so if the device was on top of the strap,

it would more than likely interfere with the signal of the magnet?

A. That -- it would certainly be untrustworthy, yes.

Q. And if Mr. Black were to move, jerk, have any sort of response during an execution, he could move the magnet?

A. He could move the magnet, yes.

Q. And again, we don't know what the magnet setting is because we don't have any reports that tell us what it was ever set to?

A. That's correct.

Q. And we don't have a contemporaneous interrogation to tell us what it's set to?

A. That's correct. I mean, even if I saw the implantation data and it had the magnet function on it and it said it's on, that was May of 2024. I don't know that it's still on and I would want to know for sure again.

Q. Now, Dr. Lambrakos talks about this beeping noise that the magnet can make when it has contact with the ICD. Can you tell us about the magnet, that beeping noise?

A. Yeah. As you might suspect, if you're going to turn off a device like this using a magnet, you'd

like to know if it worked, right? And so the device -- the -- the ICD itself is supposed to make a tone when the magnet comes in proper contact with it to -- to do what magnets do. So for pacemakers to change the pacing, and in the case of ICDs, to turn off the arrhythmias.

The problem is that -- and Boston Scientific was -- is, I mean, we -- we've seen this with Boston Scientific. Tone is actually pretty soft oftenly -- often. And we've had, at times, to get out a stethoscope to listen to that to figure out if it's beeping. That's number one.

Number two, these devices are -- create different beeping noises and patterns to give different information. So putting a magnet on a device that has a low battery should result in a different beeping pattern than the one that says, yes, you've deactivated the device. And there are a number of things -- oh, there are some that respond to tell you that one of the leads is not good, that sort of thing, by giving you a particular tone.

You need to know what those tones are and you need to be able to hear them. Someone who's the least bit hard of hearing is not going to hear a normal tone. And in some cases, the tone is so soft you can't hear it

without a stethoscope. In heavy patients, that could be hard to hear because there's just a lot of tissue between you and the noise.

So those tones and -- and I should say, some exposures of the devices to EMI can cause the tone function to turn off. I will say I've never seen that, but it is reported in the literature. And then the tone can just malfunction for various reasons, like anything about the device. So there is the only sure way to know you've turned the device off, is to program it off and then you know you've done it and it's done, one and done.

Q. And applying these magnetics or these magnets in the OR, it has been done; is that fair to say?

A. Oh, we did it all the time. Oh, I'm sorry. I thought you meant the programming head.

Q. Yes.

A. Yes. We have used magnets in the operating room, but frankly, we try not to, and it's the American Society of Anesthesiologists recommends against doing that.

Q. If a magnet needed to be applied in an emergency situation, does the person applying the magnet require special training?

A. They need to -- they may not have gone through

a formal training program, but they need to have special skills, put it that way. They need to know what the device is shaped like. They need to know where to place that magnet, and they need to know what tone they're hearing and what that tone means. And they need to be dealing with a -- a situation in which they aren't seeing malfunction of that -- of that tone function or of the -- of the magnet function.

Q. And would they, in this particular situation where we're talking about an execution, would they be someone who would need to be able to recognize those types of malfunctions?

A. Yes.

Q. So would a corrections officer or a warden, would without special training be qualified to just tape a magnet on Mr. Black's ICD?

A. No.

Q. Now I want to circle back to -- and this is the last area of questioning. We talked about the series of shocks that could happen with the ICD during the execution, and I want to get really specific when we talk about these shocks occurring over and over again, because there's a series of shocks and then a potential repeat of a series of shocks. And you were talking earlier about this possibility of the shocks occurring

30, 40 times. Did you mean in a sequence?

A. No, I mean a total. And it -- so in other words, the -- the programming in the device has a certain sequence that's usually -- it's usually about six shocks. It can be shorter. It can be longer but it's usually about six shocks. That's what I call a sequence. It's a sequence program. What I'm talking about is when a device starts to re-initiate the sequence because it's detected electrical activity that it interprets as being one of the arrhythmias it's programmed to treat.

Q. So that sequence, tell us about what the sequence of shocks is.

A. Sequence is that the device will deliver up to six shocks when it detects a target arrhythmia, but it may not deliver all six. It will start with one. It will listen and -- and it's just a microsecond. I don't want to make it sound like it stops for a long time. This is all happening very fast. It will listen and if it does not see that the first shock worked it will do -- it will deliver the second, and it will do the second before it does the third, and it will do -- it will wait again before the fourth and the fifth and the sixth.

If at the sixth shock, it has not succeeded in

converting the heart, but the arrhythmia continues, it gives up. It doesn't do it again. But if something else appears, and that something else could simply be that the EKG looks different, and the device -- the device is not a smart thing that's looking and saying, oh, that's just an artifact, or whatever, or that's a new -- the device will say, that's a new arrhythmia and shock one starts again, and it will do that until it no longer detects shockable electrical rhythm.

In other words, it may come to a point where it -- the heart is not -- it's still in that original arrhythmia and it hasn't gotten out of it and after six shocks, it stopped, or it may think that something else has happened and now I need to start a new sequence, and that's how we get these patients who get 30 shocks.

Ordinarily, you think we -- we program six, it's going to stop. No, some of them get 30 and it's been reported, I think the -- the largest number I've seen is 42 shocks before the device stopped. So you can get into those and it's -- it's well known in patients that inadvertent shocks occur, inadvertent shock sequences occur and that repetitive and prolonged sequences can occur, all three. That's not speculation. It's all been shown to happen.

Q. And in the case of the first shock, I think

you testified earlier that, 89 to 100 percent of the time it's going to get the heart back in the rhythm, at least the first time?

A. Yeah, if we go by the studies that look at how often you're in V-fib and a shock is delivered and it -- what does -- what happens? And the answer is, depending on the study, 89 to 100 percent of the time, the first shock will be successful and will -- it will restore a rhythm, which might be brief but it will restore it, and it -- then it will re-initiate the sequence. It will -- it will start listening again at Shock Number 1.

Q. And then if it sees another arrhythmia, after it's gotten the heart back into rhythm, it'll shock again?

A. It -- it goes right back to Shock Number 1 in the sequence and begins the whole process again.

Q. And these instances where folks have received up to 42 shocks, these were very sick people?

A. Yes.

Q. Who had very significant heart problems?

A. Yes, they were dying.

Q. And to avoid this for -- to happen in Mr. Black's execution, the device needs to be deactivated?

A. Yes.

Q. And that will give us 100 percent assurance?

A. If it's done with the program.
Q. By somebody who knows what they're doing?
A. Huh?
Q. By someone who knows what they're doing?
A. By someone who knows what they're doing.
MS. HENRY: Your Honor --
THE WITNESS: Yeah, I suppose I don't want -- I don't want somebody else handling the programming --
MS. HENRY: -- Your Honor, if I could just going to have a moment to consult with Co-Counsel?
THE COURT: Yes.
MS. HENRY: Thank you, Dr. Van Norman. That's all I have.

CROSS-EXAMINATION

BY MR. BRANDON:
Q. Good afternoon, Doctor.
A. Good afternoon.
Q. I'm going to pick up where I left off with a few questions. We were talking earlier today about a training you received in the interrogation and programming of CIEDs. After you received that training, you still follow a cardio electrophysiologist's orders in interrogating and deactivating CIED in the operating room, right?
A. No. We are certified at the University of

Washington to act independently because we've been trained and certified by the electrophysiology department to do so, and we're privileged by the hospital specifically, to be able to do so by completing training and completing testing at the end of that training to qualify us. So we don't have to have direct supervision of a cardiac electrophysiologist, but we do appreciate their help at times. So most of us, when we see something unusual, will consult with them.

Q. We already talked, you're not a board certified cardiologist?

A. Correct.

Q. And not a board certified pulmonologist?

A. Correct.

Q. But you've read literature in these fields that informed your report today?

A. I've read literature in this field. I practice cardiac anesthesiology, which gives me specific knowledge about cardiac physiology and anatomy. I have my internal medicine board certification that also gives me significant experience in managing patients with cardiac disease, and I have a decade of experience in programming and reprogramming cardiac implantable devices.

Q. In Footnote 33, you mentioned that you

actually asked the cardiologist's opinion on this subject to help form your report?

A. I asked -- I -- I asked a cardiologist -- I'm sorry, say again. I'm not --

Q. Footnote 33 of your report says you actually asked a cardiologist's opinion to help inform your opinion on the subject.

A. I'm going to look at the footnote to make --

Q. Sure.

A. -- sure I know what you're referring to, if you don't mind.

The doctor I talked to was Dr. Jeanne Poole. It was actually not with reference to this case, but she and I were having a conversation about end of life care in patients with ICDs.

Q. All right. You relied on the -- what's described as personal communication with Dr. Poole, Professor of Cardiology, leading investigator, to -- as part of the basis for your opinion?

A. I found that she agreed with what I had concluded.

Q. You've never been a prison administrator?

A. No.

Q. Never had any specialized experience in performing executions?

A. No.
Q. Or directing?
A. No.
Q. Or planning executions?
A. No.
Q. All right. Let's get in -- and Doctor, I think you've got your report still in front of you, right?
A. I do.
Q. I -- I'm going to refer to it throughout this afternoon just to help you and I stay on the same page, if that's all right.
A. That's fine. I think it will be evening, though, that you'll be doing this. That's fine.
Q. So if we could start on Page 15, this is under a heading called Description of Mr. Black's CIED. The third paragraph down begins, "The defibrillator function of Mr. Black's device was set at the time of implantation to treat ventricular fibrillation." Did I read that correctly?
A. You did.
Q. And that's still your opinion today?
A. Yes.
Q. All right, let's be very specific about exactly what Mr. Black's ICD is programmed to respond

to.

MR. BRANDON: If I could have M.

And I'm going to use the ELMO here, if that's all right, if the Court will save me a few trips back and forth.

THE COURT: Sure.

MS. HENRY: I'm going to object to -- excuse me, Your Honor, I'm going to object to display a declaration from Dr. Litsa Lambrakos, which has not been introduced into evidence.

MR. BRANDON: All right. It's already been an exhibit to Defendants' response. The objection to exclude it, the motion to strike it has been overruled. Happy to offer it into evidence now or later if, Your Honor, wait -- wants to wait for Dr. Lambrakos to verify it because of the objection, we can certainly ask questions about it right now and have Dr. Lambrakos verify it on Wednesday, if that's needed.

THE COURT: Go ahead.

MR. BRANDON: If we could get --

BY MR. BRANDON:

Q. All right, Doctor, do you recognize this document?

A. I'm going to have trouble reading that sideways. I'm sorry.

Q. I'm going to have to get used it. Ms. Henry's more adept at this machine than I am. How's that? Is that a little better?

A. It's better. Thanks.

Q. Do you recognize that document?

A. Yes, I do.

Q. All right. What's the title of it there?

A. Declaration of Litsa K. Lambrakos, M.D., July 10th, 2025.

Q. And did you review that declaration before your testimony today?

A. I did, yes.

Q. I want to direct your attention to Page 6 of that declaration. Does this section of the declaration look familiar to you?

A. It does. Uh-huh.

Q. All right. If I could just go through, there's a description here in the middle of Page 6 of ICD therapy parameters that list out a lot of numbers and categories.

Is that an accurate representation of the therapy parameters that you reviewed in Mr. Black's medical records?

A. It -- it is with the exception that I -- oh, okay. Yes, it is.

Q. And we have here "First Parameter Zone VF"?
A. Yep.
Q. Safe to say VF refers to ventricular fibrillation?
A. Correct.
Q. All right. And that therapy triggers at a heart rate of 220 beats per minute?
A. Yes.
Q. All right. But put it another way, that's a minimum necessary to trigger the VF function set to 220 beats per minute or higher?
A. Yeah, I -- it -- it says beats per minute, but it's -- they aren't really beats. They're -- but impulses, yes, that's correct.
Q. Sure. That -- that's fine.
A. Yeah.
Q. The duration lists two and a half seconds. Am I right in understanding that that would be the 220 impulses or beats per minute for a duration of two and a half seconds before that therapy treatment?
A. That's correct.
Q. And then we have just below that Zone VT. VT, I think, refers to ventricular tachycardia, which we've discussed today?
A. That's correct.

Q. And that's set at a rate of 180 beats per minute, right?

A. That's correct.

Q. All right. That's a bit slower. Still an elevated heart rate, but a bit slower than the VX Zone.

And there's no therapy, shock therapy, for ventricular tachycardia, it's just monitoring at the 180 beats per minute?

A. That's correct. And I'd just like to point out that I think earlier in my testimony, I said that that rate was 220 and it's 180. You -- you're correct in pointing that out.

Q. All right Dr. Van Norman, I'd like to go back to Page 9 of your report. If you'll let me know when you're there.

A. I am there.

Q. All right. The second full paragraph starting with the word "but."

A. Yep.

THE COURT: I'm sorry, I missed the page.

MR. BRANDON: This is Page 9 of Dr. Van Norman's report. I'm happy to put it up on the screen if it would be easier, Your Honor.

THE COURT: I got it. You may put on the screen if you wish.

MR. BRANDON: Okay. If we could -- I'll do both here.

BY MR. BRANDON:

Q. So in this second full paragraph, the first sentence beginning with "but," that sentence concludes saying that there's extensive literature regarding ICDs and dying patients.

A. Correct.

Q. Am I reading that correct? And you cite two sources in support of that contention in the first sentence, right? Footnotes 21 and 22?

A. Correct.

Q. All right. And in Footnote --

A. The two sources aren't inclusive, if that's what you're asking.

Q. In Footnote 21, you cite a source from myheartsisters.org?

A. Yes.

Q. All right Dr. Van Norman, I'd like to show you -- let's see if you recognize -- does that look like the source that you cite in Footnote 21?

A. It -- it -- yes, it does. It's one of many references that I cite in the ensuing pages about ICD and inappropriate shocks.

Q. All right. And at the top of that document,

it reads "Heart Sisters," looks like the title of the page?

A. Yes.

Q. And just under the date there of January 12th, 2025, includes a web address that starts with myheartsisters.org and then has a lot of following URL after that.

A. Yep.

Q. I'm going to show you another --

A. I'm sorry, could I see a copy of that source in front of me if we're going to be discussing it or you're going to be discussing it?

Q. That's all I've got to discuss about that one.

A. Okay.

Q. I'm showing you another document here. What is the title at the top of this page?

A. Heart Sisters: For Women Living with Heart Disease.

Q. And it looks like a maybe subheading just below that in bold; what is that?

A. About This Site.

Q. Okay. And then if I move to the middle of the page, we have a title -- a disclaimer about Heart Sisters, followed by a web address that's also myheartsisters.org?

A. Yes.
Q. And if I can move just a little bit to the bottom of this page, I can try at least, that also shows an address. Maybe I need to zoom in and we can try it. Myheartsisters.org?
A. Yes.
Q. With an "about heart sisters" ending that URL? Is that -- is that the end of that URL there at the bottom of the page? It ends with "about heart sisters"?
A. Yes.
Q. If you could read out loud, I'll see if I can get it on the front of the screen here, the first two sentences of this webpage beginning with, "I am not a physician"?
A. Yes. This is generated by patients. "I'm not a physician, nurse, or a member of the medical profession. The information on this site isn't intended as a substitute for professional medical advice. Please consult your doctor for specific help with your own health. Do not leave comments describing your symptoms, because I've just told you to consult a physician."
Q. And that's the site that you relied on, in part, at least, to inform the extensive literature supporting your contention on Page 9?
A. I am pointing out some patient facing

literature. If you continue down to page and look at all of the discussion, you'll see citations of multiple studies regarding this topic, so --

Q. We'll get to -- we'll get to each of those, Doctor.

A. I know we will. But I --

Q. -- have to work on those --

A. -- want to make sure that --

THE COURT: Wait a minute. She gets to talk a little bit.

THE WITNESS: Yeah.

THE COURT: I know you want to cut her off.

Go ahead.

THE WITNESS: Thank you.

Both patient-facing literature, as I mentioned before, and physician-facing literature is important here in understanding patient experiences with this, as well as physician studies. So I've, throughout this report, cited both kinds of literature in discussing the nature of inadvertent shocks.

BY MR. BRANDON:

Q. And, Doctor, I'm going to move back to Page 9 of your report. In the second sentence of the same paragraph, and we'll go back on the camera here. The second sentence reads, "Over one third of dying patients

who have ICDs experience shocks from the device while they are incapacitated."

Did I read that correctly?

A. You did.

Q. And it looks like there's not a citation following that sentence, but there's one following the next sentence in Footnote 23?

A. Wait one second.

Q. Okay.

A. Both sentences are footnoted by 23. I don't necessarily put a footnote every sentence.

Q. That's what I assumed. I was going to ask you that my next question.

A. Yeah.

Q. So 23 relates to both sentences supporting those contentions there?

A. Yes.

Q. And Footnote 23 here at the bottom of the page references a source called "Implantable Cardio-defibrillator Therapy Before Death;" is that right?

A. "High Risk for Painful Shocks at End of Life," published in Circulation, the heart journal.

Q. That's the full title, yes?

A. Yes.

Q. Thanks. I cut off part of the way through

here.

All right. Dr. Van Norman, do you recognize this document?

A. Yes, I do.

Q. All right. Could you read the title of that one?

A. "Implantable Cardioverter-Defibrillator Therapy Before Death: High Risk for Painful Shocks at End of Life."

Q. And this is the study we just discussed that you cited in Footnote 23?

A. It is.

Q. I'm going to turn to Page 426 under discussion, and I'll flip there for you as well.

A. If you're going to refer to more in the article, I would like to see a copy of the article if I can --

Q. I can bring up a copy if that'd be easier.

A. That would be easier.

Q. Sure.

A. Thank you. It's just hard to look at an isolated paragraph and get the whole meaning.

Q. Completely understand.

A. Yeah. Thank you.

MR. BRANDON: Up here, Your Honor.

THE COURT: Thank you.

BY MR. BRANDON:

Q. This will save me the embarrassment of moving it around on the camera as well.

A. It's going to be faster maybe, too.

Q. All right. Under Discussion, the heading on Page 426, there's a big bold one called Discussion. If you let me know when you've got there.

A. Yes.

Q. And in the second half of the first sentence there, the authors of this article report, "One third had ventricular tachyarrhythmia events with shocks close to death."

Did I read that correctly?

A. Yes.

Q. And that corresponds with your contention on Page 9 of your declaration that one third of dying patients experience -- who have ICDs experience shocks from the device?

A. This was -- this was the footnote of reference, yes.

Q. Okay. Understood. So let's move back to Page 423 of this same source. There's a heading in bold called "Analysis of Arrhythmias."

A. Yes.

Q. And I'd like to start with the second paragraph, the second sentence. It's a sentence that reads, "The incidence of ventricular tachyarrhythmia" --
A. I'm sorry, could -- could you repeat that again?
Q. Yes.
A. I'm sorry.
Q. Yes. The second -- so under the heading of Analysis of Arrhythmias, looking at the second paragraph, second sentence.
A. Okay. Yes.
Q. All right. And I see a sentence here that reads, "The incidence of ventricular tachyarrhythmia, ventricular tachycardia, VT, or ventricular fibrillation, VF, and shock treatment was reported."
A. Yes.
Q. Did I read that correctly?
A. Uh-huh.
Q. So this study counted shock treatments responding to both ventricular tachycardia and ventricular fibrillation?
A. That's correct.
Q. It doesn't separate its count out between those two tachyarrhythmias?
A. That's correct. And it doesn't separate out

patients who experienced both.

Q. All right.

A. Okay.

Q. It also does not describe what the threshold heart rate the investigators used to count ventricular tachyarrhythmia in any case, does it?

A. It does not. Over 180 is pretty standard.

Q. And it does not recount what threshold heart rates the ICDs in the study were programmed to respond to.

A. I'm -- say -- say again? Oh, for the pacing function?

Q. It doesn't count -- we talked about earlier Mr. Black's ICD being programmed to respond to VF events at 220 beats or impulses per minute, is that --

A. Correct. Correct.

Q. This study doesn't recount how those ICDs and the patients that were studying were programmed, at what threshold of beats per minute or impulses per minute their ICDs were programmed to respond.

A. I don't think it does. Let me just take a moment and look through because --

Q. Take your time.

A. But I think you're correct.

Q. Okay.

A. I just want to make sure.
Q. Happy to double check.
A. Sometimes they'll list them in a table and I just want to make sure since you're asking a really specific question.
Yes. I think that's accurate.
Q. And if we could turn to the next page, 424, there's a section called Statistical Analysis. If you'll let me know when you're there.
A. I'm there.
Q. Okay. We're going to go the fourth sentence. It's just after Footnote 18 that begins with the word "taking."
A. Yes.
Q. All right. And that says, "Taking the prevalence of ventricular arrhythmia as 50 percent to obtain the maximum sample size, the margin of error as 10 percent, and the confidence interval as 95 percent, a sample size of 96 patients was required for the study."
A. That's correct.
Q. Did I read that correctly?
A. Yes.
Q. All right. Now, it's been a while since I took high school statistics, so you're going to have to help me out here.

A. Oh, good.
Q. But we have what I understand here is a description of the statistical analysis being performed, starting with some suppositions, I guess you'll call them, that if you hold certain things constant to get a margin of error of 10 percent, they needed at least 96 patients to participate in the study.
A. That's -- that's true of any study that has a 95 confidence interval and plus or minus 10 percent error. That's correct.
Q. Okay.
A. 96, 97 is usually the number.
Q. Okay. That's roughly standard for those sorts of studies.
A. Yeah.
Q. And here, this study had only a hundred patients with detection on in the final 24 hours of their life; is that right?
A. It had a -- a hundred, right? Is -- is that what you're --
Q. Yes. A hundred patients with detection on in the -- in the last 24 hours --
A. I believe that's true. Yes.
Q. Okay. If we turn to Page 425, the next page, the first full paragraph that starts with the word

"among" at the very top left, the last sentence begins, "There were 38," if you could follow along with me on that one.

A. That's correct. Yes.

Q. Okay. So we have, "There were 38 patients with VT/VF during the final 24 hours (38 percent, 95 percent confidence interval, 29 percent to 48 percent), and 31, 31 percent, experienced greater than one -- or greater or equal to one shock. Did I read that roughly accurately?

A. Yes. That -- that's correct.

Q. Okay. That -- in the parentheses, 95 percent confidence interval, 29 percent to 48 percent, that range represents that 10 percent margin where -- that was discussed in the statistical analysis section?

A. It does.

Q. All right. And so that means, based on the statistical analysis of this study, 29 percent to 48 percent of the patients in this study experienced some form of tachyarrhythmia in the last 24 hours before their death.

A. Yes.

Q. All right. That 29 to 48 percent doesn't distinguish between ventricular tachycardia or ventricular fibrillation?

A. Not here. No.
Q. All right. And it doesn't tell us what the heart rate was for those tachyarrhythmias.
A. No. Although we -- what we do know is that, if they received shocks, they were -- regardless of the heart rate that was designated by the device, they fell within the therapy margins of the device. Do you understand what I'm saying?
Q. Yes. I understand and --
A. So there's no question that they got shocks that the device was told to give.
Q. Right. But we don't know what the therapy settings were on these particular devices, but they got shocks because they were triggered within those therapy settings.
A. It's true, but we don't really need to know what the therapy settings were. What we know is that, whatever they were set at, the device saw what it interpreted as being an appropriate shock window and it delivered shocks. The importance is that they got shocks, not what the device was programmed to do but what the device actually delivered. Do you understand what I'm saying?
Q. I think I heard you.
A. The --

Q. If we can turn to Page 425 again, the second paragraph in the right column that begins, "There were four system-related deaths."
A. Yes.
Q. All right. That second sentence we have, "A possible device malfunction was caused by under-sensed VF in three cases." Did I read that correctly?
A. You did.
Q. All right. So there were three cases in this study of a hundred patients where VF is reported by the investigators by examining EKG and other data on the back end --
A. That's correct.
Q. -- but it wasn't sensed by the ICD?
A. That's correct.
Q. And then just a little below that there's a sentence that begins, "There were" just above a 7 percent in parentheses. I don't know a better way to point that out.
A. I'm sorry, I'm trying to find it. Oh, there we go. There were -- the one that starts, "There were an additional nine"?
Q. Yes.
A. Okay.
Q. "There were an additional nine cases of

intermittent under-sensing, 7 percent, which was not regarded as the cause of death because of the natural change in amplitude in untreatable VF in a dying patient." Did I read that correctly?
A. Yep.
Q. So we had, again, in a sample of a hundred patients, an additional nine cases of under-sensing by the ICD?
A. Correct.
Q. All right. So that brings us to 12 cases of under-sensing out of a hundred patients.
A. Well, hold on a minute. It -- it brings you to 12 cases or -- but it is not saying that any of those -- it -- it's not giving you 12 cases in which the ICD absolutely didn't function. It's saying that there was an episode in which an arrhythmia occurred in which the ICD did not fire.
Q. Okay.
A. That's different than saying that the ICD never fired, never -- never functioned, didn't respond to an arrhythmia. Do you understand what I'm saying?
Q. But that happened 12 times.
A. It happened 12 times, not necessarily in 12 patients. Do you understand?
Q. And --

A. Well, I mean, in nine patients, they would see an episode of it or in 12 patients they would see an episode of it. But that doesn't mean necessarily that the device didn't otherwise function normally at other times in the arrhythmias.
Q. None of the patients in this study received an injection of five grams of pentobarbital before their death.
A. I think that's safe to say.
Q. All right. If we could move back to your declaration, Dr. Van Norman, to Page 15.
Okay. Thanks for your patience, Doctor. I had to find the -- my own sentence here. The very last sentence on the page that begins, "This raises concerns about the current programming."
A. I'm sorry, which page are we on?
Q. Page 15 of your declaration.
A. Yes.
Q. All right. You say in your declaration, "This raises concerns about the current programming status of Mr. Black's CIED and how Mr. Black's device will respond when it is confronted with the abnormal cardiac activity that will certainly occur during execution by injection."
Did I read that correctly?

A. You did correctly.
Q. Okay. Is atrial fibrillation considered abnormal cardiac activity?
A. It is.
Q. How about atrial flutter?
A. Yes.
Q. Supraventricular tachycardia?
A. I should back up though and say that usually AFib and A-flutter are not treated by the ICD.
Q. Understood.
A. So if we're look -- if we're going to talk about what the ICD is going to do, we should talk about the rhythms that the ICD is going to pay attention to.
Q. I'm just trying to understand what could be embraced by the phrase abnormal cardiac activity.
A. Anything other than normal sinus rhythm.
Q. Okay. And that would include supraventricular tachycardia?
A. It could.
Q. Ventricular tachycardia that we talked about, VT?
A. Correct.
Q. Bradycardia.
A. Correct.
Q. Agonal rhythms?

A. Correct.
Q. Asystole?
A. Correct, although I guess -- asystole is a rhythm, but all ICD --
Q. So a lack of activity?
A. Yeah. I was going to say it's really a lack of cardiac activity.
Q. Okay.
A. So.
Q. You could debate whether, I guess, that one would be included, but there -- there's lots of abnormal cardiac activity that are not necessarily ventricular fibrillation.
A. That's true.
Q. Moving to Page 16, the next page of the report, you recount in a number of points -- well, let's start back in the first full paragraph here. "In my opinion, the following scenario is extremely likely based on well-known pentobarbital effects." Am I reading that part of your declaration, correct. I think it's the second full sentence in the first paragraph.
A. Yes.
Q. Okay. And then you have a number of numbered points following that paragraph. Am I correct to understand that the -- your opinion that the following

is extremely likely applies to each of the paragraphs below that.

A. It -- it -- yes. It applies to the sequence of events.

Q. Okay. And in the second sentence of Point number 1, beginning with "A well known"?

A. I'm sorry, the second --

Q. Second sentence of Point number 1.

A. Correct.

Q. You say, "A well-known immediate result to pentobarbital injection is a drop in heart rate or bradycardia and a drop in systemic blood pressure."

A. Correct.

Q. And you think that that is extremely likely to occur based on the well-known effects of pentobarbital?

A. Yes.

Q. If we could move on to Page 19 of your declaration. There's two bullet points at the top of the page. I'm going to start with the first one here. You there?

A. I am. Thank you.

Q. Okay. Doctor, you say in your declaration, "Pentobarbital itself has never been widely used for anesthesia in humans in the United States due to its adverse effects on the cardiovascular system." Am I

reading that correctly?
A. You are.
Q. All right. And pentobarbital regularly has the effect of lowering blood pressure?
A. Correct.
Q. It also slows the heart rate?
A. Correct.
Q. And it decreases the strength of the pumping action of the heart?
A. Correct.
Q. If you don't mind, let's jump back temporarily to Page 17 of your declaration. We have a paragraph with a number six in front of it here?
A. Correct.
Q. And is this part of the continuation of the scenarios that you find extremely likely based on the known effects of pentobarbital?
A. Sorry, you're making me flip pages.
Q. That's fine. You take your time and flip back.
A. I want to make sure I know which sequence we're in.
Q. Yes.
A. Yes.
Q. All right. And the first sentence of that

Paragraph 6, you say, "As oxygen levels fall, arrhythmias of the heart, such as VT and/or VF, eventually happen." Did I read that correctly?
A. You did.
Q. Now I didn't see -- and correct me if I'm wrong -- there's no footnote after that sentence or anywhere in that paragraph, is there?
A. That's correct.
Q. Okay. So you don't cite any sources for that particular footnote or --
A. I'm not --
Q. -- for that particular contention?
A. No.
Q. Okay.
A. If you'd like me to find one, I'd be happy to.
Q. And you say, "arrhythmias of the heart, such as VT and/or VF." Arrhythmias of the heart would include all of the things that we just described as abnormal cardiac activity?
A. It could, yes.
Q. It doesn't necessarily mean ventricular fibrillation?
A. Almost always, the end game is VT/VF. But you're right, it doesn't have to.
Q. If we could move over to Page 20 of your

declaration --

MS. HENRY: Your Honor, I'm sorry. I'm going to need to impose an objection as to that last question. Now, Mr. Brandon is attempting to rewrite the grammar of the sentence, and he's taking arrhythmias and asking a question out of context, whereas that sentence actually read, "arrhythmias such as." I think the "such as" is rather important and I would ask that Counsel not be deconstructing the sentences out of context for the jury.

THE COURT: Okay. Well, you may proceed, Counsel.

BY MR. BRANDON:

Q. All right. Doctor, if we could start on the top of Page 20 with the sentence, "studies indicate." Are you with me there?

A. I am.

Q. All right. Your sentence reads, Studies indicate that almost all patients given IV short-acting barbiturates retain awareness for significant periods of time following injection." That's bookended by Footnote 52; is that right?

A. Correct.

Q. All right. Footnote 52 down at the bottom of the page there, you cite a source called Awareness

Detection During Cesarean Section Under General Anesthesia Using EEG Spectrum Analysis. Is that the --

A. Correct.

Q. -- correct source? I'm going to approach, Doctor, with a couple of copies here so we can look at it together.

A. Okay.

Q. All right. Doctor, do you recognize the document I've handed you?

A. I do.

Q. This is the study you cited in Footnote 52?

A. It is.

Q. All right. If we could turn to the second page, which I think is Page 378, there's a heading in bold called Methods.

A. Yes.

Q. And we're going to move to the fourth paragraph, the first sentence that starts with, "Anesthesia was induced."

A. Yep.

Q. Let me know when you've got there. All right. So this paragraph describing the methods of this study says, "Anesthesia was induced according to the drug assignment with either thiopentone 4 milligrams per kilogram or ketamine 1 milligram per kilogram." Did I

read that correctly?
A. You did.
Q. All right. And if we could move to Page 379, Table 1 at the top left. Am I understanding that table correctly to reflect that the average weight of a woman in this study was 73 kilograms?
A. I'm sorry, say again your question.
Q. Am I reading this table correctly, Table 1 here, to reflect that the average weight of a patient in this study was 73 kilograms plus or minus 7?
A. The median weight was 73 kilograms plus or minus 7.
Q. Okay. So that average or median patient would've received 292 milligrams of thiopentone?
A. I don't have a calculator, but I'll take your word.
Q. Does that sound about right --
A. Yeah.
Q. -- multiplying?
A. I'll take your word for it.
Q. All right. We get 4 milligrams multiplied by 73 kilograms. And in your report, we can go back to the specific page, but I think you opined in your report that pentobarbital and thiopental are essentially equivalent in all pharmacological characteristics

relevant to lethal injection executions?

A. That's correct. Yes.

Q. All right. So the thiopentone in this study, is that just a different name, same as sodium thiopental? Is it equivalent?

A. It is a -- it's an equivalent. It's essentially the same. I -- I believe there's an extra oxygen molecule somewhere, but it is identical in characteristics to all the others.

Q. It wouldn't affect the dosing that you'd give as an anesthesiologist?

A. No.

Q. The lethal injection protocol, as we've discussed, calls for a dose of 5 grams of pentobarbital?

A. That's correct.

Q. So the women in this study received at most a dose of thiopentone around 300 milligrams, about 6 percent of the dose in the protocol?

A. I -- again, I don't have a calculator, but they received around 300 milligrams.

Q. If we go to Page 379 -- no, actually, we can move on. All right. Back to Page 20 of your report, Doctor, I'm going to stay in this first large paragraph, and I apologize that it's a large one. Perhaps I could put it on the screen here to help us all follow along.

So we have -- this is tricky. Here we go. If you can follow me right there, that second half of the sentence beginning after "injection"?

A. Yes. Oh, wait, wait.

Q. I'm sorry?

A. Oh, yes. I've got it.

Q. Okay. Your declaration says, "After injection of thiopental, over 96 percent of patients responded to commands and indicated they were aware."

A. Correct.

Q. All right. And to support that contention, you cite in Footnote 54 a source titled, Adequacy of General Anesthesia for Cesarean Section?

A. Correct.

Thank you. I'm sorry. Can I put the other two articles away or should I keep them?

Q. I think that's fine.

A. Thank you. I -- I'm starting to pile them up here.

Q. I have to apologize. You may have a large stack by the time we're done.

A. Just let me know when you're done with one and I'll put it away.

Q. Sure.

A. And that way I -- I don't get lost in paper.

Q. How about we do this? I will let you know if I'd like for you to keep one out --
A. Perfect.
Q. -- besides your report. I think we can move along with them --
A. Perfect. Thank you.
Q. -- unless I say otherwise. All right. Let's see. I've handed you another document, Dr. Van Norman. If you could, tell me the title of that document?
A. This is the King document you're referring to?
Q. Yes.
A. Okay. That's Adequacy of General Anesthesia for Cesarean Section.
Q. All right. And that's the document you cite in Footnote 54?
A. It is. Yes.
Q. All right. I'm going to start just with the abstract here. The first page, the second sentence here beginning with, Anesthesia was induced." Let me know if you've found that.
A. Correct.
Q. All right. So I have this study saying, Anesthesia was induced with intravenous thiopental 3 milligrams per kilogram, 250 milligrams maximum?
A. Correct.

Q. Did I read that correctly? Now, thiopental, we just discussed your opinion is equivalent to pentobarbital, the dosages would be the same?
A. Yes.
Q. All right. This study reflects a maximum of 250 milligrams administered to the patient?
A. It does.
Q. And that's about 5 percent of the 5,000 milligram dose administered to the inmate in a lethal injection protocol?
A. I'll take your word for it because I -- I don't have a calculator with me and I -- I don't trust my math this late in the day.
Q. We'll say 250 milligrams divided by 5,000 milligrams.
A. Sounds right.
Q. All right. If we can move back to Page 20 of your declaration --
A. Okay.
Q. -- and we're going to move down just one sentence, but I'll put this back on the camera here in hopes that I can help point it out here. Just after Note 54, we have a sentence beginning, "similar findings."
A. Correct.

Q. You with me there? Okay. Can you read on your report if I pull this back up to my table?

A. You want me to read the -- you want me to --

Q. I can read it. I just wanted to make sure you could follow along on your --

A. I can follow it on my --

Q. -- in your copy. All right.

A. -- my copy. Thank you.

Q. We have, "Similar findings of awareness during surgery after barbiturate anesthesia induction have been confirmed in other studies," your declaration says.

Did I read that correctly?

A. Yes.

Q. All right. And you cite a number of sources in support. First we have, in Footnote 56, a source titled, Comparison of 1.5 Percent Enflurane With 1.25 Percent Isoflurane and Oxygen for Cesarean Section.

Did I read that correctly?

