IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HAROLD WAYNE NICHOLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: 3:25-cv-442 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| JONATHAN SKRMETTI, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Pending before the Court is a motion to dismiss (Doc. No. 27, "Motion") filed by Defendants Jonathan Skrmetti, Frank Strada, and Kenneth Nelsen (hereinafter, "Defendants").[1] Via the Motion, Defendants ask this Court to dismiss the complaint (Doc. No. 1, "Complaint") of Plaintiff, Harold Nichols ("Plaintiff"). In support of the Motion, Defendants filed a memorandum of law (Doc. No. 28, "Memorandum"). Plaintiff filed a response to the Motion (Doc. No. 37, "Response"). Defendants filed a reply. (Doc. No. 40, "Reply").

For the reasons discussed herein, Defendants' Motion will be GRANTED in its entirety.

PERTINENT ALLEGED FACTS[2]

---

[1] As the Motion makes clear, the other persons named as defendants in this case, the "John Doe Participants," whoever they may actually be, are not "Defendants" (as defined herein as the defendants who filed the Motion) and are not represented by counsel for Defendants. (Doc. No. 27 at 1 n.1).

[2] The facts contained herein come from Plaintiff's Complaint. (Doc. No. 1). For purposes of the instant Motion and pursuant to the typical protocol for assessing motions under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the facts in the Complaint, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges" or "Plaintiff asserts") to denote that they are not being taken as true (because, for example, they are not really facts at all but legal conclusions or subjective verbal characterizations of a given set of circumstances) and instead indicate what Plaintiff *claims* to be true. Throughout this Memorandum Opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification, while remaining aware that any such alleged fact ultimately may prove to be false.

Plaintiff is currently on death row at Riverbend Maximum Security Institution ("RMSI") and is scheduled to be executed on December 11, 2025. (Doc. No. 1 at ¶¶ 1, 10). Although Plaintiff's Complaint says nothing about the nature or timing of the conviction that led to his death sentence, the Court can and does take judicial notice that: (a) Plaintiff pled guilty to charges of felony murder, aggravated rape, and first-degree burglary committed on September 30, 1988 against Karen Pulley;[3] (b) Plaintiff was sentenced to death on the conviction for felony murder; and (c) direct review of that conviction ended in 1995,[4] and not years later when (or after) *Nichols v. State* [*Nichols II*], 90 S.W.3d 576 (Tenn. 2002) (denying Plaintiff post-conviction relief), was decided.

---

The Court notes that it has included herein, for context, some facts that relate primarily to claims that Plaintiff is abandoning.

[3] Plaintiff also was convicted of numerous other crimes, committed in December 1988 and January 1989 against four other victims, including aggravated rape and first-degree burglary. *Nichols II*, 90 S.W.3d at 583.

[4] The Tennessee Supreme Court noted in *Nichols II* that it was in 1994 that it "affirmed the convictions and the sentence of death on direct appeal." *Nichols II*, 90 S.W.3d at 585 (citing *State v. Nichols* [*Nichols I*], 877 S.W.2d 722 (Tenn. 1994)). It is clear that after that affirmance, Plaintiff petitioned the United States Supreme Court for a writ of certiorari and that that petition was denied on January 17, 1995. *See Nichols v. Tennessee*, 115 S. Ct. 909 (1995). So direct review of Plaintiff's convictions and death sentence (which includes the U.S. Supreme Court's consideration of Plaintiff's petition for certiorari) concluded in 1995. For some reason, Defendants maintain that "[Plaintiff's] state court direct review ended in 2002," when *Nichols II* was decided. (Doc. No. 28 at 19) (citing *Nichols* II). But *Nichols II* was not a decision on direct review, but rather on review of state *post-conviction proceedings*. As just noted, it was the 1995 denial of Plaintiff's petition for a writ of certiorari in connection with *Nichols I* that concluded direct review.

On the other hand, even if Defendants were correct that the direct review ended in 2002, that ultimately would make no material difference here. The date of conclusion of direct review matters herein because it is relevant to when the limitations period began running on Plaintiff's Count III. As indicated below, on a method-of-execution claim under Section 1983, if that date is later than the time when the particular method of execution was adopted by the state, then that date is the date on which the limitations period begins to run; otherwise, the limitations period begins to run when the particular method of execution is adopted by the state. Here, it does not matter whether that date (the date of conclusion of direct review) was 1995 or 2002, because either date is so long ago that Plaintiff obviously cannot prevail unless he can instead use the alternative (the date when the particular method of execution was adopted by the state) to show that the limitations period began within one year prior to the filing of this action on April 18, 2025. As discussed below, Plaintiff does seek to use this alternative and claims that the applicable date under this alternative (which Plaintiff but not the Court pegs as the date of the adoption of the Revised Protocol) was within the one-year limitations period.

Tennessee intends to use a single drug pentobarbital 100 ml of a 50 mg/ml solution (a total of 5 grams) to execute Plaintiff. (*Id*. at ¶ 22)[5]. Pentobarbital causes flash (acute) pulmonary edema as it enters the blood stream and passes through the lungs and burns the membranes of the lungs. (*Id*. at ¶ 22(a)). Fluid then enters the lungs, causing a drowning sensation akin to waterboarding; the drowning sensation is "one of the most powerful, excruciating feelings known to man." (*Id*.; Doc. No. 1-7 at 16). Pentobarbital can "cause extreme pain upon [] injection." (Doc. No. 1 at ¶ 22(b)). It also can "damage the veins in the body, causing the drug to leak into the surrounding tissues," causing "significant excruciating pain." (Doc. No. 1-7 at 14–15). The Complaint not only asserts that Tennessee's chosen (default) method of execution—i.e., lethal injection of pentobarbital alone—is cruel and unusual punishment in violation of the Eighth Amendment,[6] but also raises other alleged violations of Plaintiff's constitutional rights in connection with his upcoming execution, namely First Amendment rights, Fourteenth Amendment rights to due process and equal protection, and supposedly implicated Fifth Amendment rights to due process.[7] As relief, Plaintiff

---

[5] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

[6] The Eighth Amendment protects inmates serving sentences of imprisonment after conviction, as Plaintiff is. *See Richmond v. Huq*, 885 F.3d 928 937 (6th Cir. 2018) ("The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment."). In the case of state actors like Defendants, Eighth Amendment protections are applicable (when they are applicable) specifically by way of the Fourteenth Amendment. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). In these situations, courts generally speak in terms of "Eighth Amendment" protection without any reference (beyond an initial reference) to the Fourteenth Amendment. The Court herein does likewise.

[7] For reasons the Court cannot fathom, Plaintiff refers to the Fifth Amendment as a source of due process rights implicated in this case. In just one example of this, Plaintiff asserts that he "is entitled to due process and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution and Article I of the Tennessee Constitution." (Doc. No. 1 at p. 3). However, the Court fails to see how the Fifth Amendment would apply here. "[T]he Fifth Amendment applies to the federal government, not state or

asks the Court to make a number of particular declarations and to "issue a permanent injunction against use of the revised lethal injection protocol." (Doc. No. 1 at pp. 56-58). The Complaint also asserts that Defendants should be temporarily enjoined from executing Plaintiff pending final resolution of the issues presented by the challenges to the lethal injection protocol in *King v. Strada, et al.*, No. 3:18-cv-01234 (M.D. Tenn.) ("*King*") and *Middlebrooks v. Strada, et al.*, No. 3:19-cv-01139 (M.D. Tenn.) ("*Middlebrooks*"), (*id.* at ¶¶ 103, 110), and Plaintiff has since filed a motion for preliminary injunction seeking such relief (Doc. No. 47).

### A. "Similarly Situated" Claim

As came to light amidst litigation in *King*, "Defendant's history of error and malfeasance regarding the Tennessee lethal injection protocol," (Doc. No. 1 at ¶ 1111), includes:

- Attempting to acquire drugs for lethal injection from a veterinarian;
- Searching for other drug suppliers when one supplier restricted the sale of their drugs for use in lethal injection;
- Exploring the possibility of using other drugs, including Ketamine, as a replacement for the restricted lethal injection drugs;

---

local governments." *Mahan v. Shoupe*, No. CIV. 2:15-00001, 2015 WL 4693026, at *2 (M.D. Tenn. Aug. 6, 2015) (quoting *Myers v. Village of Alger, Ohio*, 102 F. App'x 931, 933 (6th Cir. 2004). The Fifth Amendment "cannot support a claim against state [or local] actors." *Buchanan v. Metz*, 6 F.Supp.3d. 730, 757 n. 5 (E.D. Mich. 2014); *see Scott v. Clay Cnty.*, Tenn., 205 F.3d 867, 873 n.8 (6th Cir. 2000) ("The Fourteenth Amendment's Due Process Clause restricts the activities of the states and their instrumentalities; whereas the Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government"). True, Plaintiff does assert violations of his rights under the Fourteenth Amendment, and many rights in the Bill of Rights (the first ten Amendments) are deemed to be incorporated into the Fourteenth Amendment; to this extent, a right found in the Bill of Rights (which is directly applicable only to the federal government) is implicated by a Fourteenth Amendment claim (which can be brought only against state actors and not federal actors). But the Court does not see how any of the Fourteenth Amendment rights on which Plaintiff relies—i.e., the rights to equal protection of the laws and of due process—are (or would need to be) incorporated into the Fourteenth Amendment from the Fifth Amendment; those rights are all plainly stated in the Fourteenth Amendment itself.

Since Plaintiff brings claims only against state officials, the Fifth Amendment claim(s) must and will be dismissed on this basis (alternatively to any other applicable basis for dismissal). That is to say, Plaintiff's counts—every one of which asserts (in a manner that, regrettably, effectively turns a single count into multiple counts) violations of multiple provisions of law, at least one federal and one state, and most of which assert violations of multiple federal constitutional amendments—will be dismissed from the outset to the extent that they allege a violation of the Fifth Amendment. For the sake of simplicity and brevity, the Court below omits any reference to the Fifth Amendment or Plaintiff's claims thereunder.

- Discussing ways to creatively compound the drugs to save the State of Tennessee money;
- Failing to consult the Pharmacist about the lethal injection protocol. In fact, former TDOC General Counsel Debbie Inglis drafted the protocol without reviewing medical articles, talking to pharmacists, doctors, or other experts, or consulting with other states;
- Regularly deviating from the lethal injection protocol;
- Failing to properly train the personnel enlisted to carry out lethal injection;
- Preparing expired drugs in the executions of Donnie Johnson and Billy Ray Irick;
- Failing to follow written instructions related to the drugs used for execution;
- Personally transporting lethal injection drugs across state lines to RMSI;
- Utilizing a Pharmacist who was fined by a state board of pharmacy for failing to ensure that pharmacy technicians under his supervision possessed valid licenses;
- Failing to compound lethal injection drugs in accordance with United States Pharmacopeia guidelines; and failing at least one test or not subjecting the drugs to tests required by United States Pharmacopeia
- Failing to test for endotoxins in every batch of drugs;
- Failing to properly test for potency of lethal injection drugs;
- Failing to follow compounding recipes for lethal injection drugs;
- Receiving compounded lethal injection drugs prior to receiving test results from a third-party laboratory;
- Failing to properly store lethal injection drugs according to the protocol; and
- Failing to conduct biannual inventory of lethal injection drugs and failing to dispose of expired drugs

(Doc. No. 1 at ¶ 13 & n.3).

On the afternoon of April 21, 2022—less than one hour before the scheduled execution of Oscar Franklin Smith by lethal injection—Tennessee Governor Bill Lee issued a temporary reprieve due to "an oversight in preparation." (Doc. No. 1 at 2). This reprieve led to an independent review ("Independent Review") of Tennessee's lethal injection protocol (ordered by Governor Lee). (*Id*.; Doc. No. 1-2 at 1).

Shortly after Governor Lee's order, the defendants in *King* and *Middlebrooks* submitted an unopposed motion to stay the respective proceedings in those cases "until the conclusion of the independent investigation that Governor Lee has ordered of the lethal injection process in

Tennessee and the timely completion of related corrective action." (Doc. Nos. 1 at 2; 1-3 at 4).

That motion to stay proceedings contemplated and proposed that upon its being granted, there

would go into effect an agreement ("Agreement"),[8] which stated in pertinent part:

> A motion to set King's execution date will not be filed pursuant to Tenn. Sup. Ct. R. 12(4)(A) until a judgment is entered by the district court in case number 3:18-cv-01234 (M.D. Tenn.) or, in the event of an appeal from that judgment, until an opinion is issued by a panel of the United States Court of Appeals for the Sixth Circuit. . .

> In the event Middlebrooks's execution date is reset before the conclusion of a trial or other disposition of his complaint in case number 3:19-cv01139 (M.D. Tenn.), Defendants will not oppose a motion for stay of execution for Middlebrooks filed in that district court case until a judgment is entered by the district court in that case or, in the event of an appeal, a motion for stay of execution filed under the relevant case number in the Sixth Circuit until an opinion is issued by a panel of the Sixth Circuit. If such a motion for stay is denied, Defendants also agree to advocate for another reprieve from the Governor until a judgment is entered by the district court or, in the event of an appeal, an opinion has been issued by a panel of the Sixth Circuit.

(Doc. Nos. 1 at 2-3; 1-3 at 3).

The Independent Review resulted in a report ("Independent Review report") by the law

firm of Butler Snow, LLP dated December 13, 2022, which was filed on the docket in *King* (Case

No. 3:18-cv-1234, Doc. No. 225-1). (Doc. No. 1 at 11 n.23). The Independent Review report

provided: "the investigative findings are primarily based upon the information gleaned through

witness interviews as well as an extensive review of thousands of pages of documents and/or data.

While the interviews were very insightful, they further showed an *absence of adequate expertise,*

*guidance, and counsel either enlisted by or provided to TDOC in connection with Tennessee's*

*lethal injection process. Instead, TDOC operated in a task-oriented, tunnel-vision manner that*

---

[8] The Agreement (Doc. No. 1-3) was a single document that was dual captioned, i.e., captioned for both *King* and *Middlebrooks*. It appears from the language of the Complaint that the same is true of the unopposed motion, although the Court is unable to say for sure because the unopposed motion (unlike the Agreement) was not attached as an exhibit to the Complaint.

*failed to appreciate the interwoven nature of the lethal injection process as a whole*." (Case No.