A. You did. May I put King away?

Q. Yes, you can.

A. Thank you. Thank you.

Q. All right, Doctor, do you recognize the article I just handed you?

A. I do.

Q. Okay. Is this the one cited in Footnote 56?

A. I believe so, yes.
Q. And if we could go to the second page under patients and methods?
A. Yes.
Q. The third sentence down, I believe. Hold on. Sorry. The third sentence of the second paragraph under patients and methods.
A. Okay.
Q. The sentence beginning anesthesia was induced. You're there? Okay.
A. Yep.
Q. I see the article says, "Anesthesia was induced with thiopentone, 250 milligrams IV" followed by a chemical whose name? I'm not going to try to pronounce.
A. Suxamethonium.
Q. There we go.
A. Does that help?
Q. That helps a lot there. So here in this study, the dose of the barbiturate thiopentone, which we mentioned earlier was 250 milligrams again.
A. Correct.
Q. All right. That's the same ratio. 250 milligrams to 5,000 milligrams of calcilated --
A. It's the same thing, yes.


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 243 of 390 PageID #: 1021

Q. All right. Let's move to Footnote 57. You can dispose of this one.
A. Thank you.
Q. We have in Footnote 57, a source titled Absence of Memory for Intraoperative Information During Surgery Under Adequate General Anesthesia.
Did I get that one right?
A. Yep. Although I think I misspelled surgery in the footnote. Mistyped, I didn't misspell it. I know how surgery is spelled.
Q. I'm sure you do. I do not fault you a bit, Doctor.
A. Yeah.
Q. All right, Doctor, do you recognize this document?
A. I do.
Q. This is the study side of Footnote 57.
A. It is, I believe. Yes, it is.
Q. I'm going to turn to the second page of this one. The first full paragraph under the heading summary, I believe.
It looks like we've had a reproduction problem on this one. Are you seeing the same Page a number of times, Dr. Van Norman, trying to change pages or is that my copy that's bad?

A. It's your copy. I've got -- do you want my -- do you want mine back?
Q. No. No. Here we go. Nope, it's just that one. I've got a -- I've got a backup. I'll move to this.
All right. The first full sentence on the second page, which looks like a Page 4 heading at the top beginning with after pre-medication.
A. Correct.
Q. All right. The study reflects after pre-medication with temazepam 20 milligrams orally one to two hours before operation and after baseline readings had been obtained for the monitoring system. Anesthesia was induced with thiopentone five milligrams per kilogram. Did I read that correctly?
A. It says that. Correct.
Q. Okay. So this study, again, in a say 100 kilogram woman, the dose would've been 500 milligrams at five milligrams per kilogram?
A. Yep.
Q. That's 10 percent. 500 milligrams of the 5,000 milligram dose in the lethal injection protocol?
A. That's correct. That one I could do in my head.
Q. That's a little easier. Okay. We can dispose

of that one, doctor.
A. Thank you.
Q. Move on to Footnote 58. We have a source titled Systolic Blood Pressure Not BIS is Associated with Movement During Laryngoscopy and Intubation.
A. That's correct.
Q. Doctor, do you recognize this document?
A. I do.
Q. This is the study you cited in Footnote 58?
A. It is.
Q. I'm going to go to the second page of this one as well. There's a subheading called Methods. I'm going to move, I think to the second paragraph in that method section.
A. Yes.
Q. And then the second sentence in that second paragraph, beginning with General anesthesia, you following me?
A. I am.
Q. All right.
A. I may be ahead of you.
Q. You probably are. I wouldn't put it past you. So we have here, the author's report, "General anesthesia was induced with two micrograms per kilogram, fentanyl as a bolus followed by thiopental four to five

milligrams per kilogram."

Did I read that correctly?

A. You did.

Q. Again, if we assume we have 100 kilogram patient in this study weighing about 220 pounds, that's a dose of thiopental around 500 milligrams?

A. That would be about right.

Q. And that's 10 percent of the five gram dose in the injection protocol?

A. That's correct.

Q. Okay. I may have lied, Dr. Van Norman. I am going to ask you to pull back out the source that has Defendants' Exhibit T marked on it.

A. Oh, shoot. Do you have a name for it, so I --

Q. It is Awareness Detection During Cesarean Section Under General Anesthesia Using EEG Spectrum Analysis.

A. You told me I could put that away.

Q. I did. I'm so sorry.

A. Okay. T. Awareness Detection.

Q. Yes.

A. Yes.

Q. And that's cited in Footnote 55 to the symptoms that we've been discussing?

A. Yes, it is.

Q. All right. So you cited this article a number of times that you cited in support here in Footnote 55. And as we discussed in this study, the patients received a dose of about 6 percent of the 5,000 milligrams in the lethal injection protocol?
A. You're not going to do the math for me again?
Q. I can walk you through it again.
A. It's all right. I will take your word for it because that sounds about right.
Q. Okay. I think we talked on page 379 of this one, the average weight in the woman of the study was 73 kilograms --
A. That's correct.
Q. Plus or minus seven.
A. Yeah.
Q. Got multiplied by four to 292, roughly 300.
A. I'm with you.
Q. All right. So I want to sum up after looking through all of these footnotes. When you say in your declaration, "Similar findings of awareness during surgery, after barbiturate anesthesia induction have been confirmed in other studies," all of the sources that you cite in support of that opinion involved administration of a dose less than 10 percent of the 5,000 milligrams of pentobarbital.

A. That's correct. I don't think we're going to be able to find a study that kills patients with lethal doses of pentobarbital or thiopental and then it looks at awareness.

Q. And the we saw a video of the isolated forearm technique being performed in the operating room earlier. That patient also didn't receive 5,000 milligrams of --

A. I cannot make a comment of what they did or did not receive because the anesthetic that's given in that video is not detailed and it may not have been pentothal at all. I presented that video simply the -- so that when you talk about the isolated forearm -- forearm technique, we'd all know what we were talking about.

Q. All right. So you have no idea what that patient would to receive in terms of medication?

A. I can't -- can't comment high or low on doses or even what the agents were.

Q. All right. All right. We're going to move down to the bottom of page 20 of your declaration. I do think I'm finally done with that one. I have put Exhibit 2 away.

Under a heading C, Inability to Diagnose Awareness, the first line there, beginning studies using IFT technique. I think you're with me. I see you

nodding.

A. I am.

Q. You say, "Studies using the IFT technique and others have demonstrated that no clinical parameters" -- I'm going to skip those parameters. "Reliably identify whether a patient is aware," that runs into the top of page 21. Is that --

A. That's correct.

Q. Did I read it correctly? All right. We have a string of footnotes again, cited in support of that part of your opinion. We have Footnotes 59 through 65. I'm going to start here with Footnote 59, you rely on a source called Induction of Anesthesia With Diazepam; is that right?

A. Yes. But if we're going to talk about the study, I'm going to see a copy of it.

Q. I'm going to hand it up.

A. Thank you.

Q. I want to make sure I grab the right one.

A. Yeah. No worries. I am asking for those precisely, because you're asking about so many studies. I want to be sure.

Q. Of course, the numbers would run together in my head as well.

A. I am keeping them in a neat pile for you.

Q. Thank you so much.
A. You bet.
Q. All right, Dr. Van Norman, do you recognize this document?
A. I do. It's been a while since I looked at this study, so I might be a little bit slower with it. Just fair warning.
Q. That's fine. We can work our way together. This is the article that you cite in Footnote 59.
A. Uh-huh.
Q. Okay. If we could move to the second page. There's a heading there just below the chart that says anesthetic technique.
A. Correct.
Q. And if you could, I'm not going to repeat out loud, but if you could read those two paragraphs and let me know when you finish the first two paragraphs under anesthetic technique.
A. I am going to read a little further just to orient myself to the article.
Q. That's perfectly fine.
A. So give me a moment.
Okay.
Q. The two modes of induction in this study both relied for these primarily on diazepam; is that right?

A. That's correct.
Q. And that's a benzodiazepine?
A. That's correct.
Q. And without getting into too much detail, that's a different class or category of drugs than a barbiturate?
A. That's correct. This study is being presented to show that traditional parameters that anesthesiologists often used to say that a patient is not aware don't work.
Q. And there's no barbiturate used in this study?
A. Not in this study, no.
Q. We'll move to Footnote 60. There's a source titled Clinical Comparison of Midazolam Hydrochloride and Midazola -- Midazolam Maleate for Anesthesia Induction. I got the name of that one right in Footnote 60?
A. Yeah. That's the correct -- that -- that is Footnote 60.
Q. Okay. I'll bring up another document for you, Doctor.
A. Thank you.
Q. All right. Doctor, do you recognize this document?
A. I do. But once again, it's been a little

while, so I want to take a moment and look through it.
Q. Perfect. Take your time. And I am going to specifically direct your attention to the first page under the heading Methods. You can let me know when you're ready to be there.
A. Give me just one moment and I --
Q. That's fine.
A. -- I apologize for taking extra time.
Q. That's -- you --
A. -- but I want to make sure --
Q. You can take your time.
A. Yeah.
Q. I just wanted to let you know where I'd be focusing on.
A. I'm not -- I'm not trying to make us stay later. I'm just trying to make sure I get this right.
Q. That's fine.
A. Yes.
Q. Okay. All right, I'm going to go to the very last sentence on that page that starts to hang on to the next page on the methods, begins with "All patients received."
A. I'm sorry, I'm not seeing that. Where is it?
Q. It's just above the exhibit sticker.
A. On --

Q. On the first page under the --
A. Oh, okay. I'm sorry, I was looking for the first sentence. All right. Good.
Q. Yes. Yeah. Second sentence of that last paragraph there.
A. Yeah. That's fine.
Q. The authors here describe, "All patients received midazolam maleate for one procedure and midazolam hydrochloride for the other procedure in a dosage of 0.3 milligrams per kilogram for both drugs." Did I read that correctly?
A. That's correct.
Q. Okay. So again, the two modes of induction of anesthesia you used in this study, both relied on midazolam?
A. That's correct.
Q. That's also a benzodiazepine, like diazepam?
A. That's correct.
Q. There's no barbiturate involved in this study?
A. No. Once again, this study is not intended to talk about barbiturates. It's intended to talk about awareness testing. And so that's why it was presented. It doesn't relate to pentobarbital in that in -- in terms of what pentobarbital would do on induction.
Q. Going to move on to Footnote 61. Those cites

a source called "Evaluation of midazolam as an intravenous induction agent"?
     A.   Yes.  Thank you.
     Q.   All right, doctor, do you recognize this document?
     A.   I do.  And once again, I'm going to ask you to just give me one moment.
     Q.   Take your time.
     A.   Okay.
     Q.   All right.  This is the source you cited in Footnote 61 of your declaration?
     A.   That's correct.
     Q.   Okay.  We're going to move to the second page under the heading Methods.
     A.   Yes.
     Q.   And look at the second paragraph, I believe the second sentence.
     A.   Yes.
     Q.   We have midazolam was given at four dose levels ranging from, I believe -- is that 0.15 to 0.5 milligrams per kilogram?
     A.   Oh, that's correct.
     Q.   Okay.  Did this study, likewise, relied on midazolam as an induction agent for anesthesia?
     A.   That's correct.  But once again, this is not

intended to talk about pentobarbital's CNS effects. It's intended to demonstrate that traditional anesthesia parameters for awareness, do not adequately detect awareness.

Q. I just want to get details on the specifics of the studies. I appreciate it, Doctor.

A. Yeah.

Q. Again, midazolam is in the benzodiazepine class of drugs? There's no barbiturates involved in the study?

A. That's correct.

Q. Okay. Moving to Footnote 62, we have a source cited called Comparison of Wakefulness with Two Anesthetic Agents; is that right?

A. Yes.

Q. 62 of your declaration?

A. 62. Yes, correct.

Q. All right. Doctor, do you recognize this document? You're welcome to take a moment to look at it, if you like.

A. I'll take a short look, but I do recognize it. Yes.

Q. Okay. This is the cited in Footnote 62?

A. It is correct, yes.

Q. All right. On the first page under Patients

and Methods --
A. Yes.
Q. -- we're going to take a look starting under the heading Group A Balanced Regime, and I'll just give you a moment to read through those couple paragraphs. I'm going to paraphrase. I want you to be familiar with the content.
A. I -- I -- I'm sorry. If you're waiting for me. I'm ready.
Q. Okay. Yeah. I just wanted to confirm. So Group A and the balanced regime --
A. Yes.
Q. -- received a sleep dose of thiopentone with maintenance of anesthesia with nitrous oxide and oxygen?
A. Correct.
Q. All right. And Group B, the Total IV Anesthesia Group got -- and correct me if I say this wrong, etomidate through an infusion pump in doses of micrograms per kilogram per minute?
A. Correct.
Q. All right. So we do finally have a study on chemicals. We have a sleep dose of thiopentone. We discussed earlier that's chemically equivalent, or at least for our purposes --
A. Uh-huh.

Q. -- equivalent to pentobarbital, right? Do you know what a sleep dose of thiopentone is? How big a dose that is?

A. I don't know what this author meant about it. Typically, when we talk about a sleep dose, we talk about between 2.5 and 5 milligrams per kilo.

Q. I'm sorry, what was what?

A. 2.5 and 5 milligrams per kilo?

Q. 2.5 to 5 milligrams per kilogram?

A. So this is a little bit low, but I would like to point out something. And that is in each of the studies that you've presented to me, and I meant to mention this earlier, while you are pointing out the induction drugs, you're not including other drugs that were given to the patient prior to induction of anesthesia.

So for example, each of these patients also received fentanyl 250 mics IV, which is a big dose. So these anesthetics were not accomplished by these sleep doses, and these -- and once again, these are being presented to show how monitoring for awareness under general anesthesia, the traditional monitors don't work.

Q. And none of the other chemicals that you mentioned, fentanyl or the other maintenance general anesthesia agents, were barbiturates up until we get to

the sleep dose of thiopentone in this study, correct?

A. That's correct. That's correct.

Q. All right. I just want to be clear on the details we're talking about here.

A. Yep. No problem.

Q. Could you tell me, etomidate, my understanding, it acts on GABA receptors, like pentobarbital, but might not be dosage equivalent; is that right?

A. That's correct. You can't -- but it's a different class of drugs. It's not a barbiturate, so you can't equivalate the -- you can't make the dosing equivalent.

Q. Okay. So the doses there were micrograms per kilogram per minute, but that's not equivalent to pentobarbital micrograms per kilogram?

A. You can't assume that it is. That's correct.

Q. Okay. Nothing here, again, approaches in terms of barbiturate administration, the 5,000 milligrams of pentobarbital injection protocol?

A. That -- that's correct, and that's not why it was presented.

Q. All right. If we could move to Footnote 63, the next footnote for this sentence cites a source called Midazolam-alfentanil, an Anesthetic: An

investigation into the isolated forearm technique?

A. Yes.

MS. HENRY: Excuse me, Mr. Brandon, I believe that was an investigation on using, not into.

MR. BRANDON: Oh, I'm sorry. Thank you for correcting me. I must have mistyped that wrong in my notes here.

Doctor.

THE COURT: Oh, I'm sorry.

MR. BRANDON: Sorry, Your Honor. I didn't want to disturb you.

THE COURT: That's all right. Thank you.

BY MR. BRANDON:

Q. All right. Doctor, do you recognize this document in front of you?

A. Yes.

Q. Do you need a minute with it?

A. Just one. This is very short.

Q. Okay.

A. I just wanted to make a quick look at something. Yes.

Q. Okay. All right, if we could look at -- just to confirm, this is the source you cited in Footnote 63 in your declaration?

A. Yes, it is.

Q. Okay.
A. And I think it's also 64.
Q. I think that's right.
A. Just so that you don't have to bring it up twice.
Q. I won't do it again. I've got it, but it's the same in my notes here.
A. Yeah.
Q. If we could turn to the second page, which is Page 43 of the source itself, there's a Table 1. If you could look at that with me. Let me know when you're ready.
A. Yes.
Q. So Table 1, as I understand it, shows the drug doses and infusion rates of various drugs --
A. Yes.
Q. -- administered to the patients in this study. We don't have thiopental or pentobarbital in this table at all, do we?
A. That's correct. And this study is not presented to talk about CNS effects of pentobarbital. It's presented to talk about the monitoring effects for awareness.
Q. All right. So we have midazolam showing again in the first two columns, first for midazolam bolus and

the midazolam infusion?
A. That's correct.
Q. All right. And that's the benzodiazepine class of drugs, different than barbiturates?
A. That's correct.
Q. We have alfentanil bolus and alfentanil infusion. Is that -- is that a type of fentanyl? I think we mentioned fentanyl earlier --
A. It's not fentanyl, it is a much more potent narcotic.
Q. Okay.
A. So it's -- it's -- it kind of fools you because of the name, but it's a different narcotic.
Q. Okay. But it's a -- it's a narcotic drug?
A. It is.
Q. Different than the barbiturate class of drugs?
A. That's correct.
Q. Okay. And then in the last column, we have propofol bolus?
A. Yes.
Q. Like etomidate, that's a GABAergic drug as well? Can it be --
A. You know, the interesting thing about propofol is, yeah, it works there, but we don't know exactly how it works.

Q. Okay.
A. So it may work other places, too.
Q. Yeah. Okay. Some effect on GABA, but it's not like thiopentone, thiopental --
A. No.
Q. -- not equivalent to pentobarbital?
A. It is not in that class of drug.
Q. Okay. And in this study, propofol, this chart shows that it was administered if there was a response or if pain present. So in response to certain indications from the patient, not as the induction agent?
A. That's correct.
Q. And the dose of propofol there was 25 to 50 milligrams?
A. It is. I'd like to point out one more thing about this study. And that is -- and it uses the term at one point "light anesthesia." But that -- by that they're not meaning that they gave less drug with a full on anesthetic. They're saying that the amount they gave -- was not sufficient to anesthetize the patient.
So they had to give more. So this was not a deliberate attempt at giving a light or small anesthetic. It's a full on anesthetic.
Q. And you just mentioned Footnote 64 relies on

the same source as Footnote 63.
A. It does. Uh-huh.
Q. All right. And then I think when we get to Footnote 65 --
A. In fact, I'm sorry that -- I -- I apologize, that shouldn't have been duplicated in this case.
Q. It's all right. It's happened to me, too.
A. It's like --
Q. Citing cases.
A. -- oh my gosh, go back and read it again.
Q. All right. But Footnote 65 is the same source as Footnote 62?
A. Yes, it is.
Q. Okay. I just wanted to make sure we covered all of those footnotes there. So to sum up, looking through the studies we just talked about, most of these -- services focus on a -- benzodiazepine, midazolam, diazepam, not a barbiturate class of drugs. We had one with thiopentone?
A. Most of them are actually combined, benzodiazepine and narcotic anesthesia.
Q. Okay.
A. So they aren't sole drug --
Q. Not sole drug.
A. -- conductions.

Q. But not involving barbiturates.
A. But they're -- but most of them with the exception of one we talked about did not include thiopentone in the protocol. These studies were presented to talk about monitoring for anesthesia awareness. They were not presented to talk -- to in any way, make comments about the CNS effects of pentobarbital.
Q. Okay. And none of -- none of those studies included a dose of thiopentone or pentobarbital approaching the 5,000 milligrams of pentobarbital in the protocol?
A. That is true. And I'll -- I'll tell you that in no clinical study will you see any doses of pentobarbital that approach the doses used in executions.
Q. We're going to move next to Page 21, Dr. Van Norman. Are you -- are you all right? Do you need a break at all? I realize I've been --
A. I'm good.
Q. Okay. All right. We're at the top of Page 21, the first full sentence on that page. It follows the sentence that just ended with the Footnotes 59-365. Beginning, "Research now has proven." Are you with me there?

A. I am.

Q. All right. So you say in your declaration, "Research" -- "Research now has proven that EEG monitors cannot reliably detect consciousness." Did I read that correctly?

A. That's correct.

Q. All right. We've got another string of Footnotes 66 through 70; is that right?

A. Yes. I -- sorry, the recorder --

Q. That's fine, ma'am.

A. Yes.

Q. In Footnote 66, "We have a source called the narco trend depth of anesthesia monitor cannot reliably detect consciousness during general anesthesia." Did I read that correctly?

A. That's correct.

Q. All right. Doctor, do you recognize this document?

A. I do.

Q. And this is the source you cite in Footnote 66?

A. It is.

Q. I'm going to direct your attention to Page 348. Now -- the page number here at the bottom here, under the -- we're going to be under the methods

heading. The methods heading is on Page 347, but we're going to look at Page 348.

A. Okay.

Q. At the first paragraph on the left side.

A. Yes.

Q. This very first line, "General anesthesia was induced and maintained with a target controlled infusion of propofol." Did I read that correctly?

A. Yes.

Q. Okay. So we've got here, propofol involved, we don't have anything in this study about pentobarbital or thiopentin -- or thiopental?

A. That's correct. Because this study wasn't presented to talk about the CNS effects of propofol -- or I mean, sorry, pentobarbital. In this case, I had previous -- in the previous set of articles, we were talking about the clinical monitoring techniques for awareness used by anesthesiologists. In this following series of articles, which I assume you're going to go through one by one --

Q. We are.

A. -- which is fine. We are not. But it is not intended to talk about the CNS effects of pentobarbital. It's intended to show that the monitors for CNS activity don't work. Okay.

Q. We'll move to Footnote 67, then. That indicates a source called bispectral index may not predict awareness reaction to intubation in surgical patients.
A. That's correct.
Thank you.
Q. All right. Doctor, do you recognize this source?
A. I do, yes.
Q. This is the article cited in the Footnote 67.
A. Let me correlate them -- yes.
Q. All right. If you could -- I'm going to put it on the camera here. It'd be easier to identify it that way. I want you to read along with me.
A. Okay.
Q. I'm going to start right at this sentence here that begins with "Anesthesia."
A. Yep.
Q. Okay. If you've found that in your copy, I'm going to --
A. I have it.
Q. -- grab mine in here. The authors here in the summary say, "Anesthesia was induced with alfentanil, 10 micrograms per kilogram, followed by 2 micrograms per kilogram per minute, and propofol" -- "propofol infusion

was adjusted to a BIS target level between 50 and 60."
Did I get that right?
A. You did.
Q. All right. Just to confirm here again, we don't have any pentobarbital, thiopental, or thiopentone involved in this study?
A. No. As with the previous article, this article was submitted not for the purpose of talking about CNS effects of propofol -- or pentobarbital -- I'm -- getting late in the -- the day. I apologize.
Q. I understand. That's all right.
A. I know those are two different drugs. But it was presented to talk about EEG -- processed EEG monitors and their -- their lack of success in detecting awareness.
Q. We're going to move on to Footnote 68, which cites a source called, "Preserved memory function during bispectral index guided anesthesia with sevoflurane for a major orthopedic surgery."
Did I get that right?
A. You did. Sevoflurane.
Q. Sevoflurane. I'll try to remember that.
A. I'm going to teach you how to speak anesthesia.
Thank you.

Q. You're welcome.
All right, Doctor, do you recognize this document?
A. I do.
Q. This is the source you cited in Footnote 68?
A. It is.
Q. Okay. We're going to go to the first page here under, I believe, materials and methods. Sorry. First page in the -- I suppose this is an abstract. On the top left side, there's a little paragraph called "Methods."
A. Yes.
Q. Okay. I see there -- if you could read along with me in that first sentence, "After obtaining informed consent, the 128 patients scheduled for joint replacement surgery under general anesthesia with sevoflurane."
A. Yes.
Q. Sevoflurane is an inhalation anesthetic; am I right?
A. That's correct.
Q. Okay. That's different than an IV barbiturate?
A. It is. I'm just looking what other drugs they were given so I can --

Q. Feel free.
A. -- confirm for you. Yes, go ahead.
Q. Okay. There's no barbiturates mentioned in this study?
A. No. In this case, the -- their -- induction was used with fentanyl and propofol.
Q. Okay.
A. And once again, this is presented not to talk about barbiturates' CNS effects, but to talk about the lack of ability to monitor for awareness -- for the neuro monitors to detect awareness.
Q. We're going to move to Footnote 69. You cite a source called "Anesthesia awareness and the bispectral index."
Did I get that one right?
A. Yes, you did.
Q. You're going to have quite a stack by the end of this.
A. That's all right. I'm in there with you. Although, I -- can I give you fair warning, I probably should take a break after this one if that's okay?
MR. BRANDON: That's fine. Yeah.
THE WITNESS: Just five minutes to run --
MR. BRANDON: Happy to.
THE WITNESS: -- run out there if that's okay.

MR. BRANDON: If you -- I'm happy to break now or I can finish out through Footnote 70.

THE COURT: Let's take the break.

MR. BRANDON: Yeah.

(A recess was taken.)

THE BAILIFF: All rise. Court is back in session. Please be seated.

BY MR. BRANDON:

Q. All right. Doctor, when we left off, I think we were talking about Footnote 69 in your declaration, a source titled "Anesthesia Awareness and the Bispectral Index" --

A. Yes. Uh-huh.

Q. Okay. And we -- you've got a document I think in front of you, do you recognize that one?

A. I do.

Q. All right. Is this the source cited in Footnote 69?

A. It is.

Q. I'm going to ask you to turn to Table 2, the beginning on Page 1102. The page numbers are down at the bottom of the document.

A. Yeah. Yes. I'm sorry.

Q. That's fine.

A. I keep thinking you're going to say "Are you

ready?"
Q. That's perfectly fine. I just want to make sure you're in place. I'll ask you next time.
A. Yeah. Yeah. I'm good.
Q. There's a column in Table 2 labeled "Anesthetic Agent." Do you see that column?
A. I do.
Q. Okay. Could you read me the first entry, Patient Number 1, for the anesthetic agent?
A. Isoflurane without nitrous oxide.
Q. And how about the next patient?
A. Isoflurane without nitrous oxide.
Q. And the next one?
A. The same.
Q. Does Number 3 have isoflurane or a different --
A. I'm sorry. Desflurane without nitrous oxide.
Q. And Patient Number 4?
A. Isoflurane without nitrous oxide.
Q. And Number 5 is the same?
A. Yes.
Q. Okay. And Number 6 is back to desflurane?
A. Desflurane without nitrous oxide.
Q. And then we get to Patient 7 on the next page. We have, again, isoflurane without nitrous oxide?

A. Correct.
Q. Okay. Patient Number 8?
A. Desflurane and sevoflurane without nitrous oxide.
Q. And Number 9?
A. Isoflurane without nitrous oxide.
Q. And then Number 10?
A. Desflurane and sevoflurane without nitrous oxide.
Q. Number 11?
A. Desflurane and sevoflurane with nitrous oxide.
Q. Number 12?
A. Isoflurane without nitrous oxide.
Q. And Number 13?
A. Isoflurane and desflurane without nitrous oxide.
Q. Number 14?
A. Isoflurane with nitrous oxide.
Q. And Number 15?
A. Sevoflurane without nitrous oxide.
Q. And Number 16?
A. Sevoflurane with nitrous oxide.
Q. Those are all inhalation anesthetics?
A. They are, but I want you to give me a minute to look at the induction drugs on that.

Q. Sure.
A. Just because I --
Q. You're welcome to.
A. -- know what your -- I'm anticipating what your next question will be.
Q. Yeah. My next question is, are there any barbiturates involved in this study?
A. Okay. Certainly.
Q. And I'd be happy if you could point me to any.
A. And let me just take a look, because I don't remember off the top of my head. Apologies, but I'm not -- I'm not finding induction drugs, so give me one more moment.
Q. That's fine. Take your time.
A. Okay. Okay. So I don't see induction agents. If you happen to see them, I'm happy to have you point them out to me. So I cannot make a judgment about whether a barbiturate was involved in these anesthetics at all.
Q. No --
A. What you -- what you see listed in this table is maintenance anesthesia.
Q. Okay.
A. And those did not involve barbiturates, but portions of the anesthetic, like the induction, may

have. I wouldn't know.
Q. We don't know. The authors don't report that information in the study, do they?
A. Yeah. And so in -- once again, it didn't matter to me in citing this article, because it wasn't cited about -- for the purpose of -- of demonstrating CNS effects of pentobarbital. It was cited for the effects of showing that neural monitors don't work under general anesthesia.
Q. Understood. If we could move to Footnote 70 inside a source called "Frontal alpha-delta EEF (sic) does not preclude volitional response during anesthesia". You know, forgive me if I've butchered the first half of that.
A. You did really well.
Q. Is that the right source in Footnote 70?
A. It is.
Q. All right.
A. Thank you.
Q. All right. Dr. Van Norman, if you could take a look at that document and tell me if you recognize this one?
A. I do.
Q. This is the source cited in Footnote 70?
A. It is.

Q. If we go to Page 665, the page numbers are in the bottom right of this article, and look at --
A. I'm sorry. Say again? Where -- where on 665?
Q. Page 665. We're going to go under the big heading -- the blue heading, methods.
A. Yes.
Q. And then down a few paragraphs, the smaller green heading, study conduct.
A. Yes.
Q. And I'm going to read the first sentence there. You make sure I get it correct.
"Conduct of anesthesia was at the discretion of the responsible anesthetist who is independent from the study with no stipulations upon which agents were administered."
A. That's correct.
Q. So this article never says what anesthetic agents were used in this study?
A. That's correct. Because, once again, the point of the study had nothing to do with the CNS effects of the anesthetics. It had to do with whether the neural monitoring would work, and it didn't work, regardless of the anesthetist's choice.
Q. All right. And we -- you just don't know which drugs were used in this study?

A. I'm sorry? Say again?
Q. We don't know which drugs were used in the study.
A. We don't know. Could have involved barbiturates. We just don't know, because it was not the purpose of the study.
Q. All right. So in all of the studies cited in Footnotes 66 through 70, we don't have any barbiturates involved?
MS. HENRY: I'm --
THE WITNESS: No.
MS. HENRY: -- going to object to that. I'm sorry.
THE WITNESS: Oh, I'm sorry. Go ahead.
MS. HENRY: I'm going to object. That misstates the evidence.
THE WITNESS: I was going to say, there are several of those studies that don't detail what's in the anesthetics. So we don't know if barbiturates were --
BY MR. BRANDON:
Q. I'll rephrase. We do not know from what the authors reported in any of those studies, Footnote 66 through 70, that barbiturates were involved in those studies?
A. Correct.

Q. I'm going to move to Page 22 of your declaration, and I would like to start under the heading, flash pulmonary edema; the heading D. Are you there with me?
A. I am.
Q. Okay. We have the first sentence here. You opine that IV injection of high-dose barbiturates, including pentobarbital, has been shown to be associated with flash pulmonary edema in both animals and humans. Did I get that right?
A. That's correct.
Q. Okay. You have a few footnotes there. 70 -- footnotes 74 through 78?
A. Correct.
Q. Is that right? Okay. If you could briefly tell me what the date of the footnote that you cite in Note 74 is?
A. 1966.
Q. Okay. And the date of the source in Footnote 75?
A. 1976.
Q. And in 77?
A. 2019.
Q. And Footnote 78?
A. 1964.

Q. And Footnote 79?
A. 2019.
Q. And Footnote 80?
A. 2012.
Q. Thank you. Doctor, in your direct examination with Ms. Henry, you referred to an article called "Cortical neurons and networks are dormant but fully responsive during isoelectric brain state". That was from Brain: A Journal of Neurology.
Do you remember that --
A. I do.
Q. -- article? That article was not cited in your declaration, was it?
A. It was not. I brought it up because the -- of the -- in -- in terms of the -- the reason the article was included is that Dr. Antognini in his report referred to the EEG -- isoelectric EEG brought about by pentobarbital in horses. I found the article that shows the same thing in humans, and I presented it to Attorney -- to Counsel for presentation to you for this -- this trial.
Q. Okay. That article was published in 2017?
A. That's correct.
Q. And Ms. Henry provided it to the defendants about 6:00 last night. Are you aware of that?

A. I have no idea.

Q. Okay. You and Dr. Antognini have offered competing opinions in cases before, haven't you?

A. That -- yes, we have.

Q. You're aware of his opinions about pentobarbital?

A. Very much so.

Q. The patients in this study were supported by ventilation and blood pressure support?

A. In which study?

Q. In the "Cortical neurons and networks are dormant" --

A. If we're going to talk about this study, I want to have that in front of me, please.

Q. Happy to pull it back up. Do you happen to have a copy sitting there still with you? We can --

A. Well, you haven't handed it to me, and I don't know if anybody else has, and I don't want to reach into my bag. I don't think I'm supposed to do that.

MR. BRANDON: I believe Ms. Henry -- was that admitted?

MS. HENRY: No.

MR. BRANDON: Okay. You just referenced in general.

BY MR. BRANDON:

Q. I'm happy to show you a copy. In fact, I've got one copy, Dr. Van Norman, but I'll hand it up to you and I -- you can review that for me.
A. Okay. Let me just take a quick look at it. Well, I mean --
Q. Of course. If I'm -- if I need it back, I'll let you know.
A. If you're going to ask me specific questions, I need to have it in front of me. Thank you so much.
MS. HENRY: Mr. Brandon, I have some extra copies, if you'd like.
MR. BRANDON: That would be great. Thank you.
I'll bring one to Your Honor, if you'd like.
THE COURT: Appreciate it.
BY MR. BRANDON:
Q. All right. Doctor, to ask you again, the patients in this study were supported by ventilation and blood pressure support -- blood pressure support, I suppose, intermittently, but ventilation for all of the patients?
A. Give me one more moment.
Q. Read as much as you need to answer that question.
A. Yes. Thank you.
Q. Mr. Black won't receive ventilation or blood

pressure support in his execution according to the protocol, will he?
A. He won't receive ventilation or blood pressure support, but he will receive cardiac arrhythmia support if that ICD is not turned on.
Q. In your anesthesiology practice, you wouldn't keep a patient at continuous isoelectric EEG during a major surgery, would you?
A. No.
Q. This study involved both human subjects -- human patients and an animal experiment. It is sort of a two-parter; is that right?
A. Yes. I would just say there are two experiments presented in this paper. One is a human study and one is a -- a rat study.
Q. Okay. And the human study involved four patients?
A. That's correct.
Q. All right. The dose of pentobarbital or barbiturate for the humans involved in that study ranged from 40 to 400 milligrams per hour?
A. I -- I want to make sure that's not a per -- let me just -- I think that's correct, but --
Q. And I could direct you to --
A. Yes, that's correct.

Q. Okay.
A. This -- this was titrated to about -- to have pentobarbital produce isoelectric EEG.
Q. Okay.
A. So it parallels the CNS effects that were seen in the horses that Dr. Antognini presents.
Q. Okay. So a maximum dose reported of 400 milligrams in one hour?
A. That's correct.
Q. All right. And that's less than 10 percent of the 5,000 milligrams that is administered in a lethal injection protocol?
A. I'll let you do the math.
Q. All right, Doctor. I think I may finally be done with the footnotes and articles. I've got a few more questions, though, for you.
A. Oh, great. Okay.
Q. Dr. Van Norman, the opinions in your report and that we discussed today regarding the efficacy of pentobarbital, those are your general conclusions about that chemical's effect on the body independent of any of Mr. Black's medical conditions?
A. I'm -- can you -- for some reason I -- I blanked out on the first part of your sentence. I apologize.

Q. That's fine. I'm having to repeat it. It's a bit of a long question.

A. Yeah.

Q. The opinions and report -- in your report that we discussed today about the effect of pentobarbital on consciousness, those are your general opinions about the efficacy of that chemical, regardless of which inmate it's applied to, that they don't vary based on Mr. Black's medical conditions versus others?

A. In general. There were a few points at which I think I pointed out some things during early testimony that did refer to Mr. Black.

Q. Yes.

A. But most of the material on pentobarbital is -- would refer to any prisoner.

Q. Okay. And you discussed in your earlier testimony that some of the specific effects on his heart because of his heart function and other disease, but we're talking generally, your opinions about the effects of pentobarbital wouldn't vary from inmate to inmate?

A. I'm sorry. I didn't hear the last word.

Q. Your opinions about the efficacy of pentobarbital as a drug for execution wouldn't vary from inmate to inmate. Your general conclusion would be the same, that it's not going to render any inmate

unconscious?

A. Yes.

Q. So you've offered that same opinion to courts in other litigation, right?

A. I have.

Q. And your opinion hasn't wavered or changed. You've been steadfast in that?

A. Well, the evidence keeps mounting that continues to support it. And so I will continue to support that opinion as long as the scientific evidence continues to support it.

Q. I understand. If you were confronted with evidence that contradicted that opinion, you'd change your mind?

A. I -- I would certainly consider it. My point is to try to figure out what the evidence -- were the evidence in this case.