3:18-cv-1234, Doc. No. 225-1 at 51-52) (emphasis added).[9]

The Independent Review report also acknowledged the above-listed errors and identified

additional errors, including:

- The pharmacy that tested Tennessee's lethal injection chemicals only tested the chemicals for potency and sterility, not endotoxins, because the pharmacy followed United States Pharmacopeia testing guidelines, not Tennessee's lethal injection protocol;
- The chemicals used in the execution of Billy Ray Irick in August 2018 were not tested for endotoxins, and the Midazolam used during Irick's execution was not tested for potency;
- The chemicals to be used in the event that Edmund Zagorski opted for lethal injection in November 2018 were not tested for endotoxins and failed potency testing;
- The chemicals used in the May 2019 execution of Donnie Edward Johnson were not tested for endotoxins;
- The chemicals to be used in the event that Stephen West opted for lethal injection in August 2019 were not tested for endotoxins;
- The chemicals to be used in the event that Lee Hall opted for lethal injection in December 2019 were not tested for endotoxins; and
- The chemicals to be used in the event that Nicholas Sutton opted for lethal injection in February 2020 were not tested for endotoxins.

(Doc. No. 1 at ¶ 14).

Approximately 28 months after the release of the Independent Review report, this Court

(with the Honorable Waverly D. Crenshaw presiding) granted an unopposed stay of execution in

*Middlebrooks*, pursuant to the Agreement. (Doc. Nos. 1 at p. 3; 1-4).

As a person similarly situated to the plaintiffs in *King* and *Middlebrooks* (i.e., being a death

row inmate who is scheduled for execution), and invoking his due process and equal protection

under the Fourteenth Amendment to the United States Constitution and Article I of the Tennessee

---

[9] The italicized words from this quote were quoted in the Complaint. (Doc. No. 1 at ¶15). To the extent that the Court herein refers to content in the Independent Review report, the Court can and does take judicial notice of the existence (though not the *truth*) of such content.

Constitution, Plaintiff alleges that he is entitled to an injunction staying his execution pending resolution of the lawsuits in *King* and *Middlebrooks* and the instant lawsuit. (Doc. No. 1 at pp. 3-4).

### B. Issues with the Revised Protocol, in General and as it relates to Plaintiff in particular[10]

Effective January 8, 2025, Tennessee implemented a revised Lethal Injection Execution Protocol ("Revised Protocol"), which prescribes the use of a single-drug protocol (using only pentobarbital), in place of the former three-drug protocol (using sodium pentothal, pancuronium bromide, and potassium chloride), to effectuate lethal injections. (Doc. Nos. 1-7 at 26; 28 at 7). Plaintiff alleges that the Revised Protocol fails to ameliorate the deficiencies within the lethal injection protocol as identified by the Independent Review. (Doc. No. 1 at ¶ 16).

Plaintiff also takes issue with the language of the Revised Protocol for being (in his view) vague in that, for example, it vaguely describes safe transportation of the lethal injection chemicals across state lines and safe storage of pentobarbital and vaguely refers to "quality assurance and quality control testing." (*Id*. at ¶¶ 25-27)). Plaintiff likewise takes issue with the Revised Protocol being (in his view) subject to change "on the whim of the Commissioner 'when deemed necessary to effectuate the purpose' of the [Revised Protocol]." (*Id*. at ¶ 20) (apparently quoting the Revised

---

[10] A redacted version of the Revised Protocol was filed at Docket No. 28-1 as an attachment to Defendants' Memorandum. The Revised Protocol can be considered in this Court's review of the Motion because the Revised Protocol is referred to in the Complaint and is central to Plaintiff's claims. Surely, an unredacted version conceivably could be more consistent with Plaintiff's claims than the redacted version attached for the Court's review, which the Court will keep in mind in its assessment of the viability of the Complaint.

Notably, the Court does not accept as true any subjective verbal characterization regarding the Revised Protocol (such as, for example, that it is "vague" in this sense or that sense). But the Court *does* accept as true purely factual statements about the Revised Protocol's contents—what it actually says—unless it is contradicted by Doc. No. 28-1 *and* such contradiction plainly could not even conceivably be resolved by viewing the unredacted version (i.e., it is plain from the redacted version that Plaintiff's factual statements about the contents of the Revised Protocol is just wrong, and that there is no chance that the wrongness is actually illusory, or that the illusion would be revealed by removing the redactions). The Court does not perceive any such contradictions.

Protocol). Likewise, Plaintiff asserts that the Revised Protocol is "devoid of detail" because (as the Court accepts as true) it fails to "state the source of the supplier, the procurement process or method—whether legitimate or through the gray or black market, or whether the pentobarbital is compounded or manufactured." (*Id*. at ¶¶ 19, 24).

Moreover, Plaintiff highlights a few scheduling conflicts within the Revised Protocol as it relates to his case in particular. First, the Revised Protocol requires Plaintiff to select his method of execution thirty (30) days prior to his scheduled execution (which would be November 11, 2025), but an order from the Tennessee Supreme Court requires RMSI's Warden to notify Plaintiff of the method of execution no later than November 26, 2025.[11] (*Id*. at ¶ 28; Doc. No. 1-6 at p. 2). Per the Tennessee Supreme Court's order, the RMSI Warden is to "notify Mr. Nichols no later than November 26, 2025, of the method the Tennessee Department of Correction (TDOC) will use to carry out the execution and any decision by the Commissioner of TDOC to rely upon the Capital Punishment Enforcement Act. *See* Tenn. Code Ann. § 40-23-114," (Doc. No. 1-6 at 2), whereas the Revised Protocol provides no requirement that the warden notify the inmate of the method to be used to carry out the execution.[12] The issue, according to Plaintiff, is that the Revised Protocol requires Plaintiff to select his method of execution (i.e., turn in his Affidavit for Method of execution to the Warden 30 days before execution, or November 11, 2025): before the Warden has informed Plaintiff whether Defendants have pentobarbital available for Plaintiff's execution;

---

[11] The Court does not perceive that any reason has been provided by either party as to why the Warden would notify the inmate of any method of execution than lethal injection. In any event, the fact that the Tennessee Supreme Court's order instructs the Warden to notify Plaintiff of his method of execution does not appear to change the fact that lethal injection is the default method in Tennessee. Moreover, Plaintiff neither makes an issue about the Warden's responsibility to notify Plaintiff of the method of execution, nor refutes that lethal injection is the default method.

[12] The Revised Protocol only mentions a warden notifying an inmate in relation to "changes to the conditions of confinement over the next 30 days" prior to the execution date. (Doc. No. 28-1 at 16, ¶ 5).

before he has been told whether the pentobarbital has expired; and before he has been told whether the pentobarbital has been tested. (Doc. No. 1 at ¶ 30; 28-1 at 15). Second, the Revised Protocol allows an inmate to rescind his waiver of his right to carry out his execution by lethal injection[13] up to fourteen (14) days before his execution date, which for Plaintiff means that he would have to rescind his wavier no later than November 27, 2025, Thanksgiving Day. (Doc. No. 1 at ¶¶ 28, 29). According to Plaintiff, (i) he would have just one day (between November 26 and 27) between learning the method of execution selected by the RMSI warden to decide whether to rescind his waiver consider the Warden's selection, if the Warden waited until the last day to notify Plaintiff; and (ii) the Revised Protocol does not address the mechanics of how Plaintiff would withdraw his waiver on the day his deadline expires, when his deadline to do so falls on a state holiday. (*Id*.).

The Revised Protocol also does not take into account any unique physical characteristics of the condemned prisoner (here, of course, Plaintiff) that may affect the efficacy of, or the risk of harm to that particular prisoner caused by, the Revised Protocol. (*Id*. at ¶ 54). In Plaintiff's case,

---

[13] As written at the top of the "Affidavit for Method of Execution" in the Revised Protocol:

> Under Tennessee law, you have the right to have your execution carried out by lethal injection. You also have the option of waiving this right, and choosing electrocution as the method of your execution. The purpose of this affidavit is to allow you an opportunity to either waive your right to have your execution carried out by lethal injection or to decline to waive that right. Failure to complete this form will result in the execution being carried out by lethal injection. You will not be given another opportunity to waive your right to have your execution carried out by lethal injection. If you waive your right to have your execution carried out by lethal injection, you may rescind that waiver by contacting the Warden **no later than 14 days before the date of the execution** and signing a new affidavit to that effect.

(Doc. No. 28-1 at 26) (emphasis in original). Put more simply, an inmate scheduled to be executed has the right to select between the two available methods of execution in Tennessee (lethal injection with pentobarbital or electrocution). The default method of execution is lethal injection, which an inmate can waive so as to opt instead for execution by electrocution. If the inmate changes his mind regarding that waiver—i.e., if the inmate wishes to "rescind" (i.e. take back) any waiver of being executed via lethal injection—then he must contact the warden no later than 14 days before the date of the execution to "rescind his wavier" and revert to the default method of lethal injection.

those unique characteristics include (but are not limited to) his advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes ("Medical Conditions"), and his Medical Conditions make it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff that is needed to ensure proper delivery of the pentobarbital. (*Id*. at ¶¶ 46, 48). Plaintiff alleges that his Medical Conditions make it sure or very likely that serious illness and needless suffering will occur as Defendants attempt to achieve peripheral IV access on Plaintiff during the execution process and are unable to maintain peripheral IV access on him, which will interfere with the proper delivery of the pentobarbital causing serious illness and needless suffering. (*Id*. at ¶ 49). According to Plaintiff, "[i]mproper delivery of the pentobarbital [generally], including, but not limited to, vein damage and leakage,[14] presents a risk that is certain or at least very likely to cause serious illness, needless suffering, and/or prolonged death." (*Id*. at ¶ 50). Moreover, Plaintiff's Medical Conditions—as listed above—make it certain or at least very likely that there is a substantial risk that due to the pentobarbital he will suffer flash (acute) pulmonary edema, i.e., begin to suffocate and experience a drowning sensation, while he remains aware or sensate. (*Id*. at ¶¶ 51, 80, 120).

Finally, Plaintiff alleges that the Revised Protocol did not undergo agency rulemaking as prescribed in the Tennessee Uniform Administrative Procedures Act. (*Id*. at ¶ 17).

<u>PLAINTIFF'S CLAIMS</u>

On April 18, 2025, Plaintiff filed the Complaint to initiate the instant action. The Complaint comprises eleven (11) counts, which the Court discusses below as thoroughly or briefly as necessary. As for requested relief, the Complaint asks this Court to enjoin Defendants to enter an

---

[14] Plaintiff does not clearly indicate what he means by "leakage." Presumably, Plaintiff means here that improper delivery of pentobarbital can lead to vein damage and leakage of the drug (i.e., not being transported properly and directly in Plaintiff's vein).

agreement with Plaintiff (i.e., to stay Plaintiff's execution pending outcome of litigation) like those

into which Defendants entered with the plaintiffs in *King* and *Middlebrooks,* or to issue a temporary

(i.e., preliminary) injunction preventing Defendants from executing Plaintiff prior to the

completion of the litigation in *King*, *Middlebrooks*, and the instant lawsuit. (*Id*. at p. 56).

Additionally, Plaintiff asks this Court to declare (among other things) that: Tennessee's Revised

Protocol is unconstitutional under Tennessee Code Annotated § 29-14-101 *et seq*., Tennessee Code

Annotated § 4-5-101 *et seq*., Article I, §§ 2, 3, 8, 16, 17 of the Tennessee Constitution, Article VI,

§ 2 of the United States Constitution, and the Fourteenth Amendment to the United States

Constitution; as applied to Plaintiff, the Revised Protocol inflicts cruel and unusual punishment in

violation of the Eighth Amendment; the Revised Protocol violates the Tennessee Uniform

Administrative Procedures Act ("TUAPA"); and Tennessee's secrecy laws and redaction of the

Revised Protocol violate the First Amendment to the United States Constitution. (*Id*. at pp. 56-58).

Plaintiff also seeks a permanent injunction against the use of the Revised Protocol. (*Id*. at p. 58).

LEGAL STANDARD

In all of their filings made in connection with the Motion, Defendants refer only once to

the rule(s) under which the Motion is made. There, Defendants indicate that they are moving under

Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 28 at p. 12-

13). The former rule contemplates dismissal for lack of subject-matter jurisdiction over the

Plaintiff's claims, and the latter rule contemplates dismissal due to the Plaintiff's failure to state a

claim. Fed. R. Civ. P. 12(b)(1), (b)(6). The Court will discuss in turn each of these rules and the

standards and concepts associated with them.

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*,

511 U.S. 375, 377 (1994). In other words, federal courts "have only the power that is authorized

by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). Therefore, subject-matter jurisdiction is a threshold issue that the Court must address and resolve prior to reaching the merits of the case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). "Moreover, 'where subject matter jurisdiction is challenged under Rule 12(b)(1), . . . the *plaintiff* has the burden of proving jurisdiction in order to survive the motion.'" *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017) (quoting *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986)).

Rule 12(b)(1) motions fall into two categories: facial attacks and factual attacks. *Id.* at 816. A facial attack is a challenge to the sufficiency of the pleading itself, requiring the Court to take allegations in the complaint as true and construing those allegations in the light most favorable to the non-moving party. *See id.* A factual attack, on the other hand, is a challenge to the factual existence of subject-matter jurisdiction. *See id.* at 817. In considering whether jurisdiction has been proved as a matter of fact, a trial court has wide discretion to allow affidavits, documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). In evaluating a factual attack, no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence to arrive at its decision of whether it has power to hear the case. *See United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 782 F.3d 260, 265 (6th Cir. 2015).

Regrettably, Defendants do not make clear what aspect of the Motion they view as implicating Rule 12(b)(1), so the Court was left to figure that out for itself. As far as the Court can tell, the Motion implicates Rule 12(b)(1) only to the extent that it challenges (in part) Plaintiff's

standing, which is a question of subject-matter jurisdiction. *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) ("Standing is a jurisdictional requirement. If no plaintiff has standing, then the court lacks subject-matter jurisdiction.") (citation omitted). And although Defendants indicate that their challenges to standing are factual attacks, (Doc. No. 28 at 12-13, 26 at n.6), the Court perceives that all such challenges are actually facial attacks and thus accepts as true all of Plaintiff's factual allegations that bear on standing.

As indicated below, the Motion challenges Plaintiff's standing in two ways. First, the Motion challenges Plaintiff's standing to sue Attorney General Skrmetti in particular. (Doc. No. 28 at 17). Second, the Motion challenges Counts V, VI, VII and VIII based on an alleged lack of "ripeness," (Doc. No. 28 at 25), which in recent times has been recognized as not a stand-alone ground for challenging subject-matter jurisdiction but rather merely one aspect (or at least a potential aspect, depending on the case at issue) of a challenge based on an alleged lack of standing. *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014)

When reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must take all factual allegations in the Complaint as true.[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that survives a motion to dismiss under Rule 12(b)(6) must contain sufficient allegations of factual matter, that when accepted as true, state a facially plausible claim. *Id.* Facially plausible claims are those that have sufficient factual content such that a court may draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *Id.*

---

[15] The Court has done exactly that when discussing the material factual allegations in the Complaint, as indicated above.