Q. You testified previously for Plaintiffs in a federal lawsuit in the District Court for the District of Columbia challenging the federal government's execution protocol?

A. That's correct.

Q. The federal government at the time that that challenge was ongoing, used a single lethal dose of pentobarbital like Tennessee does?

A. Yes. I believe it was the same dose, but I -- I won't swear to that.
Q. That -- that's fine. Do you remember if that was case number 19-145 in the District of Columbia?
A. Maybe.
Q. It might be an easier question, I think you've listed in your report as Roane v. Barr or --
A. Yeah, it's a branch of that.
Q. Maybe Barr versus --
A. The -- the specific clients were Higgs and Johnson, if that helps you.
Q. Okay. And that -- that's just generally a case name was known as Roane v. Barr even though --
A. Yeah, that's the overarching case.
Q. Okay.
A. Yeah.
Q. And you gave in broad strokes, the same general opinion about pentobarbital efficacy that you gave -- you've given to the Court today?
A. Yes. There were additional special circumstances about those two executions. Both of the inmates had active COVID disease, but substantially they're the same with some new -- but there's been new data that I've presented here for this case.
Q. Dr. Antognini also testified in that case on

behalf of the federal government?

A. Yes, he did.

Q. Okay. And that case was appealed to the Supreme Court?

A. I thought it was appealed -- it's the District Court. I think it was appealed to the full panel. I don't -- I don't know that it went to the Supreme Court. It might have. I get confused about the Court levels. I'm -- I'm sorry. I'm not a legal --

Q. That's very -- perfectly understandable. Let me pull through here. If you could look at your Appendix 2 to your declaration?

A. Yes.

Q. This is on Page 56 in Paragraph 1. You say, "Expert regarding the effects of lethal injection drugs on prisoners undergoing judicial executions, Roane et al. v. Barr."

At the end of that paragraph, you show, "Overturned by the U.S. Supreme Court without hearing"?

A. Yes. So I -- that's probably correct then because that was written when it happened.

Q. Yeah. I -- and I forgive you for not remembering the specifics there.

A. Yeah. Thank you.

Q. All right, Doctor, I've just handed you

another document.

Could you read there at the top left of that page the name of this case and the citation for it?

A. I -- I am not sure what -- which constitutes the citation, but I'll read the upper left-hand corner.

Q. That's perfectly fine.

A. It's Barr v. Lee, 591 U.S. 979 2020.

Q. And just a little bit below that before another string of letters and numbers, do you see a court? A name of the Court for this case?

A. Oh, I see where you're saying the title. 140 S Court -- S Court 2590, Supreme Court of the United States.

Q. Okay. And the name again is Barr v. Lee, right?

A. Yes, uh-huh. Although this -- the -- Lee was not the client involved in this hearing.

Q. Okay. If we could look at Page 981 in the reporter. So that's going to be a solid -- second page of your document here, solid black number, bold number, star 981.

A. Yes.

MS. HENRY: Excuse me. I'm sorry. I'm going to need to object to the use of Barr v. Lee, which is a case decided regarding Danny Lee. Dr. Van Norman has

testified that her testimony in the federal case of Roane v. Lee involved Mr. Higgs, and another police --

THE WITNESS: Johnson?

MS. HENRY: Mr. Johnson. And I don't believe that they were the subject to this particular preliminary injunction. There was a reversal in that case as well, but it was at a different time in a different court. I don't see Dr. Van Norman's name mentioned in this opinion, so I don't believe this is the particular instance in which Dr. Van Norman would testify.

MR. BRANDON: I -- I'd like to ask a few more questions about the opinion, Your Honor, if we could.

THE COURT: What -- she's not a lawyer. The opinion speaks for itself.

MR. BRANDON: I -- understood, Your Honor. I'd just like to identify the relevance that -- it won't take me very long.

THE COURT: Okay. When the clock strikes 5:00 on Wednesday, I don't want you complaining about not having enough time to present your case.

MR. BRANDON: Understood, Your Honor.

THE COURT: You hear that? 5:00 Wednesday. All right. Go ahead.

BY MR. BRANDON:


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 290 of 390 PageID #: 1068

Q. I am going to ask Dr. Van Norman to follow along with me in the third paragraph on Page 981 and the sentence beginning, "Against this backdrop"?

A. Yes.

Q. "Against this backdrop, the plaintiffs cite new expert declaration suggesting that pentobarbital causes prisoners to experience," quote, "'flash pulmonary edema,'" end quote, "a form of respiratory distress that temporarily produces the sensation of drowning or asphyxiation."

That -- that's the same opinion you've offered in your declaration today?

MS. HENRY: Your Honor, I'm going to object to that question because it may be confusing. Because he's suggesting that this is a summary of what Dr. Van Norman testified to in the federal execution. And it may well be, it's just very confusing as to what the testimony was here today, and whatever's being reported about whoever testified at this particular point. And it's legal opinion, not -- improper to ask her to comment on the book.

THE COURT: I'm not sure this case deals with the CBT device, or whatever it's called. But if you want to spend time on this, you may do so.

MR. BRANDON: I'll finish very quickly, Your

Honor.

BY MR. BRANDON:

Q. The next sentence -- or just to confirm, Dr. Van Norman, whether this was your specific opinion or not, you have offered a similar conclusion to the Court today that pentobarbital causes prisoners to experience flash pulmonary edema?

A. I don't know if the -- the presentation here is from anything that I've written because I'm not the only one who has presented this data to the courts. I do hold that flash pulmonary edema is a result of pentobarbital injection.

Q. All right. And then in the next sentence, the Supreme Court recites, "But the government has produced competing expert testimony of its own, indicating that any pulmonary edema occurs only after the prisoner has died or been rendered fully insensate."

Did I get that correct?

A. That -- that's what it says here. Yes.

Q. And Dr. Antognini is the expert for the government in this case?

MS. HENRY: Again, Your Honor, I'm going to object. We don't know who the expert was in the Danny Lee case, and that's not the before the Court, and there was no ICD.

THE COURT: I don't think it would necessarily be binding factually on this court. I mean, of course, the Court has to follow the law.

MR. BRANDON: I understood, Your Honor. I was just trying to make some connections between that law and the testimony that's been offered today. I'll move on.

BY MR. BRANDON:

Q. A few finishing questions, Dr. Van Norman. You've testified not just about pentobarbital, but about other lethal drugs -- lethal injection drugs, and other litigation concluding that they too involve a risk of severe pain?

A. Not today. Are you --

Q. In other cases previously?

A. I have been engaged as expert in other cases in which I have also testified that, yes.

Q. Okay. And previously in Tennessee in federal litigation, you testified that you don't know if any anesthesia is capable of producing unconsciousness.

A. I -- I may -- I might have done. I -- I'd have -- I'd ask you to present that because I'm not sure I remember doing that exactly.

Q. I -- I'm happy to.

A. Yeah. I just -- I just want to be sure. I

don't want to agree to something that I'm not understanding.

Q. All right. Dr. Van Norman, I'm going to hand you a document that I hope can refresh your recollection a bit. It's a long one, so I'm going to ask you to follow me as previously.

A. That's fine. And I'm not -- I -- I'm not questioning you so much as I want to just be sure of what I --

Q. Understood.

A. -- said, if you know, and all of that, so.

Q. All right, Doctor, the --

MR. BRANDON: If I could stay here just a moment, Your Honor.

THE COURT: You may, and Counsel may join, if you wish.

MR. BRANDON: Would you like to see the -- the page numbers here are a touch harder to identify.

BY MR. BRANDON:

Q. All right, Doctor, I'm going to hand you the first few pages here. If you could tell me, do you recognize that case name?

A. I do, that case.

Q. And you remember testifying in federal litigation in Tennessee about its -- Tennessee's former

lethal injection protocol?

A. Yes, uh-huh.

Q. All right. I'm going to direct you to --

MS. HENRY: Can we identify the case?

THE WITNESS: I'm sorry. This is -- you want me to identify?

BY MR. BRANDON:

Q. Go ahead, Doctor.

A. It's King v. Parker, et al.

Q. And the deposition was taken on the date there listed. And if could you read that date?

A. January 11th, 2022. No wonder my memory is a little bit wrong.

Q. All right. I'm going to direct you, Doctor, to Page 197 of the transcript?

A. Where do I see the page numbers?

Q. I -- I've got it here for you, Doctor. They're really hard to see.

A. Yes, they are.

Q. So I've got to have you -- selected it.

A. Okay.

Q. Okay.

A. Thank you.

Q. I'm going to ask you to read for yourself quietly Lines 8 through 10 there.

A. May I turn the page?
Q. You can.
A. Thank you. Yes.
Q. Okay. Would it be correct to say that you testified in previous litigation that you don't know if anesthesia can produce unconsciousness?
A. My testimony is there and speaks for itself. Yes. May I give this back to you?
Q. Yes.
A. Thank you.
Q. Dr. Van Norman, very briefly. I want to turn back to Page 18 of your declaration.
A. I got so much stuff up here. Hang on.
Q. Take your time to find it.
A. Okay.
Q. In the middle, I'll just put this on the camera here. So I'm going to start with this sentence right here. If you could follow along with me, that begins when electrical charges. You opine that "When electrical charges from the pacemaker are no longer able to elicit a cardiac response, the defibrillator function of the CIED will take over."
Did I read that correctly?
A. You did.
Q. Okay. Based on your testimony earlier, I

understand you to be saying that's not an accurate description of the function of the ICD. Just because a pacemaker is not able to continue to elicit cardiac response does not mean that the ICD will take over and start shocking a ventricular fibrillation?

A. Yes. And actually, that's what I said here, if you read the complete sentence. So let's read the complete sentence.

Q. Sure. Go ahead.

A. Oh. "When electrical charges from the pacemaker are no longer able to elicit a cardiac response, the defibrillator function of the CIED will take over, and if it detects continued electricity in the heart will begin delivering strong repeated shocks for an additional period of time. It's dependent on multiple factors."

So what I testified to here, to clarify that, because I believe your cardiologist misunderstood my -- my meaning there, is that the pacemaker does what it does. When the pacemaker is done, if there is a shockable rhythm afterward, the I -- the defibrillator will shock.

Q. Okay. And not just if there is continued electricity in the heart, but if there is a shockable rhythm, meaning ventricular fibrillation over 220 beets

or pulses per minute?

A. Well, the -- yes and no. What I -- what I meant by -- and I realize I was vague on this, so I apologize. What I meant by continued electricity in my heart, I should have better said, if there's electric -- electrical activity to the heart that the pacemaker interprets as a new shockable rhythm, it will shock. Those pace -- those defibrillators sometime end up shocking rhythms that aren't shockable rhythms because they've interpreted some electrical activity in the heart to be that.

So I'm trying to cover that and say if the -- if the CIED -- I hate to say that a machine believes something, but if the CIED is listening and believes that something an arrhythmia has occurred, that it should shock, it will shock. That's all I'm saying there.

Q. All right.

A. Okay.

Q. It has to sense something that it's programmed to sense as ventricular fibrillation, even if it might make a mistake about what that is?

A. It has to sense something that it believes is one of the programmed arrhythmias. Yes, that's correct.

Q. We talked briefly earlier about Nature

Magazine. The discovery of DNA was first reported in a letter to Nature Magazine by Watson and Crick by -- in 1953, wasn't it?

A. Yes.

Q. You said earlier in your testimony that 89 -- 80 to 90 percent, the first shock is effective at reviving patients 80 to 90 percent of the time.

Where does that statistic come from?

A. It's -- it's 89 to 100 percent, and I believe I footnoted it. I may not have footnoted it every time I used it.

Q. Okay.

A. So let's take a look for the footnote if you want. Otherwise, I'll have to go back and look through my resources --

Q. I --

A. -- but it is a specific source.

Q. I'll just clarify it. None of the studies that you footnoted for that particular statistic come from studies where a patient received 5,000 milligrams of pentobarbital?

A. I think we'll find that there are no human studies in which patients receive 5,000 milligrams of pentobarbital.

Q. When did you talk to the tech from Boston

Scientific?

A. Like a date?

Q. Yes.

A. I don't remember.

Q. Okay. It's not a source that you cite in your declaration, is it?

A. No. No.

Q. Did you talk to the Boston Scientific tech before or after reading Dr. Lambrakos' report?

A. Oh, way before. Way before.

Q. You just didn't mention that source in your declaration?

A. I just mentioned it as -- as a, you know, personal communication, but I didn't -- I didn't identify it. No.

Q. Okay. You did note in one of your other footnotes personal communication with a doctor at the University of Washington?

A. I did.

MR. BRANDON: Just one moment to confer, Your Honor.

THE COURT: Of course.

BY MR. BRANDON:

Q. Dr. Van Norman, you're personally opposed to any application of the death penalty?

A. I am.

MR. BRANDON: That's all my questions, Your Honor.

REDIRECT EXAMINATION

BY MS. HENRY:

Q. Dr. Van Norman, in the federal litigation in which you testified there was a pathologist named Dr. Crowns (phonetic); is that correct?

A. That's correct. I believe his first name was Jeffrey (phonetic).

Q. And Dr. Crowns testified about the phenomenon of pulmonary edema occurring as a result of executions; is that correct?

A. Yes. He was testifying on behalf of the defense in that case.

Q. On behalf of U.S. Government?

A. That's correct.

Q. Now, Dr. Van Norman, you mentioned personal communications with Dr. Jeanne Poole. Who is Dr. Jeanne Poole?

A. She's head of cardio -- cardiophysiology in the cardiac division -- Cardiology Division at the University of Washington Medical Center. And she's internationally known cardit -- cardio -- I can't say the word this late in the day, cardio-

electrophysiologist. She's a -- world renowned, one who's headed many of the organizations and physician organizations you've heard me refer to today.

Q. And is she also a personal friend?

A. She's -- I know her personally. She's actually my doctor. So yeah.

Q. So without revealing this case to her, did you also, in addition to talking to the Boston Scientific tech, also ask about the magnet response -- magnet setting in the Boston Scientific ICDs?

A. I did.

Q. And was her response consistent with what you received from the tech at Boston Scientific?

A. It was

Q. Now, Dr. Van Norman. I'm not going to go through all of your footnotes.

A. Thank you.

Q. Fair to say that with the exception of the patient experience reported on the website, Heart Sisters, all of the articles and studies that you discussed with Defense Counsel on cross-examination were published in peer-reviewed refereed journals?

A. They were. In my report, I mentioned the nature of patient-facing literature, and so I wanted to include some that's patient-facing that talks about this

topic. But the ones that I -- I quote for scientific purposes are from peer-reviewed journals.

Q. Yeah. Again, Dr. Van Norman, I think it's been a little bit confusing for all of us today to get this difference between V-tach and V-fib. Beats per minute at 220 beats per minute, that would be V-tach.

Is that correct, if your heart's being 220 beats per minute?

A. If -- if it's beating more than 180 per minute, I would say it's V-tach. Are you asking me what -- when's -- when a rhythm becomes V-tach?

Q. I'm saying that can -- it can become 180, but also 220 is also V-tach?

A. It can be. It can be V-fib. It -- the rates are -- it -- it isn't just the rate that determines the rhythm. The rhythm is determined by the way the electricity is running around the heart and the configuration of the EKG, and so it could -- it can be both.

Q. And I guess what I'm wanting to get to is, with ventricular fibrillation -- is ventricular fibrillation, that definition, always tied to however many beats per minute the device picks up?

A. It basically is. I mean, it -- that -- it's a -- it's the way they define the -- the recognition of

the arrhythmia for the device.

Q. So what happens with ventricular fibrillation?

A. Well, with ventricular fibrillation, the heart is not producing blood flow. It's -- as I mentioned, it's like -- that's when it's that bag of snakes that's just quivering. And so forward blood flow stops or becomes very minimal if it -- if it -- technically you can get some forward blood flow if the patient's breathing spontaneously, but it's minimal. It's minimal. And so ventricular fibrillation is when you just are getting a quivering, uncoordinated ventricle that is not pushing blood anywhere.

Q. And it's your opinion, to a reasonable degree of medical and scientific certainty, that ventricular fibrillation will result in Mr. Black during an execution?

A. I think it's very likely. It's one of the terminal arrhythmias that we typically see in dying patients. And Mr. Black has both severe cardiac failure, which predisposes you to that, as well on his EKGs he's been shown to have some premature ventricular contractions that predispose you to that. So I think he's particular -- he is very likely to experience that arrhythmia in the course of his dying.

MS. HENRY: Just one moment, Your Honor.

That's all I have. Thank you.

THE COURT: Additional questions?

MR. BRANDON: Nothing else, Your Honor.

THE COURT: All right.

MS. HENRY: Your Honor, may we move into evidence the article, "Cortical neurons and networks are dormant but fully responsive during isoelectric brain state" that was used by Defense Counsel? I don't believe it was marked.

THE COURT: Any objection?

MR. BRANDON: Sorry. I don't know why it needs to be moved into evidence. I'm not sure that we can stipulate to the admission of it there. It's just the underlying data relied on by the expert, which isn't normally admissible into evidence.

THE COURT: Okay. I'll allow it in. Exhibit 19 is in over objection.

(Exhibit 19 was received into evidence.)

THE COURT: Anything else for today?

MS. HENRY: Nothing, Your Honor.

THE COURT: What do the lawyers anticipate in terms of remaining witnesses?

MS. HENRY: Mr. Black will, at this moment, rest, Your Honor. We have no further witnesses.

THE COURT: Okay.

And you just have the one witness?

MR. BRANDON: We expect Dr. Antognini and Dr. Lambrakos on Wednesday afternoon.

THE COURT: Okay. That sounds like it's going to be manageable. Thank you.

Lawyers, I appreciate the work you do, because these expedited cases, they're hard. And the written work has been exceptional on both sides. I appreciate it. It helped me to kind of halfway understand what was happening in the case, so much appreciated.

THE BAILIFF: All rise. Court is adjourned.

(Hearing adjourned at 7:09 p.m.)

CERTIFICATE OF REPORTER

I, HALEY GROSSMAN, a Tennessee Licensed Court Reporter and Notary Public within and for the State of Tennessee do hereby certify that on July 14, 2025, before HONORABLE CHANCELLOR RUSSELL T. PERKINS, in the Chancery Court of Davidson County, State of Tennessee, I digitally reported the proceedings had and the evidence given, together with objections of counsel and the rulings of the Court thereto, and that said testimony was accurately captured with the annotations by me during the proceeding taken at said time and place.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 15th day of July 2025.

Haley Grossman

HALEY GROSSMAN
Tennessee Licensed Court Reporter
Notary Commission Expires: May 8, 2028

CERTIFICATE OF TRANSCRIPTIONIST

I, SANDRA REDAVID, Legal Transcriptionist do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 15th day of July 2025.

Sandra ReDavid

SANDRA REDAVID

**0**

**0**
151:24
169:20, 24,25

**0.15**
253:20

**0.3**
252:10

**0.5**
253:20

**1**

**1**
19:3,8
26:22,23
44:7
46:11,15, 16 47:1
169:20
203:11,15
230:6,8
234:25
235:4,8
259:10,14
271:9
286:14

**1,000**
26:23

**1.25**
240:16

**1.4**
13:23

**1.5**
240:16

**10**
44:25
45:1
169:20,21
171:6
221:18
222:6,9
223:14
243:21
245:8
246:24
266:23
272:7
282:10
293:25

**10,000**
26:23

**100**
48:4
87:16
151:24
156:2
162:5
180:14, 15,18
191:20
196:11
203:1,7, 25 243:17
245:4
297:9

**1000**
124:7

**10th**
26:22
209:9

**11**
50:19,21, 23 54:11, 12 80:14, 16 84:20
272:10

**1102**
270:21

**11th**
293:12

**12**
59:15,17
104:24
135:6
153:5
226:10, 13,14,22, 23 227:2
272:12

**128**
268:15

**12th**
213:4

**13**
75:20
76:9,14
272:14

**13th**
15:2

**14**
79:23,24
272:17

**140**
287:11

**14th**
45:17

**15**
84:16
102:1,5
113:4
114:7
116:3
131:13
147:17
188:12
207:15
227:11,17
272:19

**16**
103:2,3
229:15
272:21

**16th**
26:22

**17**
148:6,8
231:12

**18**
30:3
189:20,22
221:12
294:12

**180**
88:23
155:2
211:1,7, 11 220:7
301:9,12

**19**
138:24
230:17
303:17,18

**19-145**
285:4

**1953**
297:3

**1955**
165:17,24

**1964**
277:25

**1966**
277:18

**197**
293:15

**1976**
277:21

**1984**
68:23

**19th**
42:23

**1:30**
56:12

**2**

**2**
5:24 6:1
21:23
23:15
44:5
69:14
170:4
247:22
266:24
270:20
271:5
286:12

**2.5**
256:6,8,9

**20**
34:11
84:16
188:12
232:25
233:15
236:22
239:17
243:11
247:20

**200**
41:22

**2000**
34:11

**2002**
85:21

**2008**
66:25
69:20

**2009**
69:20
80:5,8,11
85:20

**2010**
172:19

**2012**
139:3
278:4

**2015**
138:25

**2017**
278:22

**2018**
29:23,24

**2019**
20:13
22:16,20
23:15,21
26:6
277:23
278:2

**2020**
15:1
22:13,20
23:10
25:8
34:14
35:23
287:7

**2021**
15:2

**2022**
39:14
42:23
293:12

**2023**
45:17
171:19

**2024**
50:12
97:11,13
98:2,5
106:9,11
113:20
114:14
115:10
166:25
197:17
50:12
106:9

**2025**
15:3 21:9
23:13,18,
19 24:16
25:8,16,
19 26:9
28:16
29:24
54:18
59:6 79:7
112:2
115:19
209:9
213:5

**21**
212:11,
16,21
248:7
263:17,22

**22**
212:11
277:1

**220**
106:23
107:2
180:2,4
210:7,10,
18 211:11
220:15
245:5
295:25
301:6,7,
13

**23**
216:7,10,
15,18
217:11

**24**
6:8
103:20
113:20
222:17,22
223:6,20

**24th**
5:24 6:11
8:2,4
32:2,3
41:9 44:8
238:23
271:15

**25**
23:10
261:14

**250**
238:24
239:6,14
241:13,
21,23
256:18

**2590**
287:12

**25th**
15:1

**26**
6:8

**27**
28:16

**27th**
15:3
28:16

**28**
155:22

**28th**
21:8

**29**
223:7,13,
18,23

**292**
235:14
246:16

**29th**
35:23

**2:35**
111:14

**3**

**3**
223:2,5,6

**30**
109:20
139:20
176:9
185:23
186:10
201:1
202:15,17

**30-some**
17:4

**300**
48:4
155:2
236:17,20
246:16

**31**
223:8

**33**
205:25
206:5

**347**
265:1

**348**
264:24
265:2

**35**
105:10

**37203**
41:23

**378**
234:14

**379**
235:3
236:21
246:10

**38**

**3rd**
10:12
39:14

**4**

**4**
33:19,21
234:24
235:21
243:7
271:18

**4-H**
143:24

**40**
185:23
201:1
281:21

**400**
281:21
282:7

**42**
202:19
203:18

**423**
218:23

**424**
221:7

**425**
222:24
225:1

**426**
217:13
218:7

**43**
259:10

**48**
223:7,13,
18,23

**480**
186:2

**5**

**5**
28:18
34:25
35:2,4
236:14
239:8
256:6,8,9
271:20

**5,000**
239:8,14
241:24
243:22
246:4,25
247:7
257:19
263:11
282:11
297:20,23

**5-24-24**
114:20

**50**
152:15
221:16
261:14
267:1

**500**
243:18,21
245:6

**50s**
156:23

**52**
233:22,24
234:11

**54**
237:12
238:15
239:23

**55**
245:23
246:2

**56**
240:15,25
286:14

**57**
242:1,4,
17

**58**
244:3,9

**59**
248:11,12
249:9

**59-365**
263:23

**591**
287:7

**5:00**
288:19,23

**5th**
10:8,14

**6**

**6**
36:19,21
51:16
209:13,18
232:1
236:17
246:4
271:22

**60**
87:16
109:13,
17,22,25
152:2,10,
14
177:20,
22,23
178:4
182:19,20
250:13,
17,19
267:1

**60s**
156:23

**61**
252:25
253:11

**615**
41:23

**62**
254:12,
16,17,23
262:12

**63**
257:23
258:23
262:1

**64**
259:2
261:25

**65**
248:11
262:4,11

**66**
264:8,12,
21 276:8,
22

**665**
275:1,3,4

**67**
266:1,10

**68**
267:16
268:5

**69**
269:12
270:10,18

**6:00**
278:25

**6th**
114:14

**7**

**7**
40:1,3
169:23
170:3,11
225:17
226:1
235:10,12
271:24

**70**
104:23
264:8
270:2
274:10,
16,24
276:8,23
277:12

**70-year-old**
165:25

**72**
6:4
110:11
134:17

**73**
235:6,10,
11,22
246:11

**74**
277:13,17

**75**
277:20

**77**
277:22

**78**
277:13,24

**79**
278:1

**7:09**
304:12

**7:30**
81:4

**8**

**8**
41:1,3,9
272:2
293:25

**8-5-24**
114:21

**8.06**
15:18

**80**
84:20
134:3,7
278:3
297:6,7

**80s**
134:23

**810**
41:22

**86**
188:25

**89**
180:14,
15,18
203:1,7
297:5,9

**9**

**9**
43:6,8
66:25
211:14,21
214:24
215:22
218:17

272:5

**9-15-2022**
40:16

**9-24-2019**
33:3

**90**
134:3
135:5
297:6,7

**90s**
129:5
134:24
137:5

**95**
221:18
222:9
223:6,12

**96**
135:5
221:19
222:6,12
237:8

**97**
222:12

**979**
287:7

**981**
287:18,21
289:2

**A**

**A's**
117:18

**A-FLUTTER**
228:9

**A-L-E-M-A-N**
138:6

**A-N-**
6:24

**AA**
29:10,20
31:19

**abdominal**
132:14

**abilities**
23:25
26:2,4,20

**ability**
10:6
12:23
13:10
27:3
75:24
123:12
143:2
148:12
150:23,24
154:2
161:7
178:17
269:10

**ablate**
179:2,3,4

**abnormal**
88:22
89:11
227:22
228:3,15
229:11
232:19

**absence**
117:18
242:5

**absent**
117:18

**absentia**
114:2

**absolutely**
226:15

**absorbed**
157:18

**abstract**
238:18
268:9

**academic**
117:7

**Academy**
173:4

**accept**
30:12
68:6
121:9,10

**accepted**
17:5,20
19:10,19
20:1 64:7
72:9,12,
25 74:22
76:8
77:15

**access**
11:25
12:3 27:7

**accidentall
y**
130:24
194:22

**accommodate**
51:7

**accompanied**
89:14

**accomplish**
122:5

**accomplishe
d**
173:15
256:19

**accordance**
10:13

**account**
122:16

**accumulatio
n**
164:4

**accuracy**
62:11

**accurate**
137:14
209:21
221:6
295:1

**accurately**
18:17,18
43:22
59:1
223:10

**achieve**
119:17
120:3

**achieved**
175:9

**acronym's**
171:21

**act**
120:25
121:5
130:25
160:5,6
205:1

**acted**
175:11

**acting**
31:13
92:11
121:17

**action**
121:7
178:10
231:9

**active**
115:13
285:22

**activities**
143:6

**activity**
87:12,14,
15 92:5
146:8
182:22
186:1,6,
13 189:8,
13 201:9
227:22
228:3,15
229:5,7,
12 232:19
265:24
296:6,10

**acts**
160:9
257:7

**actual**
15:22
89:1
97:12
106:21
131:8
137:17
190:6

**add**
14:20
55:15

**added**
135:9

**addition**
6:20
26:12
144:20
161:1
178:10
300:8

**additional**
6:7 47:9
55:2 60:9
140:9,11
143:4

193:10
225:22,25
226:7
285:20
295:15
303:2

**additive**
139:13

**address**
10:19
29:3 84:5
94:6
213:5,24
214:4

**addresses**
123:7

**adept**
209:2

**Adequacy**
237:12
238:12

**Adequate**
242:6

**adequately**
89:7
254:3

**adjourned**
304:11,12

**adjusted**
267:1

**adjustments**
115:11

**administer**
53:11

**administered**
13:17
23:20
239:6,9
259:17
261:9

275:15
282:11

**administering**
60:21

**administration**
77:9
79:19
177:2
246:24
257:19

**administrator**
206:22

**admissible**
303:15

**admission**
18:23
21:14
75:4,13
303:13

**admitted**
19:4 32:2
33:16,19
34:24
35:2
36:20
37:12
39:24
40:2,25
41:1 43:4
50:21
59:12,15
72:22
75:1 79:9
101:20
102:1,21
103:2
148:7
189:17,21
279:21

**adopters**
131:11

**advance**
43:16
45:24
191:12

**advanced**
44:3
54:14

**adverse**
230:25

**advice**
78:9
214:18

**affect**
82:14
90:23
236:10

**affected**
127:25

**affecting**
127:3

**affects**
12:23
121:18,
19,20
146:20

**affidavit**
102:20

**AFIB**
228:9

**afraid**
152:21

**afternoon**
7:1 57:22
204:16,17
207:11
304:3

**afterward**
175:22
295:21

**agenda**
79:8

**agent**
31:13
41:20,24
43:17,21,
24 45:4,
7,8 46:1
53:24
130:4
135:4
253:2,24
261:12
271:6,9

**agents**
129:20,21
155:6
247:18
254:14
256:25
273:15
275:14,18

**ages**
126:13

**Agonal**
228:25

**agonist**
144:11,12

**agonists**
144:16

**agree**
7:25
173:8
292:1

**agreed**
15:18
206:20

**agreement**
173:15

**ahead**
9:24 20:3
29:19
30:17
33:22
51:12

53:4 94:3
112:20
130:5
132:24
168:18
208:19
215:13
244:21
269:2
276:14
288:24
293:8
295:9

**AIDD**
24:14

**aim**
119:25

**air**
158:9,10
161:20
162:20,21
165:8,14

**air-**
156:13

**airway**
161:17,
18,19
178:16

**airways**
163:11

**Aleman**
138:6,10,
23,24
139:8,10
140:8
146:14,24
147:2

**alfentanil**
134:20
260:6
266:23

**alkaline**
157:23

**alleged** 14:5

**Allen** 17:18

**allowed** 30:14

**Alpha** 62:23 144:9,14

**Alpha-2** 140:17 144:11, 16,17

**alpha-delta** 274:11

**alternate** 45:7

**alternatives** 50:7

**amenable** 48:9

**amended** 6:5

**American** 63:18 173:3,4,5 199:19

**Americans** 63:2

**amnesia** 117:17 119:14 120:2 154:7,14 175:23

**amount** 89:1 90:11 117:22 120:2 124:22 136:16 156:1 184:1 261:20

**amplifies** 123:2

**amplitude** 149:18 226:3

**analgesia** 117:17 119:13,24 123:3 175:18

**analgesic** 122:25 144:19 145:10, 11,19

**analog** 145:15 146:18

**analysis** 218:24 219:9 221:8 222:3 223:15,18 234:2 245:17

**anatomy** 205:19

**and/or** 165:2 232:2,17

**anesthesia** 7:3 60:22 61:8 63:4,6 80:13 81:11 82:4 117:10, 15,23 118:1,5, 6,7,9,14, 18,23,24 119:11 120:4 122:8,13, 18 123:13,22 124:9,20 128:16,22 129:7 130:2 131:3 132:21 133:3,4, 16 134:12, 15,23 135:14 137:3,13, 17,22,25 140:1,21, 22 143:18 144:16 148:2 152:8,9 153:16 187:1 230:24 234:2,19, 23 237:13 238:12, 19,23 240:10 241:9,12 242:6 243:13 244:17,24 245:16 246:21 248:13 250:15 252:14 253:24 254:2 255:14,17 256:16, 22,25 261:18 262:21 263:5 264:13,14 265:6 266:17,23 267:18,24 268:16 269:13 270:11 273:22 274:9,13 275:12 291:20 294:6

**anesthesiologist** 9:6,7 58:11 65:10 69:4,11 86:6 96:9 122:14 130:6,12 132:4,13 236:11

**anesthesiologists** 67:2 80:24 82:6 199:20 250:9 265:18

**anesthesiology** 58:13 60:5,7, 15,21,25 61:12 62:14,24, 25 63:18 64:14 65:16 68:7 69:8 72:2,10 75:10 77:4 154:6 205:18 281:6

**anesthetic** 118:19 122:15 126:11 128:5,14 130:8 135:5,7, 8,12 140:19 152:25 153:3,6, 19 175:17 247:9 249:13,18 254:14 257:25 261:20,24 268:19 271:6,9 273:25 275:17

**anesthetics** 129:18 133:8 134:25 135:20,21 256:19 272:23 273:18 275:21 276:19

**anesthetist** 275:13

**anesthetist's** 275:23

**anesthetize** 175:10 261:21

**anesthetized** 152:7

**Angel** 145:14

**animal** 139:11 141:4,13 281:11

**animals** 141:1,7, 12 143:16 144:8 147:9 277:9

**annual** 115:14

**anoxic** 78:6,7 189:14

**answers** 152:19

**antagonist** 140:18 145:9

**antalgesic** 123:2

**anticholinergic** 146:19

**anticipate** 303:21

**anticipating** 273:4

**Antognini** 5:15 6:24 7:21 9:2, 6 55:15 57:14 78:24 79:2 137:12 138:2 140:2 148:18 151:18 160:15 165:18 174:17 176:7 278:16 279:2 282:6 285:25 290:20 304:2

**Antognini's** 9:11 137:7 140:13 141:17 144:6 163:14

**anxiety** 128:11

**anxious** 153:16

**anymore** 79:16 99:5 154:9 181:13

**APHRS** 171:22

**Apologies** 273:11

**apologize** 48:2 50:2 114:2 171:13 236:24 237:20 251:8 262:5 267:10 282:25 296:4

**apparatus** 86:22 141:22 142:17,21 143:19,23

**appeal** 10:11

**appealed** 286:3,5,6

**appearances** 64:3

**appears** 35:22 144:21 157:15 163:1 202:3

**appended** 21:12

**Appendix** 286:12

**application** 193:11 298:25

**applied** 199:22 283:8

**applies** 146:7 230:1,3

**apply** 192:7

**applying** 121:23 175:6 180:24 199:13,23

**appoint** 41:21 53:22

**appointed** 31:7,8

**appointment** 37:1 51:25

**appreciated** 304:10

**approach** 17:25 20:24 29:11,13 32:5,8 40:5 48:22 120:6 234:4 263:15

**approaches** 257:18

**approaching** 263:11

**approximately** 64:6 69:21 97:13

**architecture** 85:11 86:11

**area** 61:2 62:1 64:10,13 68:7 72:13 80:3 85:24 87:8 111:8 117:7 154:18 164:19 200:19

**areas** 61:12 86:2 88:21 90:8 121:3 149:14 150:17,20 151:4 161:10

**argue** 14:15

**arises** 87:11 89:15 91:4

**arising** 90:8

**Arleta** 45:6,20 53:22 54:8,12

**arm** 118:11 130:5

**armrest** 132:12

**arms** 132:1,11 151:1

**arousal** 121:18

**arrest** 105:14

**arrhythmia** 88:4,5,9,

10 92:9 104:18 105:2,16, 18,23 107:16,18 108:5,10, 14 184:24 201:15 202:1,7, 12 203:12 221:16 226:16,21 281:4 296:15 302:1,24

**arrhythmias** 70:24 71:18 88:2,7,14 105:4 167:15 174:11 178:13 179:7,19, 21 181:16 185:18 198:6 201:10 218:24 219:9 227:5 232:2,16, 17 233:5, 7 296:24 302:18

**arrived** 81:6

**article** 165:25 186:9,15, 19 187:18 189:6,7, 16,20 217:16 218:11 240:23 241:12 246:1 249:9,20 266:10 267:7,8 274:5 275:2,17 278:6,12, 15,18,22 303:6