On the other hand, well-pled factual allegations allow the court to assume their veracity and then determine whether they plausibly give rise to an entitlement of relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018)). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the plaintiff's burden, as mere consistency does not establish the plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief, including any "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. Then, the question is whether the remaining allegations plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

In general, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is central to plaintiff's claims, it may be considered without converting a motion to

dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-653 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-792 (M.D. Tenn. 2018).

As an initial matter, as announced in the Response, Plaintiff stipulates to dismissal without prejudice of Counts V, VI, VII, and VIII. (Doc. No. 37 at 23-24). Accordingly, these counts will be dismissed without prejudice, and therefore the Court will not delve into Counts V, VI, VII, and VIII.

Additionally, the Court finds that Count II must be dismissed. Count II lays out grounds only for an injunction (albeit while inaptly invoking the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., which does *not* provide an *injunctive* remedy), which "is an equitable remedy, not an independent cause of action." *Reschke v. CitiMortgage, Inc*., No. 11-12639, 2013 WL 625755, at *5 (E.D. Mich. Feb. 20, 2013) (quoting *Terlecki v. Stewart,* 278 Mich. App. 644, 663, 754 N.W.2d 899 (2008)). *See also Morrison v. Wells Fargo Bank*, N.A., No. 4:18-CV-2873, 2019 WL 885701, at *3 (S.D. Tex. Feb. 1, 2019), *report and recommendation adopted*, No. 4:18-CV-2873, 2019 WL 859781 (S.D. Tex. Feb. 22, 2019) (citing *Ballard v. Ditech Fin. LLC*, No. CV H-17-2159, 2018 WL 4103228, at *4 (S.D. Tex. Aug. 8, 2018)). Therefore, Count II will be dismissed because it fails to state *a claim* for relief (as opposed to stating grounds for a particular *remedy* based on *other* claims for relief).

Accordingly, the remaining pending claims are as follows: (1) Count I, seeking an "[i]Injunction under 28 U.S.C. §§ 2201–02 for violations of the . . . Due Process and Equal Protection Clauses of the Fourteenth Amendment and Article I of the Tennessee Constitution";[16]

---

[16] The invocation here under 28 U.S.C. §2201-02 is off the mark, as those statutes (the Declaratory Judgment Act) provide for the remedy of a judicial *declaration*, not an injunction. *See Perez v. Ledesma,* 401 U.S. 82, 125–26 (1971) (Brennan, J., concurring in part) (noting that "a declaratory judgment . . . is a much milder form of relief than an injunction.")

(2) Count III, which asserts that the Revised Protocol "is unconstitutional under the Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Article I of the Tennessee Constitution";[17] (3) Count IV, which asserts that the Revised Protocol "*as applied* to Plaintiff is unconstitutional under the Eighth Amendment to the United States Constitution and Article I of the Tennessee Constitution"; (4) Count IX, which asserts that (a) "[r]equiring selection of execution by electrocution violates the Plaintiff's rights under the First,…Eighth, and Fourteenth Amendments to the United States Constitution", and (b) "execution by electrocution constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution"; (5) Count X, which asserts that "Tennessee's Secrecy Law violates the First Amendment, the Due Process Clauses of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I of the Tennessee Constitution, and Tennessee Code Annotated § 10-7-501 *et seq*; and (6) Count XI, which asserts that the Revised Protocol "violates the Tennessee Uniform Administrative Procedures Act, the Fourteenth Amendment to the United States Constitution, and Article I of the Tennessee Constitution." (Doc. No. 1).

The Court will now address each of the remaining Counts separately in turn below.

<u>DISCUSSION</u>

**(A) Plaintiff is not constitutionally entitled to the same agreement and access to the Revised Protocol as the plaintiffs in *King* and *Middlebrooks* (Count I).**

---

[17] Plaintiff's reference here to a "violation" of Section 1983 is inapt, because Section 1983 provides only *remedies* for violations of federal law and (unsurprisingly, since it is a statute rather than a constitutional provision) sets forth absolutely no standards for what is or is not *unconstitutional*. Indeed, it creates no substantive rights (of any kind) and thus substantive rights that could be "violated." *Flint v. Kentucky Dep't of Corr.,* 270 F.3d 340, 351 (6th Cir. 2001) (noting that Section 1983 "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere."). So the Court will not analyze whether the revised protocol "violates" Section 1983 in particular.

The Court begins its analysis by addressing Defendants' skeletal argument that Defendant Skrmetti (who is a defendant with respect to Count I and only Count I)[18] must be dismissed because of a lack of standing to sue him and because he enjoys sovereign immunity. In their briefing, all that Defendants say in connection with that argument is this, from their Memorandum:

> Plaintiff only alleges that General Skrmetti entered the King/Middlebrooks agreement and has refused to enter a similar one with Plaintiff. (Dkt. 1, ¶ 2.) Plaintiff cannot establish standing against General Skrmetti or evade his sovereign immunity on any other claim. *Doe v. Lee*, 102 F.4th 330, 335 (6th Cir. 2024); *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023).

(Doc. No. 28 at 17).[19] In his response, Plaintiff addressed only standing and not sovereign immunity. Regarding standing, Plaintiff stated only, "Defendant Skrmetti, through his agents, successors, and assigns, is a party to the [Agreement] and is therefore a necessary party here."[20] (Doc. No. 37 at 14 n.8). The Court perceives that Plaintiff's argument here is suspect (due to being just as underdeveloped as Defendants' argument), but it is colorable. And Defendants undertook no effort to rebut that argument in their Reply. Ultimately, the Court is unpersuaded that Plaintiff lacks standing to sue Defendant Skrmetti. As for the argument that Defendant Skrmetti is shielded by sovereign immunity, which is not necessarily a matter of subject-matter jurisdiction, the Court is likewise unpersuaded. Any defendant who is serious about establishing sovereign immunity in

---

[18] At least, that is Defendants' take on the Complaint. (Doc. No. 28 at 17). Plaintiff does not disagree with that assessment, and this assessment does have a basis considering what the Complaint does and does not say about Defendant Skrmetti. Therefore, the Court accepts that assessment and for present purposes treats Defendant Skrmetti as a defendant only with respect to Count I.

[19] Notably, Defendants' challenge here to standing is made only with respect to Defendant Skrmetti; Defendants do not challenge standing here with respect to any other Defendant. This approach is permissible because "standing is defendant-specific." *Ashe v. Hargett*, No. 3:23-CV-01256, 2024 WL 923771, at *5 (M.D. Tenn. Mar. 4, 2024) (citing *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022)).

[20] The Agreement was signed by Robert W. Mitchell as a representative of the "Tennessee Attorney General's Office," counsel for defendants in the *King* and *Middlebrooks* cases. (Doc. No. 1-3 at 5).

a case like this one, which—especially given the kind of injunctive relief requested—raises the possibility of an exception to sovereign immunity under the well-known principles of *Ex* Parte *Young*, 209 U.S. 123 (1908),[21] needs to do substantially more than what Defendants did in their briefing. And so the Court declines to dismiss Defendant Skrmetti based on sovereign immunity.

Turning to the merits of Count I, Plaintiff argues that by giving the plaintiffs in *King* and *Middlebrooks* the benefit of the Agreement (i.e., not opposing a stay of their execution due to pending litigation), but not giving the same to other similarly situated persons on death row in the custody of TDOC (such as Plaintiff), Defendants have violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.[22] (Doc. No. 1 at ¶ 95). In their Memorandum, Defendants argue that "[Plaintiff] has no constitutional right to force a litigation position, particularly where rational distinctions exist between his suit and the suits of *King/Middlebrooks*."[23] (Doc. No. 28 at p. 14)

---

[21] "[T]he Supreme Court announced an exception to Eleventh Amendment sovereign immunity in *Ex parte Young* for claims for injunctive relief against individual state officials in their official capacities." *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013) "In order to fall within the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law." *Id.* It is far from self-evident that this exception would not apply to the claim in Count I against Defendant Skrmetti, and Defendants have done absolutely nothing to show that it does not apply.

[22] Notably, what Plaintiff does not allege is that entering into the Agreement (with the plaintiffs in *King* and *Middlebrooks)* is unconstitutional, or that Defendants have refused to enter into the Agreement with Plaintiff for some nefarious reason.

[23] Alternatively, Defendants argue that that "[e]ven if [Plaintiff] were similarly situated, his equal-protection claim still fails. The Supreme Court has recognized that '[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking [sic] based on a vast array of subjective, individualized assessments.'" (Doc. No. 28 at 15) (quoting *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 604 (2008)). The Court realizes that the Supreme Court concluded in *Engquist* that there may be certain "forms of state action . . . which by their nature involve discretionary decisionmaking [sic] based on a vast array of subjective, individualized assessments," just as Defendants here contend. *Engquist,* 553 U.S. at 603. *However*, the Supreme Court also stated in *Engquist* that "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." *Id.* Thus, when it appears that an individual is being singled out

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.4. Its purpose "is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination[.]" *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918). It prohibits governmental discrimination that "burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005) (citation omitted).

Defendants characterize Plaintiff's equal protection claim as one based on a "class-of-one" theory. (Doc. No. 28 at 14). A class-of-one theory describes the situation where a plaintiff brings an equal protection claim alleging some sort of discrimination against him or her as an individual; this is to be contrasted with the standard theory for an equal protection claim, where a plaintiff alleges discrimination against him or her based on his or her status as a member of a particular protected class (historically, a particular racial group or sex). *See* William D. Araiza, *Flunking the Class-of-One / Failing Equal Protection*, 55 Wm. & Mary L. Rev. 435, 438 (2013). The idea behind the term "class of one" is that the plaintiff relying on the theory is going outside the standard theory (which involves viewing the plaintiff as part of a class rather than solely as an individual person) unless one perceives of the plaintiff *alone* as comprising a class; this is relevant because, as discussed below, a plaintiff going this non-standard route bears a non-standard (higher) burden than one going the standard route.

---

by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a "rational basis for the difference in treatment." *Id.* (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Another way of putting it is to say that even where discretionary decisionmaking is involved, the discretion can be abused if there is no rational basis for the differential treatment that results from the decisionmaking. So, Defendants cannot erase Plaintiff's Equal Protection claim simply by suggesting that the complained-of state actions in this case amount to "discretionary decisionmaking."

Plaintiff does not expressly state in his Complaint that his equal-protection claim is based on a class-of-one theory. However, in his Response, Plaintiff does not challenge Defendants' claim that it is. (Doc. No. 37 at 6, 10). And it is clear to the Court that is; Plaintiff plainly bases his equal-protection claim on a class-of-one theory. As Defendants point out, Plaintiff did not plead, or make any factual allegations to suggest, that he is a member of a protected group (or, for that matter, that he was discriminated against based on his membership in that class).

Plaintiff "must overcome a 'heavy burden' to prevail based on the class-of-one theory." *Project Reflect, Inc. v. Metro. Nashville Bd. of Pub. Educ.*, 947 F. Supp. 2d 868, 881 (M.D. Tenn. 2013) (quoting *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (citing *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio,* 430 F.3d 783, 791 (6th Cir. 2005))). Plaintiffs bringing a class-of-one theory

> must show that they were treated differently than those similarly situated in all material respects. In addition, they *must show that the adverse treatment they experienced was so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.* This showing is made either by negativing every conceivable reason for the government's actions or by demonstrating that the actions were motivated by animus or ill-will.

*Id.* (internal citation omitted) (emphasis added). Put more simply, to succeed under a class-of-one theory, Plaintiff must show that (1) he has "been intentionally treated differently from others similarly situated" *and* (2) "there is no rational basis for the difference in treatment." *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Regarding the first of these requirements, "Plaintiffs alleging class-of-one equal protection claims do not need to identify specific examples of similarly situated persons in their complaints." *Capra v. Cook Cnty. Bd. of Review,* 733 F.3d 705, 717 (7th Cir. 2013); *see Geinosky v. City of Chicago,* 675 F.3d 743, 748 n. 3 (7th Cir. 2012) ("Even in a case where a plaintiff would

need to identify a similarly situated person to prove his case, . . . we see no basis for requiring the plaintiff to identify the person *in the complaint.*") (emphasis added). But in any event, Plaintiff does allege that he is similarly situated to two particular inmates, who sit on death row with pending litigation and received the benefit of Defendants agreeing not to oppose a motion to stay their respective executions, and so the first element of a class-of-one claim is satisfied here.

On the second element, however, Plaintiff falls short. There is no allegation in the Complaint that Defendants lack a rational basis for not entering into the Agreement with Plaintiff. And still less is there any factual matter in the Complaint that plausibly suggest the lack of a rational basis. Rather, Plaintiff's Complaint merely alleges that he did not receive (and wishes to receive) the benefit of the Agreement into which Defendants entered with the plaintiffs in *King* and *Middlebrooks* because he "is a similarly situated person to the plaintiffs in *King* and *Middlebrooks*."[24] (Doc. No. 1 at ¶¶ 92, 93). To reiterate, the quoted part of this allegation plausibly

---

[24] As noted, Plaintiff did not address the lack of a rational basis in the Complaint. Instead, the first time Plaintiff discusses a lack of rational basis is in his Response, after Defendants in their Memorandum provided their basis for not entering the Agreement with Plaintiff as follows:

> The State [of Tennessee] entered into the *King*/*Middlebrooks* agreement in a context unique to the litigation of those consolidated cases. At the time of the *King*/*Middlebrooks* agreement, Defendants did not know (1) the duration of Governor Lee's pause on executions, (2) the results of the independent investigation, (3) whether and to what extent the execution protocol would be amended, (4) what new staff, training, or resources might be needed to implement any changes to the protocol, and (5) what legal challenges a new protocol might face. But Defendants have answers to those questions now. And in *King*/*Middlebrooks*, Defendants faced the pressure of continued litigation and potentially intrusive discovery over a protocol that might never have been used again could they not reach an agreement on a stay.

(Doc. No. 28 at 15). Notably, the Court does not accept Defendants' factual assertions (regarding what Defendants did not previously know) underlying their purported rational basis; such acceptance would be inappropriate on the instant Motion. The Court likewise does not accept as true Defendants' conclusion that their purported basis is in fact rational as Defendants claim. That is not to say that the Court begrudges Defendants making these factual assertions or offering this conclusion regarding rational basis; Defendants may have provided their purported rational basis for not entering into the Agreement with Plaintiff (and the supposed facts underlying that rational basis) because they knew that Plaintiff is *obligated* to show a lack

suggests the first element for a claim based on a "class-of-one" theory, but nothing about this allegation plausibly suggest the existence of the second element.

In summary, Plaintiff failed to plead a viable "class-of-one" theory because—although he is similarly situated to King and Middlebrooks—he did not allege in his Complaint any factual matter to support the notion that Defendants have no rational basis for entering into the Agreement with King and Middlebrooks, but not other inmates, including Plaintiff. Therefore, the Court will **grant** the Motion as to Count I.