**articles** 126:19 154:16 176:6 237:16 265:16,19 282:15 300:20

**artifact** 202:6

**asleep** 118:15 123:22 124:24 126:7,8, 14 141:14 142:2 152:16

**asphyxiation** 289:10

**asphyxic** 167:12 179:15

**asserted** 36:6

**assess** 75:9 169:10

**assessment** 23:22 28:3

**assignment** 234:24

**assist** 21:25 59:7 76:12 139:5 159:5 172:20,22

**assistance** 15:21 37:1

**assistant** 41:21 42:9,25 51:25 56:23

**assisting** 57:1

**Association** 63:9 167:22 171:20 173:3,6,7

**assume** 141:14 191:3 245:4 257:17 265:19

**assumed** 216:12

**assurance** 203:25

**asystole** 229:2,3

**ate** 37:10

**athlete** 104:24

**Atkins** 19:15

**atria** 86:15,20, 21 87:5 89:1 90:9,10, 16,17 93:7,9

**atrial** 90:3,5, 12,23,24 91:2,4 175:7,8 228:2,5

**atrium** 86:18 92:2

**attach** 66:5 121:7

**attached** 21:7 25:13 47:3 190:13

**attempt** 7:9 15:12 161:21 261:23

**attempting** 233:4

**attended** 59:21

**attention** 14:14 26:1 99:4 169:24 209:13 228:13 251:3 264:23

**attesting** 20:21

**attorney** 27:20,22 29:21 31:8,13 41:18 42:1 53:23 68:16,17 112:1 278:20

**attorney-in-fact** 31:7

**audio** 47:11,18

**auditory** 150:18,23

**August** 10:8,14 15:1 42:23 97:13,23 98:2,5 106:11 115:10,18 166:25

**authenticate** 36:11 44:9

**authentication** 101:23

**authenticity** 36:3 101:18

**author** 138:5 256:4

**author's**

244:23

**authority**
13:22
14:5

**authorization**
29:22
30:20
31:9
32:19
33:8
34:3,18, 20 39:6, 19 40:8, 20

**authorizations**
39:15

**authorized**
31:6 33:7
34:18
39:18
40:20

**authors**
137:23
149:24
154:8
218:11
252:7
266:22
274:2
276:22

**automatically**
195:8

**autopsies**
155:9,22
157:12
162:1,16
164:5

**autopsy**
154:24
155:1,11, 15,23
156:6
161:25
163:4
164:8

**average**
84:15,16
153:6
162:10
235:5,9, 13 246:11

**avoid**
106:2
203:22

**avoiding**
196:11

**awake**
118:14
123:14
124:11,12
126:9
129:25
130:13, 15,19
135:11
150:5
152:2,16, 20 160:17
162:25
164:25
165:12
168:13

**award**
62:21,25
63:1,4,7

**awards**
62:18

**aware**
44:7
54:10
79:1
117:24
122:3
124:4,10, 18,20
128:5,15
134:11
135:6
148:14
153:13
161:13,18
164:9
183:19
184:1
237:9
248:6
250:10
278:25
279:5

**awareness**
117:6,17, 21 119:15
120:9
128:7,19, 21 129:7
133:16, 17,19,23
135:8
144:21
154:2
160:11
233:20,25
240:9
245:15,20
246:20
247:4,24
252:22
254:3,4
256:21
259:23
263:6
265:18
266:3
267:15
269:10, 11,13
270:11

**B**

**B-U-H-L**
138:16

**babies**
137:18

**back**
22:13,20
26:6 51:4
54:5
62:21
66:15,25
69:20
76:4
99:24
100:12
109:1,19, 20,22
110:25
111:13,17
125:2
134:25
143:14
146:4,23
147:5
156:22
163:12
166:4,19
171:13
172:10
174:13
175:16
187:13
194:24
200:18
203:2,13, 15 208:4
211:13
215:22,24
218:22
225:12
227:10
228:8
229:17
231:11,20
235:22
236:22
239:17,21
240:2
243:2
245:12
262:10
270:6
271:22
279:15
280:6
294:8,12
297:14

**backdrop**
289:3,5

**background**
23:5 30:2
59:20
132:16

**backs**
156:12
160:1

**backup**
111:4
243:4

**bad**
104:18
168:18
169:11
175:2
242:25

**bag**
89:22
109:4
180:8
185:6
279:19
302:5

**BAILIFF**
5:2
48:14,16
111:15,17
187:23,25

270:6
304:11

**balanced**
255:4,11

**band**
132:9

**barbiturate**
121:16,17
156:16
157:3,9,
12,19
158:13
240:10
241:20
246:21
250:6,11
252:19
257:11,19
260:16
262:18
268:23
273:18
281:20

**barbiturate s**
134:22
135:13,19
136:14,24
137:2
156:16,24
157:23
158:3,6
233:20
252:21
254:9
256:25
260:4
263:1
269:3
273:7,24
276:5,8,
19,23
277:7

**barbiturate s'**
269:9

**Barr**
285:7,9,
13 286:17
287:7,14,
24

**base**
25:2

**based**
11:22
12:1
19:4,17
24:2 30:8
35:21
97:22
164:18
223:17
229:19
230:15
231:16
283:8
294:25

**baseline**
243:12

**basic**
38:15
81:2
86:11
106:11
168:16

**basically**
63:14
84:15
88:5
93:10
104:17
107:8
113:10
114:15
118:19,20
127:21
151:22
160:20
169:21
183:7
189:13
301:24

**basis**
6:19 75:5
206:19

**Bates**
36:10

**battery**
25:20,24
26:6,10
96:22
198:16

**BB**
31:18
32:16

**bear**
36:10

**beat**
93:14,18
183:7
184:23

**beating**
87:16
163:18
183:8
185:4
301:9

**beats**
87:16
88:23
89:10
110:11
177:20,22
178:4
180:3,4
182:19
210:7,11,
12,13,19
211:1,8
220:15,19
301:5,6,
8,23

**beeping**
197:20,22
198:12,
14,16

**beets**
295:25

**began**
80:5,8,11
130:25

**begin**
81:4
83:14
179:7
295:14

**beginning**
36:23
74:14
135:22
178:18
212:5
214:13
230:6
237:3
238:19
239:23
241:9
243:8
244:17
247:24
263:24
270:21
289:3

**begins**
177:20
179:6
203:16
207:17
221:12
223:1
225:2,17
227:14
251:21
266:17
294:19

**behalf**
17:11
20:17
31:14
54:14
286:1
299:14,16

**behave**
68:3

**behavioral**
141:8

**believes**
296:13,
14,23

**belly**
132:22

**belonging**
12:6

**beneath**
50:9

**benefit**
110:20

**benefits**
50:6

**benign**
168:17

**benzodiazep ine**
250:2
252:17
254:8
260:3
262:17,21

**bet**
249:2

**big**
61:19
91:20
117:21


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 318 of 390 PageID #: 1096

126:25
129:14
133:4
134:16
137:19
157:17,20
160:20
169:9
171:15
175:12
186:1
218:7
256:2,18
275:4

**binding**
291:2

**Bioethical**
63:15

**biomechanic**
84:5

**BIS**
151:19, 20,21
152:1,14
244:4
267:1

**BIS's**
152:10

**bispectral**
151:21
266:2
267:18
269:13
270:11

**bit**
66:17
111:10
116:5
119:21
123:11
142:5
194:4,23
198:24
211:4,5
214:2
215:10
242:11
249:6
256:10
283:2
287:8
292:5
293:13
301:4

**black**
10:1,13
11:21
12:14,17, 20 13:3
20:8,9, 12,16
22:14
23:11,15
24:16,22
26:25
28:3,6, 21,24
29:23,25
30:10
31:1,12
33:1,11
34:9,20
36:4,5,25
37:4,21
38:6,12
39:12,21
40:14,22
41:20
42:10,21
44:2
45:15,20
46:5
49:12
50:10
51:24
52:12,23
53:12,17
54:9,14, 17,18
55:12
66:18
85:1
91:24
92:24
97:3
103:16
104:12
112:13
113:13
114:18
126:23
132:5
164:9
166:20
167:9
176:25
197:5
280:25
283:12
287:20
302:15,19
303:23

**Black's**
10:11
11:8,24
12:11
13:8
14:13
20:17
24:5,18
26:11
29:5
36:12,14
42:7,12
45:18
53:6,23
94:6
100:3
101:2
104:8
106:8
109:13,25
110:2
116:24
158:21
164:13
179:25
200:16
203:23
207:16, 18,25
209:22
220:14
227:21
282:22
283:9

**blanked**
282:24

**bleeding**
82:20

**blew**
149:21

**block**
118:11
144:24

**blood**
86:15,17, 22 89:1, 5,7,25
90:1,11
104:22
135:23
136:11
144:18
156:12
158:10
160:24,25
163:2,17, 22 178:14
184:7
230:12
231:4
244:4
279:9
280:18,25
281:3
302:4,6, 8,12

**bloodstream**
157:17,18
163:3

**blue**
132:3
275:5

**bluntly**
53:15

**board**
63:8
68:22
71:6
123:13
145:20
205:10, 13,20

**boarded**
60:3,10, 15

**boarding**
165:11

**body**
83:21
86:17
87:2
89:6,7
90:12
104:16
125:19
155:16
159:11,18
166:12,21
168:5
180:12,21
282:21

**bold**
31:3 50:1
213:20
218:7,23
234:15
287:20

**bolstering**
7:2

**bolus**
177:7

244:25
259:25
260:6,19

**Bondi**
112:2

**Bonica**
62:24

**book**
289:21

**bookended**
233:21

**booted**
57:15

**Boston**
71:3 80:4
92:19,22,
25 94:21
98:15
100:5
198:7,8
297:25
298:8
300:8,10,
13

**bothered**
150:2

**bottom**
30:22
32:22
34:6 39:9
40:11
114:23
214:3,9
216:18
233:24
247:20
264:24
270:22
275:2

**boundaries**
10:24
69:9

**box**
45:25
91:22
94:23
100:6
195:9

**boxes**
126:23

**bradycardia**
228:23
230:12

**brain**
23:3 89:7
120:18,
20,22,24,
25 121:3,
4,6
122:17
123:8
127:3
128:8
133:10
144:15
146:9,20
149:16,25
150:17,20
151:5
152:13
153:7
155:5
158:14
160:5
161:16
178:8,15
278:8,9
303:7

**brain's**
179:2

**brains**
149:22
160:16

**branch**
285:8

**brand**
14:23
15:9

**Brandon**
5:11,14
10:2 11:4
14:10
16:8
19:1,22
21:18
22:8,10,
19 27:17,
20 29:11
30:6,18
31:22
32:4,7,
13,14
33:15,23
34:23
35:5
36:8,22
37:23
38:3,5,
18,23,25
39:3,23
40:4,24
41:4,10,
14 43:4,9
44:12,15
45:2
46:7,10,
16,20,23
47:2,7,
20,22
48:2,10,
17,21
49:2,5
50:16,24
51:8,17
52:20
55:3 56:8
57:13,18
59:14
68:9,13,
16 71:25
72:11,16
73:3,8,16
75:3
76:20,22
79:12
85:14
86:9 98:6
100:21
101:22
102:24
105:20
111:21
131:15
142:20
148:5
158:17
164:12
167:2,6
188:6,17
189:19
204:15
208:2,11,
20,21
211:21
212:1,3
215:21
217:25
218:2
233:4,13
258:3,5,
10,13
269:22,24
270:1,4,8
276:20
279:20,
23,25
280:10,
12,15
288:12,
16,22,25
289:25
290:2
291:4,8
292:13,
17,19
293:7
298:20,23
299:2
303:3,11
304:2

**break**
49:3
56:4,7,11
93:24
111:9,23
148:10
160:23
187:17,20
188:23
263:19
269:21
270:1,3

**breaking**
56:11

**breath**
130:11
161:20,
21,22
165:5
178:17

**breathe**
161:8

**breathing**
37:7
130:9,11
165:1
186:3
302:9

**briefly**
5:23 7:20
25:23
30:14
51:11
131:18
277:15
294:11
296:25

**bring**
51:4
217:18
250:20
259:4

280:13

**bringing**
14:14

**brings**
87:15
226:10,12

**Britain**
129:6

**broad**
285:17

**broader**
20:2
21:22

**Broadway**
41:22

**bronchi**
163:11

**brought**
278:14,17

**brushing**
151:3

**Buhl**
138:10,
12,16
139:2
147:8

**Buhl's**
145:23
146:11

**builds**
104:16
156:11

**bullet**
230:18

**bunch**
133:9
134:24
166:6
173:1
179:14

**burn**
160:20

**burning**
158:4
177:14

**burns**
158:2,4

**business**
5:4
102:20

**busy**
84:17

**butchered**
274:13

**Byron**
9:25
10:13
20:8,9,
12,16,17
23:11
31:1,12
33:1,11
34:9
36:13
39:12
40:14
41:20
42:21
45:15
49:12
55:12
103:15
113:13

**C**

**C-A-R-D-I-O-V-E-R-T-**
13:25

**calcilated**
241:24

**calculator**
235:15
236:19
239:12

**calendar**
15:4

**call**
11:5
23:22
26:18
47:14
54:22
66:3
98:15
99:22
100:4
107:22
111:4
121:17,21
125:17
128:3
129:13,19
149:6
153:2
162:6
163:8
168:19
183:15
201:6
222:4

**called**
54:23
70:22
77:4
81:15
82:12
87:8,10
88:2,9
89:3 90:3
94:2
98:17,18
99:10
104:12,21
118:13,17
121:16
127:19
128:24
129:12
140:16
141:21
150:18
151:19
161:4
165:11
168:9
190:1
207:16
216:19
218:7,24
221:8
233:25
234:15
244:12
248:13
253:1
254:13
257:25
264:12
266:2
267:17
268:10
269:13
274:11
278:6
289:23

**calling**
189:25

**calls**
10:1
15:14
55:12
236:14

**camera**
57:19
215:24
218:4
239:21
266:13
294:17

**capability**
181:20

**capable**
116:7
291:20

**capacities**
65:9

**capacity**
46:2 54:1
63:3

**capture**
94:3
181:13

**captures**
182:11

**cardiac**
8:9,21
60:22,25
63:6
64:24
68:7
69:23
70:1
71:18
85:17
96:2
105:23
147:16
173:20
179:20
189:8,13
191:7
192:20,23
205:7,18,
19,22,23
227:22
228:3,15
229:7,12
232:19
281:4
294:21
295:3,11
299:22
302:19

**cardiac-related**

65:1

**cardio**
58:13
70:3
93:25
170:20
204:22
299:21,24

**cardio-**
216:19
299:25

**cardiologist**
71:8,10,12,17
81:6
85:16
95:2,14,20 99:20,22,25
114:21
195:18
205:11
206:3
295:18

**cardiologist's**
206:1,6

**cardiologists**
65:14
70:24
81:22
82:9

**cardiology**
63:5
67:1,3,4
71:7
115:15
168:17
173:4
206:18
299:22

**cardiomyopathy**
104:13

**cardiophysiology**
299:21

**cardiothoracic**
58:11,14
60:7
65:10
71:10,14
72:10
75:10
77:3
80:24
82:7
85:17
86:5

**cardiovascular**
172:16
230:25

**cardioversion**
174:18,25
175:4,5
176:2,4
180:24

**cardioversions**
174:22

**cardioverter**
13:25
49:16,20
65:5

**Cardioverter-defibrillator**
217:7

**cardit**
299:24

**care**
38:9
41:13
61:12,13,15,19,22
62:16
63:21
64:16
65:18
82:3
97:25
118:18,20
143:15
153:9
154:1
167:17
172:25
173:7
206:14

**career**
61:1,6,10

**careful**
178:24

**careless**
195:13

**carry**
10:12

**case**
8:22
11:16
12:13
17:18
19:15
20:8
27:21
30:2
74:15
76:5
77:4,16
81:18
83:9,11
84:24
91:23
92:23
99:3,5
104:23,24
105:24
122:1
141:16
156:16
163:12
179:25
192:18
193:15
194:21
198:5
202:25
206:13
220:6
262:6
265:15
269:5
284:17
285:4,13,14,24,25
286:3
287:3,10,25 288:1,7,21
289:22
290:21,24
292:22,23
293:4
299:15
300:7
304:10

**cases**
9:8 66:10
73:4,10
78:18
81:4,7
105:6
108:22
129:23
194:25
198:25
225:7,9,25 226:7,10,13,14
262:9
279:3
291:15,16
304:7

**categorically**
28:20

**categories**
126:25
128:3
209:20

**category**
127:1
170:10
250:5

**cattle**
143:14

**caused**
157:8
196:9
225:6

**causing**
86:20

**caustic**
136:18
158:11
160:18

**cautery**
82:20

**caution**
126:4

**CBT**
289:23

**center**
58:7,9
194:4
299:23

**centers**
120:7

**central**
120:13,

15,16,22 155:5 177:11,12

**Centurion** 114:24

**certainty** 6:16 8:4 24:22 74:18 302:14

**certification** 205:20

**certifications** 60:9

**certified** 42:3 61:7 67:4,5 68:22 71:7 204:25 205:2,11, 13

**certifying** 42:13

**cesarean** 134:16 234:1 237:13 238:13 240:17 245:15

**cetera** 59:3

**challenge** 77:5 124:20 284:24

**challenging** 284:20

**chamber** 49:16,19 93:8

**chambers** 86:14 93:10 159:17

**chance** 13:12 105:13

**Chancery** 5:3

**change** 53:7 96:15,22, 23 190:16 198:4 226:3 242:24 284:13

**changed** 23:21 24:17 99:20 195:11 284:6

**changing** 30:10

**chaotic** 180:7

**characteristic** 157:21

**characteristics** 116:16 122:17 235:25 236:9

**charge** 182:23 184:25 185:1

**charges** 294:19,20 295:10

**chart** 249:12 261:8

**check** 114:15 221:2

**chemical** 121:12 123:6 241:14 283:7

**chemical's** 282:21

**chemically** 255:23

**chemicals** 120:25 121:4 144:15 255:22 256:23

**chest** 54:22 161:23 163:24 164:3 169:1 175:13 180:25 194:16 196:20

**CHF** 114:18,19

**choice** 275:23

**CIED** 64:23,24 204:23 207:16 227:21 294:22 295:12 296:13,14

**CIEDS** 64:22 67:12 69:16 70:9 172:17 204:21

**circle** 200:18

**circuits** 89:17

**Circulation** 216:22

**circumstances** 66:14 285:21

**citation** 216:5 287:3,5

**citations** 126:18 215:2

**cite** 73:9 212:9,16, 21,23 232:9 233:25 237:12 238:14 240:14 246:23 249:9 264:20 269:12 277:16 289:5 298:5

**cited** 77:23 78:22 138:20 140:2 160:15 165:17 215:19 217:11 234:11 240:25 244:9 245:23 246:1,2 248:10 253:10 254:13,23 258:23 266:10 268:5 270:17 274:6,7, 24 276:7 278:12

**cites** 8:16 78:20 134:5 138:2,8 252:25 257:24 267:17

**citing** 262:9 274:5

**Civil** 6:3,18

**claim** 13:23 14:14 155:14

**claims** 163:21

**clap**
149:5,6
150:15

**clapped**
150:15

**clarification**
111:21
112:16

**clarifies**
113:9

**clarify**
14:10
295:17
297:18

**class**
121:16
250:5
254:9
257:11
260:4,16
261:7
262:18

**classic**
162:24

**clear**
8:16
14:17
28:1
112:18
119:13
257:3

**CLERK**
16:11
56:18

**client**
55:11
287:17

**client's**
23:2

**clients**
285:10

**clinic**
171:24

**clinical**
18:19
25:3
61:7,9,11
71:20
115:15
152:8
158:3
248:4
250:14
263:14
265:17

**clinically**
115:10

**clinics**
63:18

**clock**
288:19

**Clonidine**
144:17

**close**
75:25
84:1
98:12
218:12

**closer**
155:21

**closest**
145:11,12

**clots**
90:15

**CNS**
254:1
259:21
263:7
265:14, 23,24
267:9
269:9
274:7
275:20
282:5

**Co-counsel**
27:11
204:10

**Cody**
27:20
68:16

**Coe**
17:17,18

**cognitive**
23:24
26:3

**collapse**
141:19,20
147:19
161:16

**collapsed**
140:4
141:18
161:20

**collapsing**
178:17

**collecting**
160:25

**collection**
25:25

**College**
173:4

**colloquial**
125:4

**colloquially**
189:25

**Columbia**
284:20
285:4

**column**
35:20
225:2
260:18
271:5,6

**columns**
259:25

**combination**
133:22
155:3

**combined**
262:20

**comfortable**
117:12
118:7

**commands**
132:23
237:9

**commencement**
147:15

**comment**
147:13
162:6
247:8,17
289:20

**comments**
214:20
263:7

**commodity**
153:13

**common**
28:19
95:8,11, 19,20
96:8
109:18
192:1

**Commonwealth**
19:15

**communicate**
27:4

**communication**
206:17
298:14,17

**communications**
299:19

**companies**
92:16,18
94:22
95:9

**company**
151:22

**comparable**
25:5

**Comparison**
240:16
250:14
254:13

**competency**
10:11
11:8,11, 13 12:12
13:6
14:22
15:7,8
28:9,24
60:14

**competent**
13:3 31:5
33:6
34:17
39:17
40:19
122:14

**competing**
9:3 279:3
290:15

**compilation**
113:4

**complained**
37:15

**complaining**
288:20

**complaint**
12:18
13:23
14:5,6,13
15:6,20

**complete**
44:8,22
74:7
102:8
106:14
108:24
295:7,8

**completed**
24:3
60:12
61:20

**completely**
110:13
125:5
166:7
217:23

**completeness**
102:8

**completes**
108:17

**completing**
205:4,5

**complexities**
82:11

**compliance**
6:3

**complicated**
130:23
153:20

**complies**
7:14

**component**
119:13
133:4

**components**
120:5

**compos**
28:21,22

**computer**
66:3
190:12,14
192:16

**computers**
192:16

**concentration**
61:1

**concept**
119:11
126:21

**concern**
72:9
102:2,25
119:4
123:11,
19,21
147:21
154:3,4
155:12
167:16,21
174:4

**concerned**
153:25

**concerns**
147:9
227:14,20

**conclude**
10:21
24:10
77:25

**concluded**
78:1
112:11
149:25
206:21

**concludes**
212:5

**concluding**
291:12

**conclusion**
26:12
283:24
290:5

**conclusions**
11:21
24:4,8
26:5,11,
15 147:9
282:20

**condition**
38:14
89:11

**conditions**
10:7
81:17
139:18
282:22
283:9

**conduct**
20:11
23:10
275:8,12

**conducted**
24:2 26:9
148:15

**conducting**
20:15

**conduction**
93:21

**conductions**
262:25

**confer**
46:8 57:2
298:20

**confidence**
221:18
222:9
223:7,13

**configuration**
196:19
301:18

**confirm**
111:22
116:9
255:10
258:23
267:4
269:2
290:3

**confirmed**
240:11
246:22

**conflicting**
195:10

**confronted**
227:22
284:12

**confuse**
146:14

**confused**
146:3
286:8

**confusing**
289:14,17
301:4

**congestion**
155:18
156:3,4,5

**congestive**
114:19

**connect**
150:22

**connected**
126:19
127:1,16,
23

**connections**
291:5

**connectivity**
149:14

**conscious**
78:4
125:3,8,
10,20,21

**consciousness**
78:2
117:6
125:12,23
126:20,25
127:1,7,
16,20,23,
24 139:24
141:4,6,
10,11,18,
20 142:7,
14 264:4,
14 283:6

**consensus**
171:3,23
172:7,16,
24

**consent**
49:8
50:1,5,8,
9 54:7,8,
13 268:15

**consents**
42:8
45:19

**conservator**
31:7

**considerable**
136:16

**considered**

9:17
63:10
133:14
228:2

**consistent**
29:25
300:12

**consists**
74:13

**consonant**
47:22

**constant**
81:8
222:5

**consternation**
117:22

**constitutes**
287:4

**constraints**
51:5

**constructional**
26:2

**construed**
15:19

**consult**
27:11
95:8
167:10
204:10
205:9
214:19,21

**consultation**
115:15

**consulted**
64:10

**consulting**
64:12

**contact**
158:1,11
197:21
198:3

**contacted**
54:13
84:25

**contained**
74:22
113:4

**contemporaneous**
24:2
100:4
197:13

**contemporaneously**
97:7

**contemporary**
30:2

**content**
255:7

**contention**
212:10
214:24
218:16
232:12
237:11

**contentions**
216:16

**contents**
19:7
21:11

**contest**
72:1

**context**
233:6,9

**contexts**
64:16

**continually**
92:13

**continuation**
231:15

**continue**
32:10
178:7
181:12
182:10
183:18
189:14
215:1
284:9
295:3

**continued**
73:24
80:12
86:1
295:13,23
296:4

**continues**
185:1
202:1
284:9,11

**continuing**
123:13

**continuous**
281:7

**contours**
72:5

**contract**
86:15
89:19
90:10,19
93:7,10,
12 109:17

**contracting**
88:25

**contraction**
86:21
87:24
89:14
135:25
191:8

**contractions**
302:22

**contradicted**
284:13

**contribute**
90:10

**contributing**
36:17

**control**
144:20

**controlled**
265:7

**controversy**
123:11

**converge**
25:5

**conversation**
27:5
206:14

**convert**
108:11
175:6
182:24

**converting**
202:1

**conveyed**
52:23

**coordinated**
89:14

**copies**
18:3
51:18
234:5
280:11

**copy**
35:21
46:13,14,
25 48:23
101:10
102:13
172:10
213:10
217:16,18
240:7,8
242:25
243:1
248:16
266:19
279:16
280:1,2

**cord**
120:18
133:11

**Corley**
45:9,22
53:22
54:7,13

**corner**
287:5

**correct**
6:25 7:21
25:21
26:7
28:10
31:4,10
37:6,8
39:20
46:3
50:15
52:9
54:2,9,
15,16
57:12
68:24
70:10
71:16
74:3
76:22
85:2,3

94:15
99:2
104:6
113:22
116:11,15
119:1
122:1
123:15
137:7,10
138:3
170:21
171:21
179:8
184:3
187:10
189:5
193:13
197:12,15
205:12,14
210:5,14,
21,25
211:3,9,
11 212:8,
9,12
219:22,25
220:16,24
221:20
222:10
223:4,11
225:13,15
226:9
228:22,24
229:1,3,
20,24
230:9,13
231:5,7,
10,14
232:5,8
233:23
234:3,4
236:2,15
237:10,14
238:21,25
239:25
241:22
243:9,16,
23 244:6
245:10
246:13
247:1
248:8
249:14
250:1,3,
7,18
252:12,
16,18
253:12,
22,25
254:11,
17,24
255:15,
17,20
257:1,2,
10,17,21
259:20
260:2,5,
17 261:13
264:6,16
265:13
266:5
268:21
272:1
275:11,
16,19
276:25
277:11,14
278:23
281:18,
23,25
282:9
284:22
286:20
290:18
294:4
296:24
299:8,9,
13,17
301:7

**correcting**
258:6

**correction**
35:12
80:15

**correctional**
192:25

**corrections**
97:20
200:14

**correctly**
42:5
49:15
94:19
207:20
216:3
218:14
219:17
221:21
225:7
226:4
227:25
228:1
231:1
232:3
235:1,5,8
239:1
240:12,18
243:15
245:2
248:9
252:11
264:5,15
265:8
294:23

**correlate**
266:11

**corresponds**
218:16

**cortex**
149:15

**Cortical**
278:7
279:11
303:6

**counsel**
7:21 9:13
12:24
13:12
15:21
19:5
22:24
30:5 36:7
41:2
43:1,7
48:8
53:24
57:3
68:17
79:17
101:8
102:3,14
103:1
233:8,12
278:20
292:15
300:21
303:8

**count**
219:23
220:5,13

**counted**
219:19

**counteracting**
177:24
178:1,2,3

**country**
17:4
19:11

**County**
5:2

**couple**
6:14 10:3
50:25
65:9 73:4
103:22
107:10
117:20
138:2
163:20
172:5,7
234:5
255:5

**court**
5:3,4,6,
8,12,18,
22 6:6
7:12,13,
15,17,19,
25 8:24
9:14,15,
17,18,24
10:4,6,9,
15,17,18,
19,21
11:13
12:5,9,25
13:7,11,
13,14,18,
20,22
14:5,8,
11,15,16
15:14,17
16:9,19
18:2,5,7,
10,25
19:3,21,
25 20:2
21:1,4,
17,20
22:7,9,
11,15,24
23:2,4,7
25:17,23
26:16
27:14
29:13,16,
19 30:5,
16 31:19,
24 32:1,
6,10
33:14,17,
19,22
34:25
35:2
36:7,18
37:25

38:21,24 40:1 41:1,8,12 43:6 44:24 46:9,11, 12,18 47:6,16, 21,24 48:6,12, 20,25 49:4 50:19,21 51:7,9,12 52:25 53:4 55:2,5,9, 13,20,22, 24 56:5, 10,21,25 57:2,6, 11,23,24 58:18 59:15,20 63:24 64:3,5 68:6,8,11 71:24 72:8,12, 23,25 73:7,12, 14,18 74:15 75:16,21 76:8,19, 21,23 79:4,11, 17,22 85:19,20, 21 86:4 91:17 98:7 100:23 101:8,12, 14,21 102:1,15, 23,25 103:11 106:3 111:11, 13,17,19 112:5,22 123:19 131:14,16 142:25 143:8 148:4,6, 10 158:24 159:6 164:14 187:16, 20,22 188:1,10, 13,15,18 189:18,20 204:11 208:4,6, 19 211:20,24 215:9,12 218:1 233:11 258:9,12 270:3,6 280:14 284:19 285:19 286:4,6, 7,8,19 287:10,12 288:8,14, 19,23 289:22 290:5,14, 24 291:1, 2,3 292:15 298:22 303:2,4, 10,16,19, 21,25 304:4,11

**Court's**
9:20 10:25 12:7 15:16 29:25 46:24 51:3 85:22 111:9

**courtroom**
43:1

**courts**
17:2,8 19:11 74:2,21 284:3 290:10

**cover**
296:12

**covered**
262:14

**covers**
166:3

**COVID**
285:22

**cows**
143:18, 19,21

**create**
154:8 198:13

**created**
92:16

**creating**
120:25

**credibility**
36:15

**creeping**
89:22

**Crick**
297:2

**cried**
176:9

**criminal**
11:13 17:12

**crisscrossing**
194:16

**criteria**
24:14,16 28:22

**criticism**
137:9

**critique**
62:8

**cross**
72:14 188:16

**cross-examination**
8:19 9:12 27:15,16 47:25 71:23 73:21 204:14 300:21

**cross-examine**
30:14

**crosses**
69:9

**Crowns**
299:8,11

**crude**
166:1

**crying**
127:13 176:13

**current**
18:16 23:8 96:18 180:25 227:15,20

**curriculum**
17:23 18:16,17, 23 19:4, 18 58:16 59:8,12

**cut**
35:21 137:16,18 163:9 215:12 216:25

**cutting**
25:14

**CV**
15:3 19:2 58:25 59:1 68:22

**cycles**
185:22

**D**

**daily**
37:13

**damage**
23:3 93:21 169:14

**dangerous**
88:15 136:10

**dangers**
90:14

**Daniel**
10:1 16:12,20

21:15

**Danny**
287:25
290:23

**Daryl**
19:15

**data**
23:14
124:22
197:16
225:11
285:24
290:10
303:14

**date**
33:2
34:10,12
35:19
36:10
39:13
40:15
42:22
45:16
50:11
104:2
113:17
114:13,22
213:4
277:16,19
293:10,11
298:2

**dated**
15:1,2,3
28:15
172:19

**Davidson**
5:2

**day**
10:14
50:13
79:19
81:25
84:17
143:14
239:13
267:10
299:25

**DD**
33:25

**de-**
71:1

**deactivate**
190:9,22
192:2,13
193:2,9,
14,15
194:14

**deactivated**
13:15
158:21
190:11
198:17
203:23

**deactivating**
173:9
190:5,7
193:17
204:23

**deactivation**
173:15,17

**dead**
150:12
163:25
166:11

**deal**
75:19

**dealing**
200:6

**deals**
289:22

**death**
78:7
113:16
147:16
156:25
163:16,
21,24
166:9,11
167:12,13
179:15
185:18
186:4
189:14
216:20
217:8
218:13
223:21
226:2
227:8
298:25

**deaths**
179:15,16
225:3

**debate**
229:10

**decade**
205:22

**decades**
117:20
124:21

**December**
15:2

**decided**
151:25
287:25

**deciding**
92:6

**decision**
12:8
15:16
43:19
114:24

**decisions**
41:25
42:3,14
43:19
46:1,3
53:25
54:1

**declaration**
6:1,8,20,
21 7:6,22
8:7,18
11:6,12
14:25
20:21
21:6,8,
11,15
22:1,6
72:21
74:12,13,
23 75:1,
4,13
76:14
137:10
208:9
209:8,10,
14 218:17
227:11,
17,19
229:20
230:18,22
231:12
233:1
237:7
239:18
240:11
246:20
247:20
253:11
254:16
258:24
264:2
270:10
277:2
278:13
286:12
289:6,12
294:12
298:6,12

**declarations**
11:10,15
25:15

**deconstructing**
233:9

**decrease**
177:15

**decreases**
231:8

**decreasing**
178:16

**deep**
132:22

**deeply**
118:15

**default**
100:10

**Defendant**
19:5

**defendants**
5:15 10:6
11:22
12:2,12
13:21
14:3,11
15:10
18:25
19:21
27:21
64:13
68:18
103:2
278:24

**Defendants'**
5:24
29:10
31:17
32:16
33:25
35:7
39:1,4
40:6
41:6,16

43:11
51:15
53:23
72:3
208:12
245:13

**defended**
13:21

**defender**
41:22
42:9,25

**defense**
8:17 11:3
20:3
53:22
54:11
138:19
299:15
300:21
303:8

**defibrillating**
94:18

**defibrillator**
14:1,3
49:18,20
65:25
82:25
92:1
105:12
192:7
207:17
216:20
294:21
295:12,21

**defibrillators**
65:5,19
69:17
83:13
98:24
99:6
170:21
296:8

**define**
88:1
120:15
301:25

**definition**
88:13
117:15
174:1
301:22

**degree**
6:16 8:3
24:21
74:17
120:9
302:13

**delay**
11:1
14:13,16
149:13

**delayed**
149:17

**deliberate**
130:24
261:23

**delicate**
136:9
158:2,8

**delighted**
82:9

**deliver**
83:16
107:8
108:5,7,
18 168:7
185:2
201:14,
16,21

**delivered**
176:6
203:5
224:20,22

**delivering**
173:11
182:18
295:14

**delivers**
109:18

**demanding**
169:4

**dementia**
26:18

**demonstrate**
128:19
254:2

**demonstrated**
248:4

**demonstrating**
140:3
274:6

**denied**
9:14
11:23
35:25
37:4,7
97:18,22
115:7

**denier**
97:23

**denying**
11:25
97:19
147:7

**department**
35:12
58:12
62:25
67:1,3,4
70:2
77:19
78:17
79:6,14
97:20
112:3
205:3

**depend**
181:15

**dependent**
185:2
295:15

**depending**
92:21
180:15
181:14
184:4,6
203:6

**depends**
179:12
182:16

**deposition**
11:24
74:5
293:10

**depositions**
64:3

**depth**
264:13

**derive**
64:17

**describe**
13:15
22:14
25:23
26:15
59:19
87:6
91:17
129:11,15
139:8
145:25
168:25
169:2
183:16
193:10
220:4
252:7

**describes**
58:16

**describing**
214:20
234:22

**description**
49:13
103:19
182:5
207:16
209:18
222:3
295:2

**desflurane**
140:23
271:17,
22,23
272:3,8,
11,15

**designated**
43:24
45:4,7
224:6

**Designation**
41:19

**designed**
144:24
183:6
185:8

**designee**
10:12

**desires**
56:9

**destroy**
179:4

**detail**
123:18
155:25
156:1
181:10
250:4

276:18

**detailed**
38:8,13, 16 247:10

**details**
38:7 41:8 68:21 254:5 257:4

**detect**
133:17, 19,23 254:3 264:4,14 269:11

**detected**
201:9

**detecting**
174:10 267:14

**detection**
222:17,21 234:1 245:15,20

**detector**
83:6 196:2

**detectors**
82:23 196:9

**detects**
133:23 201:15 202:9 295:13

**deteriorate**
104:18

**deteriorated**
26:20

**determination**
85:23 115:8

**determine**
60:14 73:19 103:15 104:10 106:10 110:7

**determined**
92:9 301:16

**determines**
92:7 301:15

**determining**
133:15

**detomidine**
146:15

**detrimental**
159:24

**devastating**
168:21

**develop**
80:23 81:10 96:21 178:14 179:8,10, 20

**developed**
65:16 129:3,5, 18 155:16,17 169:10 178:13

**developing**
105:1

**device**
13:14 15:22 49:22 50:13 54:21 66:2,4,5, 9,12,14 68:2 81:19 82:21 83:14,23 84:3 85:1,4 91:19 92:4,10, 25 93:8, 16 94:6, 12 95:12, 19,22,25 96:5,24 97:4 98:4,10 99:1,10, 19 104:3 105:8,15, 18 108:5, 22 109:6, 14,15,25 110:8 114:6,14, 22 115:8, 11,14,17, 25 173:11 174:10 177:21,22 190:13, 14,15 191:5,10 192:13 193:7,14, 17,19 194:2,8, 12,13,21 195:1,7, 12,15,21, 23 196:3, 22,25 197:25 198:1,15, 18 199:9, 10 200:3 201:3,8, 14 202:4, 5,7,19 203:23 207:18 216:1 218:19 224:6,7, 11,18,21, 22 225:6 227:4,21 289:23 301:23 302:1