---

of a rational basis as part of a "class-of-one" theory. And it is fair for the Court treat Defendants' above quoted explanation as highlighting the legally valid principle that the Court is not to assume that there is no rational basis.

In his Response, Plaintiff argues

> [t]here is no conceivable basis that rationally supports the Defendants' decision to allow some prisoners the ability to challenge the revised lethal injection protocol, and other prisoners not to do so....Defendants here have deliberately singled out two prisoners as deserving of the right to challenge the revised lethal injection protocol, while the rest are denied that right, or are forced to do so under the threat of execution. Stated another way, granting Mr. Nichols "mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process."

(Doc. No. 37 at 9). Plaintiff conceivably could complain that the reason he did not say anything in the Complaint about Defendants' lack of rational basis is that he did not know what rational basis Defendants claimed to have had, and therefore, could not very well show something of which he was unaware. But even if assertions in the *Response* (as opposed to in the Complaint) could be used in an attempt to plausibly suggest a lack of rational basis on the part of Defendants, the attempt would fail because the above-quoted assertions (except for the last sentence, which is accurate as far as it goes but does not really get Plaintiff anywhere) are wholly conclusory. Moreover, as shown above, Defendants teed up multiple asserted facts to illustrate the existence of a rational basis for their decision to enter the Agreement with King and Middlebrook but not Plaintiff, and yet Plaintiff responded to none of these asserted facts in his Response.

Defendants contend that Plaintiff's actual argument is that Defendants are treating King and Middlebrooks differently not only from him, but also from the other forty-two inmates on death row (including Plaintiff). (Doc. No. 40 at 1-2). The Court agrees. In what was (as far as the Complaint indicates) an exception to the treatment generally afforded death-row inmates, two death-row inmates received the benefit of an agreement with the State that is not normally extended to inmates on death row; the Court concludes that this does not create an equal protection violation. *Ross Learning, Inc. v. Riley*, 960 F. Supp. 1238, 1245 (E.D. Mich. 1997) ("Carving out exceptions to generally applied policies is not enough to raise an equal protection claim"). "The Equal Protection Clause does not promise equal results to all. Instead, it provides that the government cannot discriminate against a person on an impermissible basis." *Id*.

**(B) Plaintiff's General Allegation That the Lethal Injection Execution Method in Tennessee is Unconstitutional is Time Barred (Count III).**

Plaintiff asserts in Count III that "Tennessee's lethal injection protocol is unconstitutional because the infliction of any punishment that causes a substantial and unjustifiable risk of serious pain and needless suffering is cruel and unusual punishment under the original meaning of the Eighth Amendment." (Doc. No. 1 at ¶ 116).

Early in Count III, Plaintiff asserts that "[e]xecution by poisoning is unconstitutional because it was not a method of execution at the founding of our country or when Tennessee joined the Union," and "[e]volving standards of decency do not permit the adoption of a method of execution considered barbarous at the founding of our country." (*Id*. at ¶ 119). Understandably enough, Defendants clearly took this to mean that Plaintiff was challenging the constitutionality of lethal injection generally. (Doc. No. 28 at 18). Despite this assertion, it is apparent from Count III as a whole (and from Plaintiff's Response) that Plaintiff actually is challenging not the constitutionality of lethal injection generally, but rather the constitutionality (generally, rather than as applied to him)[25] of execution via single drug pentobarbital in particular.[26]

As to the challenge that he *is* making, Plaintiff alleges (and the Court accepts as true) that pentobarbital causes flash (acute) pulmonary edema as it enters the blood stream and passes

---

[25] Plaintiff makes clear in his Response that this challenge is general (i.e., "facial") rather than as applied. (Doc. No. 37 at 14). His as-applied challenge is set forth in Count IV.

[26] It is equally apparent that if Plaintiff were challenging the constitutionality of lethal injection generally, such a challenge would be time-barred because (consistent with the limitations analysis below regarding the untimeliness of Plaintiff's challenge to lethal injection via single drug pentobarbital in particular), a claim of unconstitutionality of lethal injection generally would have accrued many years too early to have been timely brought in the instant action. And even if considered on the merits, such a challenge would have failed. *See Adams v. Bradshaw*, 826 F.3d 306, 318 (6th Cir. 2016) (noting that "lethal injection does not violate the Constitution") *(*citing *Scott v. Houk*, 760 F.3d 497, 512 (6th Cir. 2014)).

through the lungs and burns the membranes of the lungs,[27] (*Id.* at ¶ 22(a)), and that when fluid enters the lungs it causes a drowning sensation akin to waterboarding—"one of the most powerful, excruciating feelings known to man." (*Id.*; Doc. No. 1-7).

Defendants contend that a general complaint by Plaintiff concerning the constitutionality of lethal injection is time-barred based on the applicable statute of limitations. (Doc. No. 28 at 18). The Court agrees, for the reasons set forth in a footnote above. However, since Plaintiff's challenge in Count III is to the constitutionality of lethal injection by single drug pentobarbital in particular, the Court will assess whether *that* challenge is time-barred—an assessment that largely (though not completely) tracks the limitations analysis that would be applicable to a challenge to the constitutionality of lethal injection generally.

---

[27] For this allegation, Plaintiff relies on the "Review of the Federal Execution Protocol Addendum and Manner of Execution." (Doc. No. 1-7). True, that pamphlet provides that "some medical experts have concluded that the use of pentobarbital may risk inflicting painful pulmonary edema," but the part of the pamphlet from which that excerpt is taken itself casts doubt on the notion that the risk of painful pulmonary edema is a sufficient basis for relief. Specifically, referring to a July 2021 memorandum instituting a (since-revoked) moratorium on federal executions pending the Department of Justice's (Department) review of certain policies and procedures, the pamphlet states:

> Regarding the review of the federal execution protocol addendum, which provides that an injection of a single drug – pentobarbital – is the sole manner of federal execution, memorandum stated in part:
>
>> Although some medical experts have concluded that the use of pentobarbital may risk inflicting painful pulmonary edema, the Supreme Court found that this risk was insufficient "to justify last-minute intervention by a Federal Court" shortly before an execution was scheduled to occur. *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (per curiam). A risk need not meet the Court's high threshold for such relief, or violate the Eighth Amendment, to raise important questions about our responsibility to treat individuals humanely and avoid unnecessary pain and suffering.

(Doc. No. 1-7 at 3). The quoted portion of *Barr* indicates that the risk of pulmonary edema is not (or at least is not necessarily) sufficient to justify "last-minute" relief, and as touched on below *Barr* also raises serious questions as to whether such risk is sufficient to justify relief that is *not* "last-minute."

"The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). In Tennessee, actions under 42 U.S.C. § 1983 are restricted by Tennessee Code Annotated § 28-3-104(a), which is "Tennessee's one-year statute of limitations for civil rights claims." *Thomas v. Copeland*, 758 F. App'x 377, 380 (6th Cir. 2018).

Although the one-year limitations period is borrowed from state law, "[t]he date on which the statute of limitations begins to run in a § 1983 action is a question of federal law." *Eidson*, 510 F.3d at 635. Under federal law, the limitations period generally is triggered when a plaintiff "knows or has reason to know of the injury" giving rise to the plaintiff's cause of action. *Thomas*, 758 F. App'x at 381 (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)).

"[Plaintiff] does not dispute that a one-year statute of limitations applies to his claims." (Doc. No. 37 at 16) (citing *Irick v. Ray*, 628 F.3d 787, 788 (6th Cir. 2010)). Rather, Plaintiff argues that the Sixth Circuit, under *Cooey v. Strickland*, 479 F.3d 412 (6th Cir. 2007) ("*Cooey*"),[28] "leaves

---

[28] The plaintiff in *Cooey* argued that the fluid nature of *Ohio's* execution protocol requires imminency of execution to be a key factor in the accrual calculus. The Sixth Circuit rejected that argument:

> In *Alley* [*v. Little*, 186 F. App'x 604, (6th Cir.), *reh'g en banc denied*, 452 F.3d 621 (6th Cir.), *cert. denied*, 548 U.S. 921, 126 S. Ct. 2975, 165 L.Ed.2d 982 (2006)], a Tennessee inmate also argued that his § 1983 claim challenging Tennessee's lethal injection protocol was not ripe until an execution date was imminent. In rejecting this argument we stated:
>
>> Alley's brief cites *Stewart v. Martinez–Villareal*, 523 U.S. 637 (1998) as prohibiting courts from considering challenges such as the one in our case before a petitioner's execution reaches imminence. We reject this reading of this precedent. In that case, unlike in ours, the defendant's claim under *Ford v. Wainwright*, 477 U.S. 399 (1986), had originally been dismissed without prejudice. The Supreme Court's ruling merely allowed the claim to proceed in a habeas petition at a later date. The Court noted that ***the lower courts*** had specifically left open the possibility that the defendant's *Ford* claim could proceed in a future filing. *Id.* at 640 ... No such procedural history informs the posture of the § 1983 claim in our case. Moreover, we note that claims involving mental competency are

open the possibility that the limitations period resets where changes to a protocol are substantial and relate to a plaintiff's core complaints."[29] (Doc. No. 37 at 17).

*Cooey* is an important case, but it is meandering and thus requires some explication. There, the Sixth Circuit addressed what was the appropriate accrual date for a plaintiff challenging Ohio's lethal-injection protocol (but not the general notion of execution by lethal injection) under Section

---

inherently different from the § 1983 petition before us in at least one respect: mental competency is subject to variance over time. It is indeed possible that last-minute first-instance *Ford* petitions could be justified by a change in a defendant's mental health.

[*Alley*, 186 F. App'x] at 607.

In contrast, while the lethal injection protocol **in this case** is subject to change, there was no evidence, until recently, that the protocol had ever been changed. And, furthermore, the recent changes do not relate to Cooey's core complaints.

*Cooey*, 479 F.3d at 423 (internal citations cleaned up) (emphasis added). From the above, it is clear to the Court that Plaintiff blurred a few statements in order to argue that *Cooey* "leaves open the possibility that the limitations period resets where changes to a protocol are substantial and relate to a plaintiff's core complaints." (Doc. No. 37 at 17).

The court in *Cooey* noted that the Supreme Court in Stewart specifically allowed a particular claim to proceed in habeas at a later date and then distinguished between claims involving mental competency and a section 1983 petition. Indeed, *Cooey* appears to conclude there is *no* open possibility to "reset" the statute of limitations for challenges to the constitutionality of a lethal injection, and moreover, that any such consideration would only occur on a case-by-case basis—e.g., as above where the Supreme Court allowed a claim of insanity filed via a habeas corpus petition, *see Ford v. Wainwright*, 477 U.S. 399, 410 (2007), to be filed at a later date (i.e., not a claim challenging a lethal injection protocol) and where a court, as in *Cooey*, considers the execution protocol of a particular state.

[29] Plaintiff also argues that *Cooey* and its predecessors were concerned primarily with last-minute, dilatory and speculative lawsuits. (Doc. No. 37 at 16) (citing *Cooey*, 479 F.3d at 421). The Court disagrees. True, *Cooey* did use the term "dilatory or speculative suits," noting that the phrase originally came from *Hill v. McDonough*, 547 U.S. 573, 585 (2006). *Cooey*, 479 F.3d at 421 (quoting *Rutherford v. McDonough*, 466 F.3d 970, 974 (11th Cir. 2006) (quoting *Hill*, 547 U.S. at 585)). In *Hill*, the Supreme Court stated that "[t]he federal courts can and should protect States from dilatory or speculative suits . . . ." *Hill*, 547 U.S. at 585.

But *Cooey*'s mere use of that term does not mean that *Cooey* was "primarily" concerned with last-minute, dilatory and speculative lawsuits. To the contrary, *Cooey* thoroughly discussed timeliness in general and established that in general, the "most appropriate accrual date [i.e., date on which the one-year limitations period begins to run] should mirror that found in the AEDPA: upon conclusion of direct review in the state court or the expiration of time for seeking such review." *Cooey*, 479 F.3d at 422 (citing 28 U.S.C. § 2244(d)(1)(A) (1996)). That said, as indicated above, *Cooey* prescribed an alternative accrual date for method-of-execution claims. As clarified later by the Sixth Circuit, the alternative accrual date is the date when the particular method of execution was adopted by the state. *See Irick*, 628 F.3d at 788.

1983. *Cooey*, 479 F.3d at 415. At one point, summarizing an earlier discussion, the court stated

that as an accrual date, "the 'date' the lethal injection protocol is imposed is infeasible . . ." *Id.* at

421. In referring there to the "date the lethal injection protocol is imposed," the court appeared

(based on its earlier discussion) to refer to the date "when the actual harm is inflicted, i.e., at the

point of execution," *id.* at 418, 421; this indeed would be an "infeasible" date of accrual because

it would mean that the method-of-execution claim "would not accrue until he was executed, at

which time it would also be simultaneously moot." *Id* at 418. As part of that discussion, the court

noted, "[i]f the point of infliction is not a viable option, the most logical choice of a triggering

event is the point when the death penalty is ordered, upon judgment of conviction and sentence."

*Id.* at 418. The court embraced choosing that date, calling it "attractive" because that date "marks

the point at which the state has rendered its criminal judgment final and, absent collateral civil

proceedings, the point at which the state sets the execution date" and would leave time for "the

death-sentenced inmate [to] file suit and obtain relief." *Id*. at 419.

Next, the court rejected the view of the district court below that "the accrual date occurs

when execution is imminent and all state and federal remedies have been exhausted. . .." *Id.* Then,

after noting that the plaintiff's method-of-execution challenge—though cognizable under Section

1983—"fall[s] at the margins of habeas," (*id.* at 421) (quoting *Nelson v. Campbell*, 541 U.S. 637,

646 (2004)), the court embraced the accrual rules that, under the Antiterrrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), apply to habeas corpus actions. Specifically, after making

its above-quoted observation that "the 'date' the lethal injection protocol is imposed is infeasible,"

*id.*, the court stated, "[I]t stands to reason that the next most appropriate accrual date should mirror

that found in the AEDPA: upon conclusion of direct review in the state court or the expiration of

time for seeking such review."[30] *Id.* at 422. The court clearly embraced this as the general standard and noted that under that standard the plaintiff's claim would have accrued in 1991, after the United States Supreme Court denied direct review. *Id.*

Then, however, the court noted that in the plaintiff's particular case (a method-of-execution case), "the accrual date must be adjusted because Cooey obviously could not have discovered the 'injury' until one of two later dates," namely, when Ohio adopted lethal injection in 1993, or when Ohio made it the exclusive method of execution in 2001. *Id.* Although *Cooey* did not come right out and say it, what it called an "adjust[ment]" to the accrual date is actually a recognition of an *alternative* accrual date that applies in method-of-execution cases in particular; the alternative date—which applies if it is later that the date under general rule (the date of conclusion on direct review or the expiration of time seeking such review), is the date when the particular method of execution is adopted by the state. As the Sixth Circuit later put it, *Cooey* teaches that for Section 1983 method-of-execution claims (like Plaintiff's Count III), the limitations period starts running *either* "upon the conclusion of direct review in the state court" *or* "when the particular method of execution is adopted by the state," whichever is later. *Irick*, 628 F.3d at 788.