**devices**
64:25 65:1,3,8, 12,13,17 67:6 70:12,19, 21,22 71:1 81:5,14, 16,23,24 82:2,4 83:4,12, 23 84:21 92:12,15 93:5 94:1 96:10 98:1,23 99:16 107:8 172:17 174:5 185:16 192:4 193:8 194:3 195:21 196:7,10, 13,23 198:13 199:5 205:24 224:13

**Diabetes**
63:9

**diagnose**
71:18 247:23

**diagnosing**
105:23

**diagnosis**
49:9 113:13,15

**Diagnostic**
24:12

**diagram**
159:13

**diazepam**
248:13 249:25 252:17 262:18

**die**
105:5

**died**
78:6,7 140:6 155:12 186:3,4 290:17

**difference**
118:4 301:5

**differently**
68:3 81:17 83:5

**difficulties**

47:11

**difficulty** 37:4 51:1

**dire** 68:10,12 75:8 86:1

**direct** 16:14 57:20 72:15,20, 24 73:24 76:7 113:25 114:5 116:1 156:14 173:20 181:19 189:11 192:23 205:6 209:13 251:3 264:23 278:5 281:24 293:3,14

**directed** 153:20

**directing** 207:2

**direction** 130:22

**directive** 43:16 45:24 54:14 111:25

**directives** 44:3

**disability** 19:12 24:9,11, 23 26:13

**disable** 99:7 190:1 192:2

**disagree** 86:4

**disclaimer** 213:23

**disclosed** 14:24

**discomfort** 120:2

**disconnected** 126:20 127:7,23

**discover** 195:22

**discovery** 297:1

**discretion** 275:12

**discuss** 8:11 213:13

**discussed** 39:15 69:14 116:14 151:19 173:9 180:8 210:24 217:10 223:15 236:14 239:2 246:3 255:23 282:19 283:5,16 300:21

**discusses** 79:1

**discussing** 188:24 189:11,12 213:11,12 215:19 245:24

**discussion** 86:14 124:15 153:2 215:2 217:14 218:6,7

**disease** 179:13 184:8 205:22 213:18 283:18 285:22

**disorder** 13:9 26:18 53:9 168:23

**disorders** 12:22 24:13

**dispense** 12:6

**dispensed** 92:15

**display** 56:21 57:10 180:21 208:8

**dispose** 242:2 243:25

**disregard** 9:17

**disregarding** 9:18

**disrespect** 195:5

**disrupting** 75:24

**dissociative** 127:19

**distinguish** 95:12 223:24

**distress** 147:15 289:9

**District** 284:19 285:4 286:5

**disturb** 258:11

**disturbing** 183:17

**divided** 139:21 159:14 239:14

**division** 299:22

**DNA** 297:1

**doctor** 30:19 31:16 32:15 33:24 34:1 35:6,8 36:23 38:6,17 39:4 40:5,6 41:5 42:17 43:10,12 45:3 46:4 47:13 48:22 49:6 56:1 97:15 165:15 168:20 171:7 204:16 206:12 207:6 208:22 214:19 215:5,22 227:12 230:22 233:14 234:5,8 236:23 240:22 242:12,14 244:1,7 250:21,23 253:4 254:6,18 258:8,14 264:17 266:7 268:2 270:9 278:5 280:16 282:14 286:25 292:12,20 293:8,14, 17 298:17 300:6

**doctor's**
95:23
96:5
103:23
115:2

**doctors**
25:4
190:3

**document**
18:7,14
21:4
29:24
30:20
32:18
34:2
35:9,11
36:2,5,8
37:20
38:21
39:5,21
40:7,22
41:17
42:1
43:15,17
44:5,7,8,
10,11,22,
23 48:7,
22 49:3,
7,25
51:24
54:11
58:22,24
74:11
79:13,20
103:1
113:1,8,
10 114:7,
8,11
115:1
138:22
139:1
171:5,7,
10,15
172:11,
14,21
174:12
187:9
189:4
208:23
209:5
212:25
213:15
217:3
234:9
238:8,9,
10,14
242:15
244:7
249:4
250:20,24
253:5
254:19
258:15
264:18
268:3
270:14,22
274:21
287:1,20
292:4

**documents**
18:8 29:7
42:7,12
48:4
102:18
104:4
112:11,18
113:3
116:2,10,
23

**DOJ**
111:23

**domains**
26:1

**door**
129:8
149:7

**dormant**
278:7
279:12
303:7

**dosage**
252:10
257:8

**dosages**
239:3

**dose**
37:18
123:5
137:13
146:16
148:23
149:24
177:2,7
236:14,
17,18
239:9
241:20
243:18,22
245:6,8
246:4,24
253:19
255:13,22
256:2,3,
5,18
257:1
261:14
263:10
281:19
282:7
284:24
285:1

**doses**
123:1,3,5
135:20
136:15,17
137:24
150:9
158:3,5
247:3,17
255:18
256:20
257:14
259:15
263:14,15

**dosing**
236:10
257:12

**double**
221:2

**doubt**
78:4

**douse**
193:12

**downstairs**
196:4

**dramas**
175:11

**dramatically**
89:2

**Drano**
157:24

**drapes**
132:5

**draw**
11:21
26:5

**dreaming**
127:10

**dreams**
127:12,24
128:2

**drinking**
37:12

**drive**
148:1,6

**drop**
142:6
230:11,12

**drown**
161:9,13

**drowning**
78:6
161:14,15
165:2,7,
12 167:13
289:10

**drug**
77:13,20
78:10,18
119:18
120:3,6,
7,12
121:10,
13,14,16,
18 133:6,
7 134:18
139:12
140:11,19
141:2
142:3
144:17
146:16,19
149:10,19
151:6
152:18
153:23
155:3,8
156:23
157:1,2
160:5,20
161:16
175:22
177:9
178:2,15
234:23
259:14
260:14,21
261:7,19
262:23,24
283:23

**drugs**
119:3
120:11
121:9,21
122:11
123:13
124:2,8,
13 129:24
130:3

131:5
133:5
134:18
135:9
136:7,10,
12,19,24
139:14
140:9,24,
25 141:21
142:5,9
144:17
145:20
146:21,22
152:12
153:4,5,6
155:4,5
176:4
250:5
252:10
254:9
256:14
257:11
259:15
260:4,16
262:18
267:12
268:24
272:25
273:12
275:25
276:2
286:15
291:11

**DSM-5**
24:12

**dual**
49:17,19
93:8

**dual-chamber**
92:1,24

**Duct**
49:16

**due**
11:23
69:13
81:15
115:18
179:19
183:9
230:24

**duly**
16:13
56:17

**duplicated**
262:6

**durable**
31:8,13
41:18
42:1

**duration**
210:17,19

**Dust**
145:14

**dying**
167:12
173:10,
12,13,16
174:10
185:24
186:5
203:21
212:7
215:25
218:17
226:3
302:18,24

**E**

**E-R**
14:1

**earlier**
28:2,4
30:8
50:17
94:7
115:23
154:19
180:8
189:11
195:2
196:15
200:25
203:1
204:19
211:10
220:13
241:21
247:6
255:23
256:13
260:8
283:16
294:25
296:25
297:5

**early**
61:5 81:7
111:10
129:4
131:10
134:14,23
155:15
283:11

**easier**
211:23
217:18,19
243:25
266:13
285:6

**easy**
153:15
166:5

**echocardiography**
63:6

**edema**
155:17,
18,19
156:3,4,
5,7,17,21
157:5,8,
22
158:18,22
159:6,23
160:22
162:1,7,
23,25
163:15,17
164:10,
21,23
166:8,22
183:20
184:2
277:3,9
290:7,11,
16 299:12

**edema,'**
289:8

**edematous**
162:8
163:9

**edge**
194:5

**edition**
24:13
63:17

**editions**
63:16

**editor**
63:12,16,
19 166:15

**educational**
59:3,20

**EEF**
274:11

**EEG**
146:11
147:4
148:12,
14,19,24
149:2,9
151:15,
22,24
234:2
245:16
264:3
267:13
278:17
281:7
282:3

**EEGS**
146:8
147:1,7
150:7,10
160:14

**EF**
105:9

**effect**
36:16
42:2
141:19
152:13
159:24
161:11
167:9
177:16,
17,18,25
178:1
231:4
261:3
282:21
283:5

**effective**
45:24
297:6

**effectively**
27:4

**effects**
8:18
121:11
122:25
136:3,5
144:18,21
196:7
229:19
230:15,25

231:17
254:1
259:21,22
263:7
265:14,23
267:9
269:9
274:7,8
275:21
282:5
283:17,19
286:15

**efficacy**
282:19
283:7,22
285:18

**efficiency**
81:3

**efficiently**
142:15,18

**efforts**
142:12
178:19

**ejection**
104:21
105:9,17
113:14

**EKG**
110:4,8
181:23
182:2,7,
10 191:4
202:4
225:11
301:18

**EKGS**
66:8
110:2
147:18
186:13,15
302:21

**elected**
62:22

**electric**
82:15
96:14
175:14
296:5

**electrical**
86:19
87:9,12
91:23
92:5
93:5,17
109:16
146:8
148:19
175:15
182:18,22
183:6
186:1,6,
12 195:25
201:9
202:9
294:19,20
295:10
296:6,10

**electricity**
87:23,25
89:16
90:7,18
91:11
93:11
96:15
121:5
183:9
295:13,24
296:4
301:17

**electrode**
92:2

**electrodes**
147:4
152:1

**electromagnetic**
81:15

82:13,16
192:5

**electronic**
64:24
65:1 66:4
172:17

**electronically**
46:19

**electrophysiologist**
8:9,21
70:1
85:17
96:2
173:21
192:20,24
205:7
300:1

**electrophysiologist's**
204:22

**electrophysiologists**
69:24

**electrophysiology**
67:1 70:3
84:18
167:23
192:17
205:2

**elevated**
211:5

**elicit**
294:21
295:3,11

**elicited**
165:10

**eliminate**
191:20

**ELMO**
112:21
114:8
117:2
159:3
196:19
208:3

**embarrassment**
218:3

**embraced**
228:15

**emergency**
199:23

**emeritus**
58:6

**EMI**
81:16
82:12,21
83:1,3,6,
22 84:1
195:20,25
199:5

**emotion**
121:2

**emotional**
127:11

**emphasize**
108:21

**employed**
16:21
58:3,5

**encompasses**
118:6

**encounter**
67:20,24

**encountered**
67:6
70:19

**end**
38:11

77:11
108:9
167:10,25
170:25
172:18
173:23
179:5
185:16,17
205:5
206:14
214:8
216:21
217:9
225:12
232:23
269:17
286:18
289:8
296:8

**end-of-life**
61:13,15,
19,22
62:16
63:21
167:17
172:25

**end-of-life-care**
185:10

**ended**
263:23

**ending**
214:7

**ends**
214:9

**energy**
82:16
83:1,22
107:15,16

**Enflurane**
240:16

**engage**
70:8

143:6

**engaged**
291:16

**England**
186:1,9, 19 187:4, 10,18 188:24 189:16

**English**
108:2 175:3

**enhanced**
165:10

**ensuing**
212:23

**enter**
159:11

**entered**
10:15 59:5 191:5

**enters**
177:5

**entire**
151:24

**entitled**
9:4,9 74:12 189:7

**entry**
271:8

**environment**
125:17

**EP**
99:12

**episode**
105:7,11, 14 157:5 226:16

227:2,3

**episodes**
113:16

**equal**
118:24 178:22 223:9

**equipment**
82:17

**equivalate**
257:12

**equivalent**
235:25 236:5,6 239:2 255:23 256:1 257:8,13, 15 261:6

**ER**
84:11

**erratic**
83:15

**error**
6:5 8:13 10:16 221:17 222:6,10

**ERS**
157:3

**esoteric**
143:22 144:2

**essentially**
94:15 140:6 177:25 235:24 236:7

**establish**
6:21

**established**
143:2 177:3

**estimate**
84:10

**et al**
293:9

**ethical**
61:11 64:16

**ethicist**
61:9

**ethics**
61:4,6,7, 11,15 62:14 63:8,21 154:1

**etomidate**
255:18 257:6 260:21

**European**
171:20 173:6

**euthanasia**
139:18

**euthanized**
139:11

**euthanizing**
139:10,12

**evaluate**
11:16,20 20:11 29:2

**evaluated**
22:14 23:14

**evaluating**
28:9

**evaluation**
20:12,16 23:11,13, 18 24:2 29:24 30:2,9 253:1

**evaluations**
12:20 29:4 30:11

**evening**
5:21 207:13

**event**
124:6

**events**
218:12 220:14 230:4

**eventually**
91:24 104:17 185:5 232:3

**everybody's**
124:4

**everyday**
27:1

**evidence**
5:17 6:18 7:14 10:18 12:2 15:13 19:4,8 21:23 31:20 32:2,3 33:21 35:4 36:20,21 38:2,19

40:3 41:3 43:7,8 50:22,23 59:17 75:17,20 79:9,23, 24 102:2, 5 103:3 148:3,8 162:1 189:22 208:10,14 276:16 284:8,10, 13,16,17 303:6,12, 15,18

**evidentiary**
11:15

**evoked**
150:19

**evokes**
150:19

**exact**
105:8 117:14 167:23 179:11

**exam**
113:25

**examination**
11:22 16:14 22:2 25:4 28:9 51:13 57:20 68:12 72:15,21, 24 73:15, 24 76:7 114:5 189:11 278:5

299:4

**examine**
11:21
28:5 66:2
72:5

**examiner**
155:24
162:6

**examiners**
162:6

**examining**
225:11

**exception**
59:4
106:25
209:24
263:3
300:18

**exceptional**
304:8

**exchange**
158:10

**excitement**
138:13

**excludable**
6:14

**exclude**
75:5
208:13

**excluded**
6:19
11:19

**Excluding**
8:12

**exclusive**
61:2

**exclusively**
10:8

**excuse**
22:19
29:14,16
36:1
46:15
134:19
208:7
258:3
287:23

**executed**
11:9,12
12:12
13:3
14:22
15:7,9
28:10,25
154:24
155:2
162:2
163:5

**execution**
10:7,13
11:2
28:20
77:5
79:7,8
100:3
101:3
117:1
121:14,25
122:5,11,
12 123:7
124:16
153:1,2
159:7
184:4
191:10,
22,24
193:1
194:21
197:6
200:10,21
203:23
227:23
281:1
283:23
284:21
289:16
302:16

**executions**
78:19
154:19,
21,23
155:10,21
164:20
178:21
194:17
206:25
207:4
236:1
263:16
285:21
286:16
299:12

**executive**
26:3,24
79:18
111:24
112:2

**exempt**
28:20

**exhibit**
6:1,11,13
18:24
19:3,7,8
21:16,20,
21,23
29:10,18,
20,21
31:18
32:2,3,
16,17
33:19,21,
25 34:24,
25 35:2,
4,7,16
36:19,21
38:19
39:2,5,24
40:1,3,6,
25 41:1,
3,7,9,16
43:5,6,8,
11,12,13
44:25
45:1
46:11,13,
15,16
47:1,8,10
48:18
50:18,19,
21,23
51:15
53:20
54:11,12
59:13,15,
17 74:11
75:2,5,20
76:9,13
78:12
79:10,23,
24
101:20,25
102:1,5,
22 103:2,
3 113:4
114:7
116:3
148:6,8
189:17,
20,22
208:12
245:13
247:22
251:24
303:16,18

**exhibits**
5:24 18:4
47:15
50:25
52:8
101:19
111:10

**existence**
79:21

**existing**
66:20

**expanding**
112:5

**expect**
14:23
56:2
117:1
143:16
186:11
191:6
304:2

**expected**
83:5
110:13

**expedite**
57:6

**expedited**
304:7

**experience**
7:3 54:4
58:16
59:2,3
61:3
64:22
65:7
67:11
80:22
84:9
120:9
123:14
125:13,
15,20
126:2
127:4,5,8
128:6,10
141:6
143:5
148:15
154:2
156:8
164:10,
18,19,21
180:14
193:5,7
205:21,22

206:24
216:1
218:18
289:7
290:6
300:19
302:23

**experienced**
9:6,7
220:1
223:8,19

**experiences**
125:21
127:15
164:22
183:17
215:17

**experiencing**
141:9
176:2,19
181:4
183:19,21
184:2

**experiment**
281:11

**experiments**
281:14

**expert**
6:10 7:2
8:7,17
9:1,5
14:25
17:5,20
19:11,19,
24 20:1,
17 28:13
64:7,11,
15,18
68:6
72:6,9,
13,24
74:14,22,
23 75:23,
25 76:7,
25 77:3,
16 85:21,
23 171:3,
22 172:7,
15 173:19
286:15
289:6
290:15,
20,23
291:16
303:14

**expertise**
6:22 8:10
18:19
75:7 82:6
85:24
192:22

**experts**
9:3

**explain**
66:21
86:11
123:17,19
126:20
131:18,25
150:14
152:24
159:10
183:2
184:13

**explained**
52:17

**explaining**
159:5

**explanation**
88:6

**explanted**
67:25

**exposed**
195:20

**exposures**
82:2
199:5

**express**
12:23
27:7

**expressive**
13:10

**extend**
183:25
184:4

**extending**
191:10,24

**extensive**
111:8
212:6
214:23

**extent**
41:25

**external**
180:24
192:7

**extra**
162:9,11
236:7
251:8
280:10

**extremely**
136:17
157:23
160:18
175:25
229:18
230:1,14
231:16

**exudate**
163:8

**eyes**
149:8

**F**

**face**
151:1

**facility**
143:3

**facing**
214:25

**fact**
6:23
19:14
42:3 44:2
61:9 62:1
97:22
123:1
124:24
126:14
142:8
153:1
157:12
169:17
176:6
180:13
262:5
280:1

**factors**
179:14
184:8
295:16

**factory**
94:25

**facts**
14:15

**factually**
291:2

**fail**
158:21
160:1
178:11,18
185:20

**fails**
156:11

**failure**
104:13,
14,15,19
113:14
114:19
157:4,8
302:20

**fair**
84:7
94:24
100:14
107:22
126:11
183:11,13
199:14
249:7
269:20
300:18

**fairly**
18:18
50:2 59:1
177:8

**faking**
53:16

**fall**
76:5 89:2
142:2
232:1

**fallen**
135:14
142:11
181:16

**falling**
142:9
147:3

**familiar**
77:15,18
137:9
138:6
165:19
209:15
255:6

**fantastic**
131:5
187:21

**farm**
141:22
143:13,20

**Farrell**
85:19

**farther**
49:25

**fast**
87:20
88:20,23,
24 90:17
93:24
94:1
106:23,25
129:14
136:17
181:15
201:19

**faster**
218:5

**fatal**
89:8,24
90:22

**fault**
242:11

**favor**
46:11

**favorite**
156:23

**fear**
128:11

**February**
112:2

**federal**
10:15
41:21
42:9,25
77:5
78:8,9
79:7
284:19,
20,23
286:1
288:1
289:16
291:18
292:24
299:6

**feeds**
190:15

**feel**
47:14
78:5
106:4
118:13
123:8
125:13
127:14
141:7
145:17
161:13,14
164:9
165:2,5,
12,13
168:4
183:14
269:1

**feeling**
147:9
165:4

**feelings**
126:3
165:3

**feels**
165:1
168:13,18

**fell**
224:6

**fellowship**
60:7

**felt**
82:5
147:17

**fentanyl**
244:25
256:18,24
260:7,8,9
269:6

**fewer**
134:21

**FF**
35:7
51:22,23
52:2

**fib**
175:7
182:23
191:18

**fibrillated**
71:2

**fibrillation**
89:12,13
90:4,5,7,
12,23,25
91:3,5,8
180:1,2
182:13,15
207:19
210:4
219:15,21
223:25
228:2
229:13
232:22
295:5,25
296:21
301:21,22
302:2,3,
10,15

**field**
18:19
19:19,24
20:1 72:4
75:9 77:3
85:15
123:12
205:17

**fields**
72:2 82:7
205:15

**figure**
108:6
198:11
284:16

**file**
46:12,24

**filed**
5:21 6:2
14:17,18,
25 22:23
46:18

**files**
47:11,18
51:1

**filing**
6:5 47:3

**filled**
44:3

**film**
166:2

**final**
11:4
222:17
223:6

**finally**
247:21
255:21
282:14

**financial**
81:3

**find**
27:6 48:4
63:23
86:2,8
97:9 98:1
103:18
132:10
147:24
187:17
225:20
227:13
231:16
232:15
247:2
294:14
297:22

**finding**
156:6
273:12

**findings**
161:25
163:6
239:24
240:9
246:20

**fine**
34:15
37:23
38:3
83:18
103:11
207:13,14
210:15
231:19
237:17
249:8,21
251:7,17
252:6
264:10
265:22
269:22
270:24
271:2
273:14
283:1
285:3
287:6
292:7

**finger**
169:3

**fingers**
132:9
133:1

**finish**
188:3,7, 15,16 249:17 270:2 289:25

**finishing**
291:9

**fire**
121:1 226:17

**fired**
226:20

**firing**
91:5

**fit**
73:2

**fits**
8:20

**five-**
26:20

**fix**
6:5 7:9

**fixed**
108:6,7,8

**flash**
148:1,6 277:3,9 289:7 290:7,11

**flashlights**
149:8

**flat**
146:10 147:6 148:13,24 150:7,10, 11 160:14 163:24

**fleeing**
127:14

**flight**
55:8

**flip**
42:16 195:13 217:14 231:18,19

**flips**
137:1

**flood**
161:11

**Florida**
168:24 169:6,18

**flow**
81:7 86:22 89:1,7,25 90:1 93:11 177:10,14 178:15 302:4,6,8

**flowed**
92:3

**flowing**
87:23,25 180:25

**flows**
84:4 87:12 90:19

**fluid**
37:13 104:16 155:18 156:5,9, 13 160:1, 2 161:6, 12,23,24 162:9,11, 13,22 163:8,10, 23,25 164:1,3,7 166:8 178:12

**fluids**
160:23 161:1,3, 11 162:19,20 163:3

**flutter**
175:8 228:5

**Flying**
55:9

**foam**
166:5,9

**focus**
262:17

**focusing**
251:14

**fodder**
73:21

**folks**
152:15 173:22,24 203:17

**follow**
43:21 183:22,23 204:22 223:2 236:25 237:2 240:5,6 289:1 291:3 292:6 294:18

**fools**
260:12

**footnote**
205:25 206:5,8 212:13, 16,21 216:7,11, 18 217:11 218:20 221:12 232:6,10 233:21,24 234:11 237:12 238:15 240:15,25 242:1,4, 9,17 244:3,9 245:23 246:2 248:12 249:9 250:13, 16,19 252:25 253:11 254:12,23 257:23,24 258:23 261:25 262:1,4, 11,12 264:12,20 266:1,10 267:16 268:5 269:12 270:2,10, 18 274:10, 16,24 276:22 277:16, 19,24 278:1,3 297:13

**footnoted**
216:10 297:10,19

**footnotes**
188:25 212:11 246:19 248:10,11 262:15 263:23 264:8 276:8 277:12,13 282:15 298:17 300:16

**forearm**
128:25 129:1 130:3,25 132:6 247:5,12, 13 258:1

**foregoing**
19:22

**forensic**
16:22,23 17:1,12 18:19 19:19 20:12 24:4

**forget**
183:4

**forgetfulness**
117:17

**forgive**
45:3 274:13 286:22

**forgot**
183:2

**form** 34:15 43:25 45:5 50:8 64:3 67:2 139:13 206:2 223:20 289:8

**formal** 200:1

**format** 172:12

**formation** 90:15

**formed** 11:8,9,19 12:1 30:8

**forming** 167:8

**forms** 45:19 52:9,17 53:7

**formula** 151:23

**forward** 5:4 29:2 73:1,14 302:6,8

**found** 28:21 48:19 82:22 97:10 149:20 155:21 164:6 187:4 189:1 206:20 238:20 266:19 278:18

**foundation** 7:5 9:16 36:3 63:9

**fourth** 201:23 221:11 234:17

**fraction** 104:21 105:10,17 113:14 119:22

**fractures** 96:21

**frame** 85:9

**frankly** 199:19

**free** 269:1

**freeze** 131:17

**frequent** 37:5

**frequently** 99:15,18 109:19 157:4 185:17

**friend** 300:4

**front** 22:1 51:16 113:1 125:12 146:2 207:7 213:11 214:12 231:13 258:15 270:15 279:14 280:9

**Frontal** 274:11

**froth** 162:16, 17,18,23 163:1,2,6

**frothiness** 162:22

**full** 26:6 75:14 101:24 137:24 139:25 211:17 212:4 216:23 222:25 229:17,21 242:20 243:6 261:19,24 263:22 286:6

**full-on** 83:10 131:2

**fully** 111:6 278:7 290:17 303:7

**function** 14:2,3 26:24 92:8 93:3,4 94:10,17, 18 96:22, 23 99:6, 9,13 100:17,19 105:1 109:18 159:25 184:6 195:8,16, 23 197:16 199:6 200:7,8 207:17 210:10 220:12 226:15 227:4 267:17 283:18 294:21 295:2,12

**functioned** 226:20

**functioning** 13:8 23:3 24:6,18 26:3,12 27:1 53:8

**functions** 98:25 120:12 184:20 195:11

**funny** 136:20

**G**

**G-A-I-L** 57:25

**GABA** 257:7 261:3

**GABAERGIC** 260:21

**Gail** 55:12 56:16 57:25 74:13

**gained** 37:9

**game** 232:23

**garage** 182:3,4

**garlicy** 136:21

**gas-containing** 162:21

**gases** 166:11

**gasping** 165:8

**gauntlet** 62:12

**gave** 88:8 101:10 103:21 124:2 137:24 145:7 146:13 171:10 261:19,21 285:17,19

**gee** 123:22 152:23

**general** 82:18 102:11 103:13

112:1
117:15
118:1,4,
7,8
119:3,11
120:4
122:8,18
123:12,
14,18
128:5,14,
15,22
129:18
130:2
132:21
133:4,8
134:11,15
135:5,14
137:3,22,
24 140:1
151:25
152:7,25
153:15,19
173:1
234:1
237:13
238:12
242:6
244:17,23
245:16
256:22,24
264:14
265:6
268:16
274:9
279:24
282:20
283:6,10,
24 285:18

**General's**
27:22
68:17

**generally**
63:20
65:13
83:24
110:19,20
120:16
125:12,22
126:8
128:3
155:5
183:16
283:19
285:12

**generated**
214:15

**generator**
91:21
96:22

**gentleman**
27:6
138:16
165:16

**Geriatric**
173:5

**get all**
81:21
171:21

**girl**
141:23

**give**
13:7
27:10
46:1 51:6
53:24
54:13
57:3
64:14
82:19
84:25
93:5,9,23
104:24
106:22
107:8,9
108:22
109:8,16
119:24
120:11
124:9,14
131:4
135:20
137:25
140:3
142:5
144:16,19
148:23
153:4,20
172:6
175:13,
17,22
182:20
198:14
203:25
224:11
236:10
249:22
251:6
253:7
255:4
261:22
269:20
272:24
273:12
280:21
294:8

**giving**
47:23
83:1
105:22
118:18
129:23
153:22
155:6
183:3,5
198:20
226:14
261:23

**glycopyrrol ate**
146:18

**goal**
73:19
117:10,11

**goals**
95:15,16
117:15

**God**
5:5

**gold**
133:15

**good**
5:8 7:18
16:16,17
27:18,19
48:20
56:11,13
57:22
68:14,15
89:23
105:13
111:1
124:14
127:9
153:14
155:25
188:18
196:11
198:20
204:16,17
222:1
252:3
263:20
271:4

**gosh**
262:10

**govern**
72:20

**government**
78:8,9
284:23
286:1
290:14,21
299:16

**government's**
284:20

**gown**
132:3

**grab**
74:9
174:12
248:19
266:22

**gradually**
135:7
164:1

**graduate**
59:25

**graduated**
59:23

**gram**
245:8

**grammar**
233:4

**grams**
227:7
236:14

**grant**
10:23
13:23

**graphic**
169:17,19

**gravity**
164:1

**great**
76:3
101:12
131:19
160:14
167:21
280:12
282:17

**greater**
192:22
223:8,9

**greatest**
196:16

**green**
132:5

275:8

**group**
139:22
140:14
167:24
255:4,11,
16,17

**groups**
70:22
139:21
140:10

**guardian**
31:7

**guess**
14:20
35:12
36:24
43:13
47:7
50:17
66:13
183:23
222:4
229:3,10
301:20

**guided**
194:3
267:18

**gurney**
194:15
196:20

**guy**
166:6

**guys**
99:12

**H**

**H-L**
138:17

**half**
139:20,21
162:12
210:17,20
218:10
237:2
274:14

**halfway**
304:9

**hand**
16:11
33:24
34:1
35:6,8
39:4
51:17
102:17
118:10
130:7,14,
15,16
132:23
171:7,25
172:3
187:13
248:17
280:2
292:3,20

**handed**
32:15
52:8
58:22
78:13
172:1
187:10
189:4
234:9
238:8
240:23
279:17
286:25

**handful**
64:4

**handing**
18:6 21:3

**handle**
124:19

**handles**
122:10
146:20

**handling**
143:25
204:8

**hands**
48:24
149:5,6
150:15

**handwriting**
49:15
114:2

**hang**
251:20
294:13

**happen**
10:8
88:15
92:14
96:20
99:8,9
105:11
109:4
120:8
124:5
125:21
150:16
157:9
162:18,19
166:9,10,
23
167:15,25
168:3
170:25
177:1,6
178:21
180:12
182:13,
15,21
184:20
185:3,12
192:11
196:12
200:20
202:24
203:22
232:3
273:16
279:15

**happened**
105:12
124:1,3
149:9
202:14
226:22,23
262:7
286:21

**happening**
87:24
92:13
123:23
125:16,19
127:10,17
128:2,6,
7,9,22
129:10
159:20
169:22
176:18
178:3,9
182:7
186:13
201:19
304:10

**happy**
9:11 56:8
176:8
208:14
211:22
221:2
232:15
269:24
270:1
273:9,16
279:15
280:1
291:24

**hard**
136:11
179:11
198:24
199:2
217:21
293:18
304:7

**harder**
292:18

**harm**
88:16
89:10

**harmful**
88:7

**hate**
296:13

**hated**
136:21

**he'll**
6:25
177:7
180:5,8

**head**
70:2
84:19
125:18
127:11,18
142:10
152:1
190:12
195:6
199:16
243:24
248:24
273:11
299:21

**headed**
70:4
300:2

**heading**
63:5
207:16

218:6,23 219:8 234:14 242:20 243:7 247:23 249:12 251:4 253:14 255:4 265:1 275:5,8 277:3

**heads**
129:10 192:16

**healing**
96:14

**health**
29:22 30:21 32:19 34:3 39:6 40:8 69:13 104:8 214:20

**healthcare**
31:9 41:18,20, 24 42:2, 3,14 43:16,18, 19 44:3 46:1 52:16 53:25 54:8,18 63:2

**healthy**
136:2,6

**hear**
5:16,22 7:17 10:2,22, 24 12:9 14:8 15:8,9,23 18:25 19:21 38:11 67:14 73:7 76:1 88:17 94:8 125:14 130:20 131:9 132:12 150:22,23 198:23, 24,25 199:2 283:21 288:23

**heard**
5:5 70:11 106:1 224:24 300:3

**hearing**
8:8,9,22 11:15 14:20 49:23 50:14 57:15 120:19 127:25 165:20 198:24 200:5 286:19 287:17 304:12

**hearsay**
36:2

**heart**
66:6 71:2,10, 12,15 83:17 85:11,12 86:7,12, 14,18,25 87:1,2,7, 9,10,13, 15,18,20, 22,23,24 88:20 89:18,20, 21 91:25 92:5 93:11,14, 17,20,21, 25 94:1,3 104:13, 14,15,17, 19,22,25 106:21,22 107:2,3, 10 108:25 109:3,13, 17,19,22, 24 110:9, 11,17,19, 22,23 111:5 113:14 114:19 118:21 135:22 136:1,5, 8,9,10 156:11 157:4,7,8 158:7 159:13, 14,17,18, 22,24,25 163:18 167:21 170:14 171:19, 20,21 172:15 173:3,6, 13 174:2 175:6,14, 15 177:12, 15,17,20 178:3,13 179:6,12, 18 180:4, 16,17 181:8,13, 20 182:9, 10,11,13, 14,16 183:7,18, 24 184:6, 23 185:4, 6,25 191:10 202:1,11 203:2,13, 20 210:7 211:5 213:1,17, 23 214:7, 9 216:22 220:5,8 224:3,6 230:11 231:6,9 232:2,16, 17 283:17,18 295:14,24 296:5,6, 11 300:19 301:17 302:3

**heart's**
301:7

**heartbeat**
184:21

**heavy**
117:22 199:1

**held**
12:15

**helped**
304:9

**helps**
241:19 285:11

**Henry**
5:10,20, 23 7:16 9:23,25 11:5 12:10 13:5,19 14:21 16:15 17:25 18:3,6, 12,13,22 19:9,17 20:4,5,24 21:2,14, 24 22:5, 12,25 23:6,9 25:10,18 27:10 29:14,17, 20 31:25 33:18 35:1 36:1 37:19 39:25 41:21 42:9,24 44:1,13, 17 46:14, 15,18,21 47:1,4 49:3 50:20 51:11,14, 20 52:24 53:3,5 54:25

55:11,14, 21,23,25 56:13,19 57:1,5,7, 12,21 59:11,18 68:5 71:21 73:25 74:25 76:10,11, 17 77:1 79:4,18, 25 86:10 98:8 100:25 101:6,10, 13,15,17 102:6,16, 19 103:4, 8,12 106:7 111:7,12, 20,25 112:8,9, 16,24 117:2,4 131:12, 20,22 132:25 138:18,21 143:1,10 147:24 148:9,11 159:1 164:16,17 167:4,7 186:22 187:1,2, 15,17,21 188:5,11, 14,21,22 189:15,23 204:6,9, 12 208:7 233:2 258:3 276:10, 12,15 278:6,24 279:20,22 280:10 287:23 288:4 289:13 290:22 293:4 299:5 302:25 303:5,20, 23

**Henry's**
30:7,19 73:16 209:1

**hey**
130:6 166:15

**HH**
39:2,5

**Higgs**
285:10 288:2

**high**
105:1,11, 17 107:17 123:5 136:17 146:16 149:24 150:9 174:9 177:2 192:4 216:21 217:8 221:24 247:17

**high-dose**
277:7

**higher**
12:15 26:3 123:3,4 128:18 149:17 210:11

**hip**
37:15

**hips**
142:1

**history**
25:3 30:9

**hit**
120:7,14 133:10 153:6,8 164:7

**hits**
161:16

**hitting**
153:10

**hold**
27:5 118:15 129:21 142:10 161:19 222:5 226:12 241:5 290:11

**home**
55:8,10

**honor**
5:10,11, 20,23 7:18 9:23,25 10:2,4,16 11:4 12:10 13:5,20 14:10 16:8 17:25 18:12,22 19:17 20:4,24 21:14,19 22:5,8,19 25:10 27:10,12 29:11,14, 20 30:6 31:23,25 32:4,7 33:15,18 34:23 35:1 36:1,8 37:19,23 38:3,18 39:23 40:24 41:10 44:1 46:10 47:5,7, 12,20 48:2,11, 18 50:16, 20,24 51:8 52:20 55:4,7, 11,14,21 56:2,9, 13,19 57:13 59:11 62:23 63:11 68:5 71:21,25 72:11,16 73:3,9 74:25 75:3 76:10,17 79:4,12 85:14 100:22 101:17,23 102:6,13, 19,24 103:10 105:20 111:7,20, 22 112:8 131:12,15 138:18 142:20 143:1 147:25 148:9 158:17 187:15 188:5,6, 17,21 189:15,19 204:6,9 208:8,15 211:23 217:25 233:2 258:10 280:13 288:13, 16,22 289:13 290:1,22 291:4 292:14 298:21 299:3 302:25 303:3,5, 20,24