As noted above, Plaintiff asserts that *Cooey* (which Plaintiff calls "*Cooey II*") "leaves open the possibility that the limitations period resets where changes to a protocol are substantial and relate to a plaintiff's core complaints." (Doc. No. 37 at 17). For this assertion, Plaintiff relies solely on the following language in *Cooey:* "In contrast, while the lethal injection [protocol] is subject to change, there was no evidence, until recently, that the protocol had ever been changed. And, furthermore, the recent changes do not relate to [the plaintiff]'s core complaints." (*Id.*) (quoting

---

[30] In the instant case, Plaintiff's time for seeking direct review did not expire; instead, he timely requested and received direct review. Therefore, the alternative accrual date under this standard of "expiration of time for seeking [direct] review," 479 F.3d at 421 is inapplicable in Plaintiff's case and generally need not be referred to herein.

*Cooey*, 479 F.3d at 423). But Plaintiff fails to put this language into its context. Immediately before the above-quoted passage, the court in *Cooey* was contrasting the lethal injection protocol at issue in *Cooey* with mental competency, which was at issue in the case (*Stewart v. Martinez–Villareal*, 523 U.S. 637 (1998)) on which the plaintiff in *Cooey* relied upon for the proposition that "the fluid nature of Ohio's execution protocol requires imminency of execution to be a key factor in the accrual calculus." 479 F.3d 412, 423 (6th Cir. 2007). In rejecting that proposition, the court in *Cooey* first noted in effect that *Stewart* involved a particular kind of claim: a so-called *Ford* claim, which challenges the prisoner's competence to be executed; the court then noted in effect that issues with mental competency potentially could support a very late filing of a Section 1983 action *if there had been a late change in the plaintiff's competency*. *Id.* (quoting *Alley v. Little*, 186 F. Appx. 604, 607 (6th Cir. 2006)). The court in *Cooey* then contrasted that scenario (a late change in the plaintiff's mental competency) with the scenario before the court in *Cooey* (which did not involve a change in the thing that was at issue, Ohio's lethal injection protocol); the court did so by making the statement on which Plaintiff here relies: "In contrast, while the lethal injection [protocol] is subject to change, there was no evidence, until recently, that the protocol had ever been changed. And, furthermore, the recent changes do not relate to [the plaintiff]'s core complaints." 479 F.3d at 423.

Considered by itself, that quoted statement itself may "leave[ ] open the possibility that the limitations period resets where changes to a protocol are substantial and relate to a plaintiff's core complaints," just as Plaintiff claims. (Doc. No. 37 at 17). After all, nothing about that statement, viewed in isolation, *forecloses* the possibility that the limitations period resets where changes to a protocol are substantial and relate to a plaintiff's core complaints. But neither does that statement *affirmatively suggest* that the limitations period resets under those circumstances. All that it

affirmatively suggests is that in *Cooey* the plaintiff's particular reliance on *Stewart* missed the mark because *Stewart* was addressing claims based on something (mental competence, or lack thereof) that could undergo late changes close in time to the scheduled execution date, while Cooey's claim did not actually involve late changes to the thing (Ohio's lethal injection protocol) upon which his claim was based. In summary, the Court concludes that the language on which Plaintiff here relies served merely to distinguish *Cooey* from *Stewart*, and not to set forth yet a third alternative for setting (or re-setting) the limitations period.

Relatedly, but perhaps even more to the point, *Irick* made no mention of a third alternative for (re-)setting the accrual date on a method-of-execution claim. Instead, it noted that *Cooey* had set forth *two* alternatives: "upon the conclusion of direct review in the state court" *or* "when the particular method of execution is adopted by the state," whichever is later. *Irick*, 628 F.3d at 788. If a third alternative—whereby the date of accrual is re(set) to the effective date of "substantial" changes to a protocol that relate to a plaintiff's "core" complaints—had been created or recognized by *Cooey*, surely the court in *Cooey* would have made that clear and *Irick* would have mentioned it. But that did not happen.

Additionally, the overall tenor of *Cooey* is inconsistent with the notion that the limitations period resets where changes to a protocol (other than the adoption of a new "particular method of execution" is adopted by the state) are "substantial" and relate to the plaintiff's "core" complaints. *Cooey* spoke at length about the AEDPA's recognition (in the habeas context) of the importance of federal-state comity, finality of judgments, and the state's ability to carrying out its (death) sentences without perpetual delays caused by lawsuits filed close in time to a scheduled date of execution; *Cooey* also noted that these imperatives "apply with equal force in [the plaintiff's Section 1983] case [because it] falls at the margins of habeas." *Cooey*, 479 F.3d at 420-21 (internal

quotation marks omitted). All of these imperatives would be frustrated if a condemned prisoner was able to reset the limitations period merely by alleging some change in the state's execution protocol (other than the adoption of a new "particular method of execution" by the state, which as *Irick* noted *can* reset the limitations period) that could be deemed "substantial" and then making that change in the protocol the "core" of the complaint. That is to say, allowing the use a subjective and malleable notion of "substantial" changes to an execution protocol as grounds to reset a limitations period would imperil the very state and societal interests touted in *Cooey*. So the Court declines to find that *Cooey* supports resetting the limitations period where changes to a protocol are substantial and relate to a plaintiff's core complaints

The Court finds instead that the only cognizable scenario for "resetting" in a method-of-execution case is the one that *Irick* identified: the limitations period can reset upon the state's adoption of a new "particular method of execution." *Irick*, 628 F.3d at 788. So, the question for this Court is whether the implementation of the Revised Protocol constituted the adoption of a new "particular method of execution." *Cooey* indicates that with respect to lethal injection, an adoption of a new particular method occurs either when lethal injection is adopted as a method of execution or when the state makes it the exclusive method of execution. *See* 479 F.3d at 422. It follows that not just any change(s) to a lethal-injection protocol constitutes an adoption of a new "particular method of execution."

Defendants argue that the one-year limitation period for Plaintiff to challenge generally the constitutionality of his method of execution lapsed over twenty (20) years ago, given when Plaintiff's state court direct review concluded (which was in 2002 according to Defendants and

1995 according to the Court)[31] and when lethal injection became the default method of execution in Tennessee (which was in 2000, pursuant to 2000 Tenn. Pub. Acts, c. 614, § 4). (Doc. No. 28 at 19). Based on its view of what *Cooey* indicates, the Court does not find that the Revised Protocol is to be treated as a new "particular method of execution," and agrees with Defendants that the limitations period for a claim by Plaintiff to make a general ("facial") challenge to anything about his execution by lethal injection expired in early 2000.[32]

Alternatively, though, the Court will assume *arguendo* that a new "particular method of execution" is adopted whenever a state that uses lethal injection changes the drug(s) it uses in lethal injections. Even then, the Court concludes that prior to the filing of this action, the limitations period expired on Plaintiff's claim that use of single-drug pentobarbital violates the Eighth Amendment.

In so concluding, the Court first notes that Tennessee's choice of drug(s) for lethal injection has changed multiple times over the years, as Defendants outlined in their Memorandum:

> 2000: Three-drug lethal injection protocol adopted as default method of execution in Tennessee. *See State v. Morris*, 24 S.W.3d 788, 797 (Tenn. 2000); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005), *cert. denied*, 547 U.S. 1147 (2006).
> - 2013: TDOC adopted single-drug (pentobarbital) lethal injection protocol. *See West v. Schofield*, 519 S.W.3d 550, 552 (Tenn. 2017), *cert. denied sub nom. West v. Parker*, 583 U.S. 1000, (2017).
> - 2018: TDOC returned to a three-drug lethal injection protocol, as an alternative to the one-drug pentobarbital protocol.
> - 2025: TDOC returns to the use of singe-drug pentobarbital.

---

[31] As noted in a footnote above, Defendants peg this to have occurred in 2002, but actually it was 1995, which if anything is just that much better for Defendants, who (as the ones asserting a limitations defense) naturally would prefer the earliest possible accrual date, all other thing being equal.

[32] The Court pegs the date (year) as 2000, which is the later of when direct review of his conviction and sentence was concluded (1995) and when lethal injection became the default method of execution in Tennessee (2000).

(Doc. No. 28 at pp. 6-9). The Court concludes that given this timeline, Plaintiff's claim challenging the use of single-drug pentobarbital in particular accrued in 2013, when Tennessee first adopted a single-drug pentobarbital lethal injection. It was at that time that Plaintiff could have challenged the constitutionality[33] of single-drug pentobarbital lethal injection; whether or not such a challenge would have been meritorious, all circumstances (including but not limited to Plaintiff's alleged injury from single-drug pentobarbital sufficient to support standing and the substantive "injury" element of a Section 1983 action) were in place for Plaintiff to make such a challenge. But Plaintiff did not make one at that time, and the one-year limitations period then expired years before Tennessee moved away from single drug pentobarbital. And the Court simply does not see a basis for the limitations period on a facial (as opposed to as applied) challenge to reset merely because the state has gone back to single-drug pentobarbital.

For all of these reasons, the Court finds that Plaintiff's Count III is time-barred. The Court—albeit based on a more thorough and perhaps more nuanced analysis than was provided by Defendants (who, in their defense, were dealing with page limitations that do not apply to the Court and the above-referenced understandable confusion about the nature of the constitutional challenge in Count III)—therefore will **grant** the Motion as to Count III.

The Court further notes (albeit only as dicta) that even had Plaintiff's general challenge not been time-barred, it would have faced great obstacles on the merits. It would be an understatement to say the U.S. Supreme Court has expressed skepticism that use of pentobarbital necessarily violates the Eight Amendment. In particular, in vacating a district court's preliminary injunction

---

[33] The Court emphasizes that Count III presents a facial challenge to the Revised Protocol, with its single-drug (pentobarbital) lethal injection. The Court realizes that Plaintiff alleges in Count IV that Tennessee's Revised Protocol as applied to him is unconstitutional under the Eighth Amendment to the United States Constitution, and the Court reviews Count IV in the next section.

that was based on the district court's finding that the use of pentobarbital likely constitutes cruel and unusual punishment prohibited by the Eighth Amendment, the Supreme Court noted:

> [f]ar from seeking to superadd terror, pain, or disgrace to their executions, the States have often sought more nearly the opposite, developing new methods, such as lethal injection, thought to be less painful and more humane than traditional methods, like hanging, that have been uniformly regarded as constitutional for centuries. The Federal Government followed this trend by selecting a lethal injection protocol—single-dose pentobarbital—that has become a mainstay of state executions. Pentobarbital:
>
> Has been adopted by five of the small number of States that currently implement the death penalty.
>
> Has been used to carry out over 100 executions, without incident.
>
> Has been repeatedly invoked by prisoners as a *less* painful and risky alternative to the lethal injection protocols of other jurisdictions.
>
> Was upheld by this Court last year, as applied to a prisoner with a unique medical condition that could only have increased any baseline risk of pain associated with pentobarbital as a general matter.
>
> Has been upheld by numerous Courts of Appeals against Eighth Amendment challenges similar to the one presented here.

*Bar v. Leer*, 591 U.S. 979, 980–81 (2020) (citations and internal quotation marks omitted). For various reasons (including the fact that by now executions via single drug pentobarbital may well have involved "incident[s]"), *Barr* would not be conclusive in the present case, but it does suggest major obstacles Count III would have had to surmount in order to succeed on the merits.

### (C) Plaintiff Has Not Alleged Factual Matter Plausibly Suggesting that Tennessee's Revised Protocol *as Applied to Him* Is Unconstitutional under the Eighth Amendment to the United States Constitution (Count IV).

Plaintiff argues that even if the Revised Protocol is not found to be unconstitutional generally, it should be found unconstitutional as applied to Plaintiff because his "individual physical characteristics that include, but are not limited to his advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes make it sure or very

likely that there is a substantial risk that he will experience unnecessary and serious pain and needless suffering of the type alleged throughout this complaint if subjected to execution by the [R]evised [P]rotocol." (Doc. No. 1 at ¶¶ 128, 129). Additionally, Plaintiff argues that "Defendants' history of error, negligence, and malfeasance in carrying out lethal injections in Tennessee is sure or very likely to cause the Plaintiff a substantial and unjustifiable risk of serious pain and needless suffering." (*Id*. at ¶ 136). More specifically, Plaintiff alleges that "Defendants' lack of training and lack of appropriate qualifications to carry out lethal injections in Tennessee are sure or very likely to cause the Plaintiff a substantial and unjustifiable risk of serious pain and needless suffering." (*Id*. at ¶ 134).

Plaintiff faces an exceedingly high bar to succeed on his method-of-execution claim, because the Supreme Court "'has yet to hold that a State's method of execution qualifies as cruel and unusual.'" *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019). And as noted above, the Supreme Court has expressed substantial and detailed skepticism that use of pentobarbital would ever violate the Eighth Amendment. These principles make clear that the Court cannot except mere conclusory allegations that use of pentobarbital on Plaintiff rises to the level of an Eighth Amendment violation. The Supreme Court in *Glossip* summarized what Plaintiff would need to establish a successful method-of-execution claim under the Eighth Amendment as follows[34]:

> The controlling opinion in *Baze* [*v. Rees*, 553 U.S. 35 (2008)] first concluded that prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is "'sure or very likely to cause serious illness

---

[34] Classifying a challenge as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding "breadth of the remedy," but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation. *Bucklew*, 587 U.S. at 138–39 (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010)). Surely it would be strange for the same words of the Constitution to bear entirely different meanings depending only on how broad a remedy the plaintiff chooses to seek. *See Gross v. United States*, 771 F.3d 10, 14–15 (D.C. Cir. 2014) ("'[T]he substantive rule of law is the same for both [facial and as-applied] challenges'"). These principles apply to all method-of-execution claims, whether identified as "facial" or "as applied."

and needless suffering,' and give rise to 'sufficiently imminent dangers.'" *Id.*, at 50 (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)). To prevail on such a claim, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" 553 U.S., at 50, (quoting *Farmer v. Brennan*, 511 U.S. 825, 846, and n. 9 (1994)). The controlling opinion also stated that prisoners "cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." 553 U.S., at 51. Instead, prisoners must identify an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.*, at 52.