**Honor's**
85:18 105:25

**honorable**
5:6

**honors**

59:23

**hood**
129:6

**hope**
15:24
85:7
292:4

**hopes**
239:22

**hoping**
87:3
153:23

**horrible**
168:22

**horse**
142:5
143:11,20
144:1,24
146:3
169:1

**horse's**
146:9

**horses**
138:3
139:10,
17,20,25
140:4,8,
10
141:17,
18,22
142:8,14
143:5,6,
14,18,25
146:9,13,
14 147:3,
6,14,18,
20 160:15
278:18
282:6

**Hospice**
173:5,7

**hospital**
60:2 67:6
82:18
83:2
149:7
192:11
205:4

**hour**
281:21
282:8

**hours**
222:17,22
223:6,20
243:12

**How's**
209:2

**HRS**
171:3

**human**
141:13
144:16
145:11,12
149:4
150:6,8
152:6
281:10,
11,14,16
297:22

**humans**
141:10,
11,12
148:21,22
164:5
166:18
230:24
277:9
278:19
281:20

**hundred**
84:20
107:10
222:16,
19,21
225:10
226:6,11

**hundreds**
67:13,17
84:14,22

**hurry**
147:5

**hurt**
132:8
157:7
177:9

**hydrochloride**
146:15
250:14
252:9

**hypnotic**
121:17
122:20
155:8

**hypoxia**
167:13

**hypoxic**
186:4

**hysterectomies**
134:16

**I**

**ICD**
8:10 14:1
50:13
71:4
82:14
84:11
90:2,23
91:3,5,6,
9,13,16,
17,19
92:22,25
93:3
94:9,22
96:18
98:16
99:18
100:3
101:2
103:16
104:1,5,
11 106:8,
12,18
109:18
110:18
113:11,16
114:15,20
116:24
158:21
166:20,23
167:9,14
168:5,11,
12,14
169:12
173:9,19
174:18
176:25
177:1
179:22
180:17,18
181:10
182:12,21
184:9,11,
14,19,21,
24 185:6
190:1,2,
5,9,11,
18,22
193:9
196:16
197:22
198:2
200:16,20
207:25
209:19
212:23
220:14
225:14
226:8,15,
17,19
228:9,12,
13 229:4
281:5
290:25
295:2,4

**ICDS**
65:4
67:18,20,
23 70:13,
14 80:4,
9,25
84:10
94:8,10,
22 109:18
110:19
167:10,18
168:1,6
169:4
172:25
185:19
186:17
192:2
193:15
196:5
198:5
206:15
212:6
216:1
218:18
220:9,17,
20 300:10

**idea**
44:20
57:3
82:20
104:25
137:21
247:15
279:1

**ideally**
119:14

**identical**
236:8

**identification**
29:10
31:17,21

33:25
35:8 39:1
41:6,16
43:11
44:25
45:1
51:22

**identified**
18:8

**identify**
18:10,14
21:4
74:10
171:8,10
172:11
248:5
266:13
288:17
292:18
293:4,6
298:15

**IFT**
129:12,
13,16
132:20
133:6,12,
20,22
134:1,5,
7,10,18
137:10,13
141:15
148:1
247:25
248:3

**illicit**
157:2

**imaginable**
16:1

**imagine**
128:19
169:21
170:6

**impact**
169:15

**impacted**
179:6

**impacts**
13:10

**impairment**
26:23

**impedance**
96:15

**impeded**
81:7

**impedices**
96:21

**implant**
70:24

**implantable**
8:10
13:25
64:24
65:4
70:22
172:17
205:23
216:19
217:7

**implantatio
n**
96:12
97:11
104:2
113:18
114:20
197:16
207:19

**implanted**
49:16,19
50:14
65:2,13
66:2
67:25
69:17
83:25
85:1
95:22
103:16,20
105:15
106:9
110:16,17
170:20
196:24

**implanting**
104:11

**implants**
94:12

**implementat
ion**
97:4

**importance**
113:7
224:20

**important**
98:19
124:15
126:10,12
146:11
215:16
233:8

**impose**
233:3

**impossible**
147:13,14

**impression**
140:12

**improper**
7:1
289:20

**impugn**
44:4

**impulse**
183:6

**impulses**
86:19
93:5,9,18
109:16
182:18,20
183:5,14
210:14,19
220:15,19

**in-between**
161:4

**Inability**
247:23

**inadmissibl
e**
36:6

**inadvertent**
83:16
168:24
169:12
170:1
196:9
202:21
215:20

**inappropria
te**
83:17
168:9
212:24

**inaudible**
57:18,19
112:4
158:22
187:1

**incapable**
99:19

**incapacitat
ed**
216:2

**incidence**
219:3,13

**include**
119:7
169:17
175:18
228:17
232:18
263:3
300:25

**included**
58:17
67:18
70:12
74:7
103:18
163:20
186:13
229:11
263:10
278:16

**includes**
15:1
43:19
213:5

**including**
80:4
82:17
130:4
173:3
256:14
277:8

**inclusion**
15:5

**inclusive**
212:14

**income**
64:18

**incompetenc
y**
29:2

**incorrect**
80:11

**increase**
164:6
178:12

**increasing**
124:22

**independent**
67:3
275:13

282:21

**independently**
184:20
205:1

**index**
151:21
187:5
266:2
267:18
269:14
270:12

**indicating**
113:12
290:15

**indication**
54:7
100:15
105:7,8

**indications**
261:11

**individual**
28:19
54:4
179:14
181:15
184:5

**individualized**
179:12

**individuals**
52:15
162:2
163:5
167:17

**induced**
234:19,23
238:19,23
241:9,13
243:14
244:24
265:7
266:23

**inducing**
119:7

**induction**
135:4
240:10
246:21
248:13
249:24
250:16
252:13,24
253:2,24
256:14,15
261:11
269:5
272:25
273:12, 15,25

**indulgence**
111:9

**indulging**
116:22

**influence**
12:7

**inform**
206:6
214:23

**information**
6:21 13:7
23:2
29:23
30:3,21
32:20
34:4
36:16
38:13,16
39:7 40:9
44:6
52:12,23
98:5,14
100:9
104:2
162:4
198:15
214:17

242:5
274:3

**informed**
30:15
36:13
205:16
268:15

**infusion**
255:18
259:15
260:1,7
265:7
266:25

**inhalation**
268:19
272:23

**inhalational**
135:9
140:22

**inhibited**
150:1

**initial**
57:25
157:5

**initially**
107:18

**inject**
158:7

**injected**
136:15,17
177:11

**injecting**
86:23

**injection**
13:16
78:3
122:8
139:23
147:16
151:14,15
158:3

159:12,20
181:23
196:20
227:7,24
230:11
233:21
236:1,13
237:3,7
239:10
243:22
245:9
246:5
257:20
277:7
282:12
286:15
290:12
291:11
293:1

**Injections**
158:5

**injunction**
5:25
46:12,17
288:6

**injured**
160:2

**injures**
136:5

**injuries**
156:14

**injury**
158:12
161:3
181:19

**inmate**
83:7
239:9
283:7,20, 24,25

**inmates**
15:20
78:4

285:22

**Inquiry**
63:15

**insensate**
290:17

**inside**
60:18
120:25
127:10,18
166:5
274:11

**instance**
288:10

**instances**
203:17

**institution**
44:18
60:23
96:6
103:14

**instructed**
196:4

**instructions**
43:21

**insurance**
97:21

**intact**
167:14

**intellectual**
12:22
13:8
19:12
23:2
24:5,9, 11,18,23
26:13
53:8

**intend**
72:1

102:9

**intended**
68:4
214:17
252:20,21
254:1,2
265:23,24

**intending**
73:11

**interact**
121:1

**interchangeably**
122:24

**interest**
61:4,6
62:10

**interested**
61:20
91:7
92:23
100:2
148:18

**interesting**
106:19
152:11
166:15
260:23

**interfere**
197:1

**interference**
81:14,16
82:13
192:5
196:1,7,16

**interferes**
142:16

**interject**
105:21

**intermittent**
226:1

**intermittently**
280:19

**internal**
60:1,3,10,14
63:3
68:23
69:6
205:20

**internationally**
299:24

**internet**
138:20

**internist**
69:1,4
86:6

**internship**
60:1

**interpreted**
224:19
296:10

**interpreting**
174:10
192:5

**interprets**
201:10
296:7

**interrogate**
65:17,23,24 67:5
96:18
195:23

**interrogated**
67:17
96:11
97:24
115:10,22
195:12

**interrogates**
190:14

**interrogating**
67:12
80:4,8,25
81:24
192:16
204:23

**interrogation**
66:8,11
69:16
70:8
96:13
97:7,12,14,18,23
98:2
100:4,14
106:10
114:15,22
115:9,12,14 116:3
165:10
191:16
197:14
204:20

**interrogations**
96:20

**interrogator**
70:8
195:13

**interrupt**
106:3
154:11

**interrupted**
89:8,24

**interruptions**
106:2

**interstitial**
161:4

**interval**
97:14,18
221:18
222:9
223:7,13

**intervene**
181:16

**interviewing**
61:24

**Intraoperative**
242:5

**intravenous**
238:23
253:2

**intrinsic**
109:24

**introduce**
57:23
139:4
172:22
174:13

**introduced**
65:21
208:10

**introduction**
145:6

**intubation**
244:5
266:3

**invented**
151:23

**investigation**
258:1,4

**investigator**
206:18

**investigators**
151:10
220:5
225:11

**inviting**
10:16

**involve**
273:24
291:12

**involved**
50:7
61:14
122:12
130:1
153:2
246:23
252:19
254:9
265:10
267:6
273:7,18
276:4,9,23
281:10,16,20
287:17
288:2

**involvement**
20:8

**involving**
77:5,12
138:3
263:1

**irrelevant**
11:17

**ischemic**
104:13

**isoelectric**
278:8,17
281:7
282:3
303:7

**isoflurane**
140:23
240:17
271:10, 12,15,19, 25 272:6, 13,15,18

**isolate**
129:11

**isolated**
129:1
130:25
217:22
247:5,12
258:1

**Isolation**
128:24

**issue**
10:20
11:3
12:13
13:13,17, 19 14:4,7
15:24
28:13
75:7 78:1
85:22,25
90:22
117:5
154:1,6
169:9
184:10

**issues**
11:16
12:5
47:19
61:14
78:11
104:8
117:8
136:13

**italics**
31:3

**IV**
139:23
159:20
177:7
233:19
241:13
255:16
256:18
268:22
277:7

**J**

**jail**
15:14

**Jane**
63:7

**January**
59:6 79:7
111:24
213:4
293:12

**Jeanne**
70:2
99:13
206:12
299:19

**Jeffrey**
299:10

**jerk**
197:5

**jerking**
181:1

**job**
76:3
153:18
185:5,9

**John**
62:24

**Johnson**
285:11
288:3,4

**join**
292:15

**joint**
268:15

**Joseph**
5:15 6:24
78:24
79:2

**journal**
62:4,5,9
63:15
154:12
186:2,9, 19 187:5, 10,18
188:24
189:16
216:22
278:9

**journals**
62:14
63:13,17, 20 300:22
301:2

**judgment**
273:17

**judicial**
79:5,15
286:16

**judicious**
51:3

**July**
209:8

**jump**
231:11

**jumped**
170:4

**June**
21:9

**jurisdiction**
10:5,19, 22 14:12

**jurisdictional**
10:20,23

**jury**
233:10

**justice**
15:20
77:20
78:17
79:6,14
112:4

**Juvenile**
63:8

**K**

**keeping**
183:24
185:4
248:25

**Kelley**
41:21
42:8,24

**ketamine**
140:18
145:7,8, 9,15,18
234:25

**key**
117:5

**kicked**
169:1

**kicks**
111:3

**kid**
143:20, 24,25

**kill**
142:18

**killed**
166:6

**kills**
142:15
179:17
247:2

**kilo**
256:6,8

**kilogram**
234:25
238:24
243:15, 18,19
244:24
245:1,4
252:10
253:21
255:19
256:9
257:15,16
266:24,25

**kilograms**
235:6,10, 11,22
246:12

**kind**
80:19
88:12
89:16
90:9
104:25
110:25
116:12
121:14
129:6
132:1

134:23
154:12
166:4
260:12
304:9

**kinds**
64:16,25
82:2
215:19

**King**
238:10
240:19
293:9

**knew**
126:14
129:24
194:5

**knowing**
98:9

**knowledge**
8:20
42:24
52:11
143:3,23
164:20
205:19

**knowledgeable**
82:1

**KUBICEK**
7:18,20
8:1 9:1

**Kugel**
63:7

**L**

**L-A-M-B-R-A-K-O-S**
6:13

**L-I-T-S-A**
6:12

**labeled**
48:5
271:5

**lack**
117:16, 18,21
119:14
155:25
179:16,19
229:5,6
267:14
269:10

**lacks**
10:18
14:11

**LAHRS**
171:22

**Lambrakos**
6:13 7:2
8:1
184:10
195:4,5,7
197:20
208:9,15, 17 209:8
304:3

**Lambrakos'**
298:9

**language**
12:23
13:10
14:4
26:2,23
27:1

**large**
61:17
102:17
124:23
135:20
148:23
177:7
236:23,24
237:20

**largest**
202:18

**Laryngoscopy**
244:5

**late**
100:22
134:23
239:13
267:10
299:25

**latest**
154:6

**laughable**
27:6

**law**
10:14
28:19
74:21
291:3,5

**lawsuit**
284:19

**lawyer**
288:14

**lawyers**
5:12
32:11
56:5
303:21
304:6

**lay**
143:21
163:24

**layer**
83:25

**laying**
132:1

**lead**
88:16
89:25
90:17
91:5
116:16

**leading**
85:15
98:6
100:21,23
206:18

**leads**
91:23
93:8
96:14,15, 21 198:19

**leak**
161:1,3

**leaking**
158:14

**leaks**
160:3
163:8

**leaky**
158:13

**learn**
143:23,24

**learning**
66:11
128:21

**leave**
6:6 48:24
131:20
171:22
214:20

**led**
157:8

**Lee**
287:7,14, 16,24,25
288:2
290:24

**leeway**
47:17,25

**left**
35:20
87:1
96:25
124:16
135:25
159:15, 18,21,24, 25 177:14
178:10,13
188:12
204:18
223:1
235:4
265:4
268:10
270:9
287:2

**left-hand**
91:20
287:5

**legal**
20:18
77:19
79:6
286:9
289:20

**legally**
31:5,6
33:6
34:17
39:17
40:19

**legs**
140:4
142:1,2
151:2

**leisure**
32:8

**length**
184:4,5
186:8

**lengthy**
56:3

**lesson**
125:3

**lethal**
13:16
122:7
151:14,15
159:11
181:23
196:20
236:1,13
239:9
243:22
246:5
247:2
282:11
284:24
286:15
291:11
293:1

**letter**
165:16,
19,21,23
166:15
297:2

**letterhead**
35:12

**letters**
51:18
287:9

**level**
26:3
104:25
119:8
170:24
178:19
184:6
267:1

**levels**
26:23
157:19
170:5
232:1
253:20
286:8

**Lewis**
10:13
41:20

**lie**
153:17

**lied**
245:11

**life**
167:10,25
170:25
172:18
173:10,23
185:16,17
189:8
195:20
206:14
216:21
217:9
222:18

**light**
137:13,22
149:22
150:17,21
151:5
160:16
169:3
261:18,23

**lightly**
150:25
151:3

**lights**
132:16

**likable**
27:5

**likelihood**
107:18
170:25

**likened**
174:18

**likewise**
253:23

**limbs**
149:7

**limit**
72:17
73:6
75:12

**limitation**
147:23

**limited**
30:1

**limits**
27:3

**limp**
142:11

**lined**
150:11

**Lines**
293:25

**lining**
146:10

**list**
25:7 74:7
209:19
221:3

**listed**
49:10
63:22
147:23
273:21
285:7
293:11

**listen**
108:7,8,
16,17,23
109:10
198:11
201:17,19

**listening**
5:16
92:10,12
107:3
108:13
110:1
203:11
296:14

**listens**
107:11,12
109:1

**lists**
210:17

**lit**
149:14
151:6

**literally**
65:24
93:4
110:24
168:19

**literature**
125:10
126:3,4
134:5
151:18
166:14
167:20
168:16,20
199:7
205:15,17
212:6
214:23
215:1,15,
16,19
300:24

**litigation**
284:4
291:12,19
292:25
294:5
299:6

**Litsa**
6:12
208:9
209:8

**live**
7:9

**living**
24:23
156:6
213:17

**lodged**
20:2

**logical**
15:4

**long**
15:24
16:23
80:6,9
83:22
124:4
158:18
181:12
184:21
186:7
189:13
201:18
283:2
284:10
288:18
292:5

**longer**
89:10
183:19,25
184:23
201:5
202:9
294:20
295:11

**looked**
116:10
121:25
144:5,7
155:21
157:11
186:2
195:19
249:5

**loop**
70:23

**Lortab**
37:17,20
214:11
249:16

**lose**
139:24
142:14

**lost**
57:14
76:2
135:8
141:18
142:7
167:3
237:25

**lot**
36:18
37:9,10, 12 53:2
64:12
81:14
82:16,17
84:21
85:5 94:4
104:4,7
123:18
124:23
125:1
128:21
131:1
134:6
136:20
156:15
161:12
179:18
186:11
193:25
199:2
209:19
213:6
241:19

**lots**
136:22
229:11

**loud**
50:4

**loudly**
149:7

**love**
155:13

**low**
105:9,17
110:18
111:1
123:1
135:22
136:15
198:16
247:17
256:10

**lower**
123:1
177:20
178:3

**lowering**
177:17
231:4

**lowers**
177:20

**lunch**
56:7,11, 22 103:9
111:9,13
112:11

**lung**
156:13
158:14
160:19
163:9
177:14
179:13
184:7

**lungs**
87:1
104:16
118:21
155:18
156:2,6,9
158:8,12, 18
159:16, 19,22
160:2,19
161:2,5, 7,11
162:4,8, 11,16,17, 21 163:3, 25 164:6, 7 166:3
177:13
178:12

**lying**
143:19

**M**

**M-A-R-T-E-L-L**
16:20

**M.D.**
113:22
209:8

**machine**
84:3
91:10
95:7
182:19
209:2
296:13

**made**
10:6
12:13
13:1 14:3
28:4
43:20
115:8,12
136:22
183:1

**Magazine**
165:17
297:1,2

**magic**
7:23

**magnet**
98:18,22
99:1,6,8, 10,11
100:11, 17,19
173:18
193:11, 18,20,21, 23 194:4, 10,13,17, 19,20,22
195:1,8, 9,11,15, 16,23
197:2,7, 8,9,16, 21,22,25
198:3,15
199:22,23
200:4,8, 16 300:9

**Magnetic**
196:1

**magnetics**
199:13

**magnets**
193:12
194:1,24
198:4
199:13,18

**main**
92:19
135:25
161:10

**maintained**
265:7

**maintenance**
255:14
256:24
273:22

**major**
12:22
13:8
26:18
53:8
63:20
108:2
117:25
134:2
163:11
267:19
281:8

**majoring**
59:23

**majority**
157:22

**make**
7:13 9:4, 9 11:14
12:7
15:12
26:17
38:20
41:24
42:2,14
43:14,18
46:1,2
53:25
54:1
66:13
70:11
73:2,11
80:14
93:12,18
95:17
101:24
105:21
106:1
109:17
112:4
115:5
119:12
121:1
139:23,24

147:8,13
150:9
165:12
166:5
171:14,17
176:15
178:18
183:7
188:8
197:21
198:2
201:18
206:8
215:8
221:1,4
231:21
240:4
247:8
248:19
251:10,
15,16
257:12
258:20
262:14
263:7
271:2
273:17
275:11
281:22
291:5
296:22

**makes**
90:19
166:3
183:18

**making**
75:11
142:12
183:3
231:18

**maleate**
250:15
252:8

**malfunction**
199:8
200:7
225:6

**malfunction s**
200:12

**malignant**
88:10,14
105:2
184:24

**malingering**
53:12,14

**malpractice**
64:11,14

**man**
165:4

**manage**
68:1

**manageable**
304:5

**management**
7:3 69:7,
9 115:13,
14 171:23
172:16

**manages**
144:1

**managing**
82:4
205:21

**manner**
79:8
83:15
153:21

**Manual**
24:13

**manually**
192:8

**manufacture r's**
100:8

**manufacture rs**
194:6

**March**
10:12
39:14
45:17

**margin**
221:17
222:6
223:14

**margins**
224:7

**Marilyn**
156:25

**mark**
18:11
44:24
45:25

**marked**
18:8 29:9
31:17,20
32:15
33:25
35:7
39:1,4
40:6
41:6,16
43:11
45:1
51:21
139:17
140:20
245:13
303:9

**marks**
36:5

**Martell**
10:1,3
11:6,19
12:3,10,
16,19
13:5
14:18,21
16:12,16,
20,21
18:6
19:10,18,
23,25
20:6
21:3,15,
25 22:13
23:10
27:18
29:4
30:1,7
34:15
36:12
41:15
47:9
51:2,15
55:7

**Martell's**
14:24
15:3
18:23
25:12
30:12
101:11

**Mary**
63:7

**Mason**
60:2

**massive**
158:5

**material**
23:1
283:14

**materials**
25:7,11
268:8

**math**
84:18,22
239:13
246:6
282:13

**mathematic**
152:17

**matter**
5:20 7:24
36:6 86:3
123:5
147:17,18
167:16
195:10
196:22
274:5

**matters**
5:19
166:22

**maximum**
103:14
221:17
238:24
239:5
282:7

**meal**
56:4

**meaning**
61:10
67:25
98:24
108:16
117:17
123:4
127:3
135:4
139:22
149:15
167:12
179:15
217:22
261:19
295:19,25

**means**
60:12
62:5
91:16,18
93:2,13,
24 104:15

125:4,5
128:8
176:13
183:3
190:19
194:9
195:22
200:5
223:17

**meant**
171:24
186:14
199:16
256:4,12
296:3,4

**measure**
104:20
146:8

**measurement**
104:21

**Measures**
189:9

**mechanism**
156:17

**mechanisms**
154:11
156:10,15

**median**
235:11,13

**medical**
6:16 8:3
15:13
29:5,21
30:9,15
36:12,14
38:9,13
42:8,13
45:18
47:2
58:7,8
59:24
60:8
61:6,15
62:19
63:1
64:11,13,
15 74:17
100:16
101:4,24
104:11
110:3
112:12
114:4
125:5,10
126:3
135:15,
17,18
154:1
155:24
162:5
164:19
168:20
175:3
190:1
192:1,2
193:12
209:23
214:16,18
282:22
283:9
299:23
302:14

**medication**
157:16
243:11
247:16

**medications**
115:11

**medicine**
58:8,13,
14 60:1,
3,6,11,15
61:12,18
62:20,23
63:3,11
68:23
69:5,7
108:3
142:22
145:12
173:5
186:20
187:5,11,
18 188:25
189:16
205:20

**meditate**
168:19

**meet**
6:17
28:21
96:5

**meeting**
27:23

**Melba**
45:9,22
53:22
54:7,13

**member**
214:16

**members**
67:10

**membranes**
158:2,9,
14 160:2,
23

**memorandum**
25:13
111:23
112:1

**memory**
26:1,24
124:9,14,
15 131:5
147:12
154:11,13
242:5
267:17
293:12

**Mental**
24:13

**mention**
6:7 66:10
103:24
127:23
139:14
146:4
173:2
256:13
298:11

**mentioned**
50:16,25
57:7
60:10
63:10
70:21
82:12
83:19
90:6
94:11
110:22
111:25
114:4
120:13
123:10
132:7
135:13
141:17
169:6
181:18
183:1
195:25
196:8,15
205:25
215:15
241:21
256:24
260:8
261:25
269:3
288:9
298:13
299:18
300:23
302:4

**mentions**
68:22
79:3
103:22
134:5

**mentis**
28:21,22

**Merck**
62:20

**Merit**
63:1

**met**
20:8
68:18

**metal**
82:23
83:6
196:2

**meted**
157:18

**method**
70:8
190:22
191:11
193:10
244:14

**methodology**
152:4

**methods**
166:1
234:15,22
241:3,7
244:12
251:4,21
253:14
255:1
264:25
265:1
268:8,11
275:5

**microbiolog
y**

59:23

**microcontractions**
89:18

**micrograms**
244:24 255:19 257:14,16 266:24

**microsecond**
201:17

**mics**
256:18

**mid-**
137:4

**Midazola**
250:15

**midazolam**
134:20 250:14,15 252:8,9, 15 253:1, 19,24 254:8 259:24,25 260:1 262:18

**Midazolam-alfentanil**
257:25

**middle**
42:17 57:25 209:18 213:22 294:16

**milligram**
234:25 239:9 243:22

**milligrams**
234:24 235:14,21 236:17,20 238:24 239:6,14, 15 241:13, 21,24 243:11, 14,18,19, 21 245:1, 6 246:4, 25 247:7 252:10 253:21 256:6,8,9 257:20 261:15 263:11 281:21 282:8,11 297:20,23

**milliseconds**
107:11

**mimic**
183:7

**mind**
95:11 172:4 206:11 231:11 284:14

**mine**
73:17 243:2 266:22

**minimal**
302:7,9, 10

**minimum**
210:10

**minus**
222:9 235:10,12 246:14

**minuscule**
26:22

**minute**
47:5 80:20 87:17 88:24 126:17 146:4 177:21,23 178:5 180:3,5 182:20 210:7,11, 12,19 211:2,8 215:9 220:15,19 226:12 255:19 257:15 258:17 266:25 272:24 296:1 301:6,8, 10,23

**minutes**
119:23 135:7 147:17 160:8 186:10,12 188:12 269:23

**misinterpreting**
184:17

**missed**
211:20

**mission**
22:22

**misspell**
242:9

**misspelled**
242:8

**misstatement**
37:20

**misstates**
276:16

**mistake**
296:22

**Mister**
92:24 94:5 104:12

**mistyped**
242:9 258:6

**misunderstood**
295:18

**mix**
138:9 162:22

**mixed**
165:22

**mixes**
163:3

**mixing**
162:20

**MM**
40:6

**moaning**
176:14

**mode**
191:6

**moderate**
162:7

**modes**
249:24 252:13

**molecule**
236:8

**molecules**
121:7

**moment**
13:16 27:11 46:7 47:4 48:3 58:19 94:7 132:13 146:24 170:18 178:14 195:6 204:10 220:22 249:22 251:1,6 253:7 254:19 255:5 273:13 280:21 292:14 298:20 302:25 303:23

**monitor**
106:21,24 151:21,22 153:14,15 190:19 191:17 264:13 269:10

**monitored**
118:17

**monitoring**
82:17 191:16 211:7



Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 356 of 390 PageID #: 1134

243:13
256:21
259:22
263:5
265:17
275:22

**monitors**
256:22
264:3
265:24
267:14
269:11
274:8

**Monroe's**
156:25

**monsters**
127:14

**month**
35:21
84:16,17,
20 154:13

**months**
20:14
61:23
96:13,16

**morning**
5:8 6:4
7:18,19,
22 16:16,
17 27:18,
19 55:8
68:14,15
81:4

**motion**
5:21,25
6:7 9:14
11:7,17
46:12,16
73:5,10
75:12
84:24
158:20,23
208:13

**motions**
10:18

**Moto**
97:15

**mounting**
284:8

**move**
7:7 18:23
20:6
21:14
22:10
25:16
31:16,22
37:24
38:4,8,25
116:6
120:11
126:8,9
127:13
133:20
139:4
142:21
147:25
148:3
149:1,7
154:18
176:5,23
197:5,6,8
213:22
214:2
215:22
218:22
227:10
230:17
232:25
234:17
235:3
236:22
238:4
239:17,20
242:1
243:4
244:3,13
247:19
249:11
250:13
252:25
253:13
257:23
263:17
266:1
267:16
269:12
274:10
277:1
291:6
303:5

**moved**
38:19
50:17
71:23
75:5
176:9
303:12

**movement**
117:19
119:14
121:2
132:10
164:2
181:5
244:5

**movements**
163:23
181:2,3

**moves**
194:22

**moving**
89:16
120:1
126:5,6,
10 141:14
160:12
218:3
229:15
254:12

**mucus**
158:1
166:2

**multi-drug**
142:16

**multiple**
120:11
140:19,25
146:22
153:5
154:15
156:18
170:7
173:14
185:23
215:2
295:16

**multiplied**
235:21
246:16

**multiplying**
235:19

**muscle**
91:21
129:19
152:12,14
155:6

**muscles**
129:22

**myheartsisters.org**
212:17
213:6,25
214:5

**mystery**
161:23

**N**

**N-O-R-M-A-N**
58:2

**N-W-O-Z-O**
113:21

**name's**
27:20

**named**
138:5
299:7

**narco**
264:13

**narcotic**
260:10,
13,14
262:21

**narrow**
11:2 13:1
15:24

**Nashville**
41:22
102:11

**nation**
65:15

**National**
63:8
103:13

**nationwide**
66:21

**Native**
63:2

**natural**
86:17
87:7,11
226:2

**naturally**
87:9

**nature**
141:10
165:17,23
179:12
215:20
296:25
297:2
300:24

**nearing**
172:18

**neat**

248:25

**necessarily**
82:1
125:14
216:11
226:23
227:3
229:12
232:21
291:1

**needed**
81:5 92:8
100:12
118:1
122:17
139:19
168:7
199:22
208:18
222:6

**needing**
110:9

**needle**
157:10

**negative**
161:21
164:10, 20,22
165:3

**neglected**
91:15

**nerves**
121:1

**nervous**
120:8,13, 15,17,22

**networks**
278:7
279:11
303:6

**neural**
274:8
275:22

**neuro**
18:19
269:11

**neurocognitive**
12:22
13:9
26:1,11, 18,19
53:9

**Neurology**
278:9

**neurons**
278:7
279:11
303:6

**neuropsychological**
20:12
23:11,22
24:21
25:20,24
26:10

**neuropsychologist**
16:22,24
17:1,13
24:5

**neuropsychology**
17:6
18:20
19:20

**nice**
22:3
129:20

**night**
278:25

**nitrous**
255:14
271:10, 12,17,19, 23,25
272:3,6, 8,11,13, 15,18,20, 22

**NMDA**
140:18
145:9

**NN**
41:7,16

**nodal**
88:21

**nodding**
248:1

**node**
87:10,12
90:9 93:6

**noise**
176:15
197:21,23
199:3

**noises**
198:14

**nonclinical**
152:9

**noodle**
142:11

**noon**
188:4

**normal**
87:10,13, 14,15
88:7,8
156:6
168:11,12
198:24
228:16

**Norman**
9:5,10
14:1
55:12
56:15,16
57:22
58:1,3, 15,21
59:19
64:21
68:6,10, 14 74:1, 10,13,20
75:1
76:12,18, 24 77:2
78:12
80:1
101:1,16
102:17
103:5
112:10,25
123:10
137:6
142:23
143:2,11
152:21
159:2
164:18
167:8
173:22
187:9
188:7,12, 14,23
189:24
204:12
211:13
212:19
217:2
227:11
238:8
242:24
245:11
249:3
263:18
274:20
280:2
282:18
287:25
288:10
289:1,15
290:4
291:9
292:3
294:11
298:24
299:6,18
300:15
301:3

**Norman's**
9:2 55:18
56:2,20
59:12
72:1 73:6
86:2
211:22
288:8

**North**
63:18

**note**
36:25
102:7,19
188:25
239:23
277:17
298:16

**noted**
14:13
21:22
41:13
102:3,4
103:1
147:22

**notes**
35:16,19, 24 38:10, 14 78:23
258:7
259:7

**notice**
79:5
155:14
194:1



Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 358 of 390 PageID #: 1136

**noticed**
155:15

**noting**
37:21

**Notwithstanding**
19:1

**numb**
118:16

**number**
6:1,11
38:8
41:23
47:2
51:16
53:21
54:11,12
62:6
76:14
90:21
93:19
109:9
151:24
152:1
155:14
156:9
194:25
198:12,
13,18
202:18
203:11,15
222:12
229:16,23
230:6,8
231:13
240:14
242:23
246:1
264:24
271:9,15,
18,20,22
272:2,5,
7,10,12,
14,17,19,
21 285:4
287:20

**numbered**
18:24
21:16,21
39:24
43:5
59:13
75:2 79:9
101:20
189:17
229:23

**numbers**
48:5
137:3
209:19
248:23
270:21
275:1
287:9
292:18
293:16

**nurse**
36:3
37:21
192:17
214:16

**nurses**
173:7
192:19

**Nwozo**
44:22
97:16,17
113:21
114:2

**O**

**object**
16:3
19:2,23
22:20
29:15
36:2
37:19
44:2
75:4,13
85:15
132:5
158:19
208:7,8
276:12,15
287:24
289:13
290:23

**objecting**
75:15

**objection**
8:24 10:5
11:4
14:20
15:25
19:6
21:17,22
22:7
25:14
29:17
30:16
31:24
32:2
33:17,18,
20 34:25
35:3
39:25
40:1,2
41:2 43:7
47:22
50:19,22
52:20
59:14,16
68:8
72:8,17
76:19
79:11
85:18
98:6
100:21
101:21,22
102:2,23,
25 105:25
106:5
112:4
131:14
148:4,5,7
158:24
164:12
189:18,21
208:12,16
233:3
303:10,17

**objections**
10:3
19:2,23
20:2
72:18
73:2

**objects**
194:14

**observations**
30:10

**observe**
55:18

**observed**
155:10
176:11

**obtain**
221:17

**obtained**
23:14
243:13

**obtaining**
268:14

**obvious**
82:8

**occasion**
20:11

**occasional**
103:24
119:20

**occasionally**
123:24
124:5

**occasions**
20:13
53:19

**occur**
96:20
105:4
126:3
156:9
167:15
168:10
179:16,19
202:21,
22,23
227:23
230:15

**occurred**
80:5 92:9
97:11
106:11
147:16
149:17
226:16
296:15

**occurrence**
169:14
171:1

**occurring**
90:7
191:21
200:22,25
299:12

**occurs**
123:4
192:8
290:16

**October**
35:23

**offender**
32:22
34:6 39:8
40:10

**offender's**
30:22

**offer**
12:3 13:6
14:18,21
62:8,9
75:6
85:23
208:14

**offered**
11:7,12
12:11,16
31:20
64:2
102:3
173:9
279:2
284:3
289:11
290:5
291:6

**offering**
33:14

**office**
27:22
68:17
77:18
79:6

**officer**
192:25
200:14

**oftenly**
198:9

**Oftentimes**
87:18

**Omega**
62:23

**ongoing**
284:24

**oniony**
136:21

**onsite**
115:13

**onward**
61:6

**open**
53:2
132:14
133:1
137:16,18
161:19

**opened**
129:8

**operate**
132:17

**operating**
60:18
65:18
67:7,20,
23 68:3
69:7,11,
13 70:9
71:9
81:1,5,
12,15,17,
20 82:11,
18,19,21
95:16
99:17
129:9
132:21
137:16,25
192:3,6,
10 193:20
195:14
196:14
199:18
204:23
247:6

**operation**
15:4
243:12

**operations**
134:15

**opine**
72:2
277:7
294:19

**opined**
235:23

**opinion**
9:2,4,9
14:22,24
24:17,21,
25 25:2
28:14
30:15
36:13,16,
17 53:7
72:3
74:14
76:14
84:25
85:24
137:7
167:8
174:21
206:1,6,
7,19
207:22
229:18,25
239:2
246:23
248:11
284:3,6,
10,13
285:18
288:9,13,
15
289:11,20
290:4
302:13