*Glossip v. Gross*, 576 U.S. 863, 877 (2015) (internal citations cleaned up).[35] Put another way, a plaintiff bringing a method-of-execution claim under the Eighth Amendment needs to show two elements: (1) that the State's chosen method of execution presents a risk that is sure or very likely to cause serious illness and needless suffering and give rise to sufficiently imminent dangers (i.e., substantial risk of severe pain), and (2) a State's chosen method cruelly "superadds" pain to the death sentence, something a plaintiff can establish by showing that (a) there is existence of a feasible and readily implemented alternative method that would significantly reduce a substantial risk of severe pain and (b) that the State has refused to adopt that alternative without a legitimate penological reason or such refusal. *Bucklew*, 587 U.S. at 133-34.

The proposed alternative method of execution need not be "presently authorized by a particular State's law." *Id.* at 139–40. But to show that the alternative method of execution is a feasible alternative, an inmate is "required to do more than simply offer the testimony of a few experts or a few studies. Instead, an inmate challenging a method of execution should point to a well-established scientific consensus. Only if a State refused to change its method in the face of

---

[35] In the Court's view, the reference to "illness" in the context of a rapidly occurring event like an execution is inapt. It seems to the Court that few persons would refer to a condemned prisoner as experiencing "illness"—as opposed to suffering and dying—during or as a result of an execution. Herein, the Court at times speaks in terms just of suffering and not "illness," with the understanding that references to "illness" would not make any analytical difference or add any weight to Plaintiff's claims.

such evidence would the State's conduct be comparable to circumstances that the Court has previously held to be in violation of the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 67 (2008) (Alito, J., concurring) (citing *Farmer v. Brennan,* 511 U.S. 825, 836 (1994)).[36]

The plurality in *Baze* noted that its "cases recognize that subjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment." *Baze*, 553 U.S. 35, 49–50 (2008). Plaintiff needs to show that the "State's lethal injection protocol creates a demonstrated risk of severe pain. [And] [h]e must show that the risk is substantial when compared to the known and available alternatives." *Id*. at 61.

Applying these principles to the instant case, Plaintiff must show that (a) his specific Medical Conditions make it sure or very likely that he would experience "serious illness and needless suffering" if executed by Tennessee's chosen method (i.e., lethal injection using single drug pentobarbital) and (b) a feasible, readily implemented, and significantly less painful alternative method of execution exists. Defendants contend that Plaintiff "speculates that the [Revised] Protocol's failure 'to account for unique physical' and mental characteristics 'may affect the efficacy' of the execution process. But [Plaintiff] fails to show that his specific Medical Conditions are 'sure or very likely' to cause pain above any other execution under the [Revised] Protocol." (Doc. No. 28 at 21-22) (quoting Doc. No. 1. at ¶¶ 130-31).[37] However, Plaintiff does make the following allegations:

---

[36] The Court realizes that neither the plurality opinion nor Justice Alito's concurrence in *Baze* is binding authority, but it concludes that they each accurately state the applicable law.

[37] Defendants' argument is unclear, as it seems to inadvertently combine the first and second prong of what Plaintiff must show. However, it is clear that in support of their contention that Plaintiff's allegations are too speculative to state a claim, Defendants primarily rely upon four decisions—*Baze*; *Cooey*; *Jackson v. Danberg*, 594 F.3d 210 (3d Cir. 2010); *Brewer v. Landrigan*, 562 U.S. 996 (2010). But none of those decisions involved a motion to dismiss, wherein the plaintiff's factual allegations are assumed to be true. Each of those cases, except *Baze*, reviewed the condemned inmate's Eighth Amendment claim under

1. Upon information and belief, the Plaintiff presents with individual physical characteristics that include, but are not limited to his advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes. (Doc. No. 1 at ¶ 46).

2. The Plaintiff's physical characteristics of his advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes make it significantly more difficult to achieve and/or maintain peripheral IV access on the Plaintiff that is needed to ensure proper delivery of the pentobarbital. (*Id*. at ¶ 48).

3. The Plaintiff's individual physical characteristics of his advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes make it sure or very likely that there is a substantial risk that he will be subjected to unnecessary and serious pain and needless suffering as the Defendants attempt to achieve peripheral IV access on him during the execution process, and when the Defendants are unable to maintain peripheral IV access on him, make it sure or very likely that there is a substantial risk that the Plaintiff's individual physical characteristics will interfere with the proper delivery of the pentobarbital causing serious illness and needless suffering. (*Id*. at ¶ 49).

4. "The Plaintiff's physical characteristics of his advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes make it sure or very likely that there is a substantial risk that he will begin to suffocate and experience a drowning sensation while he remains aware or sensate." (*Id*. at ¶ 51).

5. The Plaintiff's individual physical characteristics that include, but are not limited to his advanced age, lung disease and scarring, obesity, fatty deposits on his liver, cholecystitis, and Type 2 diabetes make it sure or very likely that there is a substantial risk that he will experience unnecessary and serious pain and needless suffering of the type alleged throughout this complaint if subjected to execution by the revised protocol. (*Id*. at ¶ 129).

These allegations go beyond merely offering a formulaic recitation of the elements of a cause of action and set forth pertinent factual matter, which the Court must accept as true on

---

standards governing a preliminary injunction, a temporary restraining order, or summary judgment. Consequently, Defendants' cited authority offers little in support of their argument that Plaintiff has failed to plead factually matter that, when accepted as true as required at this stage, plausibly suggest that his Medical Conditions will make it sure or very likely that he will experience a substantial risk of serious illness or needless pain when executed by lethal injection.

Defendant's Rule 12(b)(6) challenge. Moreover, Plaintiff cites (and attaches to the Complaint) reports that support the notion that injection of pentobarbital causes flash (acute) pulmonary edema creating a drowning sensation akin to waterboarding that is "one of the most powerful, excruciating feelings known to man." (Doc. No. 1-7 at 14). The factual allegations in the Complaint (and incorporated attachments) are sufficient to plausibly suggest that Plaintiff is sure or very likely to experience "needless suffering."[38] This is enough for the Court to find that Plaintiff has made an adequate showing of the first requirement (i.e., that the State's chosen method of execution presents a risk that is sure or very likely to cause serious illness and needless suffering).[39]

---

[38] The Court notes that it is unsure what is meant in this context by "needless" suffering. In view of the Court, the term is problematic because surely whether suffering is "needless" depends on whether there are acceptable alternatives that would avoid such suffering. And yet the requirement of "needless[ness]" of the suffering is referenced only in the first of the two above-stated elements for this claim, before the second element (the one that addresses alternatives) is even reached. For this reason, it would seem that in order to find the first element satisfied, the Court would have to conclude that there are no acceptable alternatives to single drug pentobarbital, even before reaching the (only) element whereon the existence of acceptable alternatives is supposed to be addressed. But the Court need not conclusively resolve this tension, because it is finding the first element satisfied in any event (based on equating "needless suffering" with, essentially, "dreadful suffering" in order to avoid this tension for present purposes).

[39] Plaintiff is not required at this stage to make a more detailed or elaborate showing of how his Medical Conditions make it sure or very likely that he will experience serious illness or needless pain. Based on its review of other court decision, the Court concludes that at this stage, Plaintiff need only allege factual matter suggesting that he *could* experience serious illness or needless if he is executed by lethal injection. *Cf Nance v. Comm'r, Georgia Dep't of Corr.*, 59 F.4th 1149, 1156 (11th Cir. 2023) (finding that the plaintiff plausibly pled where the plaintiff alleged via his complaint that taking gabapentin made his brain less receptive to pentobarbital, specifically alleging that "[p]rolonged gabapentin use alters a person's brain chemistry and makes the person's brain less responsive, or even unresponsive, to other drugs, including pentobarbital."); *Wilson v. Hamm*, No. 2:24-CV-111-ECM, 2025 WL 794447, at *8 (M.D. Ala. Mar. 12, 2025) (finding that the plaintiff plausibly alleged a substantial risk of severe pain in pleading that his "pulmonary conditions cause him to regularly cough up fluid, and if he coughs during the execution, the gas mask may become dislodged, thereby introducing oxygen into the system and extending the time to unconsciousness (and death), which would be further exacerbated by his constricted airways. If the mask becomes dislodged, [the plaintiff] will experience 'severe pain and suffering associated with a pulmonary attack and asphyxiation,'" quoting from the plaintiff's complaint); *Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 116303, at *9 (M.D. Ala. Jan. 10, 2024), *adhered to*, No. 2:23-CV-656-RAH, 2024 WL 262867 (M.D. Ala. Jan. 24, 2024), and *aff'd sub nom. Smith v. Comm'r, Alabama Dep't of Corr.*, No. 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024), *cert. denied sub nom. Smith v. Hamm*, 144 S. Ct. 414 (2024) (where the plaintiff alleged via his complaint several imminent dangers—improper fit of the mask; the potential for the mask to dislodge from its sealed position for a variety of reasons such as speaking,

But the analysis does not end there. Plaintiff must also show that the State's chosen method cruelly "superadds" pain to the death sentence; he can do this by both presenting a feasible and readily implemented alternative method that would significantly reduce a substantial risk of severe pain, *and* showing the State has refused to adopt Plaintiff's alternative method without a legitimate penological reason for such refusal. *Bucklew,* 587 U.S. at 133-34.

*(1) Plaintiff Has Not Shown a Feasible and Readily Implemented Alternative Method*

Plaintiff offered two alternative methods of execution (a firing squad or a single bullet to the back of the head), as well as an alternative theory (Tennessee's recent history of erred executions by lethal injection), to support his claim that Tennessee's current protocol—single-drug (pentobarbital) lethal injection—would superadd pain, causing Plaintiff a substantial and unjustifiable risk of serious pain and needless suffering. (Doc. No. 1 at pp. 25-28; ¶ 136).

First, the Court cannot find it plausible that either method presented by Plaintiff is "feasible and readily implemented." Neither the firing squad nor a single bullet to the back of the head is currently a valid or lawful method of execution in Tennessee. *See* Tenn. Code Ann. § 40-23-114 (2024). Therefore, a court would be without any authority to order [Plaintiff] to be executed by either method proposed by Plaintiff. True, *Bucklew* states that a proposed alternative method of execution need not be "presently authorized by a particular State's law." *Bucklew*, 587 U.S. at 139–40. On the other hand, *Bucklew* also provides that an "inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Id*. at 141 (internal quotations omitted). Tennessee would have to hastily amend its

_____

praying, or vomiting; vomiting; the introduction of oxygen into the mask; and the lack of monitoring of the pulse oximeters during the execution—that present risks that are sure or very likely to increase the time for the plaintiff to reach a state of unconsciousness and "would expose [him] to a severe risk of a persistent vegetative state, a stroke, or the painful sensation of suffocation, i.e., superadded pain.").

execution statute to allow Plaintiff's proposed alternatives, and this surely cuts at least substantially against those alternatives being deemed "readily implemented."

Moreover, neither the firing squad nor a single bullet to the back of the head has ever been used as a method of execution in Tennessee, and there is no suggestion that any TDOC personnel have been trained to carry out an execution by firing squad or a single bullet to the back of the head. Tennessee has not developed a protocol to carry out an execution by firing squad or a single bullet to the back of the head. And the Court cannot assume that TDOC would readily be able to find enough qualified persons to serve on a firing squad or find a qualified person willing to shoot someone point-blank in the head (a task that for multiple reasons is very different from—and even more grim than—serving as just one member of a firing squad shooting from some distance way). "The reality is that formulating a new protocol and locating the people and resources necessary to carry out such an alternative . . . would take considerable time and would, inevitably, lead to an entire new round of legal challenges [whether timely and meritorious or otherwise] regarding the details of the protocols for constitutionally conducting an execution by firing squad." *Arthur v. Cmm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1319-20 (11th Cir. 2016), *abrogated on other grounds by Bucklew*, 587 U.S. 119) The lack of currently available resources and inevitable delay that would accompany the implementation of Plaintiff's proposed new methods of execution necessarily undercut any argument that those alternatives presently feasible or readily implemented.

Even if the Court were to determine that the firing squad is a "known and available" as well as "feasible, [and] readily implemented" method of execution in Tennessee, it would conclude that Plaintiff has failed to adequately allege factual matter supporting that this method is "significantly [likely to] reduce[ ] a substantial risk of severe pain." *Glossip*, 576 U.S. at 877

(citations omitted). The Court (as noted above) accepts as true that Plaintiff is "sure or very likely" to experience the sensation of drowning if he were to be executed via lethal injection. But now the Court must answer a narrow question: has Plaintiff plausibly alleged facts suggesting that a firing squad or single bullet to the back of the head significantly reduces a substantial risk of experiencing severe pain?

Plaintiff asserts that a firing squad would avoid unnecessary and severe pain when compared with execution via pentobarbital under the Revised Protocol, (Doc. No. 1 at ¶ 80), while in the same proverbial breath offers a second alternative (a single bullet to the back of the head in close range) because of the "error rate in firing-squad executions" *Id*. at ¶ 87).[40] But Plaintiff does nothing to substantiate the conclusory assertion that execution via a shooting (a firing squad or single bullet to the back of the head) would result in significantly less pain than execution via pentobarbital.[41] As acknowledged by Plaintiff, the potential for human error still exists (especially as to a firing squad), as the inmate could flinch or the executioners could miss their mark. There is no way for the Court to weigh a risk of human error in a not-yet-adopted firing squad or single bullet protocol against any harm that Plaintiff might face if the pentobarbital does not render him fully unconscious and insensate. Moreover, while one might *speculate* that death via a firing squad

---

[40] The allegation that there is an error rate in firing-squad executions raises the same possibility of human error in his first alternative that Plaintiff speculates would lead to severe pain in the maladministration of pentobarbital under the Revised Protocol. (*See* Doc. No. 1 at ¶ 136) ("The Defendants' *history of error*, negligence, and malfeasance in carrying out lethal injections in Tennessee is sure or very likely to cause the Plaintiff a substantial and unjustifiable risk of serious pain and needless suffering.") (emphasis added). This fact cuts against Plaintiff's argument that execution via pentobarbital in unconstitutional because (among other things) such an execution is subject to a high error rate.