**opinions**
6:15,23,
24 7:5
9:4,9,11,
13 11:8,
9,20 13:6
20:17

30:8
74:16
75:7
279:3,5
282:18
283:4,6,
19,22

**opportunity**
11:20,23
15:10
28:5 68:9
72:19
137:6
154:23

**opposed**
298:24

**Opposing**
101:8
102:14

**opposite**
9:8

**oral**
60:13
157:9,14,
16

**orally**
243:11

**order**
10:10,11
79:18
81:21
95:3,24
96:5 99:9
111:24
112:3
121:7
122:4
150:9

**orders**
204:22

**Ordinarily**
202:16

**organizations**
170:19
172:25
300:2,3

**organize**
111:10

**organized**
90:8
106:20

**orient**
249:20

**Oriented**
35:10

**original**
44:5,9,
15,17
67:9,10
69:19
98:12
202:11

**originally**
23:24

**originates**
88:20,23

**orthopedic**
267:19

**other's**
9:9

**output**
106:21
111:5

**outset**
21:19

**outward**
179:2

**overarching**
285:14

**overdose**
156:23

157:12

**overdoses**
157:3,10, 14,20 160:13

**overdrive**
94:2

**overlap**
127:24

**overrule**
106:5

**overruled**
30:16 100:24 158:24 208:13

**oversee**
192:20

**overseen**
69:25

**oversight**
7:21

**Overturned**
286:19

**overview**
123:19

**oxide**
255:14 271:10, 12,17,19, 23,25 272:4,6, 9,11,13, 16,18,20, 22

**oxygen**
160:25 179:16,19 181:15 184:7 232:1 236:8 240:17 255:14

**P**

**p.m.**
304:12

**pace**
56:9 70:19 83:14 93:1,2 99:4 109:15,22 110:9,12, 18 111:4 177:22 178:4 296:8

**paced**
71:1 110:10 181:9 182:14,17

**pacemaker**
12:19 13:24 14:2,4,7, 12 15:6, 21 54:23 65:25 70:14,16 82:24 86:18 92:1 94:5,9 103:19,25 109:21 110:12, 16,18 111:3 181:9,12, 17 182:9, 17 183:18, 20,24 184:11, 14,18,20, 23 185:4 190:23 294:20 295:3,11, 19,20 296:6

**pacemakers**
65:4,11, 18 69:17 70:13,15, 17 94:8 99:3 183:14 196:5 198:4

**pacemaking**
94:17

**pacer**
191:4,7

**pacers**
93:23 98:24

**Pacific**
63:4

**pacing**
92:7 93:3,4, 13,17 94:2,10 110:1,20, 21 111:4 182:9 183:2 191:10 198:5 220:11

**padding**
132:7

**paddles**
175:12 180:24

**pads**
192:7

**pages**
48:4,18 103:8,18 104:4,7 212:23 231:18 242:24 292:21

**pain**
7:3 37:15 58:13,14 60:5 117:18 119:23 120:10 123:2,4,8 128:11 130:7,15, 16 133:2, 5,6,8,10 136:16 144:19, 22,24 145:16 147:10,15 148:15 153:8,10 168:24 169:6,11, 15,18,20, 21,23,24 170:2,5, 6,10,14, 24 173:13 175:21 176:2 177:4 261:10 291:13

**painful**
119:10, 19,21 121:23 136:18 149:5 158:4 168:25 175:25 180:14 183:11 216:21 217:8

**Palliative**
173:5,7

**panel**
286:6

**paper**
62:12 237:25 281:14

**papers**
14:15 61:24

**paragraph**
8:2,4 28:18 31:3 33:5,12 34:16 35:22,24 39:16 40:17 41:19 207:17 211:17 212:4 215:24 217:22 219:2,10 222:25 225:2 229:17, 21,24

231:12
232:1,7
234:18,22
236:23
241:6
242:20
244:13,17
252:5
253:16
265:4
268:10
286:14,18
289:2

**paragraphs**
6:8 8:25
35:16
40:18
230:1
249:16,17
255:5
275:7

**parallels**
282:5

**paralytic**
129:20,21
130:4
152:12
155:6

**paralyze**
129:24
130:10

**parameter**
88:8
116:19
210:1

**parameters**
93:15
116:4,13,
17
209:19,22
248:4,5
250:8
254:3

**paraphrase**
33:5
255:6

**parentheses**
223:12
225:18

**Parker**
293:9

**part**
11:1 16:5
36:11
61:17
67:14
79:18
117:21
120:17
126:10
173:16
174:22
186:4
206:19
214:23
216:25
229:20
231:15
248:11
282:24

**partially**
156:24

**participate**
67:8
222:7

**participating**
5:13,15

**parties**
5:9,12
153:2
188:1,3

**parts**
75:5,18
119:13

**pass**
48:24
62:11
91:24

**passed**
53:18
60:13

**passing**
196:6

**past**
24:3 38:8
66:10
104:2
117:16
244:22

**pat**
196:5

**pathologist**
299:7

**patience**
48:17
227:12

**patient**
45:11
48:3
49:10
52:17
66:2
81:24
88:16
109:23
110:15
115:10
117:11
118:20
119:9,18
120:10
122:18
123:12
124:10
129:21,24
130:1,14,
18 132:1,
14 133:1
136:2
148:2
149:8,18
150:5
154:1
164:22
168:4,13,
16 169:11
174:24
175:10
176:7,17
184:22
214:25
215:17
226:4
235:9,13
239:6
245:5
247:7,16
248:6
250:9
256:15
261:11,21
271:9,11,
18,24
272:2
281:7
297:20
300:19

**patient's**
66:5,6
83:17
95:13
149:6
154:2
302:8

**patient-facing**
215:15
300:24,25

**patients**
60:22,23
65:2 68:1
69:7
81:12
89:9,20
105:6
123:24
124:24
126:14
128:13,18
131:1
133:20
134:11,
15,17
135:6
136:8,20
137:12
148:24
149:1,6,
11 150:6,
7,8
152:6,10
155:16
156:7
160:15
162:25
164:25
165:13
167:10,12
168:2,11,
17,21,22,
25 169:3,
13,25
170:9
172:17
173:10
176:1,3,
9,11,22,
23 183:13
185:15,17
186:2,6,
14,15,16
199:1
202:15,20
205:21
206:15
212:7
214:15
215:25
218:18
220:1,18

221:19 222:7,17, 21 223:5, 19 225:10 226:7,11, 24 227:1, 2,6 233:19 237:8 241:3,7 246:3 247:2 251:21 252:7 254:25 256:17 259:17 266:4 268:15 279:8 280:17,20 281:11,17 297:7,23 302:19

**pattern**
198:16

**patterns**
198:14

**Paul**
17:19

**pay**
99:4 169:24 228:13

**PDF**
171:16

**peak**
160:9

**peaks**
160:8

**pectoral**
91:21

**peek**
129:6

**peer-**
166:13

**peer-reviewed**
300:22 301:2

**pelvic**
132:15

**pelvis**
132:22

**pen**
147:24

**penalty**
6:2 7:23 298:25

**penetrating**
83:22

**pentobarbital**
8:19 77:13,20 78:2,10, 19 121:13 122:4,19, 25 134:22 135:1,3, 11 136:4 139:12, 16,25 140:3,6, 9,16 142:14 145:4,6, 21 147:16 148:24 149:11, 24,25 150:9 151:11 154:19, 21,22,25 155:3,7, 10,15,20 156:20 157:6 159:10 160:13,18 161:10 162:2 163:5 164:20 166:21 177:3,5, 8,18,25 178:7 179:1,7, 17 181:19 227:7 229:19 230:11, 15,23 231:3,17 235:24 236:14 239:3 246:25 247:3 252:23,24 256:1 257:8,16, 20 259:18,21 261:6 263:8,10, 11,15 265:11, 15,23 267:5,9 274:7 277:8 278:18 279:6 281:19 282:3,20 283:5,14, 20,23 284:25 285:18 289:6 290:6,12 291:10 297:21,24

**pentobarbital's**
254:1

**pentothal**
247:11

**people**
12:15 61:24 62:7 67:22 82:4 83:11 89:3 93:20 110:19 117:24 121:21 122:21 123:22 124:19 125:9 126:4,5 127:11,12 131:10 132:10 133:5 134:13 136:14 137:15 141:12 153:12,16 155:10 157:2 160:12 165:12 167:25 168:16 175:11 185:24 186:12 193:25 195:14 196:4,5 203:18

**people's**
119:4 121:18 129:10

**percent**
104:23,24 105:10 134:17 135:5 156:2 162:5 180:15,19 191:20 196:12 203:1,7, 25 221:16,18 222:6,9 223:6,7, 8,12,13, 14,18,19, 23 225:18 226:1 236:18 237:8 239:8 240:16,17 243:21 245:8 246:4,24 282:10 297:6,7,9

**percentage**
104:22 128:18 134:10

**percentile**
26:22

**Perfect**
238:3,6 251:2

**perfectly**
249:21
271:2
286:10
287:6

**perform**
60:25
81:16
83:4
98:25
101:2

**performed**
25:20
49:14
129:16
222:3
247:6

**performing**
83:18
206:25

**performs**
66:12

**period**
26:21
60:4
69:21
107:10
179:18
295:15

**periods**
233:20

**perioperati ve**
58:8 69:5

**peripheral**
86:24
152:14
159:21
177:10

**perjury**
6:2 7:23

**Perkins**
5:7

**permanently**
136:5
157:7

**permission**
32:8,10
46:1
53:25
131:12

**permit**
120:8
142:2

**permitted**
22:6
76:18,24
129:8

**persist**
186:7

**persists**
107:16

**person**
24:22
37:1
38:9,14
43:18,24
73:19
94:12
96:3
99:18
105:5
126:7
128:4
130:20
136:6
148:13,14
151:5
161:12
173:19
199:23

**person's**
118:14
161:7

**personal**
67:11
69:13
206:17
298:14,17
299:18
300:4

**personally**
11:21
298:24
300:5

**persons**
5:3 43:18

**persuaded**
75:17

**petition**
6:5 11:13

**ph**
157:24

**pharmaceuti cal**
144:8

**pharmacolog ical**
235:25

**phase**
173:10

**phases**
135:10

**phenobarbit al**
146:17

**phenomena**
119:6

**phenomenon**
299:11

**phone**
41:23

**phonetic**
17:18,19

**picture**
186:18
299:8,10

**photo**
196:17

**photograph**
196:18

**phrase**
13:25
120:14
228:15

**physically**
28:5
119:5
180:21

**physician**
42:4,13
50:10
131:8
153:25
182:1
214:14, 16,21
215:18
300:2

**physician-assisted**
61:22

**physician-facing**
215:16

**physicians**
176:10

**physiology**
205:19

**pick**
204:18

**picked**
82:7

**picks**
301:23

**picture**
27:8
196:19

**pile**
237:18
248:25

**pinging**
93:17

**pings**
149:16

**pink**
163:2,6, 7,9

**place**
65:10
69:20
85:9 99:7
105:12
158:6
167:14
168:12
175:11,12
190:12
194:20
200:3
271:3

**placement**
65:12
113:15

**places**
83:2
121:6
136:8
175:13
196:8
261:2

**placing**
194:19

**plaintiff**
9:25 41:2
43:1
55:11
64:13
72:23

**plaintiffs**
5:10
11:1,24
13:20
36:9
73:18
284:18
289:5

**plaintiffs'**
8:17 11:7
43:7
46:11
75:24
76:13

**plan**
56:10
173:16

**planning**
207:4

**plasma**
160:25

**play**
15:14

**played**
132:18

**plead**
12:18

**pleading**
12:15

**pleadings**
12:13
15:19

**point**
9:19
14:19
26:21
52:24
56:11,19
68:5
100:3
104:20
122:11
141:3
146:10
147:21
154:5
161:15
202:10
211:9
225:19
230:5,8
239:22
256:11
261:16,18
273:9,16
275:20
284:15
289:19

**pointed**
53:24
283:11

**pointing**
211:12
214:25
256:13

**points**
170:4
229:16,24
230:18
283:10

**poisoning**
156:16

**police**
288:2

**policy**
77:19
79:6,20
111:25

**Poole**
70:2
99:13
206:12,17
299:19,20

**pools**
163:10

**popular**
92:19,20

**portion**
64:17
115:1

**portions**
110:8
273:25

**position**
12:17
13:21
72:3 99:2
102:24
193:13

**positioned**
194:8,11

**positioning**
194:2

**positions**
194:6

**possibility**
7:11
191:21
193:17
200:25

**possibly**
12:4
22:22
169:21

**post-placement**
114:16

**post-traumatic**
168:23

**potassium**
155:7

**potent**
260:9

**potential**
200:23

**pounds**
245:5

**pour**
58:21

**Powell**
165:17

**power**
29:21
31:8,13
41:18
42:1
53:23
193:12

**powerful**
165:3

**PP**
43:11
53:21

**practice**
60:4,14
69:4,6
131:7
171:23
205:18
281:6

**practiced**
61:2
68:25

**practicing**
61:9
69:11

**practitioner**
36:4

**pre-**
52:16
53:6
243:10

**pre-medication**
243:8

**pre-printed**
52:9

**precise**
125:6,11
194:1

**precisely**
248:21

**preclude**
274:12

**predators**
141:24

**predict**
266:3

**predictable**
177:16
181:17

**predispose**
178:12
302:22

**predisposes**
302:20

**prefer**
18:7 23:4

**preference**
56:6

**preliminary**
5:19,25
25:13
288:6

**premature**
302:21

**prepare**
15:11
20:16

**prepared**
20:19

**prescribed**
96:2

**prescription**
95:23

**present**
44:22
47:12
75:25
90:22
162:3,4,
24
179:13,14
192:20
261:10
288:21
291:22

**presentation**
278:20
290:8

**presented**
5:17
13:20
14:23
247:11
250:7
252:22
256:12,21
257:22
259:21,22
263:5,6
265:14
267:13
269:8
278:19
281:14
285:24
290:10

**presenting**
179:1

**presents**
83:3
282:6

**preservation**
73:4,9

**preserve**
72:17

**preserved**
16:4
267:17

**preserving**
19:5 76:3

**preset**
93:14

**President**
77:9
79:19
111:24

**President's**
63:4

**presiding**
5:7

**pressure**
135:23
136:11
144:18
156:11
161:22
163:17,
22,23
164:10,
21,22
230:12
231:4
244:4
279:9
280:18
281:1,3

**presume**
95:2

**pretend**
122:14

**pretty**
111:8
120:14
130:22
136:9
166:1
168:17
176:8
196:10
198:9
220:7

**prevalence**
221:16

**prevent**
113:16
173:11
191:3,9
194:17

**prevented**
75:11

**previous**
31:25
38:19
77:8
265:16
267:7
294:5

**previously**
74:1 80:1
284:18
291:15,18
292:6

**primarily**
134:7
135:21
249:25

**primary**
99:6

**printed**
52:17
53:7
171:17
172:5

**prior**
19:1,6
24:1
29:24
32:1
52:12
56:22
145:3,20
256:15

**prison**
83:8
112:13
206:22

**prisoner**
155:17
184:22
194:22
283:15
290:16

**prisoners**
154:24
155:2
156:3
157:22
162:12
286:16
289:7
290:6

**privilege**
27:23

**privileged**
67:4
205:3

**PRN**
37:17

**pro**
20:16

**probability**
44:4
105:1
174:9
179:11

**probative**
36:19

**problem**
35:10
76:20
124:8
136:9
140:25
147:1
151:12
198:7
242:22
257:5

**problematic**
90:20

**problems**
7:10
69:13
81:8
90:13
104:8
133:17
135:19
152:4
174:1
203:20

**proceduralist**
113:11

**procedure**
6:4,18
49:14
103:19
117:12
118:22
133:12
175:20
252:8,9

**procedures**
49:8
54:18
119:19,20
133:15

**proceed**
5:9 9:21
22:11
73:23
76:6

111:19 112:7 188:3,20 233:11

**proceedings** 5:1 15:7 17:12,17 154:20

**process** 122:12 126:11 154:3,22 159:23 168:3 173:12,16 174:10 176:10 177:13 203:16

**processed** 151:22 267:13

**processes** 160:4

**produce** 121:23 136:10, 16,19 154:7 166:12 282:3 294:6

**produced** 36:11 121:11 166:11 290:14

**produces** 121:4,5 142:17 289:9

**producing** 184:21

291:20 302:4

**production** 36:10

**profession** 154:5 214:17

**professional** 18:18 59:2 60:17 65:7 170:19 174:5 192:14 214:18

**professionals** 192:1

**professor** 58:6 206:18

**proffer** 73:11 75:12

**profoundly** 145:10,18

**program** 65:17 66:18,22, 23,24 67:6,8 80:24 91:16,18 94:12,17, 18,23 95:9 96:5 98:18,22 99:10,11, 16 103:21 193:6 194:25

199:10 200:1 201:7 202:16 204:1

**programmed** 67:17 81:5 91:12 93:16 94:20 116:17 166:25 184:25 201:11 207:25 220:9,14, 18,20 224:21 296:20,24

**programming** 67:12 69:16 80:3,9,25 81:23 83:15 91:15 94:11 98:4 99:21 100:10,16 173:17,19 190:12,22 191:11 192:21 193:8,21 195:11 199:16 201:3 204:8,21 205:23 227:15,20

**programming's** 99:23

**programmings** 196:14

**progress** 35:10,17 38:7,12, 23

**prolong** 173:12

**prolonged** 179:18 202:22

**prominent** 153:8

**pronounce** 241:15

**proof** 10:24 11:3 12:25 36:3 76:1

**proper** 7:4 9:16 198:3

**properly** 9:16 79:15 99:1 194:9,11

**properties** 123:3

**propofol** 140:23 260:19,23 261:8,14 265:8,10, 14 266:25 267:9 269:6

**proportion** 124:23

**propose** 166:10

**proposed** 8:8 13:17 62:8

**proprietary** 151:23

**protests** 11:23

**protocol** 22:15 23:19 77:6,13, 21 79:7 122:1,8 123:7 151:14,15 177:4 181:23,24 182:1,6 236:13,18 239:10 243:22 245:9 246:5 257:20 263:4,12 281:2 282:12 284:21 293:1

**protocols** 155:8

**proven** 263:24 264:3

**provenance** 10:9

**provide** 6:22 7:5 20:20 39:19 44:12



Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 367 of 390 PageID #: 1145

46:14
47:4
53:11
64:8
101:3
113:17
122:17
131:6
143:3
148:10

**provided**
36:9
38:8,13
52:12
54:7,8
69:23
74:5
126:18
138:19
143:4
278:24

**providing**
23:1 97:2
102:8
167:4

**proximity**
84:2

**psychological**
168:22
169:14

**psychologically**
119:6

**public**
41:22
42:9,25

**publication**
62:6,8,10
63:17
78:16
79:5

**publications**
59:2,5
62:7

**published**
61:11
62:1,12,
13 216:22
278:22
300:22

**Pubmed**
133:25

**pull**
103:9
109:22
240:2
245:12
279:15
286:11

**pulled**
116:2
138:20

**pulleys**
141:25

**pulling**
15:14

**pulmonary**
155:17,
18,19
156:3,4,
5,7,17,20
157:4,8,
22
158:18,22
159:6,23
160:22
162:1,7,
23,25
163:15,17
164:10,
21,22
166:22
183:20
184:2

277:3,9
289:8
290:7,11,
16 299:12

**pulmonologist**
205:13

**pulses**
296:1

**pump**
104:22
255:18

**pumping**
104:15
159:25
178:10
183:25
231:8

**purport**
11:15

**purported**
6:4

**purporting**
53:21

**purpose**
23:20
104:11
267:8
274:6
276:6

**purposes**
25:14
38:4,20
44:25
51:22
73:4,9
137:3
255:24
301:2

**pursuant**
31:8

**push**
86:15,17

**pushes**
156:13

**pushing**
302:12

**put**
14:7
15:13
53:15
73:4,11
126:23
130:2,3,9
131:18
132:9
136:4
139:19
150:1
154:8
159:2
166:14,20
167:24
175:12
200:2
210:9
211:22,24
216:11
236:25
237:15,23
239:21
240:19
244:22
245:18
247:21
266:12
294:16

**putting**
105:8
116:22
149:16
198:15

**puzzle**
82:10

**Q**

**q8h**
37:17

**qualification**
75:15
85:21

**qualifications**
8:5 71:22
72:2
75:9,24
80:2,21
86:2

**qualified**
8:14
19:24
72:4,6
73:20
85:23
96:3
200:15

**qualify**
205:6

**quality**
36:15
155:23

**quantity**
175:15

**quarter**
90:11

**question**
13:12
16:3
28:12,23
37:24
38:11
52:22,25
58:11
90:3
100:13

167:2
173:24
216:13
221:5
224:10
233:3,6
235:7
273:5,6
280:23
283:2
285:6
289:14

**questioning**
30:1
52:21
200:19
292:8

**questions**
13:2
27:13
28:1,19
30:7 47:9
55:1,2
72:18,20
75:23
98:15
116:25
143:4
192:21
204:19
208:17
280:8
282:16
288:13
291:9
299:2
303:2

**quick**
121:19
258:20
280:4

**quickly**
16:6
160:6
181:16
289:25

**quietly**
293:25

**quiver**
90:9

**quivering**
89:23
90:18
109:4
302:6,11

**quotation**
36:4

**quote**
289:7,8
301:1

R

**rabbit**
165:21
166:17

**rabbits**
166:6

**raise**
16:11
76:3

**raised**
143:13

**raises**
227:14,20

**ran**
99:17

**range**
223:14

**ranged**
281:20

**ranging**
253:20

**rapidly**
105:4
158:5
177:9

**rare**
124:6
133:21
195:22

**rat**
281:15

**rate**
87:13,15,
18,20
88:20
93:14,15,
18 99:4
106:22
107:2,4
109:13,
17,20,22,
25 110:11
111:1
135:22
136:11
169:14
177:17,20
178:3
180:4
210:7
211:1,5,
11 220:5
224:3,6
230:11
231:6
301:15

**rated**
165:8
170:2,10

**rates**
90:17
93:20
94:1
110:17,19
220:9
259:15
301:14

**ratio**
241:23

**rats**
149:20,21
151:8,9,
10

**re-**
115:14

**re-initiate**
201:8
203:10

**reach**
279:18

**reached**
178:19

**reaches**
72:4
108:9
160:19

**react**
91:13
128:1
177:2

**reaction**
127:21
266:3

**read**
31:3
32:17
33:9 34:1
35:9 39:5
40:7,18
42:5
43:22
49:6 50:4
114:1,3
115:1,5
147:13
163:12
184:16,18
205:15,17
207:20
214:11
216:3
217:5
218:14
219:17
221:21
223:9
225:7
226:4
227:25
232:3
233:7
235:1
239:1
240:1,3,
4,12,18
243:15
245:2
248:9
249:16,19
252:11
255:5
262:10
264:4,15
265:8
266:14
268:13
271:8
275:10
280:22
287:2,5
293:11,24
294:23
295:7

**reading**
11:16
49:15
91:11
126:4
148:25
208:24
212:9
229:20
231:1
235:8
298:9

**readings**
243:12

**readministered**
23:23

**reads**
30:20
41:20
43:17
66:6
213:1
215:25
219:3,13
233:18

**ready**
5:9,10
9:21
48:13
141:24
182:24
251:5
255:9
259:12
271:1

**reaffirmed**
10:10

**real**
81:10
125:17,
18,20
127:2,8,
9,25
128:1
161:23

**realize**
183:2
263:19
296:3

**realizing**
193:18

**reason**
11:19
37:25
75:21
78:4
81:10
99:15
113:12
135:16,
17,18
157:15
278:15
282:23

**reasonable**
6:15
24:21
74:17
302:13

**reasons**
6:14 7:7
81:2,9
82:8
90:21
93:19
94:4
126:12
168:8
193:23
199:8

**rebut**
12:16

**recall**
45:21
47:13
99:25
110:11
112:14
152:11
174:19

**recapitulation**
6:23

**receive**
119:18
128:9
247:7,9,
16 280:25
281:3,4
297:23

**received**
19:8
21:23
32:3
33:21
35:4
36:21
40:3 41:3
43:8
50:23
59:17
62:18,20,
24 75:20
79:24
102:5
103:3
148:8
149:19
186:17
189:22
203:17
204:20,21
224:5
227:6
235:14
236:16,20
246:3
251:22
252:8
255:13
256:18
297:20
300:13
303:18

**receives**
104:22
169:11

**receiving**
167:17

**recent**
20:14
117:20

**recently**
10:10
20:20
120:14

**receptor**
133:9
140:15,
16,17,18
145:9

**receptors**
120:21
121:6,9
123:8
133:9,10
144:14
153:7,8,
11 257:7

**recess**
48:8,15
56:22
111:16
187:24
270:5

**recites**
290:14

**recognition**
301:25

**recognize**
30:23
42:18
45:11
58:22
78:12
91:12
138:23
190:20
196:18
200:11
208:22
209:5
212:20
217:2
234:8
240:22
242:14
244:7
249:3
250:23
253:4
254:18,21
258:14
264:17
266:7
268:2
270:15
274:21
292:22

**recognized**
72:25

**recognizes**
182:22

**recollection**
22:4
28:12
79:13
292:4

**recommendation**
185:11

**recommended**
96:10,12
114:22
193:19

**recommends**
199:20

**record**
7:8,10,13
14:17
16:5,18
21:22
25:12,15
30:13
32:11
35:10,17
38:12,20,
23 49:2
73:4,5,8

76:4 80:15 101:24 102:4,7 106:1 111:22 112:6,17 113:5 132:18 148:3

**recorder** 264:9

**recordkeeping** 44:21

**records** 15:13 29:5,8 30:15 36:12,14 38:7 42:8,13 44:21 45:19 47:2 97:3,6 98:1 100:16 101:4,7, 20 102:8, 10,11,20 103:14, 15,17 104:11 106:6 110:3 112:12,13 209:23

**recount** 220:8,17 229:16

**recovers** 111:6

**redactions** 41:9

**Redirect** 51:10,13 299:4

**reduce** 116:5 119:4 135:22,24 160:7,9

**reduced** 113:14

**reducing** 160:10

**refer** 22:6 59:8 74:6 76:18,24 116:2 120:16 139:6 146:12 172:21 207:10 217:15 283:12,15 300:3

**referee** 62:4,5,13

**refereed** 300:22

**reference** 206:13 218:21

**referenced** 279:23

**references** 212:23 216:19

**referencing** 187:4

**referral** 28:11,18 113:10 114:4

**referred** 278:6,17

**referring** 113:24 114:9 206:10 238:10

**refers** 64:14,25 210:3,23

**reflect** 235:5,9

**reflected** 25:11

**reflecting** 39:17

**reflects** 36:25 38:12 239:5 243:10

**reflex** 130:23 141:21

**reflexes** 161:17

**refresh** 22:3 79:12 147:11 292:4

**regard** 65:13 168:1

**regarded** 226:2

**regime** 255:4,11

**regimen** 128:14 142:16 144:8

**regional** 118:11,13

**register** 147:15

**regular** 87:9

**regularly** 231:3

**regulations** 79:8

**reinforced** 24:19

**reinterrogate** 114:6

**reinterrogated** 115:18

**reinterrogation** 103:23

**relate** 11:11 252:23

**related** 28:9,24 127:9,17

**relates** 7:20 8:5, 18 15:6 125:16 216:15

**relation** 47:10

**relationship** 122:13 126:6

**relative** 145:11,12

**relax** 129:19,22

**relaxants** 129:19

**relaxed** 118:13 129:22

**release** 29:22 30:3,20 32:19 34:3 39:6 40:8 44:16

**released** 51:6

**relevance** 158:19 288:17

**relevant** 12:4 15:16 17:17 22:22,25 86:13 101:24 116:19 158:23 236:1

**reliable** 193:22,24 196:12

**reliably** 248:5 264:4,13

**reliance** 25:4

**relied**
24:12
25:7
206:16
214:22
249:25
252:14
253:23
303:14

**relief**
10:22
13:23

**relies**
261:25

**relieve**
123:4

**relieved**
82:10

**reliever**
144:22
177:4

**relieving**
133:5

**rely**
23:13
96:24
248:12

**remain**
51:2,5
55:6,15,
16,17

**remaining**
303:22

**remains**
79:20

**remember**
91:10
123:25
124:11,
13,17,18,
25 131:4
133:21
145:13
147:11
165:20
167:23
176:8,18
195:3
267:22
273:11
278:10
285:3
291:23
292:24
298:4

**remembering**
125:22
286:23

**remind**
69:18
85:19

**remote**
171:24

**removed**
68:1
137:18,19
169:4
186:4

**render**
283:25

**rendered**
290:17

**renowned**
300:1

**rep**
98:15
195:7,10

**repeat**
200:24
219:4
249:15
283:1

**repeated**
149:20
295:14

**repetitive**
202:22

**rephrase**
98:7
164:14
276:21

**replace**
93:6

**replacement**
268:16

**replicate**
166:16

**replicated**
133:13
151:7,8,9

**report**
15:1,2,3
22:21
25:8,12
28:15
58:17
69:14
74:6,8,9,
15,16,23
76:18,25
77:18,23,
25 78:1
80:10
97:2
100:14
106:14
116:19
126:18
140:13
141:17
144:7
148:17
163:14,20
169:18,19
170:16
171:6
174:17
184:14,
16,18
189:1
196:17
205:16
206:2,5
207:7
211:14,22
215:19,23
218:11
229:16
235:22,23
236:22
238:4
240:2
244:23
274:2
278:16
282:18
283:4
285:7
298:9
300:23

**reported**
137:10
199:7
202:18
219:15
225:10
276:22
282:7
289:18
297:1
300:19

**reportedly**
97:14

**reporter**
16:19
57:24
287:19

**reporters**
70:23

**reporting**
106:6
155:24

**reports**
20:19,22
21:6,12
22:1
83:9,11
100:4
138:3,5
154:24
155:1,11,
15,23
156:2
163:4
168:1
185:23
195:10
197:10

**representat
ion**
209:21

**representat
ive**
31:6 33:7
34:18
39:18
40:20

**represents**
223:14

**reproductio
n**
196:17
242:22

**reprogrammi
ng**
205:23

**request**
11:1 22:5
28:8 36:9
44:20
103:23
114:5,12,
13

**requested**
55:16
97:17

**requesting**
172:18

**requests**
114:14

**require**
118:22
192:22
193:4
194:1
199:24

**required**
60:24
221:19

**requirements**
6:17
192:12
194:7

**requires**
113:15
120:4
144:3
163:17,18,22

**requiring**
110:12

**rescue**
105:19

**research**
63:8
78:21
117:22,23
164:19
263:24
264:3

**resemble**
122:8

**reserve**
15:25

**reserved**
16:2

**reserves**
9:15

**reset**
83:15,20
175:15

**resets**
109:11
110:23,24

**resetting**
83:19

**residency**
60:2,5,13
61:8,21
63:10

**resolved**
78:11

**resources**
167:10
297:15

**respect**
5:24 6:11
12:17,19,21 24:15
25:19
27:1
28:23
52:7
53:8,20
62:16
66:18
77:20
84:9
106:8,17
115:25
116:24
144:5
145:23
146:23
148:12
154:17
166:19
172:25
176:25
182:12
184:9

**respectfully**
5:25 9:14
10:21
86:4
106:5

**respiration**
161:10

**respiratory**
166:7
178:19
289:8

**respond**
9:11 92:6
117:1
119:9
121:19
127:5
130:22
149:3
150:4
181:5,21
198:19
207:25
220:9,14,20 226:20
227:21

**responded**
134:17
237:8

**responding**
92:6
127:11
132:22
148:2
176:21
219:20

**response**
5:24
30:5,7
36:9
126:17
133:18
142:25
149:1
150:19
197:6
208:12
261:9,10
274:12
294:21
295:4,12
300:9,12

**responses**
119:5
127:12
149:10
179:2

**responsible**
156:24
157:21
275:13

**responsive**
121:20
128:15
278:8
303:7

**responsiveness**
154:14
160:7,10
178:16

**rest**
86:17
89:6,7
130:8
150:2,3
303:24

**resting**
196:23

**restore**
203:8,9

**restrained**
176:10

**restricting**
86:13

**rests**
86:18

**result**
12:20
78:18
87:24
110:13
153:23
180:11
198:16
230:10
290:11
299:12
302:15

**results**
134:9

**resume**
108:15
189:13

**resumption**
189:7,8

**resuscitated**
105:5

**resuscitating**
105:13

**retain**
233:20

**returned**
60:4

**reveal**
131:1

**revealing**
300:7

**reversal**
288:6

**reversed**
152:18

**review**
29:5 30:9

45:18 62:7 73:12 78:17,20, 23 79:7 110:2 113:8 137:7 154:6,23 209:10 280:3

**reviewed**
36:17 103:5,13 106:5 112:12 113:3 123:7 151:13 155:9 163:14 166:14 209:22

**reviewer**
63:20

**reviewing**
104:10 155:22

**reviews**
62:12

**revive**
180:16

**revived**
180:18,19

**reviving**
173:13 297:7

**rewrite**
233:4

**rhythm**
87:6,7,8, 11,15,18, 22 88:6, 7,13,14, 22 89:2, 4,13,24 90:20 91:4 106:20 109:1,4, 20 167:21 170:14 171:19,20 172:15 173:6 175:7,16 182:10,23 185:1 192:6 202:9 203:2,9, 13 228:16 229:4 295:21,25 296:7 301:11,16

**rhythms**
87:22 179:23,24 186:16 228:13,25 296:9

**rid**
99:14 136:24 141:21 142:3 161:17 179:5

**rise**
5:2 48:14 111:15,17 187:23,25 270:6 304:11

**risk**
83:3 105:11,17 192:4 216:21 217:8 291:12

**risks**
50:6

**Riverbend**
44:18,20 101:6,19 103:14

**Roane**
285:7,13 286:16 288:2

**Robert**
17:18

**Roche**
63:9

**room**
57:17 60:18 65:18 67:7,21, 24 68:3 69:8,11, 13 70:9 71:9 81:1,5, 12,15,17, 20 82:11, 18,19,21 89:21 95:17 99:17 138:1 182:2 192:4,6, 10 193:20 195:15 196:14 199:19 204:24 247:6

**rough**
57:3

**roughly**
69:12 87:16 222:13 223:9 246:16

**routine**
130:9

**rule**
6:3 15:18 75:21

**ruled**
75:22 85:18

**Rules**
6:17,18 7:14

**ruling**
9:20 10:25 29:25 105:25

**run**
141:24 248:23 269:23,25

**running**
301:17

**runs**
89:9 248:6

**Russell**
5:7

**S**

**safe**
210:3 227:9

**safely**
153:20

**safety**
122:18

**sample**
221:17,19 226:6

**save**
5:5 208:4 218:3

**scale**
168:25 169:6,10, 18,20

**scary**
135:3

**scenario**
229:18

**scenarios**
231:16

**schedule**
56:4,9 188:2

**scheduled**
268:15

**schematic**
159:2,5,9

**scholarly**
61:10

**school**
59:21,24 62:19 175:3 221:24

**scientific**
6:16 71:4 74:17 80:4 92:20,22, 25 94:21 100:5

166:1 198:7,9 284:10 298:1,8 300:8,10, 13 301:1 302:14

**Scientific's**
98:15

**scientifically**
164:15

**scope**
22:21 72:20 75:7,14 86:1 105:24

**screen**
55:19,22 131:19 159:3 211:22,25 214:12 236:25

**scrutiny**
11:14

**search**
134:2

**seated**
5:7 48:16 111:18 187:25 270:7

**Seattle**
58:7 59:22 60:2

**seconds**
131:13 160:7 210:17,20

**section**
63:15 134:16 160:7 209:14 221:8 223:15 234:1 237:13 238:13 240:17 244:14 245:16

**security**
44:18 101:19 103:14 196:3

**sedated**
139:22

**sedation**
118:12

**sedative**
118:24 119:2,3 122:20 140:14 142:16 146:15

**sedatives**
118:19

**sees**
91:11 107:11 108:13 184:24 203:12

**seizures**
149:12

**selected**
293:20

**sends**
87:9

**sensation**
164:13 165:9 289:9

**sensations**
78:5 165:9

**sense**
99:5 150:24 165:9 296:20, 21,23

**sensed**
225:14

**sensing**
92:5,10

**sentence**
35:25 36:24,25 37:3 52:1 212:5,11 215:23,25 216:6,7, 11 218:10 219:2,10, 12 221:11 223:1 225:5,17 227:13,14 229:21 230:5,8 231:25 232:6 233:5,6, 15,18 234:18 237:2 238:18 239:21,23 241:5,6,9 243:6 244:16 251:20 252:3,4 253:17 257:24 263:22,23 266:16 268:14 275:10 277:6 282:24 289:3 290:3,13 294:17 295:7,8