[41] To be clear, the undersigned certainly can imagine the execution via pentobarbital inflicting more pain than a shooting (given how pentobarbital operates), according to Plaintiff's allegations (accepted as true). But it is not enough that a plaintiff's overarching conclusion in support of a claim is easily conceivable. Rather, under *Iqbal* and *Twombly*, such conclusion must be plausible (and not merely possible) based on underlying alleged factual matter.

or single bullet to the head as being so quick as to minimize pain as compared to death via single drug pentobarbital, the Court is unpersuaded that such speculation is reasonably inferable for purposes of *Iqbal* and *Twombly*; although such a shooting (especially a single shot to the head), seems to portend a quicker death, that is not obviously or necessarily true in any particular case, and even if it were, that would not mean that the overall amount of suffering would be less. Plaintiff alleges no facts (such as facts regarding the body's physiological response to a shooting) suggesting that a shooting would result in overall less suffering as compared to single-drug pentobarbital. And the reality that the Court cannot simply accept that suggestion without any support is undercut by multiple statements from the Supreme Court quoted above to the effect that lethal injection (and lethal injection via single drug pentobarbital in particular) is at least arguably relatively humane (and more humane than a firing squad). *Bucklew*, 587 U.S. at 134; *Barr*, 591 U.S. at 980.

"A minor reduction in risk is insufficient; the difference must be clear and considerable." *Bucklew*, 587 U.S. at 134. Furthermore, just as "traditionally accepted methods of execution - such as hanging, the firing squad, electrocution, and lethal injection - are [not] necessarily rendered unconstitutional as soon as an arguably more humane method like lethal injection becomes available[,]"[42] *id*. at 134, execution via single drug pentobarbital is not necessarily rendered unconstitutional as soon as an allegedly more humane form of execution (shooting) becomes available.

In his Complaint, Plaintiff highlights Tennessee's history of deficiencies in conducting execution by lethal injection, (Doc. No. 1 at ¶ 136). To the extent that Plaintiff does so as support

---

[42] It is not lost on the Court that seemingly contrary to this quoted statement from the Supreme Court, Plaintiff's position is that execution via lethal injection *using only pentobarbital* is *less* humane than execution via a firing squad.

for the proposition that he is "sure or very likely" to experience needless suffering, Plaintiff does not need to rely on this history, because the Court has already found him to have satisfied this element of his claim in Count IV. But to the extent that Plaintiff relies on this history to otherwise support that claim—by suggesting the satisfaction of the second element or the claim as a whole— such reliance is misplaced. As Defendants argue, "[a] method-of-execution challenge 'based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of [that court's] judicial authority.'" (Doc. No. 28 at 22-23) (quoting *Cooey v. Strickland*, [*Cooey II*] II, 589 F.3d 210,225 (6th Cir. 2009)).

It is true that Plaintiff has alleged an alarming "history of error and malfeasance" regarding the Tennessee lethal injection protocol, which is supported by the Independent Review. For example:

- August 2018: the chemicals used in the execution of Billy Ray Irick were not tested for endotoxins, and the Midazolam used was not tested for potency;

- November 2018: the chemicals to be used in the event that Edmund Zagorski opted for lethal injection were not tested for endotoxins and failed potency testing;

- May 2019: the chemicals used in the execution of Donnie Edward Johnson were not tested for endotoxins;

- August 2019: the chemicals to be used in the event that Stephen West opted for lethal injection were not tested for endotoxins;

- December 2019: the chemicals to be used in the event that Lee Hall opted for lethal injection were not tested for endotoxins; and

- February 2020: the chemicals to be used in the event that Nicholas Sutton opted for lethal injection were not tested for endotoxins.

(Doc. No. 1 at ¶ 14). But Plaintiff's allegations of medical negligence or negligent administration, even when taken as true, do not implicate any sure or very likely infliction of objectively

intolerable, superadded pain. Why? First, "Speculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional [as applied to the plaintiff]." *See Cooey II*, 589 F.3d at 225. Second, Plaintiff has alleged no connection between the errs cited in previous executions between 2018 and 2020 and the Revised Protocol governing his own pending execution. Indeed, every flawed lethal injection to which Plaintiff cites above involved failure to test for endotoxins (or failed potency tests) in chemicals that will not be used at Plaintiff's execution, because each execution cited above occurred at a time when Tennessee used a three-drug lethal injection protocol. Alleging that the flaws above would occur before or during Plaintiff's execution under the Revised Protocol (which uses a single-drug pentobarbital lethal injection) would be conjectural or hypothetical at this point. As far as the Court can surmise, the above-identified errors have no connection with the single drug (pentobarbital) or the administration of that drug. Therefore, Plaintiff has not shown that his execution using Tennessee's *current* protocol (the Revised Protocol) creates "wanton exposure to 'objectively intolerable risk,' not simply the possibility of pain." *Baze*, 553 U.S. at 61-62 (quoting *Farmer*, 511 U.S. at 846, and n.9); *see also Brewer v. Landrigan*, 562 U.S. 996 (2010) ("[S]peculation cannot substitute for evidence that the drug is sure or very likely to cause serious illness and needless suffering.") (internal quotations marks omitted).

Consequently, Plaintiff has not carried his burden of proposing an alternative method of execution that is "*significantly* [likely to] reduce a substantial risk of severe pain." *Glossip*, 576 U.S. at 877 (quotations omitted) (emphasis added).

*(2) Plaintiff Has Not Shown the State has Refused to Adopt Plaintiff's Alternative Method Without a Legitimate Penological Reason for Such Refusal.*

Even if the Court were to assume that one or both of Plaintiff's alternative methods of execution (firing squad or bullet to the back of the head) would significantly reduce a substantial

risk of severe pain brought by lethal injection via pentobarbital, Count IV still does not survive the Motion, because Plaintiff has not alleged facts plausibly suggesting that Tennessee refused to adopt either alternative method without a legitimate penological reason—an additional requirement for this claim beyond the two above-referenced elements.

The Complaint alludes to no experts and no studies (let alone a scientific consensus) indicating that his proposed alternative methods would significantly reduce a risk of pain, and in any event, as indicated above, an inmate is required "to do more than simply offer the testimony of a few experts or a few studies." *Baze*, 553 U.S. at 67 (Alito, J., concurring). "Instead, an inmate challenging a method of execution should point to a well-established scientific consensus. Only if a State *refused to change its method in the face of such evidence* would the State's conduct be comparable to circumstances that the Court has previously held to be in violation of the Eighth Amendment." *Id*. (emphasis added).

Moreover, as in *Bucklew*, 52 U.S. at 141-42, where the proposed alternative method (the lethal gas nitrogen hypoxia) had never been used, execution by single bullet to the back of the head has (as far as the Complaint indicates) never been used (in Tennessee or, as is more relevant, indeed anywhere in the United States). And Defendants' "choosing not to be the first to experiment with a new method of execution is a legitimate reason to reject it." *Price v. Dunn*, 385 F. Supp. 3d 1215, 1232 (S.D. Ala.) (quoting *Bucklew*, 587 U.S. at 142), *aff'd on other grounds sub nom. Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317 (11th Cir. 2019).

For these reasons, Plaintiff has failed to alleged facts plausibly suggesting that Tennessee lacked a legitimate penological reason for refusing his two proposed alternative methods of execution. Accordingly,  Plaintiff's Count IV fails on the merits as a matter of law. *See Creech v. Tewalt*, No. 1:20-CV-00114-AKB, 2024 WL 756356, at *7 (D. Idaho Feb. 23, 2024).

For the reasons set forth above, the Court will **grant** the Motion as Count IV.

**(D) Plaintiff Lacks Standing to Challenge Execution by Electrocution (Count IX).**

In connection with Count IX, Plaintiff essentially raises three separate arguments: (1) if he selects electrocution as his method of execution, Defendants will treat Plaintiff as having "waived" his right to raise any issues to the policies, practices, or equipment used in electrocution; (2) the Revised Protocol presents a scheduling conflict that impacts Plaintiff's timeline to make his selection of execution; and (3) the Revised Protocol provides no maintenance and testing for the electric chair. (Doc. No. 1 at ¶¶ 194-210).

As for the second of these, the Court takes judicial notice of Plaintiff's declination to choose between the electric chair and lethal injection for his December 11 execution; meaning the State will default to lethal injection. *See Travis Loller, Tennessee death row inmate declines to choose between electric chair and lethal injection, Assoc. Press (Nov. 26, 2025, at 13:58 CST)* https://apnews.com/article/execution-death-row-tennessee-death-penalty-5e3ab4d2bafe83f9518d404a8e34b80c (Lasted visited on November 19, 2025). So, to the extent that Plaintiff alleges that being forced to select an execution method, or that the schedule for making or withdrawing a selection violates his constitutional rights, those allegations are moot at this time.

That leaves the first and third of these arguments. Though couching their argument in terms of "ripeness,"[43] Defendants essentially argue that Plaintiff lacks standing to bring Count IX

---

[43] "Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage Equal Rts. Comm'n,* 220 F.3d 1134, 1139 (9th Cir. 2000) (quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93 (1945)) (cleaned up). To have standing to sue under Article III, a plaintiff must possess "a personal stake in the outcome of the controversy." *Baker v. Carr,* 369 U.S. 186, 204 (1962). "To demonstrate the 'personal stake' in the litigation necessary to satisfy the Constitution, the party must suffer "a distinct and palpable injury . . .'" *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 120 (1979) (Rehnquist, J., dissenting) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)). This requirement is reflected in the first of the below-identified three elements of standing.

because he will not be subject to electrocution unless lethal injection is held to be unconstitutional or lethal injection chemicals are unavailable to TDOC, i.e., that Plaintiff has not suffered some actual or threatened injury because lethal injection is a constitutional and available method of execution. (Doc. No. 28 at 30). Defendants do not specifically address Plaintiff's first argument (that if Plaintiff selects electrocution as his method of execution whether Defendants will treat Plaintiff as having "waived" his right to raise any issues re policies, practices, or equipment used in execution). However, the Court views Defendants' standing argument as generally applying to all of Count IX, and therefore, will evaluate Plaintiff's first augment in the context of determining whether Plaintiff has standing to bring any claim in relation to execution by electrocution.

To have standing a plaintiff must show that: (1) he suffered an injury, which means "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical[;]" (2) the injury was caused by the person sued; and (3) a court likely can redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The Court

---

The Ninth Circuit's words from *Kerr-McGee Chemical Corp. v. Department of the Interior*, 709 F.2d 597, 600 (9th Cir. 1983) are still valid today:

> Both standing and ripeness require some demonstration of injury. Standing requires that the plaintiff show that the challenged action has caused it threatened or actual injury. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S. Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

> To determine ripeness, the court assesses the appropriateness of the issue for judicial resolution and the hardship that will result from the denial of relief at this stage. *Toilet Goods Association v. Gardner*, 387 U.S. 158, 162, 87 S. Ct. 1520, 1523–24, 18 L.Ed.2d 697 (1967).

*Kerr-McGee Chem. Corp.*, 709 F.2d 597, 600. Thus, the constitutional part of ripeness "is subsumed into the Article III requirement of standing." *Doe v. Pompeo*, 451 F. Supp. 3d 100, 114 (D.D.C. 2020) (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)). Put another way, if Plaintiff had established the elements of standing—including injury—this case is "constitutionally ripe." So the Court does not address whether Plaintiff's challenges here are "ripe."

finds that Plaintiff lacks standing to bring any of the above subclaims because Plaintiff has not selected electrocution. As Defendants point out, Tennessee's default method of execution (lethal injection) remains constitutional and available, meaning Plaintiff would face immediate danger by electrocution only if he chose it, and he has not done so.[44]

Since there is no possibility that Plaintiff will personally suffer some actual or threatened injury by the electric chair (i.e., has no stake in the outcome of a controversy regarding the electric chair), Plaintiff lacks standing with respect to this claim. Therefore, the Court will **grant** the Motion as to Count IX.

> **(E) Plaintiff has not plausibly suggested that (either facially or as applied to him), Tennessee's Secrecy Law (or Defendants' Actions Based on Their Interpretation of that law) Violate the First Amendment or the Due Process or Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. (Count X).**

In Count X, Plaintiff asserts that his right to due process and equal protection of the laws under the Fourteenth Amendment has been violated because (1) that the Revised Protocol is intentionally vague and hides details in relation to pentobarbital and the lethal injection process (such as source of supplier, procurement process, quality control testing, safe transportation and storage, selection criteria of members for execution team, and a vague reference to a "central line")

---

[44] Moreover, simply alleging that the fourteen-day window for Plaintiff to withdraw his waiver falls on a holiday hardly alleges an injury. Plaintiff does not allege that he has no way of communicating a waiver to the Warden on Thanksgiving Day, and any such allegation would seem to premised on the notion that RMSI closes for the holiday and all prison staff goes home such that no messages can be given to the staff and then conveyed to the Warden that day; this premise seems implausible, since it would seem that Plaintiff on a holiday would have contact with at least one staff member to whom he could convey a withdrawal of waiver and that staff up the chain would be able and motivated to convey such an important message to the Warden (or be treated legally as having received the waiver as agents of the Warden). But to be clear, Plaintiff has not asked the Court to assume this unlikely premise, because he has in no way alleged that he cannot have a waiver communicated to the Warden on Thanksgiving Day.

and (2) Defendants, relying on Tennessee Code Annotated § 10-7-504(h),[45] provided Plaintiff a heavily redacted version of the Revised Protocol. (Doc. No. 1 at ¶¶ 211-221). The caption to Count IV makes some reference to a violation of the First Amendment, but the content says nothing at all about the First Amendment.

Defendants argue that "there is no free-standing constitutional right for death row inmates" to access the information that Plaintiff seeks here. (Doc. No. 28 at 31) (quoting *Irick v. Mays*, No. 3:18-CV-00737, 2018 WL 3753208, at *3 (M.D. Tenn. Aug. 8, 2018)). Defendants also contend that Tennessee Code Annotated § 10-7-504(h)(1) affords the State the ability to make confidential any record identifying any individual who "has been or may in the future be" involved in an execution and anyone "involved in the procurement or provision of chemicals, equipment, supplies and other items." (Doc. No. 28 at 31) (quoting Tenn. Code Ann. § 10-7-504(h)(1)).

The Court sympathizes with Plaintiff's desire to have as much information as possible when making such an important decision. However, Plaintiff is simply not constitutionally entitled to the sort of information that he seeks here. *See Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) (affirming a district court that dismissed the plaintiffs' Equal–Protection, Due–Process, and Right–of–Court–Access Claims where the plaintiffs argued that House Bill 663—which addresses

---

[45] Plaintiff also challenges Tennessee's adoption of the execution secrecy provisions in Tennessee Code Annotated § 10-7-504(h), claiming—in a conclusory fashion without any supporting factual allegations— that Tennessee's adoption of the execution secrecy provisions violates Plaintiff's right to due process. (Doc. No. 1 at ¶ 216). This pleading fails to satisfy the *Iqbal* and *Twombly* standard, and therefore, the Court will deny Plaintiff's allegation concerning Tennessee's adoption of the execution secrecy provisions in Tennessee Code Annotated § 10-7-504(h).