**sentences**
214:13 216:10,15 233:9

**separate**
11:19 219:23,25

**separated**
159:18,19

**separately**
64:15

**September**
114:14 115:9

**sequelae**
168:22

**sequence**
18:11 201:1,4, 7,9,12, 13,14 202:14 203:10,16 230:3 231:21

**sequences**
202:22,23

**serial**
23:22

**series**
107:9 108:1,15, 19,24 109:7 200:20, 23,24 265:19

**served**
63:2,12, 14,19

**service**
63:1,6 81:11 84:18

**services**
29:22 30:21 32:19 34:3 39:6 40:8 262:17

**serving**
63:7

**session**
5:3 111:18 270:7

**set**
10:7,8 30:12 66:3 81:9 93:10 95:3 108:17 111:10 197:11,14 207:18 210:10 211:1 224:18 265:16

**sets**
95:1,4

**setting**
52:16
60:17
65:17
67:7
71:19,20
95:7,18
96:18
98:12
100:5,8
106:18,21
107:6,7,
15,16,23
125:4,6
192:2,9
197:10
300:10

**settings**
66:1,9
95:9,12,
19,25
96:25
97:4
98:4,10
103:21
106:11,25
115:25
190:15,16
192:10
224:13,
15,17

**settle**
164:1

**settles**
7:24

**setup**
134:12

**severe**
104:13,20
113:13
114:18
162:6
169:23
170:3,12
291:13
302:19

**severely**
27:3

**sevoflurane**
267:18,
21,22
268:17,19
272:3,8,
11,20,22

**sewn**
83:21

**shaking**
166:10

**shaped**
194:3
200:3

**share**
29:12

**she'll**
8:5

**shock**
83:18
90:24
91:3 93:1
106:22
107:1,3,
7,9,17
108:7,8,
16 109:5,
12,19,24
110:20,
21,23
111:6
167:15
168:5,14,
24 169:12
170:2,4,
8,9
174:11,18
175:6,14
176:5
180:5,12,
16
182:23,
24,25
184:22,25
185:2,19,
20,22
191:6
201:20,25
202:8,21,
25 203:5,
8,11,13,
15 211:6
219:15,19
223:9
224:19
295:22
296:7,16
297:6

**shockable**
179:23,24
186:16
192:6
202:9
295:21,24
296:7,9

**shocked**
109:8
180:9,22

**shocking**
92:8,9
99:19
295:5
296:9

**shocks**
83:17
99:7,8
107:9,12,
13,14,15,
20 108:1,
5,9,16,
20,22,25
168:7,9
170:1,7
173:12,14
184:9
185:6,23
186:17
191:21
196:9
200:20,
22,23,24,
25 201:5,
6,13,15
202:13,
15,19,21
203:18
212:24
215:20
216:1,21
217:8
218:12,18
224:5,10,
14,20,21
295:14

**shook**
165:22
166:8

**shoot**
245:14

**short**
25:14
37:7 48:8
89:9
90:21
254:21
258:18

**short-**
121:16

**short-acting**
233:19

**shorter**
201:5

**shortly**
13:15
112:2

**shoulder**
196:22

**shoulders**
142:1
151:1

**shout**
127:13

**show**
8:14 27:8
29:7
38:17
41:5
43:10
47:14
112:17
128:13,17
131:13
138:22
139:1
152:20
157:2
158:15
159:16
163:21
171:5
181:5
182:10
186:14
195:14
212:19
213:9
250:8
256:21
265:24
280:1
286:18

**showed**
134:14
186:16

**showing**
15:12
196:18
213:15
259:24
274:8

**shown**

152:5
202:24
277:8
302:21

**shows**
131:7
141:15
169:19
214:3
259:14
261:9
278:18

**shut**
149:7

**sic**
24:14
84:12
123:10
274:11

**sick**
173:24
203:18

**side**
7:17 9:5
12:9 14:9
86:25
87:1
91:21
158:10
159:14,15
177:12,15
196:22
242:17
265:4
268:10

**sides**
9:8 132:2
159:18
304:8

**sideshow**
15:15

**sideways**
208:25

**sign**
20:17
21:8
31:5,6,9
33:6,7
34:17,18
39:18
40:19,20
50:1,5
155:19,20
169:8

**signal**
197:1

**signaling**
146:20

**signals**
87:9
93:22,23
128:9

**signature**
30:22
31:2
32:22,23,
25 33:2,4
34:5,6,8,
10 39:8,
9,11,13,
16 40:10,
11,15
42:17,18,
22 45:10,
11,12,16
50:9
52:13
53:6
115:2

**signatures**
44:6
50:11

**signed**
29:23
30:3
31:12
33:11
34:20
39:21
40:22
42:8
44:19,23
45:20
113:21

**signer**
45:25

**significant**
64:17
78:3
120:5
121:22
137:3
175:14
193:17
194:25
203:20
205:21
233:20

**significant
ly**
26:20
119:9,19

**signing**
50:8

**signs**
82:24
162:24
180:22

**silence**
148:20

**silly**
173:23

**similar**
11:23
39:15
90:6
122:23
138:9
139:9
146:1
151:10
239:23
240:9
246:20
290:5

**simple**
190:17

**simplest**
88:6

**simply**
8:12
14:13
124:25
130:12
202:3
247:11

**single**
77:12,20
78:10,18
107:17
120:3,6,7
133:7
284:24

**sinus**
87:6,7,8,
10,11,12,
14 88:7,
21 90:9
93:6
109:19
175:16
228:16

**sir**
16:10
22:9 53:3
55:23,25
57:5,7

**sisters**
213:1,17,
24 214:7,
9 300:20

**sit**
24:20
98:3
159:17
168:18
176:5

**site**
213:21
214:17,22

**sites**
168:17

**sits**
91:20
159:17

**sitting**
279:16

**situation**
179:17
180:8
191:6
199:23
200:6,9

**situations**
176:17
185:11

**sixth**
201:24,25

**size**
116:6
221:17,19

**skills**
27:2
200:2

**skip**
248:5

**slap**
147:5

**sleep**
121:21,22
125:4
130:9
141:22,23
143:19

144:1 255:13,22 256:2,5, 19 257:1

**sleepiness**
119:7

**sleeps**
143:20

**sleepwalking**
127:21

**sleepy**
139:23

**slick**
166:3

**slide**
166:4

**slight**
149:13

**slightly**
149:17 194:4

**slow**
93:20 94:3 109:20 110:17,25

**slower**
211:4,5 249:6

**slowly**
89:4

**slows**
231:6

**slug**
153:22 157:17

**small**
50:2 93:5 261:23

**smaller**
115:5 275:7

**smart**
202:5

**smell**
136:20

**snakes**
89:22 109:4 180:7 185:6 302:5

**snippet**
131:6

**social**
135:15

**societies**
70:4,5 167:21,22 170:15,23 173:2,14 174:5 185:11 192:15

**society**
62:23 170:15,16 171:19,21 172:15 173:6 199:20

**socket**
169:3

**sodium**
236:4

**soft**
198:9,25

**sole**
135:4 262:23,24

**solid**
287:19,20

**solo**
140:11 155:3,8

**solved**
78:3

**sort**
15:15 90:6 110:23 117:14 119:25 126:25 127:2 129:8 169:10 176:5,16 177:24 197:6 198:20 281:11

**sorts**
61:23 82:25 116:10 186:13 196:6 222:13

**sound**
150:19,21 201:18 235:17

**sounds**
56:13 73:21 129:20 168:17 239:16 246:9 304:4

**source**
81:8 117:21 156:21,22 212:16,21 213:10 216:19 218:23 233:25 234:4 237:12 240:15 242:4 244:3 245:12 248:13 250:13 253:1,10 254:12 257:24 258:23 259:10 262:1,11 264:12,20 266:2,8 267:17 268:5 269:13 270:11,17 274:11, 16,24 277:19 297:17 298:5,11

**sources**
212:10,14 232:9 240:14 246:22

**space**
58:1

**spaces**
156:14 161:4 162:21

**spare**
41:23

**speak**
12:24 267:23

**SPEAKER**
57:16

**speaks**
288:15 294:7

**special**
49:8 61:4 63:16 66:3,22 96:7 141:25 193:4 199:24 200:1,15 285:20

**specialist**
58:14 115:13

**specialized**
206:24

**specializing**
61:21

**specially**
192:15

**specialties**
61:18

**specialty**
60:24 61:3 64:21 65:6,16 81:11 82:6

**specific**
28:11 72:18 80:3 82:19



Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 378 of 390 PageID #: 1156

85:1
88:13
106:8
107:21
118:3
121:8
175:13
200:21
205:18
207:24
214:19
221:5
235:23
280:8
283:17
285:10
290:4
297:17

**specifically**
28:24
64:5
66:18
69:15
91:15
98:17,18
128:20
205:4
251:3

**specifics**
254:5
286:23

**spectrum**
126:22
234:2
245:16

**speculation**
52:22
164:13
179:9
185:14
202:23

**speeds**
87:21

**spell**
16:19
57:23

**spelled**
58:1
242:10

**spend**
289:24

**spent**
61:23

**spikes**
191:4

**spinal**
120:18
133:11

**splotches**
43:13

**Spokane**
63:3

**spoken**
91:14

**spontaneously**
302:9

**squeeze**
130:7,14,16

**stable**
89:3
115:11
136:25

**stack**
102:18
237:21
269:17

**stale**
30:4

**stamp**
36:10

**stand**
7:10
15:11
56:15
100:18
141:22,23

**standard**
11:11
12:15
24:10
97:25
133:15
220:7
222:13

**standards**
96:1
115:22

**standing**
114:19
132:4
144:1

**standpoint**
73:1

**star**
287:21

**start**
36:24
66:24
85:11
87:4
108:12,13
109:7,9
110:1
135:4,21
160:25
161:3,9
177:13,22
178:11
201:16
202:14
203:11
207:15
219:1
229:17
230:19
233:14
238:17
248:12
266:16
277:2
294:17
295:5

**started**
66:24
81:7
160:4

**starting**
108:14
175:1
188:4
211:17
222:4
237:18
255:3

**startling**
134:13

**starts**
35:25
50:1
89:16
108:25
109:21
111:3,4
159:23
160:1,5,6
161:1,12
201:8
202:8
213:5
222:25
225:21
234:18
251:20

**state**
5:5 6:4
16:18
17:8,11,21 41:25
44:4
54:16
72:21
74:16
85:19,20
119:17
122:4
150:1
278:8
303:8

**stated**
6:15
30:19
37:9 54:6
80:1
154:19

**statement**
156:21
171:3,23
172:16

**statements**
19:5
21:21
38:8
167:24
170:19
172:7

**states**
5:5 8:2
77:19
79:6
137:4
230:24
287:13

**stating**
113:12

**statistic**
124:7
297:8,19

**statistical**
24:13
221:8
222:3
223:15,18


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 379 of 390 PageID #: 1157

**statistics**
221:24

**status**
114:15
115:15
121:18
227:20

**stay**
10:6,14
97:1
141:21
142:16,21
143:19,23
207:11
236:23
251:15
292:13

**stays**
150:3

**steadfast**
284:7

**step**
16:10
55:5

**stethoscope**
198:11
199:1

**Stevens**
85:20

**stick**
135:17

**sticker**
251:24

**stiff**
142:3

**stimulants**
121:23

**stimulate**
149:3
150:4

**stimulation**
160:16

**stimuli**
150:21
179:2

**stimulus**
120:5
149:1,4

**stipulate**
303:13

**stipulation**
101:18

**stipulations**
275:14

**stomach**
157:19

**stop**
41:12
65:20
82:20
108:24
119:25
156:19
160:12
177:19
182:14
202:17

**stopped**
80:12
145:16
202:13,19

**stops**
104:15
109:1
141:13
201:18
302:6

**store**
196:8

**stores**
82:23

**straight**
25:16
84:22
132:2
157:17
177:12

**strap**
196:25

**straps**
194:15
196:20,22

**street**
145:14
157:1

**strength**
98:25
231:8

**stress**
168:23

**strike**
5:21 6:8
7:7 22:10
142:21
208:13

**strikes**
288:19

**striking**
9:19

**string**
248:10
264:7
287:9

**strips**
110:4,10

**strokes**
90:15
285:17

**strong**
133:5
193:11
295:14

**struggling**
181:3

**stuck**
169:3

**student**
63:1

**studied**
124:22
128:24
141:11
148:21

**studies**
128:13,17
133:25
134:3,7,14,19,21
135:1
138:9,18
139:6,9,10 141:16
146:7
152:6,9
163:20
169:13,25
178:25
185:25
203:4
215:3,18
222:14
233:15,18
240:11
246:22
247:24
248:3,21
254:6
256:12
262:16
263:4,9
276:7,18,22,24
297:18,20,23
300:20

**study**
83:10
117:7
137:22,23
138:3,6,10,12,15,23,24
139:2,8,10 140:8,11 141:4
142:13,15
144:5
145:23,25
146:1,3,12,14,24
147:2,8,22
148:15,22
149:4
151:7,10
152:12
164:4
165:15,16
166:13,17
170:2
180:15
186:2
187:3
188:24
189:10
203:7
217:10
219:19
220:9,17
221:19
222:7,8,16
223:18,19
225:10
227:6
234:11,22
235:6,10
236:3,16
238:22
239:5
241:20
242:17
243:10,17

244:9
245:5
246:3,11
247:2
248:16
249:6,24
250:7,11, 12
252:14, 19,20
253:23
254:10
255:21
257:1
259:17,20
261:8,17
263:14
265:11,13
267:6
269:4
273:7
274:3
275:8,14, 18,20,25
276:3,6
279:8,10, 13 280:17
281:10, 15,16,20

**studying**
154:22
220:18

**stuff**
53:2
132:7
149:5
294:13

**style**
62:11

**subheading**
213:19
244:12

**subject**
8:19 9:12
19:22
20:1 31:5
32:1 33:6
34:16
39:17
40:18
47:13
79:15
85:25
86:3
141:13
142:23
206:2,7
288:5

**subjective**
125:13
126:2
127:8,15
128:10
141:6

**subjects**
281:10

**submission**
13:1

**submit**
7:22 62:5
126:19

**submitted**
43:6
58:18
267:8

**subset**
23:23
26:9

**substantial**
15:19

**substantially**
285:22

**substitute**
214:18

**succeeded**
201:25

**success**
267:14

**successful**
203:8

**successive**
86:21

**sucking**
161:22

**sucks**
161:22

**sudden**
113:16

**suffer**
89:10

**suffers**
24:9
104:19

**sufficient**
261:21

**suffocating**
161:15
165:2

**suffocation**
78:6
167:13

**suggest**
12:5
188:6

**suggesting**
289:6,15

**suggests**
124:23
137:12
163:15

**suicide**
61:22

**Suite**
41:22

**suited**
85:16

**sum**
60:8
246:18
262:15

**summarize**
59:2

**summarized**
18:18
36:4

**summary**
242:21
266:23
289:15

**superhuman**
145:15

**supervision**
173:20
192:23
205:7

**supervisory**
41:21
42:9,25

**supplemental**
11:10
15:2

**supplied**
176:7

**support**
11:7,12
25:13
28:14
212:10
237:11
240:15
246:2,23
248:10
279:9
280:18
281:1,4
284:9,10, 11

**supported**
73:5,10
279:8
280:17

**supporting**
75:12
214:24
216:15

**suppose**
204:7
268:9
280:19

**supposed**
107:14
109:15,16
194:3
198:2
279:19

**supposition**
185:15

**suppositions**
222:4

**supraventricular**
228:7,17

**Supreme**
10:9
85:20,21
286:4,7, 19 287:12
290:14

**surfaces**
163:9

**surfactant**
165:21
166:1,8

**surfactants**
166:5

**surgeon**
71:10,14
85:17
126:13
129:22
153:18

**surgeons**
132:16,21

**surgeries**
68:2
71:11,13,
15 118:8
134:17
136:8
137:19,20

**surgery**
7:4 49:8
65:11
67:23
89:21
117:25
118:8,10,
12,16
122:15
123:15
124:12,13
129:23
130:7
131:3
132:5,15,
24 152:22
154:7
240:10
242:6,8,
10 246:21
267:19
268:16
281:8

**surgical**
154:3
266:3

**surprise**
195:17

**survey**
92:21

**survive**
11:14

**survived**
157:5

**suspect**
197:24

**suspected**
12:25

**Sustaining**
189:9

**Suxamethonium**
241:16

**Swanson**
45:6,20
53:22
54:8,13

**swear**
195:18
285:2

**swelling**
161:2

**switch**
195:13

**Switzerland**
61:21

**sworn**
16:13
56:17

**symptoms**
214:20
245:24

**synonymous**
87:19

**synonymously**
87:19

**syringes**
122:10

**system**
93:21
120:8,13,
15,17,23
141:25
163:23
175:16
177:5
230:25
243:13

**system-related**
225:3

**systemic**
230:12

**systems**
136:9
166:7

**Systolic**
244:4

**T**

**T-O-G-N-I-N-I**
6:25

**table**
129:10
132:11
221:3
235:4,8
240:2
259:10,
14,18
270:20
271:5
273:21

**tach**
89:4
105:3
106:18
191:17

**Tachy**
93:25

**tachyarrhythmia**
218:12
219:3,13
220:6
223:20

**tachyarrhythmias**
194:23
219:24
224:3

**tachycardia**
91:7
93:24
106:17
210:23
211:7
219:14,20
223:24
228:7,18,
20

**tacky**
99:23

**tactical**
14:16

**takes**
37:20
42:2
111:6
184:10

**taking**
11:24
28:13
37:17,22
38:9,14
56:4,6
118:20
178:15
221:13,15
233:5
251:8

**talk**
23:17
66:17
91:6,24
93:2
98:20,21
104:5,7
107:20
108:1
120:19
121:12
122:19
125:7
126:16
128:4
154:18
162:24
181:9,10
200:22
215:9
228:11,12
247:12
248:15
252:21
254:1
256:5
259:21,22
263:5,6
265:14,23
267:13
269:8,9
279:13
297:25
298:8

**talked**
80:21,22
116:1
126:19
176:23
185:22
194:15
195:2,7
200:19
205:10
206:12
220:13


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 382 of 390 PageID #: 1160

228:20
246:10
262:16
263:3
296:25

**talking**
38:21,22
49:22
83:24
86:19
95:5
107:22
108:2,19
112:19
120:19
132:19,20
141:23
155:6
179:25
188:2
190:4
200:10,24
201:7
204:19
247:13
257:4
265:17
267:8
270:10
283:19
300:8

**talks**
197:20
300:25

**tandem**
184:12

**tape**
200:15

**target**
201:15
265:7
267:1

**tasks**
81:19

152:17

**teach**
267:23

**team**
20:18
63:7
65:16
67:2,10
82:8
94:14
193:1

**tech**
95:5
143:17
195:7,10
297:25
298:8
300:9,13

**technical**
47:11
51:1 85:6
126:12
190:6

**technically**
88:9
175:6
302:7

**technician**
192:18

**technicians**
192:19

**technique**
128:25
129:1,3,5
130:1,25
131:7
247:6,13,
25 248:3
249:13,18
258:1

**techniques**
70:9
128:23

165:11
265:17

**techs**
95:8,11,
20,21
143:15

**telling**
44:10

**tells**
148:14
155:11
184:19

**temazepam**
243:11

**temporarily**
231:11
289:9

**temporary**
46:12,17
65:11
136:3,6
150:2,3

**ten**
153:5

**ten-minute**
187:20

**tend**
119:4
122:23
136:19
144:17,18
157:14

**tendons**
141:25

**Tennessee**
5:6 6:3,
17,18
7:14
10:9,14
12:16
17:9,12,
21 27:21

35:11
41:23
85:19,20
121:25
122:4,7
123:6
151:14,15
181:22
194:16
284:25
291:18
292:25

**Tennessee's**
6:3
121:13
292:25

**term**
14:12
64:25
65:21
88:11
90:22
118:6
119:3
134:3
190:6
261:17

**terminal**
302:18

**terminated**
88:16

**terms**
14:16
26:25
56:6 85:6
121:15
122:21,23
125:1,7
135:19
161:9
162:16
190:1
247:16
252:24

257:19
278:15
303:22

**terrible**
165:4
168:3
169:5

**test**
25:25
128:19,20
133:18
150:24
153:14
165:22

**tested**
150:23

**testified**
16:13
17:2,3,8,
11 28:3
36:13
56:17
63:24
74:1,2,21
86:5
154:20
203:1
284:18
285:25
288:1
289:16,19
291:10,
17,19
294:5
295:17
299:7,11

**testifies**
8:15

**testify**
7:9 8:8,
22 12:11
14:2
19:14
142:24

288:11

**testifying**
8:5 12:20
292:24
299:14

**testimony**
6:9,12
8:2,12
10:17
11:17,18
12:1,4,6
15:9
19:17
21:25
28:2
30:13
47:23
55:18
56:3,20
59:7,9
64:2,5,8,
15 69:23
72:17
73:6 74:5
75:6
76:13,15
78:21,23
79:2
105:22
139:5,6
142:21,22
143:3
154:20
158:18
172:20
209:11
211:10
283:11,17
288:1
289:17
290:15
291:6
294:7,25
297:5

**testing**
22:15
23:1,19
24:3,17
25:3,19
28:14
205:5
252:22

**tests**
23:23
25:25
26:10
53:11,14,
16,17
60:13

**that'd**
57:4
217:18

**that'll**
16:2

**therapeutic**
95:14,16

**therapies**
190:19
192:9
193:16

**therapy**
95:13,23
107:21
172:18
190:5,7
209:19,22
210:6,20
211:6
216:20
217:8
224:7,12,
14,17

**there'd**
181:6

**There're**
92:17

**thin**
83:25

**thing**
102:3
106:19
109:4
120:10
125:4
130:23
141:1
146:11,12
148:20
149:20,
21,22
152:14
153:20
170:24
171:18
172:1,12
176:16
185:12
193:25
194:10
198:20
202:5
241:25
260:23
261:16
278:19

**things**
25:5 26:2
61:23,25
62:20
70:23,24
82:16
83:1,14
84:4
85:10
90:14,16
91:2
92:12
96:20
118:21
119:8
121:19,20
125:14
128:11
130:13,16
135:24
136:22
149:16
153:19
154:14
155:19,20
157:3
178:9
183:15
196:7,11
198:18
222:5
232:18
283:11

**thinking**
29:2
270:25

**thinks**
91:9,12

**thiopental**
235:24
236:5
237:8
238:23
239:1
244:25
245:6
247:3
259:18
261:4
265:12
267:5

**thiopentin**
265:12

**thiopentone**
234:24
235:14
236:3,17
241:13,20
243:14
255:13,22
256:2
257:1
261:4
262:19
263:4,10
267:5

**Thirty-some**
16:25

**thought**
99:17
121:2
123:22
124:6,24
126:14
140:13
199:16
286:5

**threshold**
10:20
11:14
73:6
85:22
220:4,8,
19

**throat**
163:13

**tied**
301:22

**Tiffany**
186:18

**time**
28:5,8
30:10
32:8
33:5,9
38:4
44:18
46:2
47:15
48:6
51:3,4
66:7
69:10
89:6
92:11
94:20
105:21

108:25
111:12
115:13
120:18
124:5
125:21
130:5
136:23
162:5
164:2,7
176:18
180:15,19
183:21
184:1,4,
5,7
186:7,8
187:19
191:4
192:3
194:20
199:15
201:18
203:2,3,7
207:18
220:23
231:19
233:21
237:21
251:2,8,
11 253:8
271:3
273:14
284:23
288:7,21
289:24
294:14
295:15
297:7,10

**timely**
14:14

**times**
17:3
64:1,4,6
74:3
84:11,14,
15,20
91:14
96:19
124:7
129:4
140:24
154:15
162:13
174:23
185:23
196:9
198:10
201:1
205:8
226:22,23
227:5
242:24
246:2

**tissue**
83:23
84:1
177:14
194:12
199:2

**title**
32:17
34:2
35:9,13
39:5 40:7
41:17
43:14
49:6
189:6
209:7
213:1,16,
23 216:23
217:5
238:9
287:11

**titled**
237:12
240:16
242:4
244:4
250:14
270:11

**titrated**
282:2

**today**
8:23 12:5
15:16
24:20
43:2
49:23
50:14
56:4
65:21
68:18
98:3,9
138:1
139:6
158:20
188:8
204:19
205:16
207:22
209:11
210:24
282:19
283:5
285:19
289:12,18
290:6
291:6,14
300:3
301:4
303:19

**told**
100:10
132:23
134:10
144:7
160:13
214:21
224:11
245:18

**tolerable**
136:3

**tolerate**
136:6

**tomorrow**
55:10

**ton**
167:20

**tone**
198:2,9,
21,24,25
199:5,7
200:4,5,7

**tones**
198:22
199:4

**top**
30:20
40:7
43:12
46:4
49:11
74:12
196:23,25
212:25
213:16
223:1
230:18
233:15
235:4
243:8
248:6
263:21
268:10
273:11
287:2

**topic**
19:11
61:19,25
66:17
117:8
147:25
189:25
215:3
301:1

**topics**
62:14
74:22

**total**
152:11
201:2
255:16

**totally**
181:2

**touch**
150:24
292:18

**touched**
151:1,2

**touching**
151:3

**tourniquet**
130:3
132:6,8

**trachea**
163:11

**track**
80:20

**traditional**
250:8
254:2
256:22

**train**
67:2 71:3
167:3

**trained**
69:15
70:7,12
81:22
82:8
130:5
173:19
182:6
192:15
205:2

**training**
59:25
60:5,7,8,
25 65:6
69:18,19,

23 71:6 80:3 81:23 96:7 153:22 199:24 200:1,15 204:20,21 205:5,6

**transcript** 293:15

**transition** 167:5

**translate** 151:23

**transvenous** 83:25

**trauma** 169:11

**traumatized** 168:21

**travel** 86:20

**travels** 159:22 160:5

**treat** 23:4 108:10 192:8 201:11 207:19

**treated** 157:6 228:9

**treatment** 49:9 81:18 105:23 210:20 219:15

**treatments** 186:5 219:19

**trend** 264:13

**trial** 278:21

**tricky** 237:1

**trigger** 210:10

**triggered** 224:14

**triggers** 210:6

**trips** 208:4

**trouble** 57:15 110:17 134:4 208:24

**true** 21:12 222:8,23 224:16 229:14 263:13

**Trump** 77:9 79:19 111:24

**trust** 239:12

**truth** 20:21 36:6

**TSA** 82:24 196:8

**tube** 130:9

**tubes** 165:22 186:3

**turbulence** 162:19

**turn** 32:16 35:15 57:18 99:11,23, 24 117:7 170:22 171:2 185:12 189:24 190:5,23, 25 191:14,17 197:25 198:5 199:6 217:13 221:7 222:24 225:1 234:13 242:19 259:9 270:20 294:1,11

**turned** 99:15 166:22 171:13 174:6 192:9 195:2,16, 19,24 199:10 281:5

**turning** 100:2 107:18 189:25

**turns** 148:20

**TV** 88:17

**twitches** 183:16

**two-parter** 281:12

**two-year** 69:21

**type** 137:25 260:7

**types** 65:3 121:8 153:10 196:6 200:12

**typical** 124:6

**typically** 196:24 256:5 302:18

**U**

**U.S.** 79:14 92:18 286:19 287:7 299:16

**uh-huh** 66:16 88:3 112:15 138:17 144:12, 23,25 145:22,24 146:25 186:21 190:8 209:16 219:18 249:10 255:25 262:2 270:13 287:16 293:2

**Uh-oh** 187:6

**umbrella** 64:25 126:24

**unable** 27:6 31:6 33:7 34:17 39:18 40:19 42:2,14 126:2 181:4 185:5

**unaware** 117:24

**unawareness** 154:8 178:23

**uncommon** 52:15

**unconscious** 125:3,24 126:5 140:5 142:4 146:10 284:1

**unconsciousness**
142:17
291:20
294:6

**uncoordinated**
302:11

**under-sensed**
225:6

**under-sensing**
226:1,7,11

**undergo**
117:12

**undergoing**
134:15
176:1
286:16

**undergone**
54:19

**undergraduate**
59:21,25

**underlying**
303:14

**understand**
11:5
13:13
47:21
50:7
52:18
69:22
70:12
85:9
95:17
105:25
106:2
117:24
130:21
154:11
158:22
182:6
188:1
217:23
222:2
224:8,9,22
226:21,24
228:14
229:25
259:14
267:11
284:12
295:1
304:9

**understandable**
286:10

**understanding**
50:6 51:4
94:19
129:9
156:22
181:24
210:18
215:17
235:4
257:7
292:2

**understood**
16:8
47:20
49:1 73:3
218:22
228:10
274:10
288:16,22
291:4
292:10

**undisputed**
14:16

**unexpected**
83:2

**unexpectedly**
81:17

**UNIDENTIFIED**
57:16

**unique**
29:1

**United**
5:5 77:19
79:5
137:4
230:24
287:12

**universities**
66:21

**university**
58:6,8
59:22,24
60:6,23
61:7
65:14
66:19
67:5
80:23
204:25
298:18
299:23

**unlivable**
139:18

**unmarked**
48:23

**unpleasant**
136:14

**unqualified**
75:6
142:23

**unresponsive**
149:2,23
181:2

**unresponsiveness**
178:20,22,25

**untreatable**
226:3

**untrustworthy**
197:3

**unusual**
205:9

**update**
59:6

**updated**
7:22

**upper**
161:16,18
287:5

**upright**
143:21

**upsetting**
119:6

**urinating**
37:4,5

**URL**
213:6
214:7,8

**users**
145:14

**uterus**
137:19

**V**

**V-**
89:3
105:2
106:17
182:22
191:16,17

**V-A-N**
58:1

**V-FIB**
89:12,20
91:12
105:3,7,14 107:6,7,12
190:18
192:8
203:5
301:5,14

**V-TACH**
88:17,19,20 89:2,6,9 91:12
105:7
106:19,24
180:2
182:23
190:18
192:8
301:5,6,10,11,13

**vague**
296:3

**validity**
20:21

**Van**
9:2,5,10
14:1
55:12,17
56:2,15,16,20
57:22
58:1,3,15,21
59:12,19
64:21
68:6,10,14 72:1
73:6
74:1,10,13,20

75:1 76:12,18, 24 77:2 78:12 80:1 86:1 101:1,16 102:17 103:5 112:10,25 137:6 142:23 143:2,11 152:21 159:2 164:18 167:8 173:22 187:9 188:7,14, 23 189:24 204:12 211:13,21 212:19 217:2 227:11 238:8 242:24 245:11 249:3 263:17 274:20 280:2 282:18 287:25 288:8,10 289:1,15 290:4 291:9 292:3 294:11 298:24 299:6,18 300:15 301:3

**variability**
155:23

**variable**
93:15 181:14 186:8

**variety**
168:8

**vary**
283:8,20, 23

**vast**
157:21

**vein**
86:24 158:7 159:21 177:10,11

**veins**
91:25 158:5

**ventilation**
279:9 280:17, 19,25 281:3

**ventricle**
89:17,18 93:7 135:25 178:11 302:11

**ventricles**
86:15,16, 20,21 87:5 88:21,25 89:15 90:19 92:3 93:7,9,12

**ventricular**
89:12,13 90:6,17 91:4,7 106:17 179:25 180:2 182:13,15 207:19 210:3,23 211:7 218:12 219:3,13, 14,20,21 220:5 221:16 223:24,25 228:20 229:12 232:21 295:5,25 296:21 301:21 302:2,3, 10,14,21

**venture**
13:2

**verdict**
41:11 62:9

**verify**
208:15,18

**versus**
95:13 126:20 283:9 285:9

**vessels**
156:12 160:24

**vet**
143:14, 15,17

**veterinarian**
144:3

**veterinary**
139:12 142:22 143:22

**VF**
210:1,3, 10 219:15 220:14 225:7,10 226:3 232:2,17

**video**
5:13,16 55:15,16, 17 56:21 131:6,9, 13 132:15,18 148:1 247:5,10, 11

**videos**
142:8

**Virginia**
19:15 60:2

**virtually**
60:24 120:5 124:8 131:3 149:3 154:12

**vitae**
17:23 18:16,17, 23 19:4, 18 58:16 59:8,12

**vocabulary**
65:21 118:3 125:2

**vocalize**
176:4

**vocalizing**
176:12

**voice**
131:10

**voir**
68:9,12 75:8 86:1

**volitional**
274:12

**volunteers**
152:13

**VT**
210:22 219:14 228:21 232:2,17

**VT/VF**
223:6 232:23

**VX**
211:5

**W**

**wait**
201:23 208:15 215:9 216:8 237:4

**waiting**
57:16 92:13 255:8

**wake**
123:24 124:10 127:13

**Wakefulness**
254:13

**walk**
83:13
90:14
246:7

**walking**
81:13,25
196:3

**wall**
180:25

**wand**
66:3

**wanted**
56:23
75:22
76:1
81:10
136:23
146:2
191:9
240:4
251:13
255:10
258:20
262:14
300:24

**wanting**
56:20
301:20

**warden**
10:12
200:14

**warning**
168:10
249:7
269:20

**Washington**
58:7
59:22,24
60:3,6,24
61:8 63:3
66:19
80:23
205:1
298:18
299:23

**waste**
111:12

**watch**
16:10
141:8
149:2,9

**watching**
89:19
118:20

**water**
58:21
165:7,11

**Watson**
297:2

**wavered**
284:6

**ways**
13:9
121:1
122:7
125:10
172:6
190:25

**weakened**
136:1

**web**
213:5,24

**webpage**
214:13

**website**
300:19

**Wednesday**
8:6,14
188:4,9
208:18
288:20,23
304:3

**Weed**
17:19

**week**
10:10
27:8
47:17

**weeks**
22:23

**weigh**
162:9,11

**weighing**
245:5

**weight**
37:9
235:5,9,
11 246:11

**well-known**
70:3
229:19
230:10,15

**whatever's**
289:18

**when's**
301:11

**whiskers**
149:21

**white**
126:23
132:7

**who've**
162:2
163:5

**wide**
137:16
152:16,20

**widely**
133:14
230:23

**window**
224:19

**wipe**
124:9,17
131:5
133:7

**wiping**
124:14

**wise**
85:8

**withdraw**
46:11,24
50:8
69:12
79:20

**withdrawal**
111:23
172:18
186:5
189:8

**withdrawn**
46:22
79:14
112:1,3

**witnessed**
176:1

**witnesses**
7:8 9:1
12:6
188:8
303:22,24

**woman**
132:14
235:5
243:18
246:11

**women**
137:17
213:17
236:16

**wondered**
148:18

**word**
13:24
14:6 27:9
45:11
51:6
89:23
125:3
175:2
211:18
221:12
222:25
235:16,20
239:11
246:8
283:21
299:25

**words**
7:23 27:6
52:18
58:1
118:3
129:14
136:3
176:14
201:3
202:10

**wore**
151:25

**work**
8:12 16:7
41:11
58:8,12
62:18
64:12,18
65:7 71:3
77:2 81:6
84:9
85:13
152:5
159:6,11
178:8
179:11
181:12,18
183:19
184:11,14
185:8
194:12,
18,24
195:1


Case 3:25-cv-00442 Document 52-2 Filed 11/19/25 Page 389 of 390 PageID #: 1167

215:7
249:8
250:10
256:22
261:2
265:25
274:8
275:22
304:6,8

**worked**
60:17
67:1 71:1
84:11
198:1
201:20

**working**
27:21
80:18
147:2
183:25

**works**
8:11 9:3
85:5
91:17
92:4
120:24
140:15
166:21,24
181:9
260:24,25

**world**
70:3
82:22
125:17,
18,20
127:3,9,
22 128:1
300:1

**worried**
123:24

**worries**
121:22
171:14
248:20

**worrisome**
83:12

**worry**
153:1

**worse**
158:6
169:22

**worst**
165:8
169:21
170:6

**worthy**
62:9

**would've**
235:14
243:18

**write**
61:24

**writing**
13:1
42:4,13
50:2

**written**
60:13
61:10
286:21
290:9
304:7

**wrong**
7:1 31:4
48:18
73:22
138:13
170:15
172:1
232:6
255:18
258:6
293:13

**X**

**xylazine**
140:15
144:9,10,
22 145:3

**Y**

**Yay**
172:10

**year**
20:14
24:1
26:21
28:4
34:12
97:24
110:5
115:18
154:15

**years**
9:8 11:11
12:21
16:25
17:4 25:5
30:11
44:19
60:19
64:2,11
67:16
68:25
69:2,3,12
74:2,21
80:11,13,
14,16
84:20
153:21

**yelling**
176:13

**Z**

**Zone**
210:1,22
211:5

**zoom**
214:4