To the extent that Plaintiff is challenging the constitutionality of Tenn. Code Ann. § 10-7-504(h), it is well-established in Tennessee that when considering the constitutionality of a statute, the Court must start with a strong presumption that acts passed by the legislature are constitutional. *Davis v. Parris*, No. 217-CV-02846MSNTMP, 2021 WL 9638643, at *13 (W.D. Tenn. Aug. 6, 2021) (citing *Osborn v. Marr*, 127 S.W.3d 737, 740–41 (Tenn. 2004)). The Court must "indulge every presumption and resolve every doubt in favor of constitutionality." *Vogel v. Wells Fargo Guard Servs.*, 937 S.W.2d 856, 858 (Tenn. 1996). Given this strong presumption, and the fact that Plaintiff has substantiated in any way his claim that Tennessee's use of a constitutional law violates his right to due process, the Court will deny this claim within Count X.

the confidentiality of information related to lethal injection in Ohio—prevented them from bringing an effective challenge to Ohio's execution procedures) (citing *Jones v. Comm'r, Georgia Dep't of Corr.*, 812 F.3d 923 (11th Cir. 2016) (Marcus, J., concurring in the denial of rehearing en banc) (rejecting an "abstract and inchoate due process right to discover the identity of the source of the drugs and the name of the executioner so that [an inmate] may challenge [a state's] execution protocol")).

Moreover, "not only has [the] legislature declared the public policy of Tennessee to favor the anonymity of those involved in carrying out capital punishment, but there is neither a statutory nor a constitutional barrier to the adoption of a common-law privilege that would prohibit the disclosure in civil litigation of the identities of those persons involved in the execution of condemned inmates." *West v. Schofield*, 460 S.W.3d 113, 124–25 (Tenn. 2015). This is a point that Plaintiff concedes in his Response (Doc. No. 37 at 28).

Plaintiff argues that *West* did not go so far as to allow Tennessee Code Annotated § 10-7-50(h) to "prohibit disclosure of *any* information regarding Tennessee's lethal injection process." (*Id.*) (emphasis in original). Plaintiff asserts that Defendants interpret the secrecy law (overbroadly and incorrectly) as protecting "*any* disclosure of materials related to executions in any way."[46] (*Id.*). But the federal constitutional issue here does not turn on how broadly the disclosure prohibitions of Tennessee Code Annotated § 10-7-50(h) should be construed, which is obviously a question of state law. The federal constitutional question is whether there is a cognizable federal constitutional right to the disclosure of *whatever* information regarding the lethal-injection process

---

[46] Though the Court finds that argument unpersuasive; the fact that Defendants have provided Plaintiff with a redacted version of the Revised Protocol shows that Defendants do not interpret the secrecy law as protecting *any* disclosure of materials related to executions in *any* way.

the Tennessee statute (as properly construed) prohibits disclosure of. The Court cannot find that there is such a right, in either the First or the Fourteenth Amendment.

As for the First Amendment, as noted above the Complaint fails to illuminate in any way how Plaintiff's First Amendment rights were violated. And "[a]s a general rule, citizens have no first amendment right of access to traditionally nonpublic government information." *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983). Open meetings laws, such as the Government in the Sunshine Act, 5 U.S.C. § 552b, and public records acts, such as the Freedom of Information Act, 5 U.S.C. § 552, provide persons with a broad, statutory right of access to government proceedings and documents. But, in general, the right of access is statutory, not constitutional, in nature: "[The Supreme] Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws." *McBurney v. Young*, 569 U.S. 221, 232 (2013). *See also Ryan v. Wood*, 573 U.S. 976 (2014) (where the Supreme affirmed the rule above in reversing of an appellate court's finding that a district judge abused his discretion in denying a motion for a preliminary injunction, wherein an inmate sought information about how the State chose the amounts to be used of both drugs, the name and manufacturer of both drugs, the source of the drugs, and the credentials of those who would administer them.) (*case below, Wood v. Ryan*, 759 F.3d 1076, 1078 (9th Cir. 2014)).

As for Plaintiff's invocation of the Fourteenth Amendment in Count X, Plaintiff alleges that "[t]he vagueness of the revised protocol makes any challenge prohibitive and violates the Plaintiff's right to due process under the Fourteenth Amendment to the United States Constitution and Article I of the Tennessee Constitution." (Doc. No. 1 at ¶ 221). As an example, Plaintiff points to a "vague reference to 'central line'" in the Revise Protocol. (*Id*. at ¶¶ 34, 215(f)).

Plaintiff is raising a constitutional challenge based on the vagueness of certain terms within the Revised Protocol. Plaintiff has cited no legal authority suggesting that any such vagueness in this kind of document is a matter of constitutional concern. And in the Court's view, weighing in on purported vagueness of the Revised Protocol would result in precisely what the *Baze* plurality warned against: "transform[ing] courts into boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Baze*, 553 U.S. at 51. Thus, the Court declines to grant relief on Plaintiff's vagueness challenge.

Finally, as to equal protection, Plaintiff alleges that "Defendants' refusal to provide counsel for the Plaintiff anything but a heavily redacted protocol violates the Plaintiff's right to equal protection [because] Defendants have provided similarly situated prisoners residing in this District, in Nashville, Davidson County, Tennessee with an unredacted copy of the revised protocol." (Doc. No. 1 at ¶ 213, 214). This is a class-of-one equal protection claim, and it fails for the same reason his class-of-one claim failed in Count I.

In sum, the Court cannot find legal precedent supporting that Plaintiff has suffered any violations of any constitutional rights or that, even if he did, he is entitled as a remedy to the information he seeks here (source of supplier, procurement process, quality control testing, safe transportation and storage, selection criteria of members for execution team). Moreover, the Court is aware of no legal authority that (a) compels this Court to decide (or even merely counsels in favor of the Court deciding) the extent to which terms within the Revised Protocol are vague; or (b) would grant a plaintiff the kind of relief Plaintiff seeks (or indeed any relief at all) based on any such vagueness. Accordingly, this Court will **grant** the Motion as to Count X.

**(F) Tennessee's Revised Protocol Does Not Violate the Tennessee Uniform Administrative Procedures Act, the Fourteenth Amendment to the United States Constitution, or Article I of the Tennessee Constitution (Count XI).**

In his last Count, Plaintiff argues that TDOC intentionally avoided compliance with Tennessee's Uniform Administrative Procedures Act ("UAPA") in the course of promulgating the Revised Protocol, thereby violating Plaintiff's right to due process. (Doc. No. 1 at ¶¶ 222, 230). Defendants argue that the Revised Protocol "is not a rule as defined by the UAPA." (Doc. No. 28 at 33) (quoting *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 311 (Tenn. 2005) (citing Tenn. Code Ann. § 4–5–102(10)). Rather, Defendants argue that the Revised Protocol "fits squarely within two exceptions to the meaning of 'rule': statements concerning only the internal management of state government and not affecting private rights privileges or procedures available to the public," and "statements concerning inmates of a correctional or detention facility[.]" *Id.* (citations omitted).

In his Response, Plaintiff argues that *Abdur'Rahman*, 181 S.W.3d at 311 (holding that "the lethal injection protocol is not subject to the requirements of the UAPA"), was "wrongly decided," and in so doing he compares this ruling to a Kentucky decision that held that the manner of carrying out an execution is not an issue with which only the department of corrections (and not the greater public) is concerned. (Doc. No. 37 at 30). Thus, according to Plaintiff, the promulgation of an execution protocol should comply with legal requirements for rulemaking. (*Id.*) (citing *Bowling v. Ky. Dep't of Corr.*, 301 S.W.3d 478, 489–90 (Ky. 2009)).

The UAPA requires a state agency in Tennessee to follow specified uniform procedures when making rules. *Abdur'Rahman*, 181 S.W.3d 311 (citing Tenn. Code Ann. § 4–5–201 *et seq.* (1998 & Supp. 2004)). These detailed procedures govern public hearings on the content of proposed rules, the conduct of those hearings, approval of the rules by the Attorney General, filing

of the rules with the Secretary of State, and publication in the administrative register. *Id.* Under the UAPA, an "agency" refers to a "state board, commission, committee, department, officer, or any such unit of state government authorized or required by any statute or constitutional provision to make rules…." Tenn. Code Ann. § 4–5–102(2). A "rule" is an agency statement of general applicability "that implements or prescribes a law or policy or describes the procedures or practice requirements of any agency…." Tenn. Code Ann. § 4–5–102(12)(B). However, a "rule" includes neither "[s]tatements concerning only the internal management of state government and not affecting private rights, privileges or procedures available to the public," Tenn. Code Ann. § 4–5–102(10), nor "statements concerning inmates of a correctional facility." Tenn. Code Ann. § 4–5–102(12)(vi).

As Defendants stated, the Revised Protocol is not subject to the requirements of the UAPA, because the Revised Protocol is not a rule as defined by the UAPA. *See* Tenn. Code Ann. § 4–5–102(10), 4-5-102(12). The protocol instead fits squarely within two *exceptions* to the meaning of "rule": statements concerning only the internal management of state government and not affecting private rights privileges or procedures available to the public, Tenn. Code Ann. § 4–5–102(10)(A), and statements concerning inmates of a correctional or detention facility, Tenn. Code Ann. § 4–5–102(12)(vi).[47]

---

[47] Plaintiff attempts to counter this by pointing to a Tennessee Attorney General opinion, wherein the Tennessee Attorney General provided that "[c]hanges to the [Tennessee Corrections Institute ("TCI")] minimum standards for local correctional facilities must comply with the rule-making provisions of the UAPA." *See* Tenn. Op. Att'y Gen. No. 11-63 at 1 (Aug. 26, 2011). In that opinion, the Tennessee Attorney General was addressing the "TCI's establishment of minimum standards for local correctional facilities implements or prescribes law," and found that those standards "triggers the UAPA due process requirements of notice and hearing to those whose relationships with the government will be impacted by the adoption of such standards." *Id.* at 3.

Further, even if the Court found Plaintiff's argument persuasive, this Court "must defer" to a particular state's "interpretation[] of [its] law." (Doc. No. 28 at 33) (quoting *Chapman v. Brentlinger Enters.*, 124 F.4th 382, 406 (6th Cir. 2024)). And it is evident to this Court from the statutory language of Tennessee Code Annotated of § 4–5–102(10), 4-5-102(12), and the interpretation of that language by Tennessee courts, what the State intended to qualify as a "rule" within the meaning of the UAPA.

Therefore, the Court will **grant** the Motion as to Count XI.

**(G) This Court Declines to Exercise Supplemental Jurisdiction Over All of Plaintiff's State Law Claims.**

Finally, the Court addresses Plaintiff's remaining state law claims, which Plaintiff vexingly jumbled together within his several federal claims, generally alleging both violations of federal law and state law (the Tennessee Constitution or Tenneessee statutes) in the same count. Regrettably, the Complaint says nothing about the basis for subject-matter jurisdiction over the state-law claims. Perceiving no basis for original (i.e., diversity) jurisdiction over the state-law claims, the Court assumes that Plaintiff's purported basis for subject-matter jurisdiction over these claims is supplemental jurisdiction under 28 U.S.C. § 1367.[48] The Court takes no issue with the fact that supplemental jurisdiction exists in this case.

---

[48] That statute provides, in pertinent part:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. . . .

28 U.S.C. § 1367(a).

A district court may decline to exercise supplemental jurisdiction over claims if: (1) the state claims raise "novel or complex" issues of State law, (2) those claims substantially predominate over the claims where federal original jurisdiction exists, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) "exceptional circumstances," offer "compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). As relevant here, then, the court can dismiss claims falling solely within its supplemental jurisdiction, once it has dismissed all claims over which it has original jurisdiction (generally meaning federal claims or state-law claims where there is diversity of citizenship).[49] 28 U.S.C. § 1367(c)(3). *See also Martinez v. City of Cleveland*, 700 F. App'x 521, 523 (6th Cir. 2017) (holding that upon dismissal of the plaintiff's federal claims, the federal court will not retain jurisdiction over the state law claims because, pursuant to 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]").

Here, the Court perceives no basis for overcoming the "strong presumption" of declination of supplemental jurisdiction. Accordingly, the Court declines to exercise supplemental jurisdiction over the state-law claims alleged by Plaintiff via the Complaint, and those claims will be dismissed without prejudice.

---

[49] In some cases, a court has original (subject-matter) jurisdiction over state-law claims under 28 U.S.C. § 1332, which provides for original jurisdiction where there is so-called diversity of citizenship. But this is not one of those cases. Plaintiff does not allege diversity of citizenship and instead alleges original jurisdiction only in the form of federal-question jurisdiction under 28 U.S.C. § 1331. (Doc. No. 1 at ¶ 6). Jurisdiction over all of Plaintiffs' state-law claims is premised solely on supplemental jurisdiction, and not original jurisdiction.

Relatedly, the Court makes the general observation that if a federal court lacks original (subject-matter) jurisdiction over a claim, then that claim must be a state-law claim (because if it was a federal claim, the Court would have jurisdiction over it)—but not all state-law claims are ones of which a federal court lacks original jurisdiction (because a federal court *does* have original jurisdiction over state-law claims where diversity of citizenship exists).

<u>CONCLUSION</u>

The Court fully understands the basis for numerous concerns expressed in the Complaint and Plaintiff's briefing. But it cannot find that Plaintiff has a plausible claim to relief on any of his counts. For the reasons provided herein, the Court will GRANT Defendants' Motion (Doc. No. 27) in its entirety.[50] An appropriate corresponding order will be entered separately.[51]

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[50] The Court is aware that Plaintiff has embedded in his Complaint a request to stay his execution. (Doc. No. 1 at 3-4) ("Plaintiff hereby moves this Court for an injunction staying his execution pending resolution of the lawsuits in *King v. Strada, et al*., No. 3:18-cv-01234 (M.D. Tenn.), *Middlebrooks v. Strada*, *et al*., No. 3:19-cv01139 (M.D. Tenn.), and this challenge."). If Plaintiff wishes to obtain a stay of execution, he must move for it in a separate filing.

To obtain a stay of execution, Plaintiff cannot simply ask for it; he must satisfy a four-requirement test, as he would when moving for an injunction: (1) a likelihood of success on the merits; (2) he will suffer irreparable harm absent a stay; (3) the stay will not cause substantial harm to others; and (4) the stay would serve the public interest. *Workman v. Bell*, 484 F.3d 837, 839 (6th Cir. 2007). A stay of execution is an equitable remedy. *Hill*, 547 U.S. at 584. A stay is not available as a matter of right, and the Court must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal court. *Id*.

[51] The Complaint takes the metaphorical kitchen-sink approach, alleging (often in the most cursory of fashions) a dizzying array of constitutional violations. As a result, it would be easy for someone to claim that some kind of claim went unaddressed herein. The Court has done its level best to address herein all of what it perceives to be Plaintiff's claims (or at least those they were raised in the Complaint to a sufficient extent as to warrant resolution by the Court).